Kyle Whitesides
PO Box 409090
Ione, CA 95640



NO IFP
FEE DUE

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

FEB 2 0 2025

CENTRAL DISTRICT OF CALIFORNIA
BY ⸻ DEPUTY

        In Pro Per


UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


In re                                   )        No. 8 25-cv-00348-MRA-(RAO)
    Kyle Whitesides,                    )
                                        )        1. PETITION FOR WRIT OF HABEAS
On Habeas Corpus                        )           CORPUS
                                        )
                                        )        2. MOTION FOR EVIDENTIARY HEARING
                                        )
                                        )        3. MOTION FOR DISCOVERY
                                        )
                                        )        4. MOTION FOR APPOINTMENT OF
                                        )           COUNSEL


                                                 [28 USC 2254]


//


//    (continued next page)

INTRODUCTION

PROCEDURAL BACKGROUND AND REQUEST FOR EQUITABLE TOLLING

The state direct review in this case ended on August 6, 2014. There was no
petition for review to the California Supreme Court after the direct appeal until
recently when all habeas claims were exhausted upon denial for review in the California
Supreme Court (Exhibit 18C ).

From 2014 to 2017, I, Petitioner Whitesides, was in the grip of severe depression,
constant suicidal ideations, and mental illness for which I was compelled by prison
authorities to be placed in their EOP program for the mentally ill. Even after I
was let out of the program in 2017 I was still suffering from severe, bed-ridden bouts
of depression for years without much awareness of time or reality, much less any
legal rights as declared under penalty of perjury here. Beginning in 2017, after I
had somewhat recovered, I began to write my defense attorney, who has since been
disbarred, for discovery in my case. Although the discovery was incomplete, I rushed
to file my first state habeas petition with the trial court in 2023 and it was
denied on October 23, 2023 by the superior court. Thereafter I exhausted the habeas
at all levels of state courts culminating in the final state denial by the CA Supreme
Court on 12/11/2024, all awhile exercising due diligence in gathering missing
discovery as set out in my attached PC 1054.9 post-conviction discovery motion
(Exhibit 19A 3 ), which is still pending in the trial court after an appellate
writ of mandate was concluded in the Fourth Appellate District Court (Exhibit 19F ).
The trial court had originally ordered the D.A. to turn over the evidence sought
(Exhibit 19A 2 ). Motion for sanction was filed when the D.A. dragged their feet
(Exhibit 19D 7 ) but the court took no immediate action, rather extending the deadline
time after time to allow the D.A. to answer/comply, to no avail. A mandate petition
was filed in the appellate court and a writ of mandate was issued (Exhibit 19A4 ).
Still pending is the trial court's order that the D.A. had not complied with. While
the appellate mandate proceedings were ongoing, the trial court indicated that they
would not rule on the motion for sanction (Exhibit 19D 8 ). Once the mandate
proceedings in the appellate court concluded, notice was then given to the trial
court with request to the trial court to enforce compliance with the trial court's
order (Exhibit 19F 1,2. See all of Exhibit 19 for "Petition for Review" of 1054.9.

Under standards delineated by Bills v. Clark, 628 F.3d 1092, 1099-1100 (9th Cir
2010), I ask the Court to allow for equitable tolling where my mental illness was

so severe it rendered me unable    rationally to personally understand the need to
timely file the habeas petition but that once I was out of the grip of mental illness,
albeit not completely, I was diligent in going about pursuing discovery and pursuing
my habeas claims to the extent that I could understand thembut that the mental
impairment and bouts of depression I had and continue to suffer at times made it
impossible to meet the filing deadline under the totality of circumstances.

Where AEDPA's statutory one-year limitation period is not a strict jurisdictional
rule but rather subject to "equitable tolling in appropriate cases" (Holland v. Florida
(2010), 560 US 631) and where the U.S Supreme Court in Slack v. Daniel (2000) 529
US 473 and in Stewart v. Martinez-Villareal (1998) 523 US 637, both articulated
the High Court's finding that 'Congress did not want to deprive state prisoners of
first habeas corpus review," allowin  for them to obtain their full and fair bite of
the apple, I ask that the Court grant equitable tolling in this case.

I believe my wrongful prosecution is a result of persecution for my having been
convicted of prior sex crime . As set out in this petition, others charged with
similar crimes in the same county were given plea deals whereas I was taken to trial
without the benefit of Brady materials to impeach the state's witness(es).

MOTION FOR DISCOVERY, FOR EVIDENTIARY HEARING, AND FOR APPOINTMENT OF COUNSEL

As some portion of Townsend v. Sain remains good law (2 Federal Habeas Corpus
Practice and Procedure, Section 27.3, n.40, citing Townsend v. Sain, 372 US at 312-13,
as remaining good law), that requires federal courts to conduct evidentiary hearing
on disputed factual allegations and to not give presumptive weight to a state court's
fact-findings if "the habeas applicant did not receive a full and fair evidentiary
hearing in [the] state court" (Townsend, 372 US at 312-13), I respectfully request
the Court to grant evidentiary hearing in this case and appoint counsel upon any
hearing to effect due process.

The Brady evidence and other evidence set out in the above-mentioned PC 1054.9
are still being sought. For good cause showing in this petition and in the above
PC 1054.9 petition, I request the Court to order the state to turn over the items
being sought as listed below. These are evidence due under the law thus creating a
procedural due process liberty interest under the Fourteenth Amendment of the U.S.
Constitution:

//

// See next page

2

OUTSTANDING   DISCOVERY                              1054.9

   As it pertains to the Orange County Superior Court's
May 04, 2022 "ORDER" on Post-Conviction Discovery,

The office of the District Attorney was ordered to
turn over discovery in six categories, each category
is numbered and missing discovery is explained below.

Category 1: "CD and transcripts of Recorded interview with Amy D."
"by Investigator Dodd, including" all handwritten notes that may
exist of the recorded interview.
   * Petitioner's Response: As Exhibit B1 of 1054.9
Motion for Post Conviction Discovery states Ms. Dodd makes
clear that she does in fact take notes when interviewing
Amy D., Dodd also admits speaking to Amy D. about
the alleged incident in 1996. The CD interview turned
over with transcripts does not include this part of the
conversation Dodd admitted to speaking about. It can
be gleaned that the transcripts & recordings beginning is
not the actual beginning of the recorded call. Petitioner
requests audio recording & transcripts of Dale interview
never released by the District Attorney. Ms. Dodd also
makes clear she does in fact have notes on the call.
   Petitioner requests these "notes" also be turned over
as ordered.

Category 2: "All records of Kim M.'s reports" to
police including sexual assault."
   * Petitioner's Response: As Exhibit B2 of 1054.9
Motion For Post Conviction Discovery states, Detective Adham
admits to doing a "Records Check" on Kim M. to see if
she had previous reports to police. Detective Adham

evades answering the outcome of his background check, he only answers that he did do the check. Also included in Exhibit B2 was an interview with Susan Baber who told Detective Adham that Kim M. had called the police (Anaheim P.D.) to her house numerous times since her residency began, (up to this point Kim M. had only lived at this Anaheim address for 6 weeks. Every time a 911 call or a police officer was sent to this house, (of Kim M., and by Kim M.) there would have been an incident report made. Detective Adham certainly would have also gathered these reports during his investigation. Petitioner Requests all 911 calls made by Kim M., all police reports filed by Kim M., which both clearly exist be turned over to petitioner as ordered. As post conviction discovery covers all time up to this date Petitioner would like, as well, all police reports filed, all rape reports filed by Kim M. after Feb, of 2009. Detective Adhams investigation only covered a small time frame, that Kim M. continued to report rapes after the original investigation.

Category 3: "All notes from Anaheim Police Dept collected from interviews with Telecare employees Eric Burke and Susan Baber" which include all statements made by Ms. Baber and Mr. Burke"

* Petitioner's Response: Although an interview by Detective Adham with Susan Baber was turned over, nothing else was. Detective Adham states he will interview Mr. Burke as he is a key witness in this investigation, yet not a single word of or

4

or about Mr. Burke is turned over to petitioner.
Petitioner requests Detective Adham be ordered to
once again turn all his findings over to defendant.
All Detective Adham's notes with everyone he spoke
to about Kim M., Eric Burke, Telecare employees;
"Lisa" and "John" who he stated he would interview
and also the owner of the home Kim M. lived, a
woman named "Amy", who "got tired of her (Kim)
calling the police", according to Ms. Baber. Detective
Adham also spoke with another of Kim M's room-
mates named "Dana", according to Witness Leonard
in her interview with Detective Adham. Petitioner
requests ordered discovery because it clearly
exists and is clearly favorable to defense.
Detective Adham did a thorough investigation
and the old Deputy District Attorney Nichols had
it all, or Detective Adham did a severely
biased investigation. The current district attorney
claims not to possess this evidence. Assuredly
DDA Nichols did not leave incriminating evidence
in petitioner's file. Please retrieve discovery from
law enforcement.

5

Category 4: "All handwritten/field notes" pertaining
to investigation of defendant's case generated by
the Anaheim Police Department by detectives and
officers".

* Petitioner's Response: This category pertains
to field notes by Officer Candyce McMorris and
all detectives. 1054.9 Motion for Post Conviction
Discovery shows clearly in Exhibit B4 that many
people were interviewed by Anaheim P.D. One Charles
David McCollough's statement was taken and
never turned over, the same goes for one Laura
Lesniak. Evidence shows these people were
interviewed and there statements were buried.
Petitioner requests all field notes, especially
those outright named in "General Offense Hard
Copy." The cover up at this point is obvious.

Category #5: "All records of felony convictions
of all witnesses and victims who testified at
trial".

* Petitioner requests Kim M.'s criminal
background both misdemeanor and felony that
have been purged by the OCDA including up
to the current date.

6

Category #6: "All police reports, handwritten/
field notes and CD with transcripts of interview
conducted of Kelly Higgason by" the Arcata
Police Department in 1995."

      Petitioner's Response: Though the police reports
were disclosed the CD of pretexted call with
Higgason and Petitioner was not, nor transcripts.
The Arcata Police Department offered no documen-
tation on the requested/ordered discovery.
Please retrieve ordered discovery from Arcata P.D.

## DECLARATION OF KAYLA J. ROBERTS

In 2019, at the request of my father, David Roberts (CDCR # P85944), I did an internet search for his friend Kyle Whitesides (CDCR # AR1462). Mr. Whitesides was accused of raping Kim Louise McCollough (DOB 2/26/1958) in 2009, Orange County (Case # IONF0718). I ran Ms. McCollough information through BeenVerified.com which showed that prior to 2009, Ms. McCollough had reported to law enforcement that she had been sexually assaulted on a number of different occasions. The report also showed that after her accusation of Mr. Whitesides, Ms. McCollough continued to report more rapes to law enforcement. Subsequently, all of this information was somehow removed from public record. I have previously attempted to get this declaration to Mr. Whitesides but we believe CDCR intercepted it and destroyed it.

I do under penalty of perjury declare that the above facts are true and correct and hope these records will be released to Mr. Whitesides in the interest of justice.

Date: 3/29/24

Kayla J. Roberts

Kayla Joy Roberts

600 Elk Drive # 2

Kokomo, IN 46902

email: robertskaylajoy@gmail

# EXHIBIT INDEX

| | |
|---|---|
| 1-9 | Cover Sheet : "Petition For Habeas Corpus(+)  Exhibit Index |
| 10-17 | Factual Summary |
| 18-31 | Laws and Authorities |
| 32 | Declaration |
| 33-34 | Exhibit 1 : Orange County D.A. Letter of "Destroyed Transcripts" |
| 35-37 | Exhibit 2 : 1191 Jury Instructions (preponderance of Evid.) |
| 38-76 | Exhibit 3 : 1054.9 Motion For Post Conviction Discovery |
| 77-80 | Exhibit 4 : Barbero Payment $25,000 / Two $5,000 checks |
| 81-97 | Exhibit 5 : OC Public Defender + Anaheim P.D. Interview: Leonard |
| 98-100 | Exhibit 6 : "Narrative" by Officer Cordyce McMorris |
| 101-133 | Exhibit 7 : 1996 Arcata Police Report + Proof Exculpatory Evid + Notes |
| 134-144 | Exhibit 8 : Susan Baber Interview by Detective Adham |
| 145-196 | Exhibit 9 : McCollough Interview + "Narrative" by Det. Adham |
| 197-200 | Exhibit 10 : O.C. Superior Court Minutes + Notes = Evidence of Acquittal |
| 201-206 | Exhibit 11: Letters from Petitioner Requesting Atty. Files |
| 207-222 | Exhibit 12: Documents + Letters showing "Newly Discovered Evid." |
| 223-253 | Exhibit 13: Letters to Defense Counsel pleading for help from County Jail |
| 254-269 | Exhibit 14: Documentation of Due Dilligence |
| 270-274 | Exhibit 15: Appellate Counsel — "Wende Brief" |
| 275-280 | Exhibit 16: Mental Health Documents; 3½ yrs. "Enhanced Out Patient" |
| 281-284 | Exhibit 17: P.I. Reporting showing UNDISCLOSED Criminal Background<br>On Witness McCollough / 2 Courts still withheld Evid. |
| 285-300 | Exhibit 17B: Superior Court Order: Denying Habeas Petition #M-20800 |
| 301-313 | Exhibit 18 : Supplemental Pleading with "Newly Discovered Evid"<br>Signed Declaration about Kim M. reporting numerous rapes |
| 314-315 | Exhibit 18B: 4th App. Court Order: Denying Habeas #G0063468<br>* Granting Supplemental Pleading for "Newly Discovered Evid" |
| 316-317 | Exhibit 18C: California Supreme Court Order: Denying Habeas #S286059 |
| 318-493 | Exhibit 19 : Petition For Review of 1054.9 Motion For Post-<br>Conviction Discovery demanding Court Ordered Evidence<br>of Kim McCollough's many reports to Police about<br>being RAPED and her Criminal Background, PLUS more<br>exculpatory Evidence withheld/Hidden by the D.A. |

FACTUAL SUMMARY

In February of 1996 Petitioner Whitesides (PW) was arrested for the alleged
rape of Kelly Higgason in Humboldt County, California. On 7/2/1996, PW took a plea
bargain by pleading guilty to Penal Code 243.3 (sexual battery). See Exhibit 10B.
PW was released from jail shortly after. Unbeknown to PW, at this same time his
live-in girlfriend, Amy Dale, reported to the same police department (Arcata
Police Department) that PW had raped her 25-30 separate times, though she had
no memory of discussing these assaults with PW during or after any of these
alleged assaults. Ms. Dale's claims prompted no investigation and PW was never told,
questioned, or charged with any crime concerning M. Dale. See Exhibit 7A, pgs.
x23-x26.

In February of 2009, PW, himself a county mental health program participant,
was invited for a night of drinking with two other mental health participants at
a group home, arriving at approximately 4 pm. The accuser, Kim M., told her therapist,
Susan Baber, weeks later that at some point during that night she was raped by PW.
This prompted Ms. Baber, by law, to notify the police. Rose Leonard, the other
drinking participant that night, based on a written police report, stated that
Kim M., who is her roommate, was a liar, an attention seeker, and a "drama mamma".
See Exhibit 5B

On March 03 of 2009, officer Candyce McMorris, #720, of the Anaheim Police
Department made an initial investigation interviewing accuser Kim M. who reported
her version of events on the day of the alleged crime. Kim M.'s story would in
fact changed in many ways, though she was adamant that the rape was "set up" by
her roommate Rose Leonard. See Exhibit 6A. Also interviewed was another roommate,
Lorenzo Gutierrez, who spoke with both PW and Km M. after the alleged rape that
night and told officer McMorris that he believed PW did not commit the rape. See
Exhibit 6A.

On March 04 of 2009, Detective Omar Addham was assigned to investigate this
now,alleged premeditated rape for hire crime. Detective Adham chose not to interview
the accuser, Kim M., until April 20 of 2009, approximately two months after the
incident was reported. Kim M. again asserts that her roommate Rose Leonard "set up"
the rape (Exhibit 9A and 9B). On May 20 of 2009, Detective Adham then interviewed
Rose Leonard. Leonard insisted that Kim M.'s version of events were false and stated
that Kim M. was a habitual attention seeker, a liar, and a drama mamma (Exhib. 5B).
Subsequently, concerning witness Leonard, on the day trial began, defense counsel
David M. Nisson, who has since been disbarred, asked PW if he knew how to get a

hold of Leonard. Stunned, PW told his defense counsel he did not know how to contact Leonard. PW then realized that after three years of preparation time for trial, defense counsel Nisson neither spoke to nor contacted any witnesses. Deputy District Attorney Cynthia Nichols overheard the conversation and told Mr. Nisson that Rose Leonard was dead. To date, PW is still unaware of Leonard's condition or circumstances. As the jury had already been selected and opening statements were minutes away, defense counsel sought no continuance and made no attempt to introduce Rose Leonard's recorded interview with Detective Adham as evidence. PW believes it would have shown Mr. Nisson's complete and utter lack of preparation and readiness for trial.

On September 9, 2009, seven months after the alleged crime was reported, Detective Adham interviewed PW who denied any wrong doing. On March 10, 2010, over one full year since the alleged crime was reported, Detective Adham then interviewed Susan Baber, the person who initially reported the alleged rape to the police. Baber spoke to the version of events told to her by Kim M., which contradicted portions of what Kim M. herself reported to the police. Baber also reconfirmed that Kim M. frequently lies, is constantly calling the police, and had arrest warrants. See Exhibit 8A.

Petitioner Whitesides was arrested on April of 2010, fourteen months after the alleged premeditated rape for hire conspiracy was reported. PW was charged with the rape and sodomy of Kim M. from 2009. Also, fifteen years after initial accusations were made and "rejected" by the Humboldt County D.A. (see Exhibit 7A, p. x28), PW was charged in Orange County for the rape, sodomy, and forced oral copulation of Amy Dale from Humboldt County in 1996.

Defense counsel David M. Nisson never pursued any investigation. He took $25,000 from PW's friend, Charles Barbero (Exhibit 4A), who contributed on PW's behalf as well as hiring Mr. Nisson for himself. Then Mr. Nisson took $10,000 from PW (Exhibits 4B & 4C). For those amounts, the only investigation Nisson effected was a six page informal request for discovery with the wrong client's name and incorrect case number listed, then never followed up on items withheld by the D.A. (Exhibit 3A, p. x8-x14). The $25,000 was later reversed by Mr. Barbero, hence, presumably, Nisson's DO-NOTHING performance. Mr. Nisson did not tell PW of Mr. Barbero's actions for several months. This prompted PW's first payment to Mr. Nisson. PW sat and decayed in county jail for three and a half years while defense counsel repeatedly post-poned court dates. PW begged and pleaded with Nisson for help in representation, a testimony to three years of neglect and despair can be seen in several short letters sent to Mr. Nisson from PW while in county jail

awaiting trial. See Exhibit 13A.

The state used as character evidence witness Kelly Higgason, an accuser from a 1996 prior conviction in which there was a recorded pretexted phone call that contradicted her testimony at trial as set out below in the Brady Due Process violation portion of this petition. Despite requests, the tape was also not turned over. See Exhibits 7B, p. x30; 7C p. X31-x32 and Exhibit 3A.

The direct appeal ended on August 6, 2014, when the Court of Appeal rendered its denial. Because of PW's mental health, he was unable to function without care and was placed in the prison's heightened mental health program, namely EOP (Enhanced Outpatient Program). Due to bedridden depression and other symptoms of his diagnosed mental illness, PW was mentally isolated and non-functional much less aware of any legal right or issue in his criminal case. PW could only try and stay alive. Beginning in 2017, as evidenced by the attached exhibits, 11A, 11B, and 14A, consisting of numerous documentations of his persistent efforts to seek help, PW has exercised due diligence in pursuing his legal rights after graduating from the above mental health program. See Exhibit 16a.

After unfruitful attempts to obtain his criminal file, PW then sent defense counsel Nisson a "Notice of Intention to Commence Action" to urge Nisson to send him his criminal file in August of 2017 (Exhibit 11B). After attempting to find legal help from the Innocence Project and others (Exhibit 14A), PW was assisted by Root & Rebound in San Francisco in June of 2019 to send his criminal file in by "Legal Mail" to assure it remained confidential (Exhibit 14).

Since March 12, 2020, Petitioner has been constantly engaged in fighting the District Attorney's Office to obtain discovery as evidenced by the multiple filings in the trial court as they relate to Penal Code 1054.9 (Exhibit 3A). COVID-19 and waves of sevre/chronic depression in between, not the least of which had to do with PW's father's death, PW was left reeling. After an appellate writ of mandate in August of 2022, PW is now in possession of newly discovered evidence in the form of a suppressed District Attorney investigator's interview transcript of Valerie R., an ex-girlfriend who denies multiple times as the investigator repeatedly attempted to get her to say that PW was the type who engaged in non-consensual sex. This interview was clearly suppressed by the D.A. and was Brady in that it was favorable and material to the issue of consent, the very issue on which PW was on trial (see Exhibit 12B).

PW has also learned that substantiation of trial record/Reporter's Transcripts and all documents relevant to this case in chief cannot be referenced, specifically because the state has destroyed, intentionally, all record of this case in violation of the law (Exhibit 1A). Summarily the Orange County District Attorney may attempt

to fabricate a substitute set of transcripts to avoid any wrongdoing. As no transcripts exist, none should be accepted.

Petitioner was completely unprepared for trial having never been interviewed by counsel Nisson in any meaningful way. PW only learned of his potential 200 year sentence days before trial, believing the entire three and a half years of his incarceration in county jail leading up to trial he was facing 25 to life, defense counsel kept PW in the dark. PW attempted to contribute to his own defense with little benefit (Exhibit 13). At trial counsel Nisson made no opening statement, missing a valuable opportunity to highlight so many inconsistencies as well as missing the opportunity to clarify to the jury that all elements of trial were to be measured against "reasonable doubt" standards. Jury instruction Calcrim 1191 was read to the jury where it showed that "preponderance of evidence" standards were acceptable. Mr. Nisson chose not to make an opening statement and correctly instruct the jury. Summarily, appellate counsel David Kelly failed to raise this issue on appeal, reasoning that because PW was not convicted of assaulting both accusers that CalCrim 1191's "preponderence of evidence" standards were simply fine (Exhibit 15). PW asserts that appellate counsel was ineffective in not raising this issue.

Mr. Nisson's overall representation was minimal, perfunctory, and ineffective. Defense counsel's failures are memorialized as follows. PW alleges that due to $25K payment being rescinded by Charles Barbero (Exhib 4A), without PW knowledge, cr eated prejudice by defense counsel Nisson that clearly and adversely affected counsel's performance.    . (1) Defense counsel Nisson failed to file a Motion for Discovery, the only effort made by Nisson was to make an informal request for discovery, with the wrong defendant's name (Exhib 3A, pp. x8-x14). Had defense counsel followed through, exculpatory evidence would have gained. (2) Had counsel investigated, the below impeachment evidence and character evidence would have been presented and likely undermined the jury's verdict. The particular evidence discussed herein does not appear on record at any time throughout trial, and the jury never heard this evidence of character nor the evidence which calls into question the validity of Kim M.'s testimony and allegations, and constitutes evidence that impeaches witness credibility, and a Brady violation claim. The newly discovered evidence in the recordings and transcripts of the "Valerie R. Interview" and recordings/transcripts of witness "Rose Leonard's Interview", who is a direct witness and had direct knowledge of Kim M.'s character. Though defense counsel possessed the Leonard interview throughout his representation, it bears repeating

that defense counsel Nisson made no attempt to contact witness Leonard for the 3 years leading up to trial. Nisson only found out about Leonard's death the day trial began. Had counsel known of her death, Ms. Leonard's recorded interview with Detective Adham would therefore become the testimony evidence allowable under multiple evidence codes and the jury would have heard that testimony (Exhib 5B). (3) Mr. Nisson failed to interview, contact, or subpoena witnesses. None of the prosecutor's witnesses were contacted by Mr. Nisson. Witness Higgason could not be contacted as shown by Mr. Nisson's handwritten note (Exhibit 7C). Defense witnesses also have one witness Nisson could not have known to call as the District Attorney intentionally suppressed her name and interview, "Valerie R." (Exhibit 12B). Mr. Nisson could have subpoenaed Rose Leonard or presented her testimony as evidence (Exhibit 5A, 5B), though he did not. There was yet another witness, Lorenzo Gutierrez, listed on the Anahein Police report, who stated to the police that he spoke to PW and Kim M. on the night of the incident and Mr. Gutierrez believed Kim M. was lying and PW was innocent (Exhibit 6A). In all aspects Mr. Nisson failed to represent his client. (4) Mr. Nisson's failure at trial was monumental beyond not investigating or presenting evidence. Failure to impeach multiple witnesses on key points throughout the trial hardly seems to be a slight error or lapse in judgement. Petitioner contends Mr. Nisson with prejudice, purposefully neglected to challenge these witnesses while basically colluding with the prosecution to assure his client's conviction.

During the testimony of witness Higgason, she denies playing pool (billards) with PW. As PW testified to at trial, he and Higgason played several games of pool and flirted, including a wager for fun on the final game in which the loser would be "sex slave" for a day to the winner. In Exhibit 7A, p. x14, Higgason clearly states that she in fact did play pool with PW. Counsel Nisson failed to impeach Higgason as she lied under oath. Higgason again admitted to playing pool and making the wager on the undisclosed pretext call that the D.A. never turned over. At another point in Higgason's testimony she stressed the point that PW had asked her for a ride home. In Exhibit 7a, p. x5, Higgason stated clearly that she offered PW a ride home, that she initiated the continuance of the evening. Defense counsel failed to impeach Higgason on this false statement as well.

During the testimony of Susan Baber, she stated that Kim M. told her that PW forced his way into the bathroom. Defense counsel Nisson failed to show that Ms. Baber's sworn testimony is a direct contradiction of Kim M.'s statement to police that the bathroom door was standing open (Exhibit 9A, p. x35). Counsel Nisson displays a complete lack of preparation by not questioning Witness Baber about her

statements in her recorded interview. In Ms. Baber's interview with Detective Adham she reports that Kim M. did not want to report the rape because the manager of her halfway house had gotten tired of police involvement at the house since Kim M.'s residency began. Ms. Baber stated that Kim M., "she kept about calling the police over to the house", (Exhibit 8A, p. x4). Counsel Nisson failed to show the jury that Kim M. was in fact a chronic 911 caller and attention seeker. Evidence of this magnitude would not be overlooked by any ethical defense counsel. Again, Ms. Baber's stated in her interview that Kim M. had arrest warrants at the time of the incident (exhibit 8A, p. x5). Counsel Nisson asked no question nor ddid he do a simple background check on Kim M.  Mr. Nisson only replied on the selective discovery turned over by the D.A. and either never read it or sabotaged his own client.  Witness Baber stated in her recorded interview with police that she sort of believed Kim m. was not lying about the rape, but she does have a history of lying about things (exhibit 8A, p. x5). For defense counsel not to question Ms. Baber about her knowing Kim M. to be a liar and a chronic 911 caller it is shockingly egregious for defense counsel to keep these details from jurors.

During the trial testimony of Kim M. counsel Nisson again fails to impeach another witness. Kim M. stated to the police in her recorded interview that the bathroom door was opened when defendant walked in (exhibit 9A, p. x35). Kim M. told Ms. Baber that PW forced his way into the bathroom (Exhibit 8A, p. x2-x3). These two contradicting stories should have been addressed during Kim M.'s testimony and challenged by defense counsel but was not. So many inconsistencies clearly equate to lies and defense counsel does nothing.  At another point, Kim M. stated to Officer McMorris that she was crying and locked the door after PW left the bathroom (exhibit 6A, p. x1-x2). Kim M. contradicts this statement when interviewed by Detective Adham, stating that the door was open when her roommate Lorenzo came in (exhibit 9A, p. x18). Defense counsel Nisson failed to attempt any adversarial testing to Kim M.'s testimony. Another missed opportunity by the defense was that Kim M. stated in her interview with officer McMorris that her roommate, Rose Leonard, "set up" the rape (exhibit 6A). When Kim M. was questioned by detective Adham in a recorded interview, she confirmed that she knew Rose Leonard "planned the rape" (exhibit 9A, p. x27). Defense counsel Nisson's failure to confront Kim M. during trial on such an outrageous statement seems to show on intent in aiding the D.A. in solidifying a wrongful conviction. It is unimaginable that a defense counsel would ever allow such an absurd statement to not reach the jury's ears.

Another of Nisson's errors was failing to show jurors that Kim M. stated to officer McMorris that she had "stood up and lost her balance" when PW came into the

bathroom (exhibit 6A). Then in a recorded interview with detective Adham, Kim M. changed her story to PW having had "jerked" her up (exhibit 9A, p. x13). Another inconsistency goes unchallenged by defense counsel. Continuing, Kim M. stated to detective Adham that Lorenzo Gutierrez was in fact home at the time of the alleged rape (exhibit 9A, pp. x4-5). In detective Adham's Narrative (Exhbit 9B), Kim M. again stated that Gutierrez was home and playing loud music, and that is why Gutierrez did not hear the rape. Mr. Gutierrez made it clear to the police that he was not home during the alleged assault (exhibit 6A). Kim M.'s story about "loud music" was repeated to Ms. Baber (exhibit 8A, p. x2). Defense counsel repeatedly failed to impeach Kim M.'s fabricated details. Again, Kim M. claimed that she was "screaming", "it hurts", and "stop" (see exhibit 6A). Kim M. then contradicts herself once again when telling detective Adham in a recorded interview that she did not call out anything (exhibit 9A, pp. x15). Defense counsel Nisson again failed to present an outright lie by Kim M. to the jury.

PW testified at trial that he  and Kim M. had consensual sex standing over the toilet. Kim M. testified at trial that the sex was over the sink. Kim M. lied under oath again as can be shown by Ms. Baber's testimony and interview (exhibit 8A, p. x9), where Kim M. told Baber the truth and for whatever reason lied during her trial testimony. Defense counsel makes the briefest of comments about the factual location of the assault and failed to capitalize by pointing out a now considerable amount of verifiable lies. The jury hears about none.

Evidence of Acquittal

Defense counsel Nisson knew of the 1995 plea bargain of Penal Code 243.3 (sexual battery) that PW pled to in 1995 concerning witness Kelly Higgason. Ms. Higgason testified to rape, verifiably lying under oath about multiple statements as stated in the IAC claim of "failure to impeach witness" concerning Ms. Higgason stated earlier. When PW took the stand Mr. Nisson never stated to the jury that PW was not convicted of rape. Lacking the desire to impeach Higgason on her varying testimony he also failed to show evidence that PW was never convicted of the crime witness Higgasson testified to. As the court admitted testimony from Kelly Higgason that PW raped her, PW was asked by DDA Nichols why he pled guilty. PW told Nichols that he pled guilty because he got out of jail weeks later. DDA Nichols stated to the court and jury that this was not true. PW told Nichols to look at the dates, then made the same request to defense counsel while PW was on the stand. Neither defense counsel nor DDA Nichols read the dates showing PW did get out of jail

weeks after taking a plea bargain. Neither did the judge, DDA Nichols, nor defense counsel stated that PW did not plead guilty to rape. All the jury heard was rape and guilty. See also exhibit 10A-C.

While post-trial discovery is still ongoing in mandate proceedings in the appellate court at this writing (July 2023) and even though Petitioner does not wish to engage in piecemeal litigation, Petitioner believes that he has sufficient evidence that his constitutional rights were violated in substantial ways to warrant habeas relief and hereby submits, without further delay, his first habeas petition for the court's adjudication.

Petitioner's most recent diligent effort in obtaining evidence is attached in Exhibit 17A which is a compilation of court information of misdemeanors by Kim McCullough, the accuser in this case, as compiled by M.W. Thompson Investigation Services in Sacramento, CA (P.I. #24051). This was material Brady information favorable to the defense that was never turned over at trial by the prosecution despite request by defense counsel and legal duty under the law for the prosecution to do so at or before trial, and it would have been used to impeach the accuser's credibility and/or changed the course of the defense's investigation to further yield impeaching character witnesses as it relates to the crimes committed by the chief accuser in those misdemeanors, thereby calling into question the accuser's credibility where Petitioner's criminal case revolves around the accuser's words and credibility without any corroborating forensics as she waited weeks after the event in question to make a false report of rape.

LAW & AUTHORITIES


I.

DUE PROCESS VIOLATIONS


a. Brady

In Brady v. Maryland, 373 US 83 (1963), the U.S. Supreme Court
defined exculpatory evidence as evidence "favorable to the accused"
and material either to guilt or to punishment.  Id. at 87.

Materiality is defined as a reasonable probability that, had
the evidence been disclosed to the defense, the result of the
proceeding would have been different.  Greenidge v. Edwards 2000 US
Dist Lexis 806.  The US Supreme Court further extended its holding
in Brady to circumstances involving loss or destruction of potentially
exculpatory evidence by the Government in California v. Trombetta,
467 US 479,489.  See also US v. Bagley, 473 US 667,682 (1985)
(probability of a different result had evidence been disclosed to
the defense).

Under such Brady violation, the 9th Circuit had ruled in one
case that the defendant was entitled to a new trial when the govern-
ment failed to turn over evidence of the prime witness's negative
prior conduct as the withheld information was material as impeachment
evidence and the violation was prejudicial to the outcome.  United
States v. Price, 565 F.3d 900 (9th Cir. 2009).

As set out above, Petitioner Whitesides in this case had
requested discovery of the Higgason pretext call, in which Higgason

1   contradicted/perjured herself at trial. The prosecution never turned the tape over,

2   and Petitioner learned that the tape was destroyed. The tape would have shown that

3   Higgason did in fact play pool with Whitesides as well as making a bet that the

4   loser would be "sex slave for a day", contrary to her testimony at trial (since

5   there are no trial transcript, see exhibit 7A) which also shows Higgason lied about

6   playing pool with Whitesides during her testimony. The evidence also comports with

7   sexual battery as Petitioner testified to (RT 421; see also Direct Appeal Opening

8   Brief, p.16) rather than rape.

9       The prosecution also failed to turn over recorded interview of Valerie R., who

10  was a key rebuttal character witness for the defense (exhbit 12B).

12      These were impeaching evidence that were withheld and were

13  prejudicial to the outcome.

14      Thus the three Brady components in this case had been satisfied:

15  1) The evidence was favorable to the defendant and either exculpatory

16  or impeaching; 2) The evidence was suppressed by the state either

17  willfully or inadvertently; and 3) prejudice ensued.  Strickler

18  v. Greene, 527 US 263,281-282 (1999).

19      The above violations were also Giglio violations as they go

20  to the credibility of the witnesses.  The US Supreme Court held

21  in Giglio v. United States (405 US 150)(1972) that "suppression of

22  material evidence, irrespective of good faith or bad faith, justifies

23  a new trial.  When the reliability of a given witness may well be

24  determinative of guilt or innocence, nondisclosure of evidence

25  affecting credibility falls within this general rule."  See also

26  Napue v. Illinois, 360 US 264,269 (1959).

27      In this case, there was no forensic evidence, only the accusers'

28  testimonies, whose credibilities Petitioner was prevented from

attacking by virtue of the government's failure to turn over favorable
impeachment evidence.

The victim's mental health status in this case had made her
prone to delusions and fabrications. See Esser v. Johnson, 2005
US Dist Lexis 35830 (rape-prone victim who had suffered bouts of
schzophrenia, which may cause instances of fabricated scenarios);
Dixie v. Harrington, 2019 US app Lexis 7115 (finding that schizophrenics
are prone to delusions and blackouts in combination with  alcohol
and drugs.) As such, the victim's mental health records should have
been examined and released, as both the D.A. and the Court have
such power to effect its release.  CCP 2020.210(b). WIC 5328(a)(6)
(mental health records may be released to courts as necessary to
the administration of justice); In re The Clergy Cases I (Cal.App
2d. Dist Sept 30 2010) 188 Cal.App 4th 1224 (trial court has jurisdic-
tion to order the public release of psychiatric and other confiden-
tial records).  Also Bennett v. Ducart, 2016 US Dist Lexis 187901,
at 35 (defense attorneys have the power to also subpoena records).


        b. Selective Prosecution


The state in this case also engaged in selective prosecution.
In the same Orange County jurisdiction, other similarly situated
defendants were allowed to plead to much lesser charges and time.
Erpinar v. Asuncion, 2020 US Dist Lexis 51204, at 19 (defendant was
allowed to plead to rape of intoxicated person and forcible rape for
15 years); People v. Mazumder, 34 Cal.App.5th 732,747 (4th Dist,
Orange County)(2019) (Oral copulation of an intoxicated and uncon-

scious person was reduced to battery).  Such selective prosecution

violates equal protection.  Flynt v. Ohio, 451 US 619,622 (1981).

Such violations of fundamental fairness as set out above
constitute outrageous government conduct.  US v. Black, 733 F.3d
294 (9th Cir 2013).  Numerous courts, including the U.S. Supreme
Court, have held that a criminal defendant's right not to have
exculpatory evidence destroyed, like other fundamental fairness
rights of criminal defendants, safeguards the liberty of the citizen
against deprivation through the action of the state.  Maryland v.
Brady (1963), 373 US at 86; Mooney v. Holohan 294 US 103,112(1935);
Armstrong v. Daily, 756 F.3d 529 (7th Cir 2015); United States v.
Cooper, 983 F.2d 928 (9th Cir 1993)(finding that the defendant
was unable to obtain comparable evidence).


c. Cumulative Errors


Although no single trial error is sufficiently prejudicial to
warrant reversal, the cumulative effect of several errors, as above,
may still prejudice a defendant so much that his conviction must
be overturned.  Cooper v. McGrath, 314 F.Supp.2d 967,999.  See
also Alcala v. Woodford, 334 F.3d 862,893-95 (9th Cir 2003)(Reversing
conviction where multiple constitutional errors hindered defendant's
efforts to challenge every important element of proof offered by
the prosecution).

//

//

d. Insufficient evidence

Even when properly instructed, a jury may occassionaly convict even when no rational trier of fact could find guilt beyond reasonable doubt.   Jackson v. Virginia 443 US 307,317 (1979); Glasser v. United States, 315 US 60,80; Bronston v. United States, 409 US 352.

However, here in Petitioner's case, the jury was not properly instructed.  Calcrim 1191 as given ascribed a lesser burden of proof for evidence of previous offenses by the use of the preponderance of evidence standard.²  In Gibson v. Ortiz, 2004 US.App Lexis 20685 (9th Cir 2004), the Court held that was contrary to the U.S. Supreme Court's clearly established law in Winship (397 US at 364) and that the burden of proof such an instruction supplied for permissive inference was unconstitutional, citing Taylor, 436 US at 485-86 ("The Due Process Clause of the Fourteenth Amendment must be held to safeguard 'against dilution of the principle that guilt is to established by probative evidence and beyond a reasonable doubt.'").   The prepond-erance of evidence standard as it relates to prior offenses used as propensity evidence violates People v. Cruz (2016) 2 Cal.App.5th 1178.   See also People v. Frazier, 89 Cal.App.4th 30 (2001(reverse and remand under similarly infirm instruction).

This is a state error requiring reversal because "a different verdict would not have been improbable had the error not occurred." People v. Putnam, 20 Cal.2d 885,892.  See also People v. Watts, 198 Cal.776,792-93 (1926)(the accused was substantially injured by the error).

e: Unavailability of witnesses

When the prosecution has introduced evidence of other sexual offenses under Evidence Code Section 1108(a) as here in this case, Petitioner may introduce rebuttal character evidence in the form of opinion evidence, reputation evidence, and evidence of specific incidents of conduct under similar circumstances. People v. Callahan 91999) 74 Cal.App.4th 356,378-379.

As set out above, Valerie R. and Rose Leonard were such rebuttal character witnesses for Petitioner. Valerie's undisclosed interview under the Brady doctrine and Leonard's audio-recorded interview under the dying declaration doctrinal exception to hearsay, had they been presented, could have been admitted as rebuttal evidence.

Similarly, where the government in another case had failed to disclose a material tape-recorded interview before trial and that key witness subsequently died, denying the defendant an opportunity to impeach, dismissal of the indictment was granted in that case. The 9th Circuit held that such "tapes would have given the jury information to appraise bias, motives, and credibility" of the accuser. Thomas v. Cardwell, 626 F.2d 1375,1386 n.34 (9th Cir 1980). U.S. v. Fitzgerald, 615 F.Supp.2d 1156 (2009 S.D Cal)(dismissal of indictment when government failed to turn taped interview over and the key witness died). In Fitzgerald, the court held that because the witness died, there was no way to remedy the problem. Id at 1162.

//

f. Premature destruction of trial transcript

If the trial record has been lost or destroyed in whole or in substantial part, a new trial may be granted.  See PC 1181(9).

Here, Petitioner's entire trial transcripts was destroyed 7 1/2 years after his 2013 conviction, which is 2 1/2 years premature of the 10 years mandated by GC 69955, et seq. See Exhibit 1A.

This now has substantially affected his rights to pursue collateral attack of his conviction as well as affect the court's ability to engage in meaningful review.

Where the U.S. Supreme Court has held that a criminal defendant is entitled to a complete transcript (Hardy v. United States, 375 US 277 (1964)), reversal and a new trial must be granted in this case.

g. Unfair prevention of evidentiary presentation:

As pointed out in appellate counsel David Kelly's May 27, 2014 letter, the trial court refused to admit or allow questioning of Higgason on the pretext call. As such, Petitioner was prevented from cross-examining Higgason when her trial testimony contradicted what she said in the pretext call.

Due process is thus denied and the presumption of correctness of state record is inapplicable where serious procedural errors occur (Townsend v. Sain, 372 US at 316); where state procedures, as here, are inadequate for ascertainment of truth (Ford v. Wainwright, 477 US 399,430); where structural error or faulty trial mechanism prevented presentation of evidence (Wainwright, 409-419; Lewis v. Jeffers, 497 US 764,801 (1990)); and when factual determination, as a result of the above due process violations, was not fairly supported by the record as here in Petitioner's case. Wiggins v. Smith, 539 US 510, 527-531 (2003).

And as evidenced by testimony (RT 421) and defense counsel's notes as well as exhibits 7B-7C, Petitioner contends that what occurred in Higgason's case and what he pleaded to was sexual battery consistent with his contention of what the pretext tape of Higgason would have shown in addition to showing that she had admitted to playing pool and betting to be "sex slave" for a day, which she lied about at trial. Thus, the state's presentation of Higgason's testimony without discovery of the pretext tape to the defense and without opportunity to cross examine Higgason about the pretext's call as the trial court so ruled (see appellate attorney David Kelly's May 27, 2014 letter referencing the trial court's ruling) had unfairly prevented the defense from presenting evidence.

II.

INEFFECTIVE ASSISTANCE OF COUNSEL

a. Cronic error

As set out above, the minimal nature of counsel's assistance
must be presumed to have been ineffective.  "We recognize that in
some cases ineffective assistance must be presumed 'without inquiry
into the actual conduct of the trial' because 'the likelihood that
any lawyer, even a fully competent one, could provide effective
assistance is so small' that that cost of litigating the issue is
unjustified."  People v. Bonin (1989) 47 Cal.3d 808,844, quoting
U.S. v. Cronic (1984) 466 US 648,659-660.  Where the system requires
"meaningful adversarial testing" (Cronic at 656), counsel's failure
in this instant case to investigate had resulted in an unreliable
and unfavorable trial outcome.

Had counsel in this case done his duty to investigate, the
impeachment evidence referred to above would have reasonably been
presented and would have probably undermined the jury's verdict.
Mickey v. Ayers, 606 F.3d 1223,1236-37 (9th Cir 2010).

In Porter v. McCollum, 558 US 30,38 (2009), the US Supreme Court
reversed the conviction when counsel failed to investigate
mitigating circumstances during sentencing (much less during trial
as here) as diminished capacity in that case would have lessened
moral culpability (see Hall v. Florida, 572 US 701 (2014)).  Here
in Petitioner's case, counsel only effected an informal discovery
request and never followed through with anything else that Petitioner

26

1  was entitled to but that was not turned over.

2      Furthermore, the state's discovery omissions contributed to
3  the defense's failure to investigate.  The lack of evidence therefrom
4  was held by the US Supreme Court to be prejudicial requiring reversal.
5  Banks v. Dretke, 540 US 668 (2004).
6
7      Trial counsel, David M. Nisson, in several cases, were found
8  to be ineffective.  In People v. Palmer, 2019 Cal.App.Unpub Lexis
9  1556, the court found Nisson to have violated discovery rule on
10 purpose.  In People v. Austin, 2010 Cal.App.Unpub Lexis 2951, Nisson
11 failed to subpoena a key witness upon which the court found prejudice
12 and vacated the conviction.

13     In the three years plus that Petitioner spent in jail awaiting
14 trial, Nisson rarely visited Petitioner and had never discussed the
15 evidence with Petitioner.  Despite having been informed, Nisson was
16 unaware of Leonard's death and had asked Petitioner on the day of
17 trial if Petitioner knew how to get a hold of Leonard.

18
19
20
21
22
23
24
25
26
27
28

Counsel's ineffective assistance ran the gamut of failures throughout, including failure to investigate, failure to file discovery motion, to follow up on discovery, to subpoena and present favorable statements of Leonard, Gutierrez, and Valerie R.; to impeach Higgason, Baber, and McCollough (Kim M.); to present evidence of prior acquittal, and, among other things, to even make an opening statement (see Stougger v. Reynolds, 214 F.3d 1231 (CA 10 2000)(failure to make opening statement)).

In Rompilla v. Beard, 545 US 374 (2005) the US Supreme Court held failure to investigate to be ineffective assistance. The California Supreme Court similarly held failure to investigate facts in manner of diligent and conscientious advocate constitutes ineffective assistance. In re Cordero, 46 Cal.3d 161 (1988). See Also People v. Shaw, 35 Cal.3d 535 (1984)(failure to investigate factual basis of client's claims and to present potentially meritorious defense). In this case, there was no showing of any conceivable tactical reason for counsel's omissions under Strickland v. Washington, 466 US at 689.

Likewise, courts have granted writ for failure to call crucial witnesses (Mitchell v. Henry, 1997 US Dist Lexis 24989); to impeach (Lewis v. Mayle, 391 F.3d 989 (9th Cir 2004)); and, inter alia, to present evidence that raises substantial doubt about Defendant's guilt (Hart v. Gomez, 174 F.3d 1067 (9th Cir 1999)).

In Johnson v. Baldwin, 114 F.3d 835 (9th Cir 1997), failure to investigate where the rape case was weak and the physical evidence did not support the case, was held ineffective assistance. Here there was no physical evidence in Petitioner's case.

There was also a breakdown in the attorney-client relationship after Babero's payment to counsel was reversed. Thereafter, counsel only effected a letter of request for discovery, never followed up, and rarely saw Petitioner    in jail before trial. Such inadequate representation constitutes lack of advice and consultation. See U.S. v. Tucker, 714 f.2d 576 (9th Cir 1983); U.S. v. Moore, 159 f.3d  1154 (9th Cir 1998)(breakdown of attorney-client relationship). Such inadequate representation may also be construed as constructive denial of assistance. Plumlee v. Sue Del Papa, 426 F.3d 1095 (9th Cir 2005).

Elsewhere, both the 9th Circuit and the US Supreme had affirmed a defendant's right to present a defense and to call witnesses, whereas here in this case counsel had thoroughly failed. In re Oliver, 333 US 257 (1948); Lord v. Wood, 184 F.3d 1083 (9th Cir 1999). Where the heart of effective assistance is preparation (Richter v. Hickman, 578 F.2d 944 (9th Cir 2009)), counsel was barely and poorly prepared

in this case, and thus could not effect a complete defense as guaranteed by Crane v. Kentucky, 476 US 683,690 (1986). Crandell v. Bunnell, 144 F.3d 1213 (9th Cir 1998); Kimmelman v. Morrison, 477 US 365 (failure of discovery); Hart v. Gomez, 174 F.3d 1067 (9th Cir 1999)(failure to read and study exculpatory records).

Where tactical decision analysis first requires that counsel engage in in investigation (Reynoso v. Giurbino, 462 F.3d 1079 (9th Cir 2006)), here counsel had engaged in no investigation.


//

//

b. Ineffective assistance of appellate counsel:

Appellate counsel, David L. Kelly, in his attached May 27, 2014 letter, refused to raise the issue of the Calcrim Instruction 1191 given, i.e., EC 1108 evidence, on ground that the jury hung on counts 3 and 4. However, the jury did use this evidence in convicting Petitioner of the crimes involving Kim M. As set out above, the dilution of the standard of proof in 1191 rendered the trial unfair , and appellate counsel's failure to raise this issue is prejudicial and ineffective assistance on appeal. Kimmelman v. Morrison (1986) 477 US 365.

III.

EIGHTH AMENDMENT VIOLATION

The Eighth Amendment of the U.S. Constitution prohibits sentences that are grossly disproportionate to the crimes committed. Solem v. Helm, 463 US 277,288 (1983). Prison sentences are subject to proportionality analysis. Id 289. Also Weems v. United States, 217 US 349,377 (1910). No penalty is per se constitutional. Solem at 290. Robinson v. California, 370 US at 667 (noting even a single day in prison may be unconstitutional in some circumstances).

The gravity of the offense must thus be examined. In Coker v. Ga., 433 US 584, 597-98 (1997), the US Supreme Court compared rape to murder and held that "in terms of moral depravity and injury to the person and to the public, [rape] does not compare to murder," stating that "by definition it does not include the death of or even the serious injury to another person. Murder kills. The rapist, if no more than that, does not..." The Court noted that life is over in a murder but not beyond repair in rape cases.

Petitioner's 100 years to life sentence is thus excessive under the above analysis and must be reversed.

_____/ /___

(s) Kyle J. Whitesides

# DECLARATION

I, Kyle J. Whitesides, declare under penalty of perjury that statements of fact included within are true and correct. Where statements are made on information and relief, I believe them to be true.

Additionaly, petitioner pleads that the court orders outstanding, exculpatory evidence that has been hidden by the District Attorney, yet ordered by the Court to be turned over. Kim McCollagh's history of calling 911 and reporting crimes is made clear in the discovery/exhibits. The declaration by Ms. Kayla Roberts further proves Ms. McCollaghs history of reporting crimes, including multiple RAPE claims. The D.A. still defies the court by suppressing this critical evidence. Kim McCollagh also has a criminal history, including fraud and other charges destroyed by the DA.

Petitioner's prayer is that this court can unravel this inmate created Petition into the clear facts that stand out. Provide petitioner with appellate counsel that will help rather than hurt his constitutional rights. I beg the court to allow petitioner a fair chance to prove his case. Regards.

Executed on the date below in Amador County, CA.

Dated : /    /          (s)
                                        Kyle J. Whitesides

CV-127 (09/09)          PLEADING PAGE FOR A SUBSEQUENT DOCUMENT

HABEAS EX: 1A

1a — Orange County Court Reporter Services Letter
   Dated : March 18, 2021          ( 1 pg. )

   · shows premature destruction of   marked (×1)
     all Trial Transcripts

HABEAS
**EXHIBIT** __1 A__
                      (1pg)

IA



# Superior Court of California
## County of Orange

**ADRIANA ARANETA**
COURT REPORTER MANAGER

700 CIVIC CENTER DRIVE WEST
P.O. BOX 1970

SANTA ANA, CA 92702-1970
PHONE: (657) 622-7306
FAX: (657) 622-8256

March 18, 2021

Re: Case number: 10NF0718
Kyle Whitesides

Dear Mr. Whitesides

This is in response to your December, 13th 2020 letter requesting a copy of the trial transcript for the above mentioned case.

**The transcripts you are requesting have been destroyed in accordance with California Government code §69955.**

Sincerely,

X _Tim Jensen_

Tim Jensen
Court Reporter Coordinator

Operations System Support
Court Reporter Services
(657) 622-7550

Rev. 1/31/17

34

HABEAS EX: 2A

2A — Orange County Superior Court
     - Jury Instruction Cover sheet
     - 1191. Evidence of Uncharged Sex Offense (2 pgs.)
                         marked.. (×1- ×2)

   * Jury Instructions contain

   "Preponderance of Evidence" standards

HABEAS
EXHIBIT 2A        (2 pgs.)

2A

1

2

3

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

4

## COUNTY OF ORANGE

5

6

7

8      PEOPLE OF THE STATE OF CALIFORNIA

9

10                    Plaintiff

11           vs.

12                                              CASE NO.   10NF0718

13

14      Kyle Jason Whitesides

15

16                    Defendant

17

18

19

20

21

22

23                          **JURY INSTRUCTIONS:**

24                              [   X   ]   Given

25                              [       ]   Refused/Withdrawn

26

27

28                                        36

2A

## 1191. EVIDENCE OF UNCHARGED SEX OFFENSE

| Requested by Plaintiff | ☐ | Requested by Defendant | ☐ | Requested by | ☐ |
|---|---|---|---|---|---|
| Given as Requested | ☐ | Given as Modified | ☐ | Given on Court's Motion | ☐ |
| Refused | ☐ | | | | |
| Withdrawn | ☐ | | | Judge | |

The People presented evidence that the defendant committed the crime[s] of Rape by Force of Kelley Higgason and Oral Copulation by Force of Amy D. that (was/were) not charged in this case. (This/These) crime[s] (is/are) defined for you in these instructions.

You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense[s]. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

If the People have not met this burden of proof, you must disregard this evidence entirely.

If you decide that the defendant committed the other sexual offenses, you may consider that evidence and weigh it together with all the other evidence received during the trial to help you determine whether the defendant committed Rape by Force and Sodomy by Force. Remember, however, that evidence of another sexual offense is not sufficient alone to find the defendant guilty of Rape by Force or Sodomy by Force. The People must still prove each charge and allegation in this case beyond a reasonable doubt.

Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility.

HABEAS EX: 3A

3A — 1054.9   Motion for Post-Conviction Discovery

(38 pg.)

• Shows Informal Request for Discovery   marked:  (x1 - x38)

w/ Wrong Defendant & Case # (x7 - x13)

• Shows Due Dilligence

HABEAS

**EXHIBIT  3A**   (38 pgs.)

3A

1  Kyle Whitesides (In Pro Per)

2  PO BOX 409090

3  Ione, CA    95640

4                    Superior Cart of California Orange County

5

6  The People of the State of California,  ) No. 10NF0718

7  Plaintiff                               ) Notice and Amended Motion for

8          V.                              ) Post-Conviction Discovery

9  Kyle Jason Whitesides                    ) Pursuant to Penal Code 1054.9

10  Defendant                               ) With Memorandum

11

12  To the District Attorney of Orange County:

13

14       Notice is hereby given that on the date for this matter to

15  be heard in court can take up or schedule the above matter, Defendant

16  Whitesides with this motion will move the court for a 1054.9 discovery

17  order for copies of all documentations of all items listed below on

18  grounds that these are materials to which defendant was entitled at the

19  time of trial and are needed currently as Petitioner is in the process

20  of  preparing  a  writ  of  habaes  corpus  based  on

21  Factual   Innocense  to  be   filed   upon   the  receipt

22  of  Full  Discovery  as  sought  within  this  motion pursuant

23  to  P.C. 1054.9.  Petitioner has provided reasonable

24  basis that the  documents exist. Filing  a  Habaes

25  Corpus  is not a prerequisite  to this  court granting

26  discovery.  So  long  as  petitioner  is  in  the  process

27  of  filing, of preparing filing of a Habaes Corpus. 1054.9(a)

28

1  specifically states, in cases in which a defendant is or has ever

2  been convicted of a serious felony or a violent felony resulting in a

3  sentence of 15 years or more, upon prosecution of a post-conviction

4  writ of habeas corpus or a motion to vacate judgement, or

5  "in preparation to file that writ" or motion and on showing good

6  faith efforts to obtain discovery materials from trial counsel were made

7  and were unsuccessful, the court shall, except as provided in

8  subdivision (b) or (d), order that the defendant be provided reasonable

9  access to any of the materials described in subdivision (c).

10   AB 1989 amended P.C. 1054.9. In its consideration of the

11  amendments the legislature made absolutely no requirement that a

12  petitioner/defendant have a reasonable belief that documents exist

13  rendering California Supreme Court rulings in Barnett moot. Had the

14  legislature intended to add provisions or the requirements it would

15  have conclusively put these provisions in the law. Moreover any

16  relation to timeliness or reasonable time to file are moot. Specifically

17  when amending 1054.9 adding the 15 years provision would mean

18  that any petitioner is seeking discovery 15 years after the conviction

19  in most cases. Accordingly any and all court cite requirements

20  have been rendered moot since the enactment of the changes to P.C.

21  1054.9 in 2019.

22   Petitioner pleads with the court to stop the mental torment with

23  continuous denials and in the spirit of the legislatures clear provisions

24  provide petitioner with all requested Post-Conviction Discovery so he may

25  reconstruct his File. All documents requested are actively and constructively

26  in the possession of law enforcement by way of P.C. 1054.1 and these

27  documents through the ordinary course of criminal investigation to the

28  extent that the

1  requested documents, notes, recordings, reports, etc., are associated
2  administrative records of the investigation under P.C. 1054.1 and are
3  non-testimonial evidence (P.C. 1054.3) to which Defendant is entitled
4  under the requirement of reciprocity of discovery contained in California
5  Constitution, Article I, Section 30 (c), which was glaringly and
6  obviously not met by prosecution.
7      Discovery being sought was requested by Defense Counsel (Exhibit A1)
8  (albeit one of the requests as turned over by counsel shows that it was
9  for someone named "Mark Heers", the wrong name). All of the
10  materials were not turned over and defense counsel never did bring
11  any formal motion to compel. The materials that were turned
12  over include a small allotment of Arcata Police Department records from
13  1995 without the transcripts or tapes of a recorded/pretexted phone
14  call from a witness who testified to uncharged offenses in this trial,
15  (Kelly Higgason). As to which, Defense counsel was unaware of her
16  involvement throughout all of the time before trial, (Exhibit A2). Anaheim
17  Police Department interviews were amongst the small amount of discovery
18  provided due to them being listed on Defense counsels cover letter in
19  Exhibit A1, several others were never provided. A copy of the Public
20  Defender Interview with key witness Leonard was provided, but the page
21  was copied askew and showed a small fraction of a following page, also
22  not provided to defendant (Exhibit A3). As such, Defendant has
23  no possession of any other discovery and hereby seeks to reconstruct
24  the lost and withheld discovery.
25      Wherefore copies of documentation of the following items
26  are hereby requested:
27  //
28  (continued next page)

41

1. CD and transcripts of recorded interview with Amy Dale
by D.A. Investigator Dodd, including all handwritten notes. As
requested by the court in the denial of this motion previously,
Petitioner provides proof of this discovery existing with transcripts
from Preliminary Hearing, (Page 75, lines 10-26), (Page 76, lines
1-26), & (Page 77, lines 1-6), enclosed as Exhibit B1.

2. All records of Kim McCollough's many reports to police including
sexual assault. Petitioner has included proof of this discovery existing
with transcripts from Preliminary Hearing, (Page 66, line 9-14)
enclosed as Exhibit B2. Further proof is shown in transcripts
from interview with Susan Baber (Page 4), within Exhibit B3.

3. All notes from Anaheim Police Department collected from interviews
with Telecare employees Eric Burke and Susan Baber, who had made
notes with Ms. McCollough about her report of sexual assault. This
includes all statements made by Ms. Baber and Mr. Burke. Petitioner
has included proof of this discovery existing with transcripts from a
recorded interview between Anaheim Police Department and Ms. Baber
(Pages 2-5) enclosed as Exhibit B3.

4. All handwritten/field notes of Anaheim Police Department, both
Detective and Police officers. Petitioner has included proof of this
discovery existing with a copy of "Anaheim Police Department's
General Offense Hard Copy", enclosed as Exhibit B4. This shows
statements taken by Lorenzo Gutierrez, Rose Leonard, Charles
David McCollough, and Laura Leisniak, none of these notes
were ever turned over in full or at all.

5. All records of misdemeanor or felony convictions of all witnesses
and victims who testified at trial, which also was never turned
over by the District Attorney, and are standard to investigation.

6. All police reports, handwritten/field notes, and CD with transcripts of interview conducted by Kelly Higgason by Arcata Police Department in 1995.

    This motion is based on this notice of motion, on the grounds set forth, on the verification below, on all the records before the court including attached exhibits, as well as any other evidence that Defendant may additionally offer hereafter.

    Defendant also declares that in his effort to seek the above discovery he had written his trial attorney, David Nisson, who only turned over a portion of his case file, which included in part, Exhibit A1, a cover letter and informal request for discovery, with the main body of the request in the wrong name and wrong case number. The only discovery Defendant has to this day is the few items requested on the CoverPage in "Exhibit A1", & a small allotment of Arcata Police Department records from 1995. The District Attorney only provided discovery that was on the Cover Page of the letter from Mr. Nisson dated January 6, 2012 (Exhibit A1). Petitioner has viewed no other discovery to this day.

    In February of 2021, both the District Attorney, Defense Cansel, and Orange County Public Defender were sent request letters unto which none provided the additional discovery, these are attached as Exhibit C.

//

(continued next page)

Verification: I, Kyle J. Whitesides, declare under penalty of perjury that statements of fact above are true and correct. Where statements are made on information and belief, I believe them to be true.

Executed on the date below in Amador County, California.

Dated: 7/7/21

(s) _Kyle J. Whitesides_

Kyle J. Whitesides

CV-127 (09-09)                    PLEADING PAGE FOR A SUBSEQUENT DOCUMENT

# EXHIBIT COVER PAGE

EXHIBIT

A

❖ <u>Description of this Exhibit</u>:

1) Letter from Attorney Nisson dated Jan. 6, 2012 attached to Informal request for Discovery w/wrong defendant & case #. (5 pages)

2) Handwritten note from Mr. Nisson concerning witness who testified to uncharged crimes (1 page)

3) Copy of page 1 of Leonard interview from Public Defender, incomplete. (1 page)

❖ <u>Number of pages in this Exhibit</u>: __8__ total pages.

❖ <u>JURISDICTION</u>: (Check only One)

☐ U.S. Supreme Court
☐ U.S. Court of Appeals
☐ United States District Court
☐ CA State Supreme Court
☐ CA Appellate Courts
☒ Superior Court
☐ Municipal Court
☐ County Grand Jury

45

DAVID M. NISSON
ATTORNEY AT LAW
17291 IRVINE BOULEVARD, SUITE 154
TUSTIN, CALIFORNIA 92780
TELEPHONE (714) 730-2171
FAX (714) 730-2195

January 6, 2012

Attn: Cindy Nichols
Sexual Assault Unit
District Attorney's Office
Orange County Superior Court
Central Justice Center
401 Civic Center Drive West
Santa Ana, CA 92701

Re:  My Client:   Kyle Whitesides
     Case No.:    10NF0718

Dear Ms. Nichols:

Enclosed please find an Informal Request for Discovery pursuant to Penal Code §1054
per 1054.5(a)(b).  The following items in bold type are our primary objectives in this
informal discovery request.  **We need a copy of the DVD interview of victim
Mccollough, a copy of the audio tape of Leonard, the digital recording of the
Whitesides interview for the 2009 incident, a copy of the digital recording of the
interview of witness Baber for the 2009 incident, a duplicate copy of all 911 tapes,
duplicate copies of all color photographs, and any additional audio or video tapes
prepared in connection with this case.**

Please contact me at (714) 730-2171 if you have any questions regarding the above
request. Pursuant to PC §1054.5(b) opposing counsel must respond within 15 days from
the date of the request.

Thank you for your courtesy and cooperation in this regard.

Very truly yours,

DAVID M. NISSON
Attorney at Law

DMN:mep
Enclosure

q9HF0192

46

1   David M. Nisson, Esq.   SBN 109075
    Attorney at Law
2   17291 Irvine Boulevard, Suite 154
    Tustin, California 92780-3147
3   (714) 730-2171
    (714) 730-2195 FAX
4   Attorney for Defendant

5

6

7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9           COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11   THE PEOPLE OF THE STATE OF    )  Case No.:   11NF0718
    CALIFORNIA,              )
12                       )
              Plaintiff,     )
13      vs.                 )  INFORMAL REQUEST FOR DISCOVERY
                    )
14   MARK HEERS,          )
                    )
15           Defendant.    )
                    )
16                       )
                    )
17                       )
                    )
18   _____)

      TO THE COUNTY OF ORANGE AND ITS REPRESENTATIVE, THE DISTRICT ATTORNEY:
19
      Notice is hereby given, pursuant to Penal Code §§ 1054 per 1054.5, subdivision (b), that
20
the above-named defendant is requesting disclosure and production of the following materials
21
and information:
22
      1.    All statements of the defendant regarding this case, whether oral, written,
23
videotaped, or tape-recorded, and any transcriptions of such oral, videotaped, or tape-recorded
24
statements.
25
      2.    The names and addresses of persons the prosecutor intends to call as witnesses
26
at trial.
27
      3.    The existence of a felony conviction of any material witness whose credibility is
28
likely to be critical to the outcome of trial.

4.    Any exculpatory evidence.

5.    Relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at trial, including any reports or statements of experts made in conjunction with this case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at trial.

In addition to the above listed information, defendant is requesting disclosure and production of the following materials and information, which defendant asserts is exculpatory and/or material to the defense of the case:

6.    All statements made, shown, read, or played to the defendant during any conversation regarding this case in which the defendant participated or was present.

7.    Any photographs taken or sketches made of the defendant, if any, or any portion of the defendant's body which were shown, or will be shown, to any potential witness in this case.

8.    All photographic "line-ups," if any, shown to any person during the investigation of the alleged crimes, whether or not the defendant's photograph was placed among such photographs.

9.    The names of and addresses of each witness shown the photographs and the results of any such showing referred to in Item No. 8, above.

10.    Dates, times, and locations of any physical examination or viewing of any portion of the defendant's body pursuant to the investigation of the alleged crimes.

11.    Identities, including names, addresses, phone numbers, badge numbers, and present assignments of all persons, if any, who physically examined or viewed any portion of the defendant's body pursuant to the investigation of the alleged offenses.

12.    Any substance taken from the defendant's person, if any, including, but not limited to, specimens of hair, blood, tissue, breath or urine.

13.    Any samples of personal characteristics, including, but not limited to, fingerprints, voiceprints, and handwriting samples, if any, which were obtained by law enforcement for use in establishing the identity of the perpetrator of the offenses charged by the People in this case.

48

14. Any items of clothing and personal effects worn by the defendant at the time of the alleged crime or at the time of his arrest or otherwise seized, if any, by law enforcement pursuant to the investigation of the alleged crimes.

15. Any books, papers, documents, photographs or tangible objects which the People intend to use in the trial or which were obtained from or belong to the defendant.

16. The defendant's arrest and conviction record (i.e., "rap sheet"), if any.

17. All police, arrest, and crime reports prepared by the People or their agents in relation to the investigation and prosecution of this case.

18. The names and addresses of all witnesses to the alleged crime, whether or not the prosecution intends to call them at trial.

19. All statements regarding this case, whether written or oral, made by potential witnesses in this case, whether or not the prosecution intends to call them at trial. The contents of any such oral statements must be disclosed only to the extent that they are not presently contained in police reports given to the defendant or in the preliminary examination transcripts, but the People must disclose all additions to, deletions from, and denials, explanations, and clarifications such statements contained in the police reports and preliminary examination transcripts.

20. All notes, if any, made by police officers regarding their conversations, interviews with witnesses in the present case and any written reports based on those conversations and interviews.

21. All police officer's notes, if any of their activities, observations, and investigation of this case.

22. All notes, if any, made by prospective witnesses relating to matters covered in their testimony at trial.

23. All photographs and/or diagrams of the scene of the crime prepared by the People.

24. All relevant real evidence seized or obtained as part of the investigation of the offense(s) charged.

///

49

25.   Latent fingerprints lifted in the investigation of this case and photographs of such latent fingerprints, if any.

26.   The known exemplars of fingerprints, if any, used for comparison with latent fingerprints lifted during the investigation of the alleged offense.

27.   Names and addresses of all persons detained or arrested as suspects in the investigation of this case.

28.   The statements of all persons interviewed as potential suspects in this case.

29.   All photographs taken by the people or law enforcement agencies in this case of the alleged victims or otherwise relating to the investigation of this case.

30.   All tangible evidence which relates to this case, whether or not the prosecution intends to introduce the evidence at trial.

31.   All exhibits the People intend to present at the trial.

32.   Any relevant material or information which has been provided by an informant.

33.   Any electronic surveillance (including wiretapping), if any, of conversations to which the accused was a party or of his premises.

34.   Any information favorable to the defense in that it tends to exonerate the defendant, minimize his probable sentence or constitutes information that the defendant might use to impeach or contradict prosecution witnesses.

35.   All requests, whether in writing or oral, for analysis of physical evidence between or amongst the named parties to this order, excluding work product.

36.   All names, addresses, and reports of all expert witnesses consulted by the People in preparation for trial or during trial.

37.   All prior felony convictions of witnesses whether or not resulting in a state prison commitment which the People intend to introduce in their case in chief or for purposes of impeachment; whether any prospective witness is on probation/parole or has pending charges at the time of trial; whether any prospective witness was on probation/parole or had any pending charges at the time of the alleged offense/events that render witness status; whether any witness has suffered prior felony conviction, or an misdemeanor conviction of a moral turpitude crime.

1      38.    Investigation reports, whether written or oral, by District Attorney investigators.

2      39.    The names and addresses of all persons who were present when interviews were

3 conducted relating to this prosecution and any of the questions or answers which were not written

4 or recorded.

5      40.    All records pertaining to chemical tests administered to defendant.

6      The accused is asking not only for that information which is in the possession of the

7 prosecuting attorney or known by the prosecuting attorney to be in the possession of the

8 investigating agency, but for all above-described information in the possession of the investigating

9 agencies which the prosecuting attorney should know about.

10      Defendant is requesting the above items be provided to the defense within three days of

11 receipt of this request. This document was served on a District Attorney for the County of Orange

12 on this date.

13

14                            LAW OFFICE OF DAVID M. NISSON

15

16 DATED: _1 - 8 - 12_

17                            DAVID M. NISSON
                                    Attorney for Defendant

18

19

20

21

22

23

24

25

26

27

28

402

## HIGGASON

WHY IS IT THAT PROSECUTION HAS NEVER PROVIDED ANY INFORMATION TO DEFENSE THAT THEY HAVE EVER BEEN IN CONTACT WITH HILGASON — NO REPORTS OF CONTACT NO UPDATED CONTACT INFO — NOTHING. BOTTOM LINE = NO TAPES — NO TESTIMONY.

## IMPEACHMENT PRIORS

WHICH PRIOR CONVICTIONS WILL DA SEEK TO INTRODUCE FOR IMPEACHMENT IF Δ TESTIFIES?

243.4? = MISDEMEANOR = NOT ADMISSIBLE FACTS ARE 352 ~~AND STAPED~~

288(a) = 352 / SANITIZE

ONCE DA HAS STATED WHICH PRIORS THEY ARE SEEKING TO INTRODUCE WE WILL BRIEF ISSUE

## 1108

① Fresh Complaint — ~~vimmm~~ admitted

② AMY D. FORCED cop — admitted.

③ Infant in crib MASTURBATION — excluded.

③ ~~~~

but a "drama queen." She's seen
...tention wasn't on her, she

Febr

# OFFICE OF THE PUBLIC DEFENDER
# INVESTIGATION REPORT



ATTORNEY:
INVESTIGATOR:
CASE NAME:
CASE#:
CHARGES:
COURT DATE:

FRANK BITTAR
LORRIE DELGADILLO
PEOPLE VS. KYLE WHITESIDES
10NF0718
261(a)(2)X2; 286(c)(2); 286(c):288a(c)
JUNE 30, 2010

WITNESS:

ROSE MARIE LEONARD-DOB: 8/19/67
1310 W. Diamond Street #305
Anaheim, CA 92804
(714) 808-9678-Home Phone
(714) 226-9888-Work Phone

On Friday, June 25, 2010 at approximately 3:30 PM, I conducted an interview with Rose
Marie Leonard in the recreation room of her apartment complex. I complied with CA
Penal Code § 1054.8 by identifying myself as an Investigator for the Public Defenders
Office and handed her my business card. I informed her that we are representing Kyle
Whitesides. Rose told me the following:

She first met Kyle Whitesides in Santa Ana approximately 2 years ago when they were
both homeless and loitering around the homeless area. She described Kyle as a nice,
responsible guy who was never violent or temperamental. He was a "sweetheart", and
even though he drank a lot of beer and would get drunk, he never became violent, ...east
not to her knowledge.

Rose never had a romantic relationship with Kyle. Some unknown time a...
they were both hanging out. Kyle bought a bottle of vodka for Rose. P...
drunk and had sexual intercourse. The sex was a "hit and run" and
This was the first and only time they had sex in the two years th...
other. They remained friends after that encounter.

Rose was living at a room and board house on Victoria St...
when she met Kim McCollough. Rose was living at the b...
rived. She showed Kim around and became her ro...
...ple of months" before moving to her curr...

53

# EXHIBIT COVER PAGE

EXHIBIT

**B**

❖ <u>Description of this Exhibit</u>:

1. Transcripts from Preliminary hearing (pages 75-77).
   - (3 pages)

2. Transcripts from Preliminary hearing (Page 616) (1 page)

3. Transcripts from recorded interview with Susan Baber,
   (pages 2-5). (4 pages)

4. Copies of Anaheim Police Department - General Offense HardCopy (5 pages)

❖ <u>Number of pages in this Exhibit</u>:  __13__  total pages.

❖ <u>JURISDICTION</u>: (Check only One)

☐ U.S. Supreme Court

☐ U.S. Court of Appeals

☐ United States District Court

☐ CA State Supreme Court

☐ CA Appellate Courts

☒ Superior Court

☐ Municipal Court

☐ County Grand Jury

75

1   AND T-SHIRT.

2       Q.   THE RECORD WILL REFLECT THE WITNESS HAS

3   IDENTIFIED THE DEFENDANT.

4           SO JANE DOE NUMBER 2 IDENTIFIED THE DEFENDANT AS

5   THE PERSON WHO ASSAULTED HER IN 1995 AND IN 1996.

6       A.   CORRECT.

7           MS. NICHOLS:  I HAVE NOTHING FURTHER.

8           THE COURT:  MR. SCHARF?

9                       **CROSS-EXAMINATION**

10      Q.   BY MR. SCHARF:  DURING YOUR CONVERSATION WITH

11  JANE DOE NUMBER 2, DID YOU DISCUSS WITH HER ANYTHING

12  ABOUT THE CASES THAT WERE HAPPENING DOWN HERE?

13      A.   NO DETAILS, NO.

14      Q.   OKAY.  DID YOU ASK HER TO CORROBORATE ANY OF THE

15  STATEMENTS SHE HAD MADE BACK IN 1996 TO SPECIAL AGENT

16  PARKS?

17      A.   IT HAS BEEN A WHILE SINCE I'VE LISTENED TO MY

18  INTERVIEW.  I DO BELIEVE I DID ASK HER QUESTIONS

19  REGARDING THE INCIDENT.

20      Q.   SO DID YOU AUDIO RECORD THIS INTERVIEW?

21      A.   I AUDIO RECORDED THE PHOTO LINEUP, YES.

22      Q.   OKAY.  DID YOU AUDIO RECORD ALSO THE INTERVIEW

23  THAT YOU MADE WITH HER REGARDING THE INCIDENT?

24      A.   I WOULD HAVE TO CHECK MY RECORDS.

25      Q.   OKAY.  DID YOU TELL HER ANYTHING ABOUT THE CASES

26  DOWN HERE?

55

76

1      A.   JUST THAT THERE WAS A PENDING CASE.

2      Q.   OKAY.   DID YOU TELL HER THAT MR. WHITESIDES WAS

3  ACCUSED OF ANOTHER SEXUAL ASSAULT?

4      A.   MOST LIKELY, YES.

5      Q.   OKAY.   WHY DID YOU TELL HER THAT?

6          MS. NICHOLS:   OBJECTION, RELEVANCE.

7          THE COURT:   YES.   SUSTAINED.

8      Q.   BY MR. SCHARF:   WELL, DURING THIS INTERVIEW, IS

9  IT FAIR TO SAY YOU WERE ATTEMPTING TO OBTAIN HER

10  COOPERATION?

11      A.   YES.

12      Q.   OKAY.   AND IN ORDER TO OBTAIN HER COOPERATION,

13  DID YOU TELL HER THAT THERE WAS A SEXUAL ASSAULT CASE

14  THAT MR. WHITESIDES WAS ACCUSED OF AS OCCURRING IN ORANGE

15  COUNTY RECENTLY?

16      A.   I WOULD HAVE PUT IT THAT THERE IS A PENDING

17  SEXUAL ASSAULT CASE.

18      Q.   AND DID YOU ASK HER -- WELL, STRIKE THAT.   DID

19  YOU DOCUMENT IN ANY REPORT THIS CONVERSATION THAT YOU HAD

20  WITH JANE DOE NUMBER 2 REGARDING THE FACTS AND

21  CIRCUMSTANCES OF THE INCIDENT THAT OCCURRED IN 1995 AND

22  '6?

23          MS. NICHOLS:   OBJECTION, LACK OF FOUNDATION.

24          THE COURT:   YES.   SUSTAINED.   I THINK SHE SAID

25  SHE DIDN'T TALK ABOUT ANY DETAILS OF THAT.

26      Q.   BY MR. SCHARF:   OKAY.   WHAT DID YOU TALK ABOUT

1    WITH JANE DOE NUMBER 2 WHEN YOU HAD THE CONVERSATION WITH

2    HER REGARDING THE PHOTO LINEUP?

3        A.   IT IS ON THE TAPE.  AND I APOLOGIZE, I DON'T

4    HAVE MY FILE WITH ME.  IT IS IN SANTA ANA.

5        Q.   SO YOU DON'T RECALL THE EXACT --

6        A.   I DON'T RECALL DETAILS, I APOLOGIZE.

7            MR. SCHARF:  I HAVE NOTHING FURTHER.

8            THE COURT:  ANYTHING ELSE?

9            MS. NICHOLS:  NO.

10           THE COURT:  THANK YOU FOR YOUR TESTIMONY.

11   YOU'RE EXCUSED.

12           MS. NICHOLS:  I HAVE NOTHING FURTHER.

13           THE COURT:  PEOPLE REST?

14           MS. NICHOLS:  YES.

15           THE COURT:  FOR THE DEFENSE?

16           MR. SCHARF:  NOT AT THIS TIME.

17           THE COURT:  MOTION?

18           MS. NICHOLS:  THANK YOU.

19           THE PEOPLE WOULD ASK THE DEFENDANT BE HELD TO

20   ANSWER ON COUNTS 1 THROUGH 4 AND THE ALLEGATIONS ALLEGED

21   TO COUNTS 1 THROUGH 4.

22           THE PEOPLE ARE NOT ASKING THAT HE BE HELD TO

23   ANSWER ON COUNT 5.

24           THE COURT:  ALL RIGHT.

25           MR. SCHARF:  YOU'VE STOLEN MY THUNDER NOW.  BUT

26   CERTAINLY, UNDERSTANDABLE.

66

1    OF TIME.

2        Q.   HOW LONG WAS THAT TIME?

3        A.   IT IS UNKNOWN.

4        Q.   WELL, WHEN SHE CAME OUT OF THE BATHROOM, SHE

5    WENT IN THE BEDROOM WHERE MR. WHITESIDES WAS, CORRECT?

6        A.   CORRECT.

7        Q.   AND SHE WENT TO BED, CORRECT?

8        A.   CORRECT.

9        Q.   DID YOU MAKE ANY -- I'M SORRY.  DID YOU MAKE ANY

10   INVESTIGATION TO DETERMINE WHETHER OR NOT JANE DOE NUMBER

11   1 HAD MADE PRIOR FALSE ALLEGATIONS OF SEXUAL ASSAULT?

12       A.   I CONDUCTED A RECORDS CHECK AND RAN HER NAME,

13   THAT KIND OF THING, TO SEE IF SHE WAS AN INVOLVED PARTY

14   IN SOMETHING PREVIOUSLY.

15       Q.   DURING YOUR INVESTIGATION, I BELIEVE THAT YOU

16   INTERVIEWED A SUSAN BARBER, CORRECT?

17       A.   YES.

18       Q.   AND MISS BARBER INDICATED TO YOU THAT SEVERAL

19   WEEKS AFTER THE REPORTED INCIDENT SHE HAD SPOKEN TO JANE

20   DOE NUMBER 1 ABOUT THE INCIDENT, CORRECT?

21       A.   CORRECT.

22       Q.   AND MISS BARBER TOLD YOU THAT WHEN JANE DOE

23   NUMBER 1 DESCRIBED THE INCIDENT TO HER, SHE SAID THAT SHE

24   WAS BENT OVER THE TOILET; IS THAT CORRECT?

25           MS. NICHOLS:  OBJECTION, HEARSAY.

26           MR. SCHARF:  IF I MAY?

DEFENDANT:
INTERVIEWEE(s):                    WHITESIDES, KYLE                      2
INTERVIEW DATE:                    BARBER. SUSAN
                                   03/10/10
                                                        CD NO: E-419-10

Q:     Okay. Um, um, do you remember what she told you when she came to you and told you
       about that?

A:     It was um, it was actually two us I believe um, Eric...

Q:     Okay.

A:     Eric um, he's there --

Q:     Okay.

A:     -- um, Eric, what was his name.  [laughs] My co-worker Eric.

Q:     Your, okay.

A:     Oh God, Eric Burke.  Okay.

Q:     Burke.  Okay.

A:     He was involved and we had given police report.

Q:     Right.  [various background noises & static]

A:     And uh, she stated she had been sodomized by one of, like an outsider.

Q:     Okay.

A:     He was not a part of the room and board at the time.

Q:     Okay.

A:     And um, she was, he had came into the bathroom --

Q:     Okay.

A:     -- uh and there was a lot of stuff going on, loud music and so no one heard her.

Q:     Okay.

A:     In the bathroom with him.  He had forced himself into the bathroom.

DEFENDANT:              WHITESIDES, KYLE                    3
INTERVIEWEE(s):         BARBER. SUSAN
INTERVIEW DATE:         03/10/10              CD NO: E-419-10

Q:    Okay.  So he had, he had forced himself into the bathroom um --

A:    She had went into the bathroom to I guess um, puke.

Q:    Okay.

A:    From the alcohol or whatever.

Q:    Okay.

A:    And um, he forced her, he forced himself in the bathroom --

Q:    Okay.

A:    -- upon her.

Q:    Okay and what, when she told you about this how long um after, how long before --

A:    How long after?

Q:    Yeah, exactly.

A:    Uh, gosh it's been so long ago.  [laughs]

Q:    I know, I know.

A:    Um, [various background noises & static] I believe it was like maybe a week after.

Q:    A week after, roughly.  Okay.

A:    Uh...

Q:    Do you know if you have, do you have any notes or does Tele Care have any notes on when,

      do you guys take any notes when spoke with her about it.  [various background noises &

      static]

A:    I think um, 'cuz the person that had her before me --

Q:    Uh huh.

60

DEFENDANT:
INTERVIEWEE(s):          WHITESIDES, KYLE          4
INTERVIEW DATE:          BARBER. SUSAN
                         03/10/10          CD NO: E-419-10

A:    -- Eric, I think he has the note on her.

Q:    Okay perfect.

A:    Um, I don't think I wrote any notes and if I did it would be [various background noises & static] I can't even remember where they'd be.

Q:    Right, right. It, it was awhile ago.

A:    Yeah, I remember him doing the crisis because she was originally under him and then because he couldn't deal with the sensitive situation --

Q:    Okay.

A:    It got changed to me.

Q:    Okay, gotcha. Um, and was, was she believable when she, when she told you about it?

A:    Yes, she was (?).

Q:    Okay. Um, let me think of what else. And did she say why she waited to report it? Why, why she didn't report it right away?

A:    Because she had felt that um, room and board operator had gotten tired of the police involvement at the house --

Q:    Uh huh.

A:    -- and um, um, she was scared that [various background noises & static] it would jeopardize her housing.

Q:    I'm sorry [various background noises & static] that it would what?

A:    It would jeopardize her housing.

Q:    Oh, okay, okay.

DEFENDANT:                  WHITESIDES, KYLE                    5
INTERVIEWEE(s):             BARBER. SUSAN
INTERVIEW DATE:             03/10/10
                                                  CD NO: E-419-10

A:     And she was she was just 'cuz she kept about calling the police over to the house.

Q:     Okay.

A:     And so that's why I think we had the meeting and then she had a warrant or two so she was scared of being, being arrested. And at, at the time.

Q:     Okay.

A:     She was scared of being.

Q:     Okay.

A:     And um, and jeopardizing her housing.

Q:     Okay. Alright. I think that pretty much covers everything. Is there anything um; is there anything I didn't ask you that you thinks important for me to know about, about it?

A:     Um, generally, no um, you said that she was believable, you know. She didn't appear to be uh, suspicious on this.

Q:     Okay. Uh, had she ever, the reason why I asked you that is because um, one of the other witnesses said she was a drama queen. You know she created a lot of drama but had she ever lied to you um about anything you know of this, of this --

A:     Of this nature, no.

Q:     Okay.

A:     No, not of this nature. But other natures, yeah. [laughs]

Q:     Okay.

A:     But uh, but this no I, I wouldn't think that she would just falsify a statement.

Q:     Okay. And when, when she spoke with you and Eric what was her state? Was she crying,

ANAHEIM POLICE DEPARTMEN
GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

General Offense Information

Operational status : OPEN
Reported on : Mar-03-2009 (Tue.) 1829
Occurred on : Feb-13-2009 (Fri.) 1829
Approved on : Mar-03-2009 (Tue.)  by : A0233 - RAULSTON, RICHARD #S93
Report submitted by : A1864 - MC MORRIS,CANDYCE #720 (Resigned)
Org unit : PATROL TEAM SIX
Accompanied by : A1039 - CHRISTY, PAUL #184
Location : 2019 W VICTORIA AVE
Municipality : ANAHEIM County : ORANGE
District : 1 Beat : 15 Grid : 1720
Felony/Misdemeanor : F
Bias : None (No Bias)
Gang involvement : No
Family violence : NO

Offenses (Completed/Attempted)

Offense : #1 261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC - COMPLETED
Location : Residence/Home
Offender suspected of using : Not Applicable
Weapon type : None

Related Event(s)

CP    2009-31742

Related Person(s)

Victim #1: MCCOLLOUGH, KIM LOUISE
(Case Specific Information)

Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Feb-26-1959
Address : 2019 W VICTORIA AVE , ANAHEIM , California 92804-
Phone Numbers: Home : (714)635-5940
Place of birth : California
Occupation : UNEMPLOYED
Marital status : Separated
Language(s) spoken: English
Citizenship : American
Height : 5'8
Weight : 229 lbs
Hair color : BROWN
Eye color : BLUE

Master Name Index Reference
Victim #1: MCCOLLOUGH, KIM LOUISE
Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Feb-26-1959

Linkage factors
Resident status : Resident

**ANAHEIM POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

Statement taken : YES
Type of injury : None
Access to firearm : NO
Victim of :
  261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC - COMPLETED

Victim's Relationship to Offender: Victim Was Acquaintance
Person's role : Suspect  # 1
Person's name : WHITESIDES, KYLE JASON

Suspect #1: WHITESIDES, KYLE JASON
(Case Specific Information)

Sex : MALE
Race : WHITE
Ethnicity : White
Date of birth : Apr-20-1972
Address : 10459 SALINAS RIVER CIRCLE , FOUNTAIN VALLEY , California 92708-
Phone Numbers: Business : (800)701-0131
Place of birth : California
Occupation : FOOD PREPARER
Employer : MENTAL HEALTH ASSOCIATION SANTA ANA
Marital status : Single
Language(s) spoken: English
Citizenship : American
Height : 6'4
Weight: 210 lbs
Build : Medium
Hair color : BROWN
Hair style : Receding,Shaved/Bald
Eye color : BROWN

Master Name Index Reference
Suspect #1: WHITESIDES, KYLE JASON
Sex : MALE
Race : WHITE
Ethnicity : White
Date of birth : Apr-20-1972

Linkage factors
Resident status : Nonresident
Statement taken : YES
Access to firearm : NO

Case Specific Clothing Details

Witness #1: GUTIERREZ, LORENZO
(Case Specific Information)

Sex : MALE
Race : WHITE
Ethnicity : Hispanic/Latino/Mexican
Date of birth : Feb-22-1974
Address : 2019 W VICTORIA AVE , ANAHEIM , California 92804-
Height : 5'7

2

For: A1219  Tuesday March 30, 2010

ANAHEIM POLICE DEPARTMEN
GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

Weight: 170 lbs
Hair color : BLACK
Eye color : BROWN

Master Name Index Reference
**Witness #1: GUTIERREZ, LORENZO**
Sex : **MALE**
Race : **WHITE**
Ethnicity : **Hispanic/Latino/Mexican**
Date of birth : **Feb-22-1974**
Aliases     : **GUTIERREZ, LENCHO**
            : **GUTIERREZ, VICTOR DANIEL**
            : **RIZO, LOUIE**

**Linkage factors**
Resident status : **Resident**
Statement taken : **YES**
Access to firearm : **NO**

**Witness #2: LEONARD, ROSE MARIE**
(Case Specific Information)

Sex : **FEMALE**
Race : **WHITE**
Ethnicity : **White**
Date of birth : **Aug-19-1967**
Address : **1310 W DIAMOND ST  Apt: 305 , ANAHEIM , California 92804-**
Phone Numbers: Home : **(714)533-9702**
Occupation : **UNEMPLOYED**
Marital status : **Single**
Language(s) spoken: **English**
Height : **5'7**
Weight: **205 lbs**
Hair color : **RED OR AUBURN**
Eye color : **BROWN**

Master Name Index Reference
**Witness #2: LEONARD, ROSE MARIE**
Sex : **FEMALE**
Race : **WHITE**
Ethnicity : **White**
Date of birth : **Aug-19-1967**

**Linkage factors**
Resident status : **Resident**
Statement taken : **YES**
Access to firearm : **NO**

**Witness #3: MCCOLLOUGH, CHARLES DAVID**
(Case Specific Information)

Sex : **MALE**
Race : **WHITE**
Ethnicity : **White**
Date of birth : **Sep-02-1959**
Address : **TRANSIENT**

3

65

ANAHEIM POLICE DEPARTMEN
GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

Occupation : UNEMPLOYED
Marital status : Separated
Language(s) spoken: English
Height : 5'10
Weight: 160 lbs
Hair color : BROWN
Eye color : BLUE

Master Name Index Reference
Witness #3: MCCOLLOUGH, CHARLES DAVID
Sex : MALE
Race : WHITE
Ethnicity : White
Date of birth : Sep-02-1959

Linkage factors
Resident status : Resident
Statement taken : YES
Access to firearm : NO

Witness #4: MCCOLLOUGH, JACQUELINE MARIE
(Case Specific Information)

Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Mar-17-1983
Address : 1830 16TH STREET  Apt: R101 , NEWPORT BEACH , California 92663-
Language(s) spoken: English
Height : 5'7
Weight: 112 lbs
Hair color : BROWN
Eye color : BLUE

Master Name Index Reference
Witness #4: MCCOLLOUGH, JACQUELINE MARIE
Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Mar-17-1983

Linkage factors
Resident status : Nonresident
Access to firearm : NO

Case Specific Clothing Details

Witness #5: LEISNIAK, LAURA MJ
(Case Specific Information)

Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Sep-11-1964
Address : 11921 LAMPSON , GARDEN GROVE , California 92840-
Phone Numbers: Business : (714)668-1530 Cellular : (714)234-9103

4

For: A1219  Tuesday March 30, 2010

66

ANAHEIM POLICE DEPARTMENT
GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

Occupation : DIRECTOR
Employer : MENTAL HEALTH ASSOCIATION  2416 S MAIN ST, #B, SANTA ANA
Language(s) spoken: English
Height : 5'4
Weight: 145 lbs
Hair color : BROWN
Eye color : HAZEL

Master Name Index Reference
Witness #5: LEISNIAK, LAURA MJ
Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Sep-11-1964

Linkage factors
Resident status : Nonresident
Statement taken : YES
Access to firearm : NO

Witness #6: BABER, SUSAN ELIZABETH
(Case Specific Information)

Sex : FEMALE
Race : WHITE
Ethnicity : Black
Date of birth : Dec-06-1974
Address : 151 E 73RD STREET , LOS ANGELES , California 90003-
Phone Numbers: Cellular : (323)742-9395
Language(s) spoken: English
Height : 5'02
Weight: 150 lbs
Hair color : BROWN
Eye color : BROWN

Master Name Index Reference
Witness #6: BABER, SUSAN ELIZABETH
Sex : FEMALE
Race : WHITE
Ethnicity : Unknown
Date of birth : Dec-06-1974

Linkage factors
Resident status : Nonresident
Statement taken : YES
Access to firearm : NO

# EXHIBIT COVER PAGE

EXHIBIT

C

❖ Description of this Exhibit:

Letters of request for post-conviction discovery to:
Defense Counsel Nisson, Orange County Public Defender,
and Orange County District Attorney

❖ Number of pages in this Exhibit: __6__ total pages.

❖ JURISDICTION: (Check only One)

☐ U.S. Supreme Court

☐ U.S. Court of Appeals

☐ United States District Court

☐ CA State Supreme Court

☐ CA Appellate Courts

☒ Superior Court

☐ Municipal Court

☐ County Grand Jury

68

Whitesides, K
619-?????-??
C-201

## DECLARATION OF SERVICE BY MAIL

CASE NAME: People v. Whitesides          CASE NO: 10NF0718

I, Kyle J Whitesides _____, am a resident of the State of California,
Mule Creek State Prison (MCSP) at Ione, County of Amador, California, and am at least 18
years of age, and am party to the within action. My mailing address is P.O. Box 409000,
Ione, California 95640-9000.

On 2-14-21 _____, I served a true and correct copy of the following document(s):

Informal Request for Discovery Under P.C. 1054.9

On each party listed below by placing it in a sealed envelope, with adequate postage or
provided, and depositing said envelope in the institutional mail box, or turned said envelope
to custodial personnel for the United States Mail at Mule Creek State Prison, P.O. Box
409000, Ione, California 95640-9000. Each party to the action has been duly served.

This copy is being mailed to:
                    David M. Nisson
                    attorney at law
                    17291 Irvine Blvd., Ste. 154
                    Tustin, CA
                              92780

I have mailed additional copies to:
                    Orange County Public Defender
                    Frank Bittar
                    14 Civic Center Drive West
                    Santa Ana, CA
                              92701

There is regular service by the United States Mail between the above place of mailing and
the parties listed.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this date: 2-14 _____, 20 21, at Ione, California

Signed: _____, CDCR No: AR1462

## MCSP MAILROOM ACKNOWLEDGEMENT OF MAILING

DATE 2/16/21 _____ SIGNED: _____

69

X

February     , 2021


Kyle Whitesides
AR1462
PO Box 409090
Ione, CA 95640

David M. Nisson
attorney at law
17291 Irvine Blvd, Ste. 154

Tustin, CA     92780


RE: Informal Request for Discovery Under Penal Code section 1054.9,
    People v. Whitesides, Orange County Superior Court docket number 10NF0718


        This is an informal request for discovery under Penal Code section 1054.9.
I am requesting materials that are in the actual and constructive possession of
your Office to which I would have been entitled to at trial under Brady v.
Maryland, and should have been provided with the initial discovery.

        In particular, I am seeking 1) Police reports and transcripts of all
interviews conducted with Kelly Higgason; 2) All reports and transcripts of
the interview of Amy Dale, conducted by D.A. investigator Courtney Dodd; 3) All
record of misdemeanor or felony convictions of all witnesses and victims that
testified at trial; 4) All hand written/field notes turned over by the Anaheim
Police Department, both detectives and police officers; 5) Report and transcript
of interview of witness Lorenzo Guiterrez, conducted by Anaheim Police Officer
Candyce McMorris, badge number A1864.

        Thank you for your time and compliance. I look forward to hearing back from
you or your Office.


Regards,

Kyle Whitesides          Dated: 2-14-21          .

*whitesides, K*
*e19 - B2t2 2t*
*e-201*

# DECLARATION OF SERVICE BY MAIL

CASE NAME: _People v. Whitesides_          CASE NO: _10NF0718_

I, _Kyle J. Whitesides_ , am a resident of the State of California, Mule Creek State Prison (MCSP) at Ione, County of Amador, California, and am at least 18 years of age, and am party to the within action. My mailing address is P.O. Box 409000, Ione, California 95640-9000.

On _2-14-21_ , I served a true and correct copy of the following document(s):

_Informal Request for Discovery Under P.C. 1054.9_

On each party listed below by placing it in a sealed envelope, with adequate postage or provided, and depositing said envelope in the institutional mail box, or turned said envelope to custodial personnel for the United States Mail at Mule Creek State Prison, P.O. Box 409000, Ione, California 95640-9000. Each party to the action has been duly served.

This copy is being mailed to:

_Orange County Public Defender_
_Frank Bittar_
_14 Civer Center Drive West_
_Santa Ana, CA_
_92707_

I have mailed additional copies to:

_David M. Nisson_
_attorney at law_
_17291 Irvine Blvd., Ste. 154_
_Tustin, CA   92780_

There is regular service by the United States Mail between the above place of mailing and the parties listed.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this date: _2 - 14_ , 20 _21_ , at Ione, California

Signed: _____ , CDCR No: _AR1462_

## MCSP MAILROOM ACKNOWLEDGEMENT OF MAILING

DATE: _2/16/21_   SIGNED: _____

71

February      , 2021


Kyle Whitesides
AR1462
PO Box 409090
Ione, CA 95640

Orange County Public Defender
Frank Bittar
14 Civic Center Drive West
Santa Ana, CA  92701


RE: Informal Request for Discovery Under Penal Code section 1054.9,
    People v. Whitesides, Orange County Superior Court docket number 10NF0718


        This is an informal request for discovery under Penal Code section 1054.9.
I am requesting materials that are in the actual and constructive possession of
your Office to which I would have been entitled to at trial under Brady v.
Maryland, and should have been provided with the initial discovery.

        In particular, I am seeking 1) Police reports and transcripts of all
interviews conducted with Kelly Higgason; 2) All reports and transcripts of
the interview of Amy Dale, conducted by D.A. investigator Courtney Dodd; 3) All
record of misdemeanor or felony convictions of all witnesses and victims that
testified at trial; 4) All hand written/field notes turned over by the Anaheim
Police Department, both detectives and police officers; 5) Report and transcript
of interview of witness Lorenzo Guiterrez, conducted by Anaheim Police Officer
Candyce McMorris, badge number A1864.

        Thank you for your time and compliance. I look forward to hearing back from
you or your Office.


Regards,

Kyle Whitesides          Dated: 2-14-21          .

*l19—B702-2U*

## DECLARATION OF SERVICE BY MAIL

CASE NAME: _People v. Whitesides_    CASE NO: _1ONF0718_

I, _Kyle J. Whitesides_, am a resident of the State of California, Mule Creek State Prison (MCSP) at Ione, County of Amador, California, and am at least 18 years of age, and am party to the within action. My mailing address is P.O. Box 409000, Ione, California 95640-9000.

On _2/28/21_, I served a true and correct copy of the following document(s):

_Informal Request for Discovery under Penal Code section 1054.5_

On each party listed below by placing it in a sealed envelope, with adequate postage or provided, and depositing said envelope in the institutional mail box, or turned said envelope to custodial personnel for the United States Mail at Mule Creek State Prison, P.O. Box 409000, Ione, California 95640-9000. Each party to the action has been duly served.

This copy is being mailed to:

_Orange County District Attorney (1ONF0718)_
_401 Civic Center Drive West_
_Santa Ana        CA_
_92701_

I have mailed additional copies to:

There is regular service by the United States Mail between the above place of mailing and the parties listed.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this date: _2/28_, 20 _21_, at Ione, California

Signed: _____, CDCR No: _AR1462_

## MCSP MAILROOM ACKNOWLEDGEMENT OF MAILING

DATE: _3/1/21_    SIGNED: _____

73

x
25

February 28, 2021


Kyle Whitesides
AR-1462
P. O. Box 409090
Ione, CA 95640


Orange County District Attorney
401 Civic Center Drive West
Santa Ana, CA 92701


RE: Informal Request for Discovery Under Penal Code section 1054.9,
    People v. Whitesides, Orange County Superior Court, Docket # 10NF0718


To: District Attorney of Orange County

    This is an informal request for discovery under Penal Code section 1054.9.
I am requesting materials that are in the actual or constructive possession of
your Office to which I would have been entitled to at trial under Brady v.
Maryland, and should have been provided with the initial discovery.

    In particular, I am seeking the following items:

    1) All police reports and/or transcripts of the interview conducted with
Kelly Higgason;
    2) All reports and/or transcripts of the interview of Amy Dale, conducted by
D.A. investigator Courtney Dodd;
    3) All record of misdemeanor or felony convictions of all witnesses and
victims who testified at trial;
    4) All records of Kim McCollough's *many* reports to police including sexual
assaults;
    5) All hand written/field notes turned over by the Anaheim Police Department,
both detective and police officers;
    6) Report and transcripts of interview of witness Lorenzo Guiterrez,
conducted by Anaheim Police Officer Candyce McMorris, badge number A1864;
and
    7) Record and transcript of statement made by Charles McCollough to Anaheim
Police Department.

    I have requested the above from my defense counsel, David M. Nisson and the
Orange County Public Defender. Both requests were unfruitful. Thank you in
advance for your time and compliance. I look forward to hearing from your
office.

Regards,


Kyle Whitesides                         Dated:  2/28/21

36

Memorandum In Support of Motion for Post-Conviction Discovery

The California Supreme Court explained that PC 1054.9 materials include materials the prosecution provided at trial but had since been lost or materials to which the defendant was actually entitled. In re Steele, Cal. 4th 682, 695-697. This includes, among other things, materials which were specifically requested and materials that were not requested but both of which, requested and non-requested materials, the prosecution was obligated to provide. Id. Furthermore, the legislative intent of 1054.9 was to enable defendant's to efficiently reconstruct defense attorney's trial files that had become lost or destroyed.

As evidenced by Defendant Whitesides' declaration in the verification portion of this motion, Defendant had made a good faith effort under the requirements of PC 1054.9 to request both defense counsel and the prosecution for the lost discovery as originally requested by defense counsel (with the wrong name and case number) in his informal request for discovery (Exhibit A1) and as evidenced by the attached letters in Exhibit C.

Wherefore, the Court should grant the motion and order the prosecution to turn over all items requested and any other discovery not requested that was required by the California Constitution, Article I, section 30(c).

Dated: 7/7/21                    Respectfully Submitted,

                                 Kyle J. Whitesides
                                 Defendant in pro per

PLEADING PAGE FOR A SUBSEQUENT DOCUMENT

## DECLARATION

I, Kyle J. Whitesides, declare under penalty of perjury that the letters contained within "Exhibit C" are true copies that represent my diligent effort to obtain the requested discovery to trial attorney, the District Attorney's office, and other state actors and law enforcement to no avail, including the Public Defenders office.

Executed on the date below in Ione, Amador County, California.

Date: 7/7/21          (s) [signature]

                        Kyle J. Whitesides

CV-127          PLEADING PAGE FOR A SUBSEQUENT DOCUMENT

X
38

HABEAS EX: 4A-C

4A — $25,000 payment receipt from Charles Barbero (1pg.)
(×1)

4B — $5,000 payment to Defense Counsel Nisson (1 pg.)
(×2)

4C — $5,000 payment to Defense Counsel Nisson (1 pg.)
(×3)

HABEAS
**EXHIBIT** _4A-C_ (3pss)

4A

# DAVID M. NISSON
### ATTORNEY AT LAW
17291 IRVINE BOULEVARD, SUITE 311
TUSTIN, CALIFORNIA 92780
TELEPHONE (714) 730-2171
FAX (714) 730-2195

DATE: _8-11-10_

Received _$25,000.00_ from _Charles Barbero_

(Check No. _____) towards $ _25,000.00_ in attorney's fees for:

_Representation of Kyle Whitesides in North_
_Justice Center Felony case_

The rate at which the fees shall be paid: _Fees cover all representation_
_necessary to resolve case including all costs_
_and jury trial if necessary._

**I understand that all costs incurred during the processing of this case are the client's responsibility.**

DATED: _8-11-10_                       _____
                                       David M. Nisson, Esq., SBN 109075

DATED: _____

                                       _____
                                       Signature

                                       _____
                                       (Print Name)

X1

4B

David,

Thanks For helping Kyle.

Tom



Thomas E. Whitesides
Rosalind S. Whitesides
10459 Salinas River Cir
Fountain Valley, CA 92708

5038

90-8239/3222

APR. 8 2011

EZ Shield™ Check
Fraud Protection

Pay to the Order of  DAVID Nisson                    $ 5,000 00/xx

FIVE Thousand   N0/100                        Dollars

NuVision Federal Credit Union
P.O. Box 1220
Huntington Beach, CA 92847

For KYLE Attorneys            Thomas E Whitesides   MP

⑈3222 8239⑈:    573560 50 18⑈  5038

DECEIVED
APR 1 1 2011
By

79

v2

4C

Mw 9/6/12

Thomas E. Whitesides
Rosalind S. Whitesides
10459 Salinas River Cir.
Fountain Valley, CA 92708

5133
90-8239/3222

Sep 5 20 12

Pay to the
Order of __DAVID Nisson__ _____ | $5,000 00/H

Five Thousand _____ no/100 _____ Dollars

NuVision Federal Credit Union
P.O. Box 1220
Huntington Beach, CA 92647

For R. Whitesides                Thomas E Whitesides     MP

⑆322282399⑆    5735605018⑆ 5133

80

v3

HABEAS   EX: 5 A-B

5A — Orange County Public Defender Interview with Witness Leonard

    • Rebuttal Character Evidence   (IAC)          ( 1 pg.)
                                  ( x1 )

5B — Anaheim Detective's Interview with Witness Leonard

                                  ( 15 pg.)

    • Rebuttal Character Evidence (IAC)        ( x2 - x16 )


    *Failure to Present Evidence
    *Failure to Subpoena Witness


HABEAS
**EXHIBIT**   5A-B
                            (16 pgs.)

5A

but a "drama queen." She's seen
attention wasn't on her, she

Febr

# OFFICE OF THE PUBLIC DEFENDER
# INVESTIGATION REPORT

ATTORNEY:          FRANK BITTAR
INVESTIGATOR:      LORRIE DELGADILLO
CASE NAME:         PEOPLE VS. KYLE WHITESIDES
CASE#:             10NF0718
CHARGES:           261(a)(2)X2; 286(c)(2); 286(c);288a(c)
COURT DATE:        JUNE 30, 2010

WITNESS:           ROSE MARIE LEONARD-DOB: 8/19/67
                   1310 W. Diamond Street #305
                   Anaheim, CA  92804
                   (714) 808-9678-Home Phone
                   (714) 226-9888-Work Phone

On Friday, June 25, 2010 at approximately 3:30 PM, I conducted an interview with Rose
Marie Leonard in the recreation room of her apartment complex. I complied with CA
Penal Code § 1054.8 by identifying myself as an Investigator for the Public Defenders
Office and handed her my business card. I informed her that we are representing Kyle
Whitesides. Rose told me the following:

She first met Kyle Whitesides in Santa Ana approximately 2 years ago when they were
both homeless and loitering around the homeless area. She described Kyle as a nice,
responsible guy who was never violent or temperamental. He was a "sweetheart" and
even though he drank a lot of beer and would get drunk, he never became violent, at least
not to her knowledge.

Rose never had a romantic relationship with Kyle. Some unknown time a
they were both hanging out. Kyle bought a bottle of vodka for Rose. P
drunk and had sexual intercourse. The sex was a "hit and run" and
This was the first and only time they had sex in the two years th
other. They remained friends after that encounter.

Rose was living at a room and board house on Victoria St
when she met Kim McCollough. Rose was living at the
rived. She showed Kim around and became ho
ple of months" before moving to her cu

on
com
e asked
ight a
and rap

/le wouldn
wanted att

82

PUBLIC DEFENDER
ORANGE COUNTY
CD TRANSCRIPTION

DEFENDANT(s):   WHITESIDES, KYLE

CD No.:   E418-10

Total Time:   10:00 MIN

Sup. No.:   10NF0718

CHARGE(s):   261(a)(X2); 288(a)(c)

INVESTIGATOR(s):

Trial Deputy(ies):   BITTAR

INVESTIGATION DATE:   07/14/10

DATE TRANSCRIBED:   5/21/10

TRIAL:   N/A

LEGEND:

Q:  Det. Adhan
A:  Rosemarie Leonard
Q1:  Det. Wayne

NOTE:   (..?)  =   Non-intelligible or non-distinguishable words or phrases.
--  =   Change / Interruption in thought.
...  =   Incomplete thought / Pause in thought.
[ ]  =   Transcriber's comment(s).
Uh huh  =   Affirmative response.
Huh uh  =   Negative response.

83

DEFENDANT:
INTERVIEWEE(s):                    WHITESIDES, KYLE                    **1**
INTERVIEW DATE:                    **LEONARD, ROSEMARIE**
                                   05/20/09
                                                                CD NO: **E-418-10**

CD NO. E-418-10, BEGINS AT 10:00 MIN/SEC

Q:     So today is March 20th, 2009.  It's approximately uh, nine, fifty-nine AM and its Detective

       Adham and Detective Wayne and we're speaking with Rosemarie Leonard.

A:     Yes.

Q:     Is that right?

A:     Yes.

Q:     Um, what's your date of birth Rosemarie?

A:     Eight, nineteen, sixty-seven.

Q:     Okay.  Nineteen, sixty-seven and okay how long have you been living here?

A:     I moved in March 25th.

Q:     March 25th okay.  And do you have a home phone number or a cell phone number?

A:     I have a home phone.

Q:     Okay.

A:     Seven, one, four…

Q:     Uh huh.

A:     Five, three, three…

Q:     Uh huh.

A:     Nine seven, "O". two.

Q:     Nine seven, "O", two.  Okay.  Let's see here, okay, and then when, how long did you live

       um, on --

A:     At Amy's?

| DEFENDANT: | WHITESIDES, KYLE | 2 |
|---|---|---|
| INTERVIEWEE(s): | LEONARD, ROSEMARIE | |
| INTERVIEW DATE: | 05/20/09 | CD NO: E-418-10 |

Q:     -- Victoria?  Yeah.

A:     I lived; I lived there for nine months.  I was in, in room and board for nine months.

Q:     So from when to when do you remember when you moved in?

A:     [pause] Uh, probably the end of, like towards the end of April or the end of March.

Q:     Okay.

A:     Till I got here.

Q:     Okay.  So almost a year than?

A:     Yeah, I just like, well nine, ten months there.

Q:     Okay.  So um okay.  March 2008 until… Okay.  So why don't you tell me, tell me what happened on [pause] on uh, I guess this was February 13th, it was a Friday night.  Why don't you tell me uh, what you remember?

A:     What I remember?

Q:     Yeah.

A:     Um, a friend of mine called and asked 'cuz it was kind a rainy you he's homeless he stayed out in the rain --

Q:     Okay.

A:     -- um, wanted to know if he could stay for the night and I said you know okay.

Q:     Okay.

A:     I talked to her about it and she didn't seem to mind.

Q:     Okay and you shared a room with uh --

A:     Kim.

DEFENDANT:
INTERVIEWEE(s):                  WHITESIDES, KYLE
INTERVIEW DATE:                  LEONARD, ROSEMARIE                                    3
                                 05/20/09
                                                      CD NO: E-418-10

Q:     Kim.

A:     Yeah.

Q:     What's your friend's name?

A:     Kyle.

Q:     Kyle, okay.

A:     Okay and um, we were all drinking.

Q:     Okay.

A:     Okay um, she started to uh, she was soaking his feet and doing like taking the dry parts off his feet.

Q:     Soak, soaking his feet?

A:     Soaking his feet in a bucket.

Q:     Okay.

A:     Okay.

Q:     Wa, water?

A:     Yeah.

Q:     Okay.

A:     And then she was like massaging and like taking the dry, exfoliate or whatever --

Q:     Uh huh.

A:     -- and she was telling him how beautiful his feet were how --

Q:     Okay.

A:     -- how beautiful he was and on and on and on.

| DEFENDANT: | WHITESIDES, KYLE | 4 |
|---|---|---|
| INTERVIEWEE(s): | LEONARD, ROSEMARIE | |
| INTERVIEW DATE: | 05/20/09 | CD NO: E-418-10 |

Q:    Okay.

A:    Okay.  We had drank a little bit more um --

Q:    What were you guys drinking?  Beer, wine --

A:    He drank beer and I was drinking a little Vodka and she drinking wine.

Q:    Wine.  Okay.

A:    Okay.  And um, it came time for me, I wanted to go to bed and my friend needed to go to bed

because he had to go to work the next day at four o'clock in the morning --

Q:    Okay.

A:    -- in Santa Ana.  So I took my medication.  He took his medication.

Q:    Uh huh.

A:    I made, here's my bed --

Q:    Okay.

A:    Her bed was here and I made him a bed right here --

Q:    On the floor?

A:    -- next to me on the floor.

Q:    Okay.

A:    Um, he went to bed the same time I did.  We turned the lights out and went to sleep and that -
-

Q:    Can you remember about what time that might have been?

A:    I'm not positive on the time --

Q:    Okay.

DEFENDANT:
INTERVIEWEE(s):        WHITESIDES, KYLE
INTERVIEW DATE:        LEONARD, ROSEMARIE                    5
                       05/20/09
                                              CD NO: E-418-10

A:    -- no.  I didn't really pay attention --

Q:    Do you know what time he might have come over?

A:    Um, I think it was still light out.

Q:    Okay.

A:    It was still light out.

Q:    Okay.

A:    Um --

Q:    [inaudible]

A:    And as far as I know --

Q:    Uh huh.

A:    -- to my knowledge --

Q:    Uh huh.

A:    He went to sleep when I went to sleep.

Q:    Okay.

A:    Okay.  He left in the morning to go to work 'cuz he had his little alarm set I guess.  I was asleep.

Q:    Do you know what time he left roughly?

A:    Well no, he had to be to work by four thirty in Santa Ana.

Q:    Four, thirty in the morning?

A:    Yes.

Q:    Okay.

DEFENDANT:
INTERVIEWEE(s):                WHITESIDES, KYLE                               6
INTERVIEW DATE:                LEONARD, ROSEMARIE
                               05/20/09                      CD NO: E-418-10

A:    Okay. I wake up to her crying and upset and not knowing what she was upset about.

Q:    And was she crying in her bed or where?

A:    On her bed.

Q:    Okay.

A:    And she had a couple of the other gals in the house in there with her.

Q:    Okay. What time was that?

A:    [pause] I'm guessing maybe around seven, eight o'clock. I mean I don't really...

Q:    Did you wake up at four, thirty when Kyle left?

A:    No.

Q:    Okay.

A:    No.

Q:    Okay.

A:    And um, she was upset and she was crying.

Q:    Uh huh.

A:    And um, I wasn't sure what was wrong because she's like a total drama mama.

Q:    Uh huh.

A:    She loves attention.

Q:    Okay.

A:    She will do anything for attention.

Q:    Okay.

A:    Um, if she's not the center of attention, she's not happy.

DEFENDANT:
INTERVIEWEE(s):                    WHITESIDES, KYLE                         7
INTERVIEW DATE:                    LEONARD, ROSEMARIE
                                   05/20/09                    CD NO: E-418-10

Q:    Okay.

A:    Okay.  That's how I know of her.

Q:    Okay.

A:    Okay and they were talking and then they didn't tell me right away what happened or what

      they say happened.

Q:    Okay.

A:    Later on like about an hour or so later they told me what happened.

Q:    On Saturday?

A:    Yeah.

Q:    Okay.

A:    Little bit later on they told me what happened.

Q:    Okay.

A:    And I said, "Are you sure?"

Q:    Okay.

A:    I go because when I went to sleep we both took our meds and we went to sleep.

Q:    Okay.  You and Kyle?

A:    Kyle, exactly.

Q:    Okay.  Did Kim go sleep when you guys went to sleep?

A:    No, she was still awake.

Q:    Where was, was she still in the room or was she somewhere else in the house?

A:    Somewhere else in the house.  Maybe in the living room, kitchen I don't know.

DEFENDANT:
INTERVIEWEE(s):          WHITESIDES, KYLE                    8
INTERVIEW DATE:          LEONARD, ROSEMARIE
                         05/20/09               CD NO: E-418-10

Q:    Okay.  You're not in trouble.

A:    I know I'm not in trouble.

Q:    So --

A:    I haven't done anything.

Q:    Um, you didn't hear any, any screaming, any anything?

A:    No.

Q:    Have, have you talked to Kyle since --

A:    Yes, I have.

Q:    What has Kyle told you?

A:    Kyle says that's a bunch of bullshit.  He says he had went and talked to somebody at the

      Police Department to say hey this is what somebody's saying about me --

Q:    Uh huh.

A:    -- and it's not true.  He says he spent almost a whole day down at the Police Department

      trying to clear up this crap.

Q:    So did he say at any, if they had sex but it was consensual or?

A:    He didn't say, nothing he said he didn't touch her.  He didn't do nothing, he didn't touch

      her.

Q:    Okay.  Okay.

A:    You know and I've known Kyle for probably close to a year --

Q:    Okay.

A:    -- and I don't believe that's his character.

DEFENDANT:
INTERVIEWEE(s):          WHITESIDES, KYLE                              9
INTERVIEW DATE:          LEONARD, ROSEMARIE
                         05/20/09              CD NO: E-418-10

Q:    Uh huh.

A:    I really don't.

Q:    Okay.

A:    I mean we've all been homeless together.  We're like family, we're like friends.  We all
      camp out together.

Q:    Okay.

A:    We look out for each other.

Q:    Okay.  Did, did you know if anybody else spoke with um, Kyle about what happened?

A:    I have no idea.  I haven't talked him, see, I have restricted dialing on my phone.

Q:    Okay.

A:    He has a, a different number that I can't reach from my phone.

Q:    Okay.

A:    Okay.  So I haven't really been able to communicate with him.  I've called him at, at where
      he works and he's been busy.  Like he works in the kitchen, he does janitorial, he does like a
      little bit of everything.

Q:    Where does he work?

A:    MHA.

Q:    Mental Health Association --

A:    Yeah.

Q:    -- Santa Ana?

A:    Yes.

x11

DEFENDANT:
INTERVIEWEE(s):     WHITESIDES, KYLE     10
INTERVIEW DATE:     LEONARD, ROSEMARIE
                    05/20/09     CD NO: E-418-10

Q:     Okay. Um, I was gonna ask you... Oh when, when did you when, when did you speak with him and he told you it wasn't true? When?

A:     I called him the next day and I --

Q:     The next day --

A:     -- was ready to cuss him out. And I said did, did you do this and he said no.

Q:     Okay.

A:     And I've asked him numerous times you know. Like a week later, two weeks later.

Q:     Do you still in touch with him?

A:     Occasionally, we talk on the phone.

Q:     Okay, okay.

A:     I have no reason to go to Santa Ana anymore.

Q:     Okay.

A:     I was with the mental health --

Q:     Uh huh.

A:     -- but look where I am now. Do you think I want to go back to the slums?

Q:     [laughs] Right.

A:     [laughs]

Q:     Okay, um, did, do you know if anybody else in the home saw what happened? Or believes that it happened or anything like that? What do, what do the other --?

A:     Well she had the girls believing everything. Okay.

Q:     Well do you know if anybody saw what happened?

x 12

DEFENDANT:
INTERVIEWEE(s):                          WHITESIDES, KYLE                          11
INTERVIEW DATE:                          LEONARD, ROSEMARIE
                                         05/20/09
                                                           CD NO: E-418-10

A:    Not to my knowledge.  I have no idea.

Q:    Okay.

A:    Okay.  She has the girls believing and like I talked with Dana.  I don't know if you met --

Q:    I met Dana, yeah.

A:    I told Dana I think it's all a fabricated lie.

Q:    Uh huh.

A:    Bullshit just to get information, not information but attention to herself.

Q:    Uh huh.

A:    Um, she's a drama mama.

Q:    Uh huh.

A:    She just tries to make a scene or if it's not um, her attention she has to make it that way.  And
      so --

Q:    So --

A:    -- when I talked to Dana later on she's told me, "You know, you're right."

Q:    Well why, so let me ask you then.  Why do you think she would make an allegation that Kyle
      sexually assaulted her?

A:    For attention.  I don't, I just...

Q:    She would go that far?

A:    I believe, yes I do, one hundred percent.

Q:    But she didn't report it.  Somebody else reported it.

A:    See she...  Okay, in my case if that would have been me --

x 13

DEFENDANT:
INTERVIEWEE(s):          WHITESIDES, KYLE                    12
INTERVIEW DATE:          LEONARD, ROSEMARIE
                         05/20/09              CD NO: E-418-10

Q:     Uh huh.

A:     -- I would have reported it that night.

Q:     Uh huh.

A:     Or that morning. Not wait consecutive days after.

Q:     But she, she didn't report it.

A:     She, I know who reported it. Tele care.

Q:     Tele care reported it.

A:     Yeah, her, her case manager.

Q:     Okay. But it was much. if she wanted attention why, why wouldn't she report it then?

A:     That's what I'm trying to say --

Q:     Uh huh.

A:     -- you know. I think its all bullshit, to be honest with you okay. And if you need me to come

       down and witness stand and say that I will say that.

Q:     Okay. Um, is, how do you think I can prove or disprove the allegation?

A:     [pause] Like I said if it happened that night --

Q:     Uh huh.

A:     -- I would have called the cops (?). Oh my God, I need a (?) I'm really bummed. I'm pissed

       off at her. She's been giving me harassing phone calls; I'm tired of her shit.

Q:     You guys didn't get along to well?

A:     We were good friends until this happened or supposedly happened.

Q:     Okay. Um --

r14

DEFENDANT:
INTERVIEWEE(s):                    WHITESIDES, KYLE
INTERVIEW DATE:                    LEONARD, ROSEMARIE                    13
                                   05/20/09
                                                    CD NO: E-418-10

A:     We were buddies.

Q:     -- did you, did you invite Kyle over with the intention of having --

A:     No.

Q:     -- having him --

A:     No.

Q:     -- hook up with --

A:     She said that too.  No.

Q:     Okay.

A:     Definitely, positively no.

Q:     Okay, alright so um, did you guys have problems before this incident happened?

A:     No, we were, were good buddies.

Q:     Okay.

A:     We even gave things to each other you know.

Q:     How long did you guys share a room together?  For the whole time or was it...?

A:     Uh, I don't know, I don't remember when she moved in.

Q:     But since she moved in and you guys shared a room together?

A:     Yeah.

Q:     Okay, so I know when she moved in then.  I can't remember right now but I have it written down somewhere.

A:     Okay.

Q:     Okay is there anything else that you feel is important for me to know about?

x 15

DEFENDANT:
INTERVIEWEE(s):                      WHITESIDES, KYLE                         14
INTERVIEW DATE:                      LEONARD, ROSEMARIE
                                     05/20/09
                                                              CD NO: E-418-10

A:    No.

Q:    Okay.  Alright.  This will conclude the inter –

[recording ends]

CD NO. E-418-10, ENDS AT 10:00 HR/MIN

TRANSCRIBED BY PSR ON 05/21/10

x 16

HABEAS EX: 6A

6A — Anaheim Police Dept. "Narrative" by Officer Candyce
         McMorris, #720                (2 pg)
                                        (x1 - x2)

· Shows Failure to Present Evidence
· Failure To Call Witness
· Failure To Impeach Witness

# EXHIBIT ___6A___

(2 pgs.)

6A

x1

## ANAHEIM POLICE DEPARTMENT
## GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

Related text page(s)

Document: NARRATIVE
   Author: A1864 - MC MORRIS,CANDYCE #720 (Res
   Subject: INITIAL NARRATIVE
Related date/time: Mar-03-2009 2125

On Tuesday March 3, 2009 at 1436 hours Officer Christy and I responded
to 2569 W. Woodland Ave. to investigate a rape.

Upon our arrival I contacted V-Doe who stated the following: V-Doe said she
was in her bedroom at with her roommate "Rose" (W-Leonard) and they were
drinking. V-Doe said she had two glasses of wine. V-Doe said she believes
W-Leonard invited "Kyle" (Suspect-A) over to the house. V-Doe said
W-Leonard began laying blankets out on the floor for Suspect-A to sleep on.

V-Doe said she was sitting on the edge of her bed and Suspect-A put his
foot in between her legs and began toughing her inappropriately. V-Doe
said she felt uncomfortable and decided to leave her bedroom. V-Doe said
she went into the bathroom and did not lock the door. V-Doe stated she was
"dry heaving" over the toilet and Suspect-A entered the bathroom and he
offered to help her stand up.

V-Doe said she stood up and she lost her balance and Suspect-A pushed her
waist area up against the sink counter and he held her head down in the
sink. V-Doe said Suspect-A held her head down with one hand as he reach
around her waist and untied the drawstring of her pants. V-Doe said she
realized Suspect-A pulled down her pants because she could feel the air on
her naked buttocks.

V-Doe said Suspect-A first penetrated her anally with his penis. V-Doe
said Suspect-A was wearing a condom and she felt something cold which she
believed was lubricant. V-Doe said she was screaming, "It hurts!", and,
"Stop!" but Suspect-A did not stop. V-Doe stated "He (Suspect-A) pulled
out and did it vaginally."

V-Doe said Suspect-A told her to get up, and he walked out of the bathroom.
V-Doe said she was crying and locked the bathroom door after Suspect-A
walked out. V-Doe said "Lorenzo" (W-Gutierrez) knocked on the bathroom
door and she told him, "Kyle attacked me." V-Doe said she asked
W-Gutierrez for the telephone so she could talk to her daughter (Jacquelyn
McCollouch).

V-Doe said she went into her bedroom where Suspect-A was sleeping on the
floor. V-Doe said she woke up the next morning and Suspect-A was gone.
V-Doe said she told W-Leonard about the incident and she said W-Leonard was
"Outraged."

I asked V-Doe when the incident had occurred and she said it occurred on
February 13, 2009 at approximately 2100 hours. I asked V-Doe to give a
description of Suspect-A and he was described as a white, 35 to 40 years
old, 6'2 to 6'3 and he weighed approximately 210 pounds. He has light
brown hair and is balding. I asked V-Doe how long the anal penetration
continued and she said approximately ten seconds. I asked V-Doe how long
Suspect-A vaginally penetrated her and she said approximately one minute.
V-Doe stated she was bleeding from her anus for approximately three days
after the incident. V-Doe said she is going to see a doctor because she is
having continuous problems. V-Doe said she will submit a copy of her
medical records to the Police Department to add to the report if the
bleeding is a result of this incident. I asked V-Doe why she did not
report the incident immediately. V-Doe said she was afraid she would get

x2

ANAHEIM POLICE DEPARTMEN
GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

kicked out of her house because she was drinking and broke the rules.
V-Doe said she desires criminal prosecution against Suspect-A.

V-Doe said she believes W-Leonard "Set up" the incident. V-Doe said she
and W-Leonard were arguing approximately two weeks ago and during the
argument W-Leonard stated, "I set it up."

On a follow up investigation Officer Christy and I responded to 1310 W.
Diamond Ave. #305 to interview W-Leonard. W-Leonard said she and Suspect-A
went to sleep at the same time on the night of the incident. W-Leonard
said V-Doe told her about the incident but she did not witness the
incident. W-Leonard said she spoke with Suspect-A the day after the
incident occurred and she questioned him about the incident. W-Leonard
said Suspect-A denied the incident occurred. I asked W-Leonard if she knew
Suspect-A's whereabouts last night and she said, "No." I asked W-Leonard
if she knew where Suspect-A lived and she said he is a transient in Santa
Ana. W-Leonard said Suspect-A works in Santa Ana as a janitor. W-Leonard
could not give any further details about Suspect-A or the incident.

On a second follow up investigation Officer Christy and I responded to 2019
W. Victoria Ave. to interview W-Gutierrez. I spoke to W-Gutierrez who
stated the following: W-Gutierrez said he was not home when the incident
occurred. W-Gutierrez said he returned home he heard V-Doe crying in the
bathroom. W-Gutierrez said V-Doe told him Suspect-A molested and raped
her. W-Gutierrez said he confronted Suspect-A about the incident.
W-Gutierrez said, "He could sense that Suspect-A did not rape her (V-Doe)."
W-Gutierrez said, "I could sense his (Suspect-A) guilt." W-Gutierrez
could not give further details about Suspect-A or the incident.

1

HABEAS EX: 7A-D

7A  — Arcata Police Dept. Crime Report (1996)    (28 pg.)
    • BRADY / Failure To Impeach    ( x1 - x28 )

7B  — Preliminary Information From Trial Counsel As To Appeal
    • Shows Existance of Exculpatory Discovery    (1 pg.)
                                                  ( x 29 )

7C  — Handwritten Note From Defense Counsel Nisson    (1 pg.)
        "402"                                          ( x 30 )
    • Shows Existance of Exculpatory Discovery

7 D  — Orange County District Attorney Letter
        dated: August 30, 2022                    ( 2 pgs )
      Pending Oral Arguments                     ( x31 - x32 )

      - 911 calls

      - Lesniak Interview
      - Charles McCollaugh Interview
      - Misdemeanors / Felonies
      - Humboldt Tapes

# EXHIBIT  7A-D    (32 pgs)

7A

ARCATA POLICE DEPARTMENT  CA 0120100
CRIME REPORT  (96020096)                    DR 960379

CODE SEC:      261(A)(2) PC   RAPE BY FORCE/FEAR/ETC
                                                              V-1
DATE/TIME REPORTED:   Sat.  02/03/96 08:48 hrs.

DATE/TIME OCCURRED:   Sun.  01/28/96 19:30 hrs.
LOCATION OF OCCURENCE: 14TH ST SIDE REDWOOD PARK
                                                    BLOCK AREA:  15
VICTIM-1:       HIGGASON, KELLEY DEANNE    WF19  (05/08/76) 826-2385
ADDRESS:        1120 F St, #C, Arcata, CA  95521

WITNESS-1:      DALE, AMY JENNIFER         WF
ADDRESS:        57 F ST, Arcata, CA  95521            826-9272

SUSPECT-1:      WHITESIDES, KYLE JASON     WM23  (04/20/72) 677-0851
ADDRESS:        1302 PATRICKS POINT DR, #2, Trinidad, CA  95570
DL NO./STATE:   A3369984/CA
RACE: White                                           BK NO.:  16837
                SEX: M HT: 604    WT: 180    HAIR: BRO  EYES: HAZ
DETAILS OF INVESTIGATION:


KELLEY DEANNE HIGGASON (V) OF RAPE IN REDWOOD PARK.  KYLE JASON WHITESIDES
(SUSP) ARRESTED, BOOKED AND LODGED IN COUNTY JAIL.

CASE CLEARED.


CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE
CONTROLLED BY LAW
Released to Orange Co. DA
By  BB          Date 2/18/10
Arcata Police Department


CLEARED BY ARREST

REPORTED: 02/03/96 by OFFICER T. CHAPMAN
RECORDED: 02/03/96 by DISPATCHER J. PARRISH      102        INCIDENT: 96020096
REVIEWED: 02/12/96 by OFFICER C. PARKS                      SUPPLEMENT:    0
Follow up? Yes/ / No/ /  Copies to: Inv/ / DAO/ / Juv/ /

ARCATA POLICE DEPARTMENT   CA 0120100
ARREST REPORT   (96020096)                    BK  16837

ARRESTED:  Thursday  02/08/96 23:30 hrs.
LOCATION:  1302 PATRICKS POINT DR, #2                    DR NUMBER:  960379

NAME:              WHITESIDES, KYLE JASON        WM23  (04/20/72) 677-0851
ADDRESS:           1302 PATRICKS POINT DR, #2, Trinidad, CA  95570
DL NO./STATE:      A3369984/CA
RACE: White                SEX: M HT: 604    WT: 180    BK NO.:  16837
                                                       HAIR: BRO  EYES: HAZ

OFFENSES:
1. 261(A)(2) PC              RAPE BY FORCE/FEAR/ETC                    BAIL
                                                                      0.00
VICTIM-1:          HIGGASON, KELLEY DEANNE       WF19  (05/08/76) 826-2385
ADDRESS:           1120 F ST, #C, Arcata, CA  95521

WITNESS-1:         DALE, AMY JENNIFER            WF
ADDRESS:           57 F ST, Arcata, CA  95521                    826-9272

REPORT OF FACTS OBTAINED:


KELLEY DEANNE HIGGASON (V) OF RAPE IN REDWOOD PARK.  KYLE JASON WHITESIDES
(SUSP) ARRESTED, BOOKED AND LODGED IN COUNTY JAIL.

CASE CLEARED.

CONFIDENTIAL

LODGED/HUMBOLDT COUNTY JAIL

ARRESTED BY: OFFICER T. CHAPMAN      103    REPORTED: OFFICER T. CHAPMAN
TRNSPRTD BY: Same                           REVIEWED: OFFICER C. PARKS
Follow up? Yes/ / No/ /   Copies to: Inv/ / RECORDED: DISPATCHER J. PARRISH
                                    DAO/ / JuvHall/ / SO/ / Other/ /



**ARCATA POLICE DEPARTMENT**
736 F Street
Arcata, CA 95521
(707) 822-2428

| PAGE | 2 CASE NUMBER |
|---|---|
| 1 | 02 96-0379 |

☐ ADULT ARREST   ☐ JUVENILE ARREST   ☐ DOMESTIC VIOLENCE

**OCCURRENCE**

| 3 CODE SECTION | TITLE | 5 CLASSIFICATION | FELONY · MISDEMEANOR INCIDENT | 7 REPORT AREA |
|---|---|---|---|---|
| 261(a)(2) PC | RAPE | FORCE/FEAR | ✗ FELONY | 15 |

| 8 DATE & TIME OCCURRED — DAY | 9 DATE & TIME REPORTED | 10 LOCATION OF OCCURRENCE |
|---|---|---|
| 1/28/96  1930 Sun | 2/2/96  1400 | Redwood Park, Arcata |

**VICTIM**

| 11 VICTIM NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 12 | 13 RESIDENCE PHONE |
|---|---|---|---|---|---|---|
| Higgason, Kelley Deanne | | | | | 120 F St Apt C  Arcata | 826-2385 |

| 14 OCCUPATION | 15 RACE | 16 SEX | 17 AGE | 18 DATE OF BIRTH | 19 BUSINESS / OTHER ADDRESS | 20 OTHER PHONE |
|---|---|---|---|---|---|---|
| | W | F | 19 | 5/8/76 | | |

| 21 VICTIM VEHICLE COLOR | 22 YEAR | 23 MAKE | | 24 MODEL | 25 BODY STYLE | 26 LICENSE NO | 27 STATE |
|---|---|---|---|---|---|---|---|

| COMPLETE IF PERSONAL INJURY OR RAPE | 28 WHERE HOSPITALIZED | 29 DATE / TIME | 30 DOCTOR | 31 NATURE OF INJURY | 32 MEDICAL RELEASE |
|---|---|---|---|---|---|
| | North County Clinic | 1/30/96 | DeOto | RAPE | ☐ YES ☒ NO |

CODES:   V = VICTIM   W = WITNESS   R = REPORTING PERSON

☐ ADDITIONAL PERSONS INVOLVED

**OTHERS INVOLVED**

| 33 CODE | 34 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | 35 RESIDENCE ADDRESS | 36 RESIDENCE PHONE |
|---|---|---|---|---|---|---|
| 37 OCCUPATION | 38 RACE | 39 SEX | 40 AGE | 41 DATE OF BIRTH | 42 BUSINESS / OTHER ADDRESS | 43 OTHER PHONE |
| 44 CODE | 45 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | 46 RESIDENCE ADDRESS | 47 RESIDENCE PHONE |
| 48 OCCUPATION | 49 RACE | 50 SEX | 51 AGE | 52 DATE OF BIRTH | 53 BUSINESS / OTHER ADDRESS | 54 OTHER PHONE |
| 55 CODE | 56 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | 57 RESIDENCE ADDRESS | 58 RESIDENCE PHONE |
| 59 OCCUPATION | 60 RACE | 61 SEX | 62 AGE | 63 DATE OF BIRTH | 64 BUSINESS / OTHER ADDRESS | 65 OTHER PHONE |

☐ ADDITIONAL SUSPECTS

**SUSPECTS**

| 66 SUSPECT # 1 (LAST, FIRST, MIDDLE) | 67 AKA | 68 RACE | 69 SEX | 70 AGE | 71 DATE OF BIRTH | 72 HT. | 73 WT. | 74 HAIR | 75 EYES |
|---|---|---|---|---|---|---|---|---|---|
| Whitesides, Kyle Jason | | W | M | 23 | 4/20/72 | 6'4 | 180 | Bro | BLU |

| 76 SUSPECT'S ADDRESS | 77 PHONE | 78 PLACE OF BIRTH | 79 CITE # | 80 ARREST # | 81 MIRANDA |
|---|---|---|---|---|---|
| 1302 Patricks Point Dr #2, Trinidad | 677-0851 | | | | ☐ YES  b-NO  WAIVE MIRANDA  c-YES  d-NO |

| 82 BUSINESS / OTHER ADDRESS | 83 DRIVER'S LICENSE | STATE | 84 SAME AS # |
|---|---|---|---|
| Butter Valley Inc. Arcata 822030 | A3369984 | CA | |

| 85 SUSPECT # 2 (LAST, FIRST, MIDDLE) | 86 AKA | 87 RACE | 88 SEX | 89 AGE | 90 DATE OF BIRTH | 91 HT. | 92 WT. | 93 HAIR | 94 EYES |
|---|---|---|---|---|---|---|---|---|---|

| 95 SUSPECT'S ADDRESS | 96 PHONE | 97 PLACE OF BIRTH | 98 CITE # | 99 ARREST # | 100 MIRANDA |
|---|---|---|---|---|---|
| | | | | | a-YES  b-NO  WAIVE MIRANDA  c-YES  d-NO |

| 101 BUSINESS / OTHER ADDRESS | 102 DRIVER'S LICENSE | STATE | 103 SAME AS # |
|---|---|---|---|

104 FURTHER SUSPECT DESCRIPTION (I.E., GLASSES, TATTOOS, TEETH, BIRTHMARKS, JEWELRY, SCARS, MANNERISMS, WEAPONS ETC.)

(S) WORKS 2300 HRS to 0700 HRS @ Butter Valley Incorp.

| 105 SUSPECT VEHICLE COLOR | 106 YEAR | 107 MAKE | 108 MODEL | 109 BODY STYLE | 110 LICENSE NO | 111 STATE |
|---|---|---|---|---|---|---|

| 112 ADDITIONAL VEHICLE IDENTIFIERS (DAMAGE, CHROME WHEELS, VINYL, ETC.) | 113 TOWED TO | 114 HOLD YES  NO | 115 HOLD FOR WHOM |
|---|---|---|---|

**SUMMARY**

116 LOG ENTRY / SUMMARY (THREE OR FOUR SENTENCES BRIEFLY OUTLINING WHAT OCCURRED AND ESTABLISHING THE ELEMENTS)

*CONFIDENTIAL*

(S) had sexual intercourse w/ (V) against (V)'s will.

✗ VICTIM REQUESTS CONFIDENTIALITY per 293 PC ✗

**ADMIN.**

| 119 OFFICER(S) REPORTING | I.D. NUMBER | DATE OF REPORT | 120 SUPERVISOR REVIEW | | DATE | 121 OTHER RELATED REPORTS |
|---|---|---|---|---|---|---|
| T. Chapman | 389 | 2/3/96 | 54 | 2864 | | |

122 COPIES TO:   ☐ CII   ☐ INVEST   ☐ PATROL   ☐ DISTRICT ATTORNEY   ☐ PROBATION   ☐ C.P.S   ☐ OTHER

X 3

104

ARCATA POLICE DEPARTMENT
735 F Street • Arcata, CA 95521 • (707) 822-2428

| 201 PAGE | 2 |
| 202 CASE NUMBER | 02 96-0379 |

**M.O. / CRIME ANALYSIS**

| 203 TYPE OF STRUCTURE | 204 DESCRIPTION OF AREA | 205 POINT OF ENTRY | 206 METHOD OF ENTRY | 208 SECURITY USED | 210 INJURY |
|---|---|---|---|---|---|
| ☐ 1-Single Family Dwelling | ☐ 1-Residential | ☐ N/A | ☐ A | ☒ N/A | (Crimes Against Persons Only) |
| ☐ 2-Other Residential | ☐ 2-Business | ☐ 1-Front ☐ 2-Rear | ☐ 1-Forced | ☐ 1-None | ☐ 1-Used Force |
| ☐ 3-Storage | ☐ 3-Industrial | ☐ 3-Side ☐ 6-Gr. Level | ☐ 2-No Force | ☐ 2-Neighborhood Watch | ☐ 2-No Force |
| ☐ 4-Industrial Mfg. | ☐ 4-School | ☐ 5-Upper Level | ☐ 3-Attempted Force | ☐ 3-Operation I.D. | ☐ 3-Fatal |
| ☐ 5-Other Commercial | ☐ 5-Institutional | ☐ 6-Unknown | | ☐ 4-Window Decals | ☐ 4-Major |
| ☐ 6-Community / Public | ☐ 6-Parking Lot | ☐ 7-Door | 207 METHOD USED AGAINST PROPERTY | ☐ 5-Peephole / Viewer | ☒ 5-Minor |
| ☐ 7-All Other Structures | ☐ 7-Recreational | ☐ 8-Window | ☐ 1-Key Slip | ☐ 6-Audible Alarm | ☐ 6-None |
| ☐ 8-Motor Vehicles | ☐ 8-Rural | ☐ 9-Sliding Glass | ☐ 2-Bodily Force | ☐ 7-Silent Alarm | ☐ 7-Other _____ |
| ☐ 9-Other Mobile Property | ☐ 9-Secluded | ☐ 10-Duct / Vent | ☐ 3-Saw / Drill / Burn | ☐ 8-Other _____ | |
| ☐ 10-Other | ☐ 10-Other | ☐ 11-Adjacent Building | ☐ 4-Channel Locks | | |
| | | ☐ 12-Roof / Floor / Skylight | ☐ 5-Pipe Wrench | | |
| | | ☐ 13-Wall | ☐ 6-Tire Iron | 209 TYPE OF LOCK | 211 WEAPON |
| | | ☐ 14-Garage | ☐ 7-Brick / Rock | ☒ N/A | ☐ 1-Handgun |
| | | ☐ 15-Basement | ☐ 8-Pry Tool | ☐ 1-None | ☐ 2-Knife |
| | | ☐ 16-Trunk / Hood | ☐ 9-Bolt Cutters / Pliers | ☐ 2-Dead Bolt | ☒ 3-Hands / Feet |
| | | ☐ 17-Wing Window | ☐ 10-Punch | ☐ 3-Window Lock | ☐ 4-Shotgun |
| | | ☐ 18-Window Molding | ☐ 11-Smashing Tool | ☐ 4-Padlock | ☐ 5-Rifle |
| | | ☐ 19-Other | ☐ 12-Wire / Coat Hanger | ☐ 5-Inadequate Lock | ☐ 6-Other _____ |
| | | | ☐ 13-Screwdriver | ☐ 6-Other _____ | |
| | | | ☐ 14-Unknown | | |
| | | | ☐ 15-Other | | |

| 212 INVESTIGATIVE ACTIVITIES | | 213 EVIDENCE OBTAINED | | |
|---|---|---|---|---|
| ☐ 1-Dusted for Latents | ☐ 6-Scene Diagramed | ☒ 1-Statements | ☐ N/A | ☐ 5-Other Prints | ☐ 10-Clothing |
| ☐ 2-Tool Marks Photographed | ☐ 7-Neighborhood Checked | ☐ 12-Dest. Notified (Who____ | ☐ None | ☐ 6-Vehicle Impounded | ☐ 11-Other |
| ☐ 3-Vehicle / Shoe Tracks Phot. | ☐ 8-Area Checked | ☐ 13-Local Teletype / Radio Bdc. | ☐ 2-Diagrams | ☐ 7-Weapons / Tools | |
| ☐ 4-Scene Photographed | ☐ 9-Witness(es) Contacted | ☐ 11-I.D. Notified (Who____ | ☐ 3-Photos | ☐ 8-Stains | |
| ☐ 5-Victim Photographed | ☒ 0-Victim(s) Contacted | ☐ 15-Other | ☐ 4-Fingerprints | ☐ 9-Blood / Semen | |

**NARRATIVE**

On 2/2/96, I was the on-call sexual assault investigator. At about 1400 hrs, I received a page from Sgt Zanotti at the Arcata Police Department. I called Sgt Zanotti. He stated that a female came to the Police Department and reported being raped on 1/28/96. Sgt Zanotti provided me with the victim's home phone number.

At about 1435 hrs, I called the victim. I arranged to interview the victim on 2/3/96, at 0900 hrs. At the victim's request, I called North Coast Rape Crisis. I arranged for Rape Crisis to contact the victim.

On 2/3/96, at about 0900 hrs, I met with and interviewed the victim. Present during the interview was a representative from Rape Crisis. I advised the victim of confidentiality per 293 PC. The victim requested confidentiality. The following is a summary of the victim's statement.

On 1/28/96, during the afternoon, she was watching the Super Bowl at a tavern in Arcata. She met up with several friends at the tavern. She stated that a subject by the name of Kyle Whitesides was also at the tavern.

The victim stated that she knows Whitesides from previous contacts. She has known him for the past six months. She would consider herself a friend of Whitesides. Their relationship has strictly been friends.

CONFIDENTIAL

**ADMIN.**

| 214 OFFICER(S) REPORTING | I.D. NUMBER | DATE OF REPORT | 215 SUPERVISOR REVIEW | DATE |
|---|---|---|---|---|
| _____ | 389 | 2/3/96 | | |

216 COPIES TO: ☐ CII ☐ INVEST ☐ PATROL ☐ DISTRICT ATTORNEY ☐ PROBATION ☐ C.P.S. ☐ OTHER _____

# ARCATA POLICE DEPARTMENT

| Suspect's Name | | PAGE NO. 3 |
|---|---|---|
| Whitesides, K. | Offense  261 PC | |

The victim stated that at the conclusion of the Super Bowl, she offered to give Whitesides a ride home. He agreed and got into her car, with his dog. Whitesides asked the victim if she wanted to go to the beach or the park. The victim told Whitesides that she did not want to go to the beach, however they could go to the park.

The victim drove Whitesides to the 11th Street side of Redwood Park. They parked and got out of the car. They started to walk through the park. The victim stated that they stopped walking near a picnic table.

Almost immediately, Whitesides started to kiss the victim. The victim stated that they kissed mutually for about one minute. Whitesides started to lift up the victim's skirt and shirt. The victim stated that she felt uncomfortable, and decided that she did not want to kiss Whitesides. She told Whitesides "no" and that she wanted to go back to the car.

Whitesides agreed and they walked back to the car. The victim stated that she got in the front driver's side and Whitesides got into the front passenger's side. Whitesides left his dog outside.

Once inside the car, Whitesides started to kiss the victim and tried to pull up her skirt. The victim told Whitesides that she did not want to do this. However, Whitesides physically pulled the victim over to the passenger's seat. Once there, the victim was pinned by the weight of Whitesides' body on top of her (the victim was on the seat with her back to the seat and the suspect on top of her). Whitesides proceeded to take off the victim's shirt and bra. The victim stated that she told Whitesides "no". The victim stated that she was in "disbelief" about what was happening. However, she did tell Whitesides that she did not want to do this.

The victim stated that Whitesides pulled her skirt up and took off her underpants. She stated that Whitesides pulled down his pants. The victim stated that she told Whitesides "no, stop".

At this point, Whitesides physically moved the victim from the passenger's seat pushing her between the two bucket seats. The victim was on her stomach, with half of her body in the back and half in the front compartment.

CONFIDENTIAL

| Reporting Officer  Chapman | Date and Time | Reviewed | Copies To: | Dr. No. 0296-0379 |
|---|---|---|---|---|

106

5

# ARCATA POLICE DEPARTMENT

| Suspect's Name | | Offense | PAGE NO. 4 |
|---|---|---|---|
| Whitesides K | | 261 PC | |

The victim stated that from behind, Whitesides inserted his penis inside of her vagina. She stated that she was telling Whitesides "no, please stop". She stated that at one point she asked him "why are you doing this"? She said that Whitesides said "I'm going to fuck you. You are going to get fucked. I'm sorry but I'm still going to fuck you".

The victim stated that Whitesides raped her for several minutes. She said that Whitesides is tall, and that there was not very much room in her car. She said that after about five minutes he removed his penis from her vagina and got out of the car.

The victim stated that she sat back in the driver's seat and got dressed. The victim stated that Whitesides walked around to the driver's door and opened it. She stated that Whitesides took her out of the car and walked her to the rear of the car.

Once at the rear of the car, Whitesides tried to take off the victim's shirt. The victim said that she begged Whitesides to let her keep her shirt on. Whitesides proceeded to pull the victim's skirt up, and take off her underpants. Whitesides then physically turned the victim around. He pinned her against the car (the victim was facing the trunk of her car, with the suspect behind her). Whitesides held the victim's arms behind her back. He was holding both of her wrists. Whitesides then inserted his penis inside of her vagina.

The victim stated that she was begging Whitesides to stop. She was telling him "no" and struggling to get free. However, Whitesides continued to rape her.

The victim stated that Whitesides told her that "I've wanted you for a long time. I'm going to fuck you. You are going to get fucked". The victim stated that at one point she was able to get free and she spun around. She stated that Whitesides grabbed her, spun her back around, and pinned her against the car. Whitesides then pinned her arms behind her back, and pushed her head onto the trunk of the car. He then put his penis inside of her vagina again, and proceeded to rape her.

The victim stated that Whitesides apologized several times during the assault. He said "I'm sorry", the victim said "you're not sorry", then Whitesides said "you're right I'm not".

CONFIDENTIAL

| Reporting Officer | Date and Time | Reviewed | Copies To: | Dr. No. |
|---|---|---|---|---|
| | | | | 0296-0379 |

107

## ARCATA POLICE DEPARTMENT

| Suspect's Name | Offense | PAGE NO. |
|---|---|---|
| Whitesides, K | 261 PC | 5 |

The victim stated that finally she was just exhausted. She felt like she could no longer fight Whitesides. She stated that she stopped struggling against him. A few minutes later, Whitesides withdrew his penis and got dressed.

The victim stated that she got her clothes on and got in her car. She stated that she drove Whitesides downtown. While they were driving, Whitesides continued to try to lift her skirt and kiss her on her neck. The victim stated that she was pulling away from Whitesides and telling him no.

She said that Whitesides would not tell her where he lived. The victim stated that eventually she just stopped on F St, in Arcata and told him to walk home. She stated that Whitesides would not get out of the car. She said that he asked her if he could stay the night at her house. She told Whitesides no.

The victim stated that eventually Whitesides got out of the car and she drove home.

The victim stated that she did not report the assault earlier because she was afraid and embarrassed about what had occurred.

I provided the victim with a sexual assault referral card.

This investigation will be forwarded to SART Invesitgator Parks for follow-up.

**PENDING**

CONFIDENTIAL

| Reporting Officer | Date and Time | Reviewed | Copies To: | Dr. No. |
|---|---|---|---|---|
| T. Chapman | | | | 02 96-0379 |

**ARCATA POLICE DEPARTMENT**
736 F Street • Arcata, CA 95521 • (707) 822-2428  ⊕ARRESTED  ⊙DOMESTIC VIOLENCE

| | | 301 PAGE | | 302 CASE NUMBER |
|---|---|---|---|---|
| | | 1 | 02 | 96-0379 |

| MISDEMEANOR ☒SUPPLEMENTAL ☐CONTINUATION ☐INCIDENT | 303 DATE TIME REPORT 2/8/96 | 304 INCIDENT CRIME CLASSIFICATION PC 261 - Rape | | 305 AREA |
|---|---|---|---|---|
| | 306 DATE TIME OCCURRED 1/28/96 | 307 LOCATION Redwood Park Arcata | | 15 |

| 308 CODE | 309 NAME V   Higgason Kelley Deanne | 310 ADDRESS "PI" | | | | | | | 311 PHONE |
|---|---|---|---|---|---|---|---|---|---|
| 312 SAME AS | 313 RACE | 314 SEX | 315 AGE | 316 DATE OF BIRTH | 317 HT | 318 WT | 319 EYES | 320 HAIR | 321 OTHER |

| 322 CODE | 323 NAME S   Whitesides Kyle Jason | 324 ADDRESS "PI" | | | | | | | 325 PHONE |
|---|---|---|---|---|---|---|---|---|---|
| 326 SAME AS | 327 RACE | 328 SEX | 329 AGE | 330 DATE OF BIRTH | 331 HT | 332 WT | 333 EYES | 334 HAIR | 335 OTHER |

On 02-04-96 Ofc Chapman requested that I arrange for Kelley Higgason to make a pretext telephone call to Kyle Whitesides. I read Ofc Chapman's report and contacted Higgason. Higgason agreed to come to APD on 02-04-96 at approx 2330 hrs. Higgason telephoned Whitesides at his place of employment, Butler Valley Incorporated. I was present during the telephone call and the conversation was recorded.

During the conversation it appeared that Whitesides was very hesitant to talk. Higgason asked Whitesides if there was somebody there making it uncomfortable for him to talk. Whitesides said that his girlfriend, Amy, was there. Higgason told Whitesides that she needed to know why what happened did happen. Whitesides said that he thought it was OK for a while. Higgason asked Whitesides how he could think it was OK and then asked how many times she told him no. Whitesides said "We kept stopping, I can't, I know". Higgason then asked Whitesides if he realized that he raped her. Whitesides answered, "No". Higgason said, "What do you mean no". Whitesides replied, "Not until you just told me no I didn't". Higgason said, "What, now you do?". Whitesides said "That's what you're telling me". Higgason asked "What do you think it was, as I was saying no, as my arms were held behind my back, what do you think it was". Whitesides replied, "OK".

At one point in the conversation, Whitesides told Higgason that he was sorry. Whitesides said that he did not know what to say to make it justifiable. Higgason said that there was nothing he could say. Whitesides replied, "I know".

Whitesides said that he would take it all back if he could and that he did not want to hurt her. Higgason said "But you did hurt me". Whitesides said, "I know". Whitesides also said that what he did was "wrong".

Higgason agreed to call Whitesides back on 02-05-95 at approx 2300 hrs.

CONFIDENTIAL

| 336 OFFICER(S) REPORTING C. Parks | I.D. NUMBER 334 | DATE OF REPORT 2-8-96 | 337 SUPERVISOR REVIEW | DATE |
|---|---|---|---|---|
| 338 COPIES TO ☐CII ☐INVEST ☐PATROL ⊗DISTRICT ATTORNEY ☐PROBATION ☐C.P.S. ☐OTHER | | | | |

ARCATA POLICE DEPARTMENT

| Suspect's Name | | PAGE NO. 2 |
|---|---|---|
| Whitesides Kyle Jason | Offense P.C. 261 | |

On 02-05-95 at approx 2330 hrs Higgason came to APD.
Amy Dale came to APD with Higgason. Amy Dale waited in the
front lobby of APD while Higgason again made a pretext
telephone call to Kyle Whitesides. This telephone call was
recorded and I was present during the call.

During this conversation Whitesides talked with a very
low voice. Higgason asked Whitesides if he realized what he
did was wrong. Whitesides said, "I thought it was all right
for a while". Higgason then asked Whitesides, "After a while
what did you think?". Whitesides asked, "What do you want me
to say to you?". Higgason again asked why it happened.
Whitesides said, "I did not mean to hurt you, Kelley".
Whitesides also said that he was sorry. Whitesides said that
he told Amy what he did. Higgason asked Whitesides, "You told
her that you raped me or whatever?". Whitesides answered,
"Yeah, the truth".

Higgason asked Whitesides why he just didn't stop when
she said no. Whitesides said, "I wanted to but you just
didn't want to". Higgason asked, "What?". Whitesides replied,
"I can't tell you anything that is going to sound right".

Higgason told Whitesides that she had talked to somebody
about what happened and they told her that she has to report
it to the police. Whitesides asked Higgason if she wanted him
to go to the police. Higgason asked Whitesides if he was
serious. Whitesides asked Higgason, "What do you want me to
tell them?". Higgason asked what to you mean? Whitesides
said, "Tell them what happened". Higgason said, "Yeah".
Whitesides asked, "Is that what you want me to do?". Higgason
said, "Of course that is what I would want you to do".
Whitesides said "I will". Higgason said, "Then go ahead".
Whitesides asked,"What do think they are going to say".
Higgason asked, "What are you going to say". Whitesides said,
"I'm going to tell them what happened". Whitesides asked,
"So, I should go tell them that we left the bar together, and
that we were doing stuff and then you didn't want to have sex
but I did right, and I just pretty much forced myself on
you". Higgason said, "That's what happened, isn't it?".
Whitesides said, "And none of the other stuff is relevant".
Higgason asked, "What other stuff?". Whitesides interrupted
and said, "And nothing else happened, I just straight grabbed
you and threw my dick in you".

Higgason told Whitesides to do whatever he wanted to do.
Whitesides said that he will do whatever makes her happy.
Whitesides said, "If you want me to go jail then I'll go to

CONFIDENTIAL

| Reporting Officer C. PEAKS | Date and Time 2/8/96 | Reviewed | Copies To: D.A. | Dr. No. 02 96-0379 |

110

ARCATA POLICE DEPARTMENT

Suspect's Name: Whitesides, Kyle JASON

Offense: P.C. 261

PAGE NO. 3

jail, I don't care". Whitesides said that, "I'll do it tomorrow". Higgason said, OK. Whitesides said, "I'll do whatever you want me to do, I'm in no position to do anything, I don't really care about myself". Whitesides said, "I'm sorry I hurt you".

I should be noted that the above statement is not all of the conversation between Higgason and Whitesides. A lot of the conversation on Whitesides' part was unable to be heard due to fact that he spoke in a very low voice.

I then asked Higgason how she came in contact with Amy Dale. Higgason said that she came home this afternoon and Amy Dale was at her house. They talked about what had happened and Dale told her that she had also been raped by Whitesides.

I then spoke with Amy Dale separately. Dale has lived with Whitesides in Trinidad for the past few days.

Amy Dale told me that she met Kyle Whitesides because they work together at Butler Valley Inc. About 6 months ago Whitesides started coming over to her house. They then started seeing each other as boyfriend and girlfriend. About five months ago, Whitesides came over to Dale's house at about 5:00am. They were laying on her bed and hugging. Whitesides then took Dale's pajama bottoms off. Dale told Whitesides that she did not want to have sex. Whitesides told Dale "Don't fight, you can't win". Whitesides then grabbed Dale's hands and held them over her head. Dale was laying on her back and Whitesides got on top of her and raped her. Dale told me this was the first time that she had ever had sex with Whitesides. Dale said that since that time she and Whitesides have had sex about 50 to 60 times. Dale said about half of those times, Whitesides forced himself on her.

Amy Dale said that she did not want to pursue any charges against Whitesides for what he had done to her. Dale said that she would do anything she could to see him prosecuted for raping Higgason.

I told Dale that if she changes her mind and decides to pursue charges against Whitesides to contact me at this department.

Dale then told me that she was with Whitesides when Higgason called him last night (02-04-96) at Butler Valley. After Whitesides got off the telephone with Higgason, Dale

CONFIDENTIAL

Reporting Officer: C. Yenks    Date and Time: 2/7/96:    Reviewed:    Copies To: D.A

Dr. No. 02 96-0377

31

(11)

X 10

ARCATA POLICE DEPARTMENT

| Subject's Name | | PAGE NO. 4 |
|---|---|---|
| Whitesides, Kyle JASON | Offense P.C. 261 | |

demanded that he tell her what was going on. Whitesides told
Dale that he had gotten together with Kelley. Whitesides told
Dale, "I did something wrong, I kind of forced it, I think".
Dale asked Whitesides, "Did you force it enough for her to
press charges?". Whitesides answered, "I don't know".

Dale told me that she does not plan on going back to
Whitesides' house, where she had been staying. Dale and
Higgason then left APD.

I discussed this case with Det Johnson on 02-06-96 at
approx 0700 hrs. It was decided that I would contact
Whitesides at Butler Valley Inc on 02-06-96 at approx 2300
hrs. On 02-06-96 Bob Clayton telephoned APD at approx 1430
hrs. Clayton is the Executive Director at Butler Valley Inc.
Clayton advised that he was going to suspend Whitesides from
Butler Valley Inc on 02-06-96 at approx 2300 hrs. Clayton
requested that an officer be present in case of any problems.
Sgt Davie advised Clayton that I would meet with him at 2300
hrs at Butler Valley Inc. On 02-06-96 at approx 2200 hrs I
arrived at APD. I was told that Clayton had contacted APD and
advised that Whitesides was not coming to work tonight.

On 02-07-96 at approx 0720 hrs Ofc Goodale and I went to
Whitesides' residence, 1309 Patricks Point Drive in Trinidad.
I knocked on the door and Kyle Whitesides opened the door. I
identified myself to Whitesides and advised him that I needed
to talk to him regarding a report that Kelley had made.
Whitesides invited me into his residence to talk. Ofc Goodale
waited outside the residence.

I asked Whitesides if he knew why I was there. He said
yeah, he knew. I asked Whitesides to tell me what happened.

Whitesides said that he was at the Pin Room Bar watching
the Super Bowl. Whitesides said a lot of people were at the
bar but only person he knew was JB (James Beck). Kelley said
that she would give him a ride home. About ten minutes after
the game, he and Kelley started walking out to the parking-
lot behind the bar. As they were walking they started kissing
and fooling around. They stood outside Kelley's car and
kissed. Whitesides said that he penetrated Kelley's vagina
with his finger several times while they outside the car.
They then got into the car and started kissing some more.
Whitesides again penetrated Kelley's vagina with his finger.
They then decided to go somewhere else. As they were driving
around, Whitesides penetrated Kelley several more times. They
then parked at Redwood Park and continued to kiss. Kelley

CONFIDENTIAL

| Reporting Officer C. Parks | Date and Time 2/8/96: | Reviewed | Copies To: D. A | 32 |
|---|---|---|---|---|

112

Dr. No. 02 96-0377

X 11

## ARCATA POLICE DEPARTMENT

Suspect's Name: Whitesides, Kyle Jason

Offense: P.C. 261

PAGE NO. 5

then climbed over and got on top of Whitesides. Whitesides moved Kelley's underwear over to the side and penetrated her vagina with his penis. Whitesides said that at this time Kelley said, "No, we can't do this". Whitesides said that Kelley was not saying, "no, no, no, or pushing me away". Whitesides said that there was not enough room in the car so they got out of the car. Whitesides said that he then penetrated Kelley's vagina with his penis from behind while she was against the car. Kelley said again "No" and then Whitesides stopped. I asked Whitesides if he stopped when Kelley said no. Whitesides said that he did not thrust any more than one more time. I asked Whitesides how many times Kelley told him no. Whitesides said that he did not know how many times she said no. Whitesides said that she said no a couple of times and tried to run away but not really. He said that Kelley was feeling guilty because she knew that he had a girlfriend. Whitesides that it wasn't like she was screaming and she did not make him feel like she did not want to do it at all.

I told Whitesides that I had talked with Kelley and that she had told me what had happened. Whitesides said that he did not rape Kelley. He said that Kelley is perceiving it wrong. Whitesides then asked why Kelley did not scream, hit him or run away. I told Whitesides that I did not know why Kelley did not do these things. I asked Whitesides, "She did say no, didn't she". Whitesides answered, "Yeah". Whitesides said that it wasn't like Kelley was really saying "NO, NO, NO!" it was like she was saying it in "passion".

I asked Whitesides to tell me the first time that he remembers Kelley telling him "No". Whitesides said it was when they at the rear of the car. He said that his penis was already inside of Kelley's vagina. I asked Whitesides why he was holding Kelley's hands behind her back. Whitesides said that he was not really holding her hands behind her back. He said that he had a hold of her hands and was pulling on them while he thrusted. Whitesides said that he does the same thing with his girlfriend, Amy. I asked Whitesides if Amy tells him no. Whitesides said that she sometimes tells him no and he stops.

I asked Whitesides if when he penetrated Kelley from behind at the rear of the car, if she turned around on him and told him no. Whitesides said that it wasn't like she didn't want to do it, she was just feeling guilty. Whitesides said, "It was there". I asked what he meant by "It was there". Whitesides it was there, it was happening, it wasn't

CONFIDENTIAL

Reporting Officer: C. Parks   Date and Time: 2/27/96   Reviewed   Copies To: D. A   Dr. No. 02 96-0377

83

113

# ARCATA POLICE DEPARTMENT

Suspect's Name: Whitesides, Kyle JASON

Offense: P.C. 261

PAGE NO. 6

forced.

Whitesides then asked, "Why did Kelley step out of her underwear when I pulled them down around her ankles when we at the rear of the car?". I told Whitesides that I did not know.

I then asked Whitesides about him telling Kelley that she "Was going to get fucked". Whitesides said that he told her that when they were at the rear of the car. Whitesides said that he was "just talking dirty to her". Whitesides denied apologizing to Kelley at this time.

I asked Whitesides about the conversations that he had with Kelley on the telephone over the past two nights. Whitesides said that he said things to Kelley to just make her feel better. Whitesides said that Kelley was crying during the telephone calls and he was telling her what she wanted to her.

I asked Whitesides if he told Amy that he "kind of forced it" with Kelley. Whitesides said that he told Amy this after Kelley said she was raped. Amy asked Whitesides if she was going to call the police. Whitesides told Amy that he did not know.

I then asked Whitesides to tell me again what happened starting from the beginning. Whitesides gave the same statement with a few changes. Whitesides said that Kelley said, "No, we can't do this" while they were driving to the park. Whitesides said that when Kelley told him no at the rear of the car he only thrust his penis inside a few more times. I asked him how many times was a few. Whitesides three or four more times. Whitesides that he tried to penetrate Kelley a few times after that, but never "Got it in again".

Whitesides then asked what was going to happen next. He said whatever was going to happen that he wished it would just happen. I this time I advised Kyle Whitesides that he was under arrest for rape. Whitesides put some more clothes on and I transported him to APD.

At APD I read Whitesides his Miranda rights which he chose not to waive by saying "I want an attorney present because I'm nervous and might say something wrong".

Ofc Schmidt transported Whitesides to the Humboldt County Jail where he was lodged for violation of PC Section

CONFIDENTIAL

Reporting Officer: C. Fouks    Date and Time: 2/8/96    Reviewed    Copies To: T. A    Dr. No. 02 96-0379

34

114

x 13

ARCATA POLICE DEPARTMENT

| Suspect's Name | | PAGE NO. 7 |
|---|---|---|
| Whitesides; Kyle JASON | Offense P.C. 261 | |

261.

On 02-07-96 at approx 2130 hrs Kelley Higgas̶
APD at my request. Higgason was accompanied by Ca
(Rape Crisis) and Amy Dale. I spoke with Higgason
present. I asked Higgason to tell me about all t'
the night of the rape.

Higgason said that she went to the Pin Roor
Higgason said that there were a lot of people a̶
only people that Higgason knew was Karen, "Dick
(Male), and JB. Higgason said that she did not
the last names of these people. However she kne̶
lived, but could not give an address. She said
off Samoa Blvd towards Manila.

Higgason said that she was sitting with these peo̶r̶
the chairs that were set up in front of the big screen
television. Whitesides was sitting to the left of the bar
watching a smaller TV behind the bar. Towards the end of the
game, Higgason started playing pool and talking with
Whitesides. During the conversation Whitesides mentioned
that he walked to the bar. Higgason offered to give
Whitesides a ride home. When the game was over they walked
out to her car that was parked behind the bar. Higgason,
Whitesides and his dog got into the car and she started
driving.

Whitesides asked her if she wanted to take the dog for a
walk on the beach or at the park. Higgason said that they
could go to the park. While they were driving to the park,
Whitesides reached over and was rubbing her on the thigh.
Kelley pushed his hand away several times and he kept putting
his hand back on her thigh. She drove to the park and they
got out. Whitesides tied the dog outside the car and they
walked out to a picnic table. At the picnic table they
started kissing. This is the first time that she had ever
kissed Whitesides. Whitesides reached under Higgason's skirt
and she kept pushing his hand away. He then tried to put his
hand into her underwear. She told him no, and said she wanted
to go back to the car. They left the picnic table and went to
the car.

They got into the car and Whitesides immediately started
kissing her. He reached under her skirt and she again pushed
his hand away. Whitesides then grabbed her and pulled her
over to the passenger seat. Whitesides then started taking
his pants down and Higgason told him, "No, we can't do this".

CONFIDENTIAL

| Reporting Officer C. ̶Peaks | Date and Time 2/7/96 | Reviewed | Copies To: D A | Dr. No. 02 96-03.77 |
|---|---|---|---|---|

35

115

X
14

ARCATA POLICE DEPARTMENT

Suspect's Name: Whitesides, Kyle JASON    Offense: PC 261    PAGE NO. 8

Whitesides was rubbing the opening of Higgason's vagina with his fingers. Whitesides then continued taking his pants down and Higgason told him "No" again. With Higgason laying on her back on the seat, Whitesides penetrated her vagina with his penis. Whitesides was kneeling on the floor of the car facing her. After less than a minute, Whitesides removed his penis from her. Whitesides then rolled Higgason over to her left and pushed her head into the backseat. Higgason's hips were pushed against the sides of the bucket seat. Her hands were trapped behind the seats. At this time Higgason again said "No" with a stronger voice and began to beg Whitesides to stop. Whitesides told Higgason, "You're going to get fucked". Whitesides penetrated Higgason's vagina with his penis and thrust for a few minutes. Whitesides then stopped and said, "Let's get out of the car". Whitesides then got out of the passenger's door. Higgason put her underwear and shirt on.

At this time, Whitesides opened the driver's door and told her to get out of the car. Whitesides had his arm on Higgason and walked towards the rear of the car. Whitesides started to lift her shirt up and she said she was cold and asked to keep her shirt on. Whitesides then pulled Higgason's skirt up around her waist and turned her around, facing the car. Whitesides pulled her underwear down around her ankles. Whitesides held her hands behind her and penetrated Higgason's vagina with his penis from behind. Higgason was struggling and was trying to stand up straight. Whitesides penis came out of her several times but he kept sticking it back in. Whitesides told Higgason, "I'm sorry". Higgason said, "You're not sorry". Whitesides replied, "You're right, I'm not sorry, and I'll do it again". Higgason then turned around and pushed at Whitesides with both hands. Her hands missed him and went over his shoulders. Whitesides said, "Go ahead and fight, if you want". Whitesides grabbed Higgason and turned her back around and held both of her hands behind her back with one hand. Whitesides other hand was on Higgason's neck, pushing her head on the back of the car. Higgason gave up and just wanted Whitesides to finish and get it over with. Whitesides started thrusting his penis into her vagina very hard for several minutes. Whitesides then stopped and Higgason reached down and pulled her underwear up from around her ankles. Without either of them saying anything, they got into the car. Higgason asked Whitesides where he lived. He told her to just drive downtown.

When they got to 11th and F St, Higgason stopped the car and told Whitesides to get out and walk. Whitesides asked

Reporting Officer: C. Parks    Date and Time: 2/13/96    Reviewed: Copies To: T A    Dr. No. 02 96-0374    36

## ARCATA POLICE DEPARTMENT

Suspect's Name
Whitesides, Kyle JASON

Offense
P.C. 261

PAGE NO. 9

Higgason if he could spend the night with her at her house. She told him to get out. Whitesides said to Higgason, "you know I have to hate you now". Whitesides started to get out of the car and then stopped. Whitesides asked what's going to happen the next time he saw her. Higgason answered, "nothing". Whitesides said, "I don't want nothing". Whitesides then got out of the car and walked away. Higgason then went home and told her roommate, Lorie Ladd, what had happened.

I asked Higgason if she and Whitesides were kissing outside the Pin Room. Higgason said that the first time she kissed Whitesides was at the picnic table at the park. I asked Higgason if Whitesides penetrated her vagina with his finger while they outside the Pin Room. Higgason again said no. I asked Higgason if Whitesides penetrated her vagina with his finger while she was driving. Higgason said no, he touched my thigh but his hand did not get in my underwear.

The interview with Higgason was stopped. Higgason told me that she has been with Amy Dale for the past few days and Dale is really afraid of what is going to happen if he gets out of jail. I told Higgason that I would speak with Dale. Higgason also told me that she knows of two other girls that said that Whitesides had assaulted them. Higgason said that the girls' names were Valerie and Joanna. Higgason does not know how to contact these girls and she does not know their last names. Higgason said that she would have these girls contact me if they were willing.

I then spoke with Amy Dale. Carrie Slack and Janine Mallano (Humboldt County Women For Shelter) were present.

Amy Dale told me that she is afraid of Whitesides. She said that she went to her residence, 1309 Patricks Point drive and got her belongings today. She said that she does not plan to ever go back to the residence and does not ever want to see Whitesides again. Dale said that Whitesides has sexually abused her in the past. Dale said that she has left Whitesides several times, the last time being around 01-31-96. At that time Whitesides threw things at her and was very threatening to her. Dale said that Whitesides came to her sister's house at 57 F St, Arcata and said he was sorry. Dale then decided to go home with Whitesides.

Dale said that she is currently staying with her sister and Whitesides called there looking her about fifteen times yesterday. Dale believes that Whitesides will rape her again

CONFIDENTIAL

Reporting Officer C. Parks   Date and Time 2/3/96   Reviewed   Copies To: D.A.   Dr. No. 02 96-0377

37

117

## ARCATA POLICE DEPARTMENT

Suspect's Name **Whitesides, Kyle JASON**    Offense **P.C. 261**    PAGE NO. **10**

if he gets out of jail. Dale asked if there was any kind of Emergency Restraining Order that I could get against Whitesides from contacting her.

I asked Dale if she was willing to tell me the specifics about the physical abuse and sexual assaults that Whitesides has committed against her. Dale said that she was not comfortable talking about it at this time.

I advised Dale to contact me at anytime in the future if she wanted to talk about the abuses.

I completed the attached Application For Emergency Protective Order and contacted Judge Brown. Judge Brown granted the EPO.

I then served Kyle Whitesides in jail with a copy of the EPO and read him the Warning on the back of the EPO. Whitesides looked at the EPO for several minutes and said he understood the order.

I then contacted Amy Dale at 57 F St. I provided her with a copy of the EPO.

A copy of this report will be forwarded to the District Attorney's office.

Disposition: **Cleared**

CONFIDENTIAL

Reporting Officer: C. Parks    Date and Time: 2/3/96    Reviewed    Copies To: D. A

38

Dr. No. 02 96-0377

118

X 17

**ARCATA POLICE DEPARTMENT**
736 F Street • Arcata, CA 95521 • (707) 822-2428

CODES:    V = VICTIM    W = WITNESS    R = REPORTING PERSON

| 501 PAGE | 502 CASE NUMBER |
|---|---|
| 02 | 96-0379 |

☐ ADDITIONAL PERSONS INVOLVED

| 503 CODE | 504 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 505 RESIDENCE ADDRESS | 506 RESIDENCE PHONE |
|---|---|---|---|---|---|---|---|
| W | DAle, AMy JeNNifer | | | | | 57 F St. ARcAtA | 826-9272 |
| 507 OCCUPATION | 508 RACE | 509 SEX | 510 AGE | 511 DATE OF BIRTH | 512 BUSINESS / OTHER ADDRESS | | 513 OTHER PHONE |
| | W | F | 24 | 11-19-71 | | | |
| 514 CODE | 515 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 516 RESIDENCE ADDRESS | 517 RESIDENCE PHONE |
| 518 OCCUPATION | 519 RACE | 520 SEX | 521 AGE | 522 DATE OF BIRTH | 523 BUSINESS / OTHER ADDRESS | | 524 OTHER PHONE |
| 525 CODE | 526 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 527 RESIDENCE ADDRESS | 528 RESIDENCE PHONE |
| 529 OCCUPATION | 530 RACE | 531 SEX | 532 AGE | 533 DATE OF BIRTH | 534 BUSINESS / OTHER ADDRESS | | 535 OTHER PHONE |
| 536 CODE | 537 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 538 RESIDENCE ADDRESS | 539 RESIDENCE PHONE |
| 540 OCCUPATION | 541 RACE | 542 SEX | 543 AGE | 544 DATE OF BIRTH | 545 BUSINESS / OTHER ADDRESS | | 546 OTHER PHONE |
| 547 CODE | 548 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 549 RESIDENCE ADDRESS | 550 RESIDENCE PHONE |
| 551 OCCUPATION | 552 RACE | 553 SEX | 554 AGE | 555 DATE OF BIRTH | 556 BUSINESS / OTHER ADDRESS | | 557 OTHER PHONE |
| 558 CODE | 559 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 560 RESIDENCE ADDRESS | 561 RESIDENCE PHONE |
| 562 OCCUPATION | 563 RACE | 564 SEX | 565 AGE | 566 DATE OF BIRTH | 567 BUSINESS / OTHER ADDRESS | | 568 OTHER PHONE |
| 569 CODE | 570 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 571 RESIDENCE ADDRESS | 572 RESIDENCE PHONE |
| 573 OCCUPATION | 574 RACE | 575 SEX | 576 AGE | 577 DATE OF BIRTH | 578 BUSINESS / OTHER ADDRESS | | 579 OTHER PHONE |
| 580 CODE | 581 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 582 RESIDENCE ADDRESS | 583 RESIDENCE PHONE |
| 584 OCCUPATION | 585 RACE | 586 SEX | 587 AGE | 588 DATE OF BIRTH | 589 BUSINESS / OTHER ADDRESS | | 590 OTHER PHONE |
| 591 CODE | 592 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 593 RESIDENCE ADDRESS | 594 RESIDENCE PHONE |
| 595 OCCUPATION | 596 RACE | 597 SEX | 598 AGE | 599 DATE OF BIRTH | 600 BUSINESS / OTHER ADDRESS | | 601 OTHER PHONE |
| 602 CODE | 603 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 604 RESIDENCE ADDRESS | 605 RESIDENCE PHONE |
| 606 OCCUPATION | 607 RACE | 608 SEX | 609 AGE | 610 DATE OF BIRTH | 611 BUSINESS / OTHER ADDRESS | | 612 OTHER PHONE |
| 613 CODE | 614 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 615 RESIDENCE ADDRESS | 616 RESIDENCE PHONE |
| 617 OCCUPATION | 618 RACE | 619 SEX | 620 AGE | 621 DATE OF BIRTH | 622 BUSINESS / OTHER ADDRESS | | 623 OTHER PHONE |
| 624 CODE | 625 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 626 RESIDENCE ADDRESS | 627 RESIDENCE PHONE |
| 628 OCCUPATION | 629 RACE | 630 SEX | 631 AGE | 632 DATE OF BIRTH | 633 BUSINESS / OTHER ADDRESS | | 634 OTHER PHONE |

**VICTIMS / WITNESSES** (side label)

☐ ADDITIONAL SUSPECTS

| 635 SUSPECT #3 (LAST, FIRST, MIDDLE) | 636 AKA | 637 RACE | 638 SEX | 639 AGE | 640 DATE OF BIRTH | 641 HT. | 642 WT | 643 HAIR | 644 EYES |
|---|---|---|---|---|---|---|---|---|---|
| 645 SUSPECT'S ADDRESS | 646 PHONE | | | 647 PLACE OF BIRTH | 648 CITE # | 649 ARREST # | 650 MIRANDA ☐ a-YES ☐ b-NO |
| 651 BUSINESS / OTHER ADDRESS | 652 DRIVER'S LICENSE | | STATE | 653 SAME AS # | | | WAIVE MIRANDA ☐ c-YES ☐ d-NO |
| 654 SUSPECT #4 (LAST, FIRST, MIDDLE) | 655 AKA | 656 RACE | 657 SEX | 658 AGE | 659 DATE OF BIRTH | 660 HT. | 661 WT. | 662 HAIR | 663 EYES |
| 664 SUSPECT'S ADDRESS | 665 PHONE | | | 666 PLACE OF BIRTH | 667 CITE # | 668 ARREST # | 669 MIRANDA ☐ a-YES ☐ b-NO |
| 670 BUSINESS / OTHER ADDRESS | 671 DRIVER'S LICENSE | | STATE | 672 SAME AS # | | | WAIVE MIRANDA ☐ c-YES ☐ d-NO |

673 FURTHER SUSPECT DESCRIPTION (I.E... GLASSES, TATTOOS, TEETH, BIRTHMARKS, JEWELRY, SCARS, MANNERISMS, WEAPONS, ETC.)

**SUSPECTS** (side label)

Cf #334   2/8/96   119

**ARCATA POLICE DEPARTmENT**
736 F Street • Arcata, CA 95521 • (707) 822-2428

| | | |
|---|---|---|
| ARRESTED | 301 PAGE / | 302 CASE NUMBER |
| DOMESTIC VIOLENCE | | 02  96-0379 |

**HEADING**

| | | |
|---|---|---|
| ☐ MISDEMEANOR | 303 DATE TIME REPORT 2/22/96 | 304 INCIDENT CRIME CLASSIFICATION P.C. 261 |
| ☑ SUPPLEMENTAL | 306 DATE - TIME OCCURRED 1/28/96 | 307 LOCATION Redwood Park Arcata |
| ☐ CONTINUATION | | |
| ☐ INCIDENT | | 305 AREA 14 |

| 306 CODE | 309 NAME Higgason, Kelley | 310 ADDRESS Previously Indexed | 311 PHONE |
|---|---|---|---|
| V | 312 SAME AS | 313 RACE | 314 SEX | 315 AGE | 316 DATE OF BIRTH | 317 HT | 318 WT | 319 EYES | 320 HAIR | 321 OTHER | |

| 322 CODE | 323 NAME Whitesides, Kyle | 324 ADDRESS Previously Indexed | 325 PHONE |
|---|---|---|---|
| S | 326 SAME AS | 327 RACE | 328 SEX | 329 AGE | 330 DATE OF BIRTH | 331 HT | 332 WT | 333 EYES | 334 HAIR | 335 OTHER | |

**NARRATIVE**

On 02-19-96 I spoke with Deputy District Attorney Jeannie Tunison-Campbell. Tunison-Campbell requested that I forward a copy of the tape recordings between Higgason and Whitesides to her. Tunison-Campbell advised that she would send the tapes to DOJ for enhancement and transcription if possible.

**Disposition: Cleared**

**ADMIN.**

| 336 OFFICER IS REPORTING C. Burks | I.D. NUMBER 334 | DATE OF REPORT 2-22-96 | 337 SUPERVISOR REVIEW | DATE |
|---|---|---|---|---|
| 308 COPIES TO | CII  INVEST  PATROL  ☑ DISTRICT ATTORNEY  PROBATION  CPS  ☑ OTHER  Tunison Campbell | | | |

120

& cancis MF

<u>DISTRICT ATTORNEY FELONY COMPLAINT REQUEST</u>

Suspect Booked [X]     Date: 2-7-96          Time: _____
Felony   [X]            Agency Case No. 96-0379
Original [X]   Supplemental [ ]   Review/Comment Only [ ]   Req By
From:   HSO [ ] EPD [ ] CHP [ ] APD [X] FPD [ ] RDPD [ ] F&G [ ] Other [ ]
Defendant(s): 1. Kyle JASON Whitesides        3. _____
              2. _____                       3. _____
Victim(s): 1. Kelley Deanne Higginson         4. _____
Reporting Officer: OFFicer PARK90    Reviewing Officer: _____
Charges Requested:          261 (A)(2) PC
Agency Comments:
          suspect arrested 2-7-96

*          *          *          *          *          *

                    (DA USE ONLY)

                                              RECEIVED
Court:  EMC [ ]   AJC [ ]   FJC [ ]   GJC [ ]   KTJC  FEB 08 1996

CT  FEL  MISD  DEF NO    CHARGE          DATE   DISTRICT ATTORNEY
I   [X]  [ ]    1       PC 261(a)(2)    1-28-96

WORDING _____
                                              1-1243
        V: Jane Doe    per PC 293
_____

II  [ ]  [ ]   ____    _____
WORDING _____
_____
_____

III [ ]  [ ]   ____    _____
WORDING _____
_____
_____

IV  [ ]  [ ]   ____    _____
WORDING _____
_____

Status:  Review & Filed [X]   Approved but Follow-up Requested [ ]
         Rejected (see comments) [ ]   Pending [ ]  Lab [ ]  Vic Contact [ ]
Comments: _____

Warrant [ ]   Cite Issued [ ]     Letter [ ]
Reviewing Deputy _____         Date 2-8-96

121

ARCATA POLICE DEPARTMENT   CA 0120100
CRIME REPORT   (96020389)                      DR 960480

CODE SEC:              261 PC    RAPE:NOT SPECIFIED
SECONDARY:          286(A) PC    Sodomy not specified                V-1
                   288A(A) PC    Oral Copulation                     V-1
                                                                     V-1

DATE/TIME REPORTED:    Mon.  02/12/96 02:23 hrs.

DATE/TIME OCCURRED:    Tues. 08/01/95 00:00 hrs. - Thurs. 02/01/96 00:00 hrs.
LOCATION OF OCCURENCE: 1925 G ST, #3
                                                            BLOCK AREA:   11

VICTIM-1:        DALE, AMY JENNIFER
ADDRESS:         57 F ST, Arcata, CA  95521        WF24   (11/19/71) 826-9272

SUSPECT-1:       WHITESIDES, KYLE JASON            WM23   (04/20/72) 677-0851
ADDRESS:         1309 PATRICKS POINT DR, #2, Trinidad, CA  95570
DL NO./STATE:    A3369984/CA
RACE: White            SEX: M HT: 604    WT: 180    HAIR: BRO EYES: HAZ
                                                      BK NO.:  16837

DETAILS OF INVESTIGATION:


CASE INITIATED.  INVESTIGATION PENDING.

CONTROLLED DOCUMENT
DUPLICATION OR REISSUANCE
CONTROLLED BY LAW
Released to _Orange Co. DA_
By _BB_ _____ Date _2/18/10_
Arcata Police Department

CASE PENDING

REPORTED: 02/12/96 by OFFICER C. PARKS
RECORDED: 02/12/96 by CSO/DISPATCHER D. PIALORSI    122    INCIDENT: 96020389
REVIEWED: 02/15/96 by SGT. B. JOHNSON                      SUPPLEMENT:   0
Follow up? Yes/ / No/ /   Copies to: Inv/ / DAO/ / JuvHall/ / CO/ /



**ARCATA POLICE DEPARTMENT**
736 F Street
Arcata, CA 95521
(707) 822-2428

| PAGE 1 | 2 CASE NUMBER |
|---|---|
| 02 | 96-0480 |

☐ ADULT ARREST    ☐ JUVENILE ARREST    ☐ DOMESTIC VIOLENCE

**OCCURRENCE**

| 3 CODE SECTION | 4 TITLE | 5 CLASSIFICATION | 6 | 7 REPORT AREA |
|---|---|---|---|---|
| P.C. 261 P.C. 286 P.C. 288(?) | Rape Sodomy Oral Copulation | FORCE | ☑ FELONY ☐ MISDEMEANOR ☐ INCIDENT | 14 |

| 8 DATE & TIME OCCURRED — DAY | 9 DATE & TIME REPORTED | 10 LOCATION OF OCCURRENCE |
|---|---|---|
| 8-95 - 3-96 | 2/12/96 | 1925 G St. #3 ARCATA |

**VICTIM**

| 11 VICTIM NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | | 12 RESIDENCE ADDRESS | | 13 RESIDENCE PHONE |
|---|---|---|---|---|---|---|---|
| DALE Amy Jennifer | | | | | 57 F St. ARCATA. | | 826-9272 |

| 14 OCCUPATION | 15 RACE | 16 SEX | 17 AGE | 18 DATE OF BIRTH | 19 BUSINESS / OTHER ADDRESS | 20 OTHER PHONE |
|---|---|---|---|---|---|---|
| | W | F | 24 | 11-19-71 | | |

| 21 VICTIM VEHICLE COLOR | 22 YEAR | 23 MAKE | 24 MODEL | 25 BODY STYLE | 26 LICENSE NO. | 27 STATE |
|---|---|---|---|---|---|---|
| | | | | | | |

| COMPLETE IF PERSONAL INJURY OR RAPE | 28 WHERE HOSPITALIZED | 29 DATE / TIME | 30 DOCTOR | 31 NATURE OF INJURY | 32 MEDICAL RELEASE ☐ YES ☐ NO |
|---|---|---|---|---|---|
| | | | | | |

CODES:    V = VICTIM    W = WITNESS    R = REPORTING PERSON

☐ ADDITIONAL PERSONS INVOLVED

**OTHERS INVOLVED**

| 33 CODE | 34 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | 35 RESIDENCE ADDRESS | | 36 RESIDENCE PHONE |
|---|---|---|---|---|---|---|---|
| 37 OCCUPATION | 38 RACE | 39 SEX | 40 AGE | 41 DATE OF BIRTH | 42 BUSINESS / OTHER ADDRESS | | 43 OTHER PHONE |
| 44 CODE | 45 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | 46 RESIDENCE ADDRESS | | 47 RESIDENCE PHONE |
| 48 OCCUPATION | 49 RACE | 50 SEX | 51 AGE | 52 DATE OF BIRTH | 53 BUSINESS / OTHER ADDRESS | | 54 OTHER PHONE |
| 55 CODE | 56 NAME — LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | | 57 RESIDENCE ADDRESS | | 58 RESIDENCE PHONE |
| 59 OCCUPATION | 60 RACE | 61 SEX | 62 AGE | 63 DATE OF BIRTH | 64 BUSINESS / OTHER ADDRESS | | 65 OTHER PHONE |

**SUSPECTS**

☐ ADDITIONAL SUSPECTS

| 66 SUSPECT #1 (LAST, FIRST, MIDDLE) | 67 AKA | 68 RACE | 69 SEX | 70 AGE | 71 DATE OF BIRTH | 72 HT | 73 WT. | 74 HAIR | 75 EYES |
|---|---|---|---|---|---|---|---|---|---|
| Whitesides, Kyle Jason | | W | M | 23 | 4/20/72 | 6'4" | 180 | BRO | HZZ |

| 76 SUSPECT'S ADDRESS | 77 PHONE | 78 PLACE OF BIRTH | 79 CITE # | 80 ARREST # | 81 MIRANDA |
|---|---|---|---|---|---|
| 1309 Patricks Pt. Dr. #2 Trinidad | 677-0851 | | | | ☐ YES  ☐ NO |

| 82 BUSINESS / OTHER ADDRESS | 83 DRIVER'S LICENSE | STATE | 84 SAME AS # | WAIVE MIRANDA |
|---|---|---|---|---|
| | A3369984 | CA | | ☐ YES  ☐ NO |

| 85 SUSPECT #2 (LAST, FIRST, MIDDLE) | 86 AKA | 87 RACE | 88 SEX | 89 AGE | 90 DATE OF BIRTH | 91 HT. | 92 WT. | 93 HAIR | 94 EYES |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| 95 SUSPECT'S ADDRESS | 96 PHONE | 97 PLACE OF BIRTH | 98 CITE # | 99 ARREST # | 100 MIRANDA |
|---|---|---|---|---|---|
| | | | | | c-YES  b-NO |

| 101 BUSINESS / OTHER ADDRESS | 102 DRIVER'S LICENSE | STATE | 103 SAME AS # | WAIVE MIRANDA |
|---|---|---|---|---|
| | | | | c-YES  d-NO |

| 104 FURTHER SUSPECT DESCRIPTION (I.E., GLASSES, TATTOOS, TEETH, BIRTHMARKS, JEWELRY, SCARS, MANNERISMS, WEAPONS, ETC.) |
|---|
| |

| 105 SUSPECT VEHICLE COLOR | 106 YEAR | 107 MAKE | 108 MODEL | 109 BODY STYLE | 110 LICENSE NO | 111 STATE |
|---|---|---|---|---|---|---|
| | | | | | | |

| 117 ADDITIONAL VEHICLE IDENTIFIERS (DAMAGE, CHROME WHEELS, VINYL, ETC. | 113 TOWED TO | 114 HOLD YES  NO | 115 HOLD FOR WHOM |
|---|---|---|---|
| | | | |

**SUMMARY**

| 116 LOG ENTRY / SUMMARY (THREE OR FOUR SENTENCES BRIEFLY OUTLINING WHAT OCCURRED AND ESTABLISHING THE ELEMENTS) |
|---|

(V) states that (S) sexually assaulted her on several occasions

**CONFIDENTIAL**

*(V) request confidentiality per P.C. 293

**ADMIN.**

| 119 OFFICER(S) REPORTING | I.D. NUMBER | DATE OF REPORT | 120 SUPER. REVIEW | DATE | 121 OTHER RELATED REPORTS |
|---|---|---|---|---|---|
| C. Yorks | 334 | 2-13-96 | 89 | 2-15-96 | |

| 122 COPIES TO: | | | | | |
|---|---|---|---|---|---|
| ☐ CII | ☐ INVEST | ☐ PATROL | ☑ DISTRICT ATTORNEY | ☐ PROBATION | C.P.S.  ☐ OTHER  123 |

X 22

**ARCATA POLICE DEPARTMENT**
736 F Street • Arcata, CA 95521 • (707) 822-2428

201 PAGE 2
202 CASE NUMBER 96-0480
02

**M.O. / CRIME ANALYSIS**

| 203 TYPE OF STRUCTURE | 204 DESCRIPTION OF AREA | 205 POINT OF ENTRY | 206 METHOD OF ENTRY | 208 SECURITY USED | 210 INJURY (Crimes Against Persons Only) |
|---|---|---|---|---|---|
| N/A | N/A | ☑N/A | ☑N/A | ☑N/A | |
| ☑1-Single Family Dwelling | 1-Residential | 1-Front / 2-Rear | 1-Forced | 1-None | 1-Used Force |
| 2-Other Residential | 2-Business | 3-Side / 4-Gr. Level | 2-No Force | 2-Neighborhood Watch | 2-No Force |
| 3-Storage | 3-Industrial | 5-Upper Level | 3-Attempted Force | 3-Operation I.D. | 3-Fatal |
| 4-Industrial Mfg. | 4-School | 6-Unknown | | 4-Window Decals | ☑4-Major |
| 5-Other Commercial | 5-Institutional | 7-Door | 207 METHOD USED AGAINST PROPERTY | 5-Peephole / Viewer | 5-Minor |
| 6-Community / Public | 6-Parking Lot | 8-Window | 1-Key Slip | 6-Audible Alarm | 6-None |
| 7-All Other Structures | 7-Recreational | 9-Sliding Glass | ☑2-Bodily Force | 7-Silent Alarm | 7-Other |
| 8-Motor Vehicles | 8-Rural | 10-Duct / Vent | 3-Saw / Drill / Burn | 8-Other | |
| 9-Other Mobile Property | 9-Secluded | 11-Adjacent Building | 4-Channel Locks | | |
| 10-Other | 10-Other | 12-Roof / Floor / Skylight | 5-Pipe Wrench | 209 TYPE OF LOCK | 211 WEAPON |
| | | 13-Wall | 6-Tire Iron | ☑N/A | 1-Handgun |
| | | 14-Garage | 7-Brick / Rock | 1-None | 2-Knife |
| | | 15-Basement | 8-Pry Tool | 2-Dead Bolt | 3-Hands / Feet |
| | | 16-Trunk / Hood | 9-Bolt Cutters / Pliers | 3-Window Lock | 4-Shotgun |
| | | 17-Wing Window | 10-Punch | 4-Padlock | 5-Rifle |
| | | 18-Window Molding | 11-Smashing Tool | 5-Inadequate Lock | 6-Other |
| | | 19-Other | 12-Wire / Coat Hanger | 6-Other | |
| | | | 13-Screwdriver | | |
| | | | 14-Unknown | | |
| | | | 15-Other | | |

| 212 INVESTIGATIVE ACTIVITIES | | 213 EVIDENCE OBTAINED | |
|---|---|---|---|
| 1-Dusted for Latents | 6-Scene Diagramed | N/A | 5-Other Prints | 10-Clothing |
| 2-Tool Marks Photographed | 7-Neighborhood Checked | ☑None | 6-Vehicle Impounded | 11-Other |
| 3-Vehicle / Shoe Tracks Phot. | 8-Area Checked | 2-Diagrams | 7-Weapons / Tools | |
| 4-Scene Photographed | 9-Witness(es) Contacted | 3-Photos | 8-Stains | |
| 5-Victim Photographed | 10-Victim(s) Contacted | 4-Fingerprints | 9-Blood / Semen | |
| | ☑1-Statements | | |
| | 12-Det. Notified (Who____) | | |
| | 13-Local Teletype / Radio Bdc. | | |
| | 11-I.D. Notified (Who____) | | |
| | 15-Other | | |

**NARRATIVE**

On 02-12-96 at approx 2030 hrs Amy Dale came to APD to report a rape. Amy Dale is a witness in another rape case that I have been investigating (APD Case# 96-0379). Dale disclosed to me at that time that Kyle Whitesides has also raped her in the past but she did not wish to make the report at that time. Dale told me that she is afraid that Whitesides will hurt her if he gets out of jail. Dale told me that she now wishes to pursue charges against Whitesides for assaulting her.

Amy Dale told me that she and Kyle Whitesides worked together at the Butler Valley Care Home. About six months ago Whitesides started coming over to her house, 1925 G St #3. Whitesides told her that he really liked and needed her. Then in late August of 1995, Whitesides came over to Dale's house at approx 0500 hrs. Dale and Whitesides were laying on top of Dale's bed and they were hugging. Suddenly Whitesides got on top of Dale and started to unfasten his pants. Whitesides then starting pulling Dale's pajama pants off of her. Dale started struggling with Whitesides and was trying to push him off of her. Dale told Whitesides, "No get off, I don't want to have sex with you". Dale continued to struggle with Whitesides and was unable to get him off her. Whitesides took Dale's pants and underwear off and then penetrated her vagina with his penis. Whitesides was inside of Dale for about ten minutes until he ejaculated. Whitesides then got off Dale and went to sleep. Dale said that she could not remember if she fell asleep or not. Dale said that she then went for a bike

CONFIDENTIAL

**ADMIN.**

214 OFFICER(S) REPORTING: C. Yarks   I.D. NUMBER 334   124
216 COPIES TO: CII / INVEST / PATROL / DISTRICT ATTORNEY / PROBATION / C.P.S. / OTHER
DATE OF REPORT 2-13-96
215 SUPERVISOR REVIEW   21596 DATE
X 23

## ARCATA POLICE DEPARTMENT

| Suspect's Name | | Offense | | PAGE NO. 3 |
|---|---|---|---|---|

ride when the sun came up. Dale said that she met a friend, James Hibbits and they had breakfast together at the Day Break Cafe in Arcata.

Dale told me that prior to this assault by Whitesides that she had never kissed him. Dale said that she did not kiss Whitesides during this assault. Dale said that she never reported the assault to the police because she was embarrassed.

Dale said that after the above incident she still saw Whitesides at work and he continued coming over to her house. Dale said that her relationship with Whitesides turned into a boyfriend and girlfriend relationship. Dale said that she consented to having sex with Whitesides during this time. Dale said that over the next five months she consented to having sex with Whitesides. Dale said that Whitesides also had sex with her numerous times when she did not consent.

The follow are times that Amy Dale can remember that Whitesides had sex with her when she did not consent.

On an evening in late November or early December Whitesides again sexually assaulted her. Dale said that she was having consented sex with Whitesides while in her bedroom. Dale said that she was on her hands and knees and Whitesides was having vaginal intercourse with her from behind. Suddenly Whitesides removed his penis from her vagina and started to penetrate her anus with his penis. Dale said, "no" but Whitesides continued to insert his penis into her anus. Dale continued saying "no", and began to push back on Whitesides' hips with her hands. Whitesides thrust his penis into her anus and thrust very hard a couple of times. Whitesides then removed his penis from her anus.

Dale told me that she felt extreme pain to the area of her anus during and after the assault. Dale said that this was the first time that she had ever been penetrated in the anus with a penis. Dale said that the next morning she went to the bathroom and urinated. Dale said that when she wiped she noticed that there was blood on the tissue. Dale told me that she was not menstruating at this time and she believes the blood came from her anus.

Dale told me that the next time she remembered Whitesides sexually assaulting her was on an evening in late December or early January. Dale said that she again was on her hands and knees and was consenting to intercourse with

CONFIDENTIAL

| Reporting Officer | Date and Time | Reviewed | Copies To: | Dr. No. |
|---|---|---|---|---|
| C. Parks | 2-13-96 | | 125 | 02 96-0480 |

ARCATA POLICE DEPARTMENT

PAGE NO. 4

| Suspect's Name | Offense |
|---|---|
| | |

Whitesides. Whitesides had penetrated Dale from behind. Then Whitesides started "spanking" her. Dale said that Whitesides started slapping her on the upper right thigh and right buttocks. The slaps started out light and then got very hard. At this time Dale told Whitesides, "No" to stop having sex with her. Whitesides did not stop and continued to penetrate her vagina and continued slapping her. For the next several minutes Dale told Whitesides to stop and she tried to block the slaps with one of her hands. Whitesides ejaculated and then removed his penis from Dale's vagina and stopped hitting her.

Dale said that the next morning that her right thigh and right buttocks were bruised from the assault.

Another time that Whitesides sexually assault Dale was on February 3rd or 4th. Dale said that she and Whitesides were now living together in Trinidad. Dale said that she was sitting on the bed and Whitesides came into the bedroom. Whitesides took his penis out of his pants and started masturbating. Whitesides then stood at the edge of the bed and told Dale, "Suck my dick". Dale started to orally copulate Whitesides. After a few seconds, Dale moved her mouth away from Whitesides' penis. Whitesides grabbed the back of Dale's head with both hands and pulled her back towards his penis. Whitesides' penis went into Dale's mouth and Dale started choking because the penis was in the back of her throat. Whitesides moved Dale's back and forth several times. Whitesides then pulled Dale's head back to the point that the penis was out of her mouth. At this time Whitesides ejaculated.

Amy Dale told me that she could not remember any more about the above assaults. Dale said that she could not remember ever talking to Whitesides about the assaults. Dale also could not remember any conversation that she had with Whitesides during the assaults. Dale said that Whitesides use to tell her that she could not tell him no when it came to sex.

I asked Dale if she ever told anybody that Whitesides had sexually assaulted her. Dale said that two or three weeks after Whitesides raped her in August, she telephoned a friend, Erin Kerrigan, in the San Fernando Valley. Dale told Kerrigan about the rape at that time.

It should be noted that Kyle Whitesides is currently in the Humboldt County Jail for violation of PC 261 regarding

CONFIDENTIAL

| Reporting Officer | Date and Time | Reviewed | Copies To: | Dr. No. |
|---|---|---|---|---|
| C. Parks | 2-13-96 | | 126 | 02 96-0480 |

## ARCATA POLICE DEPARTMENT

| Suspect's Name | | PAGE NO. 5 |
|---|---|---|
| | Offense | |

APD Case #96-0379). A copy of this report will be forwarded
to the District Attorney's Office for consideration of filing
rape charges against Whitesides for the assaults on Dale.

Disposition: <u>Pending</u>

CONFIDENTIAL

| Reporting Officer C. Burks | Date and Time 2-13-96 | Reviewed | Copies To: 127 | Dr. No. 02 96-0480 |
|---|---|---|---|---|

26.

```
                        ARCATA POLICE DEPARTMENT  CA 0120100
                        SUPPLEMENTAL CRIME REPORT  (96020389/1)              DR 960480


     CODE SEC:              261 PC   RAPE:NOT SPECIFIED                        V-1
     SECONDARY:          286(A) PC   Sodomy not specified                     V-1
                        288A(A) PC   Oral Copulation                          V-1

     DATE/TIME REPORTED:   Fri.  04/03/98 14:00 hrs.

     DATE/TIME OCCURRED:   Tues.  08/01/95 00:00 hrs. - Thurs. 02/01/96 00:00 hrs.
     LOCATION OF OCCURENCE: 1925 G ST, #3                    BLOCK AREA:  11

     VICTIM-1:        DALE, AMY JENNIFER             WF26   (11/19/71) 825-7558
     ADDRESS:         1925 G ST, #2, Arcata, CA  95521

     SUSPECT-1:       WHITESIDES, KYLE JASON         WM25   (04/20/72) 677-0851
     ADDRESS:         1309 PATRICKS POINT DR, #2, Trinidad, CA  95570
     DL NO./STATE:    A3369984/CA                                    BK NO.:  16837
     RACE: White             SEX: M HT: 604     WT: 180    HAIR: BRO  EYES: HAZ

     DETAILS OF INVESTIGATION:

        VICTIM DECLINED TO PROSECUTE.  CASE CLEARED.
```

*cl*

CLEARED/NO PROSECUTION DESIRED

REPORTED: 04/03/98 by OFFICER C. PARKS
RECORDED: 04/03/98 by DISPATCHER B. JOHNSON          128
REVIEWED: 04/03/98 by OFFICER C. PARKS

CONFIDENTIAL

INCIDENT: 96020389
SUPPLEMENT:       1

x27

# Arcata Police Department


### Supplemental Report

Case #: 96-0480

## Report of District Attorney Action

Suspect: Whitesides, Kyle    Victim: Dale, Amy

Date of Contact/Dispo Log Review: 4-3-98

Name of Official Contacted: S Braca

## Action

- ☐ - Filed, Suspect Arraigned    Arraignment Date: _____
- ☐ - Filed, Suspect Cited In: _____
- ☐ - Filed, Arrest Warrant Issued
- ☐ - Rejected, Victim Did Not Contact D.A.
- ☑ - Rejected, Victim Declined to Prosecute
- ☐ - Dismissed, Interest of Justice
- ☐ - Dismissed, Lack of Evidence
- ☐ - Case Consolidated (With Case #: _____) Docket #: _____
- ☐ - Other (Be Specific): _____
  _____
  _____
  _____

## Case Disposition

- ☑ - Cleared
- ☐ - Suspended
- ☐ - Pending _____
- ☐ - Other (Be Specific) _____

Officer: C. Parks    ID#: 334    Date: 4-3-98

Reviewed: ___    ID #: 334    Date: 4-3-98

CONFIDENTIAL

x28

129

10:

| PRELIMINARY IN. ORMATION FROM TRIAL COUNSEL AS TO APPEAL: |

People v. <u>Kyle Jason Whitesides</u>    Appeal No. <u>G048833</u>   Superior Ct. No. <u>10NF0718</u>

Name of trial counsel: <u>DAVID M. NISSON</u>

Address: <u>17291 IRVINE BL. STE. 154  TUSTIN, CALIF. 92780</u> Phone: <u>714.730.2171</u>

Is Mr. Whitesides  a United States citizen? Yes <u>X</u> No ___ Unknown ___

To your knowledge, has Mr. Whitesides retained an attorney to handle this appeal? Yes ___ No <u>X</u>
If so, please name: _____

Were there other defendants convicted in same case? Yes___ No <u>X</u> If so, their names and trial counsel:

_____

_____

Did Mr. Whitesides need an interpreter in the trial court proceedings? Yes ___ No <u>X</u>
If so, what language? _____

Is it essential that he  have an attorney proficient in that language on appeal? Yes___ No ___ <u>N/A</u>

Mr. Whitesides's convictions and sentence: <u>1 COUNT OF FORCIBLE SODOMY, 1 COUNT</u>
<u>OF FORCIBLE RAPE w/PRIOR 288a CONVICTION FOUND TRUE — 100 YEARS TO LIFE</u>

Is this a "2 Strikes" case?  Yes <u>X</u> No ___ ;  a "3 Strikes" case? Yes ___ No ___ <u>SEX CASE</u>

Duration of trial court proceedings: <u>2 WEEKS ( APPROX.)</u>

Brief factual summary: <u>A STAYED OVERNIGHT AT HALFWAY HOUSE FOR</u>
<u>EMOTIONALLY / MENTALLY CHALLENGED PERSONS. STAYED IN</u>
<u>ROOM OF GIRL HE KNEW AND HER ROOMATE CLAIMED A RAPED</u>
<u>AND SODOMIZED HER IN BATHROOM WHILE SHE WAS DRUNK AND THROWING UP.</u>
Potential issues on appeal: <u>INFLAMMATORY 1108 EVIDENCE ALLOWED</u>
<u>IN DESPITE UNAVAILABLE DISCOVERY ( RECORDED PHONE CALLS)</u>
<u>WHICH MIGHT HAVE PROVED EXCULPATORY</u>

Mr. Whitesides's last known address: <u>ORANGE COUNTY JAIL, THEO. LACEY FACILITY</u>
Questions or comments: <u>MR. WHITESIDES HAS A VERY PLEASANT</u>
<u>DISPOSITION.</u>

Was an application for bail pending appeal made? Yes___ No <u>X</u> Is further action needed? <u>NO</u>

130

x29

7C

## 402

### HIGGASON

WHY IS IT THAT PROSECUTION HAS NEVER PROVIDED ANY INFORMATION TO DEFENSE THAT THEY HAVE EVER BEEN IN CONTACT WITH HILGASON — NO REPORTS OF CONTACT NO UPDATED CONTACT INFO — NOTHING.

BOTTOM LINE = NO TAPES — NO TESTIMONY.

### IMPEACHMENT PRIORS

WHICH PRIOR CONVICTIONS WILL DA SEEK TO INTRODUCE FOR IMPEACHMENT IF △ TESTIFIES?

243.4? = MISDEMEANOR = NOT ADMISSIBLE
           FACTS ARE 352 ~~ADMISSIBLE~~

288(a) = 352 / SANITIZE

ONCE DA HAS STATED WHICH PRIORS THEY ARE SEEKING TO INTRODUCE WE WILL BRIEF ISSUE

### 1108

① Fresh Complaint - ~~~~~~ - admitted -

~~~~~~~~~~~~~~~~~~~~~~ - admitted -

131

x30

7D



OFFICE OF THE
# DISTRICT ATTORNEY
ORANGE COUNTY, CALIFORNIA

TODD SPITZER

August 30, 2022

Kyle Whitesides, CDCR #AR-1462
Mule Creek State Prison
4001 Highway 104
Ione, California 95640

RE: Your request for judicial notice in *People v. Whitesides*, Orange County Sup. Ct Case No. 10NF0718

Mr. Whitesides:

The Office of the District Attorney of Orange County (OCDA) is in receipt of your letter dated August 18, 2022, requesting the superior court take judicial notice of our letter to you dated August 9, 2022. Your request for judicial notice is not authorized by Evidence Code sections 451 and 452, nevertheless, your concerns are addressed as follows.

In your letter, you complain to the court that you have not received the following from OCDA:

1) Handwritten notes from field investigators;
2) Criminal backgrounds;
3) False reports made by Kim M.;
4) Discovery on witnesses Baber, Burke, and Higgason; and
5) Transcripts of the recorded interviews of the witnesses

As to each request, be advised:

1) There are no handwritten notes by investigators from Anaheim Police Department;
2) There are no criminal convictions pertaining to trial witnesses;
3) There are no false reports made by Kim M;
4) All discovery relating to witnesses Baber, Burke, and Higgason are including in the reports sent to you previously. All information relating to Baber and Burke is found in Bates stamped pages 1-21. All information relating to Higgason is found in Bates stamped pages 22-41.
5) There are no transcripts of witness interviews, nor of the interview the police conducted with you.

REPLY TO: ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE

132

WEB PAGE: http://orangecountyda.org/

x31

☒ MAIN OFFICE      ☐ NORTH OFFICE       ☐ WEST OFFICE       ☐ HARBOR OFFICE      ☐ JUVENILE OFFICE      ☐ CENTRAL OFFICE
300 N. FLOWER ST    1275 N. BERKELEY AVE   8141 13th STREET

You should also be advised that while the court ordered the production of transcripts of the interviews of the witnesses and you pursuant to Penal Code section 1054.9, such order is predicated on two things: 1) That such transcripts are in OCDA's possession; and 2) That you would have been entitled to them at the time of trial. (See Penal Code section 1054.9, subdivision (c).)

Transcripts of interviews are required to be prepared and given to the opposing party only if a party seeks to enter the recordings of the interviews into evidence. (See California Rules of Court, rule no. 2.1040, subdivision (b).) As you know, no electronic recordings were introduced into evidence at any hearing prior to or during your trial. As such, you were not and are not entitled to a transcription of any of the interviews, whether or not OCDA is in possession of them, as section 1054.9(c) only authorizes you to obtain evidence you would have been entitled to at time of trial.

While you were not entitled to possession of transcriptions at time of trial, since you cannot now possess electronic media in prison, had OCDA transcribed the interviews, as a matter of comity, we would provide the transcriptions to you. However, OCDA has not ever transcribed them and we are under no obligation now to do so on your behalf.

As stated in the previous letter to you, should you hire an attorney or other representative, OCDA can provide the recordings to that person on your behalf.

Sincerely,

/s/ *Matthew Lockhart*

Matthew Lockhart
Senior Deputy District Attorney
Writs & Appeals Unit
Office of the District Attorney of Orange County

133

x32

HABEAS EX: 8A

8a — Anaheim P.D. Detective's Interview with    (10 pg.)
        Susan  Baber
                                              (× 1 – × 10)

    ∘ GIGLIO / Failure To Impeach  (IAC)

# EXHIBIT  8A

(10 pss.)

8A

M

# PUBLIC DEFENDER
# ORANGE COUNTY
# CD TRANSCRIPTION

DEFENDANT(s):   WHITESIDES, KYLE

CD No.:  E419-10

Total Time:  10:00 MIN

Sup. No.:  10NF0718

CHARGE(s):   261(a)(X2); 288(a)(c)

Trial Deputy(ies):   BITTAR

INVESTIGATOR(s):

INVESTIGATION DATE:   07/14/10

TRIAL:  N/A

DATE TRANSCRIBED:   5/21/10

LEGEND:

Q:  Det. Adhan
A:  Susan Barber

NOTE:   (..?)   =   Non-intelligible or non-distinguishable words or phrases.
          --   =   Change / Interruption in thought.
         ...   =   Incomplete thought / Pause in thought.
         [ ]   =   Transcriber's comment(s).
      Uh huh   =   Affirmative response.
      Huh uh   =   Negative response.

x 1

DEFENDANT:                 WHITESIDES, KYLE                              1
INTERVIEWEE(s):            BARBER. SUSAN
INTERVIEW DATE:            03/10/10                    CD NO: E-419-10

CD NO. E-418-10, BEGINS AT 10:00 MIN/SEC

[phone ringing]

A:    Hello. [various background noises & static]

Q:    Hi, is this Susan? [various background noises & static]

A:    Yes. [various background noises & static]

Q:    Hi this is Detective Adham with the Anaheim Police Department.

A:    Yes.

Q:    Can you talk right now?

A:    Sure.

Q:    Okay. I wanted to, I got your return phone call and um, I wanted to ask you about Kim McCollaugh. Do you remember her?

A:    [various background noises & static] About a Kim?

Q:    Kim.

A:    Uh huh.

Q:    Kim McCollaugh, do you remember her?

A:    Yes.

Q:    Um, she was the lady who had come to you with an allegation that she'd been sexually assaulted.

A:    Uh huh.

Q:    Do you remember that?

A:    Yeah.

136

x 2

DEFENDANT:
INTERVIEWEE(s):          WHITESIDES, KYLE                    2
INTERVIEW DATE:          BARBER. SUSAN
                         03/10/10                    CD NO: E-419-10

Q:    Okay. Um, um, do you remember what she told you when she came to you and told you about that?

A:    It was um, it was actually two us I believe um, Eric...

Q:    Okay.

A:    Eric um, he's there --

Q:    Okay.

A:    -- um, Eric, what was his name.  [laughs] My co-worker Eric.

Q:    Your, okay.

A:    Oh God, Eric Burke.  Okay.

Q:    Burke.  Okay.

A:    He was involved and we had given police report.

Q:    Right.  [various background noises & static]

A:    And uh, she stated she had been sodomized by one of, like an outsider.

Q:    Okay.

A:    He was not a part of the room and board at the time.

Q:    Okay.

A:    And um, she was, he had came into the bathroom --

Q:    Okay.

A:    -- uh and there was a lot of stuff going on, loud music and so no one heard her.

Q:    Okay.

A:    In the bathroom with him.  He had forced himself into the bathroom.

DEFENDANT:                WHITESIDES, KYLE                                3
INTERVIEWEE(s):           BARBER. SUSAN
INTERVIEW DATE:           03/10/10                      CD NO: E-419-10

Q:     Okay. So he had, he had forced himself into the bathroom um --

A:     She had went into the bathroom to I guess um, puke.

Q:     Okay.

A:     From the alcohol or whatever.

Q:     Okay.

A:     And um, he forced her, he forced himself in the bathroom --

Q:     Okay.

A:     -- upon her.

Q:     Okay and what, when she told you about this how long um after, how long before --

A:     How long after?

Q:     Yeah, exactly.

A:     Uh, gosh it's been so long ago.  [laughs]

Q:     I know, I know.

A:     Um, [various background noises & static] I believe it was like maybe a week after.

Q:     A week after, roughly.  Okay.

A:     Uh…

Q:     Do you know if you have, do you have any notes or does Tele Care have any notes on when, do you guys take any notes when spoke with her about it.  [various background noises & static]

A:     I think um, 'cuz the person that had her before me --

Q:     Uh huh.

x 4

DEFENDANT:
INTERVIEWEE(s):                  WHITESIDES, KYLE                          4
INTERVIEW DATE:                  BARBER. SUSAN
                                 03/10/10                    CD NO: E-419-10

A:    -- Eric, I think he has the note on her.

Q:    Okay perfect.

A:    Um, I don't think I wrote any notes and if I did it would be [various background noises & static] I can't even remember where they'd be.

Q:    Right, right. It, it was awhile ago.

A:    Yeah, I remember him doing the crisis because she was originally under him and then because he couldn't deal with the sensitive situation --

Q:    Okay.

A:    It got changed to me.

Q:    Okay, gotcha. Um, and was, was she believable when she, when she told you about it?

A:    Yes, she was (?).

Q:    Okay. Um, let me think of what else. And did she say why she waited to report it? Why, why she didn't report it right away?

A:    Because she had felt that um, room and board operator had gotten tired of the police involvement at the house --

Q:    Uh huh.

A:    -- and um, um, she was scared that [various background noises & static] it would jeopardize her housing.

Q:    I'm sorry [various background noises & static] that it would what?

A:    It would jeopardize her housing.

Q:    Oh, okay, okay.

DEFENDANT:                    WHITESIDES, KYLE                              5
INTERVIEWEE(s):               BARBER. SUSAN
INTERVIEW DATE:               03/10/10                    CD NO: E-419-10

A:    And she was she was just 'cuz she kept about calling the police over to the house.

Q:    Okay.

A:    And so that's why I think we had the meeting and then she had a warrant or two so she was scared of being, being arrested. And at, at the time.

Q:    Okay.

A:    She was scared of being.

Q:    Okay.

A:    And um, and jeopardizing her housing.

Q:    Okay. Alright. I think that pretty much covers everything. Is there anything um; is there anything I didn't ask you that you thinks important for me to know about, about it?

A:    Um, generally, no um, you said that she was believable, you know. She didn't appear to be uh, suspicious on this.

Q:    Okay. Uh, had she ever, the reason why I asked you that is because um, one of the other witnesses said she was a drama queen. You know she created a lot of drama but had she ever lied to you um about anything you know of this, of this --

A:    Of this nature, no.

Q:    Okay.

A:    No, not of this nature. But other natures, yeah. [laughs]

Q:    Okay.

A:    But uh, but this no I, I wouldn't think that she would just falsify a statement.

Q:    Okay. And when, when she spoke with you and Eric what was her state? Was she crying,

140                                                                          x6

DEFENDANT:
INTERVIEWEE(s):                    WHITESIDES, KYLE                          6
INTERVIEW DATE:                    BARBER. SUSAN
                                   03/10/10                    CD NO: E-419-10

was she sad?  You know how was --

A:    Yeah, she was emotional about it and um, she gave very graphic details as far as um, her medical condition from like [inaudible] she has um, um, well females we get that after childbirth you know like what are those things --

Q:    Hemorrhoids.

A:    Yes.  [laughs]  So um...

Q:    Okay.

A:    Being, mentioned you know those, it was bleeding and she went on for a period of time and yeah --

Q:    Okay.

A:    -- that's all it took.  I was like ugh.

Q:    Okay.

A:    [laughs] Yeah, so I felt real bad for her and I, I we did all we could.

Q:    Okay.

A:    As far as making the report as soon as we got the information.

Q:    Okay.

A:    But I don't know if, you know it was helpful because of the rape kit you know wasn't applied right after you know.

Q:    Right, right.  Um, no it was helpful.  I mean what you guys did was helpful.  There's no doubt about that so.  Okay um, and then when she, I just want to get into a couple of the details.  When she said that he had forced his way into the bathroom what did she say about

141                                                           x7

DEFENDANT:
INTERVIEWEE(s):                WHITESIDES, KYLE                7
INTERVIEW DATE:               BARBER. SUSAN
                              03/10/10
                                              CD NO: E-419-10

what he did to her I mean?

A:     Uh, that he, he said, she said she had bumped her head on the sink or something --

Q:     Okay.

A:     -- like that.

Q:     Uh huh.

A:     Or on the wall and she was you know kinda in a daze --

Q:     Okay.

A:     -- you know and, and that was it. But I didn't see any bruises on her when I, when I went. But I did see did I see some bruises on her legs? I can't remember --

Q:     [low/muffled] Okay.

A:     -- if it was bruises. But I don't remember seeing anything like facial wise and she didn't, she didn't alert me to anything during my home visit.

Q:     Okay.

A:     But. She may have.

Q:     Okay.

A:     She may have told Eric.

Q:     Okay. And I'll talk to him also. Um --

A:     Yeah.

Q:     -- when, when she said that he sodomized her did she say what, what position or what he did when he did that to her?

A:     Um --

142

x 8

DEFENDANT:
INTERVIEWEE(s):                 WHITESIDES, KYLE                              8
INTERVIEW DATE:                 BARBER. SUSAN
                                03/10/10
                                                        CD NO: E-419-10

Q:    What he did after he came in the bathroom to her?

A:    He just forced her like, to, to turn away from him.  She wasn't able to you know, defend herself.

Q:    Uh huh.  Did she where in the bathroom that happened?  Do you remember?

A:    Oh...  I remember, well the bathroom is not that big.

Q:    Uh huh.

A:    Uh, and um and I think the tub is to the left so when you go, as you go in the toilet is to your right --

Q:    Okay.

A:    -- and the sink is directly in the front.

Q:    Okay.

A:    So she was uh stooped over the toilet.

Q:    The toilet.  Okay.

A:    And uh, yeah and then he was able to shut the door --

Q:    Uh huh.

A:    -- and he, and then she turned around and then he grabbed, I guess grabbed her head and shoved it into the top of the toilet whatever.

Q:    Oh, okay do you remember her telling you that or you're not sure?

A:    I remember her telling me that.

Q:    Okay, okay.  And then he so he, he turned her around?

A:    Uh huh and then assaulted her.

143                                        x9

DEFENDANT:
INTERVIEWEE(s):    WHITESIDES, KYLE
INTERVIEW DATE:    BARBER. SUSAN    9
                   03/10/10
                                   CD NO: E-419-10

Q:    Okay, okay.

A:    Yeah so. That's all I remember.

Q:    Okay.

A:    I remember those details.

Q:    Okay. Alright well thank you so much I appreciate um, you talking with me and we'll give um, Eric a call.

A:    Yes.

Q:    Okay, thank you so much.

A:    Okay, you're welcome.

Q:    Okay, take care.

A:    Bye-bye.

Q:    Oh, I'm sorry Susan?

A:    Huh? Yes, yes, hello?

Q:    Yeah actually you know what hang on just a second –

[recording ends abruptly]


CD NO. E-419-10, ENDS AT 10:00 HR/MIN

TRANSCRIBED BY PSR ON 05/21/10

x 10

# HABEAS EX: 9 A-B

9A — Anaheim P.D. Detective's Interview with
Ms. Kim McCollough          (46 ps.)

• Failure To Impeach        (IAC)    (×1- ×46)

_____

9B — Anaheim P.D. "Narrative" by Detective
Omar Adham                  (5 ps.)
_____   (×47- ×51)
_____

# EXHIBIT  9A-B   (51 pss.)

145

9A

## PUBLIC DEFENDER
## ORANGE COUNTY
## TAPE TRANSCRIPTION

DEFENDANT: _____ KYLE WHITESIDES _____

PD TAPE NO.: ____ E417-10 ____    CASE NO.: ____ 10NF0718 ____

CHARGE: ____ 2616.1; 288(a)(c) ____

INVESTIGATOR(S):
   PARALEGAL(S): _____

ATTORNEY(S): _ BITTAR _____

TRIAL DATE: ____ N/A ____    INTERVIEW DATE: _ 4/30/2009 _

LEGEND:

Q:    DETECTIVE ADHAM

A:    MS. KIM McCOLLOUGH

Note:   (..?)    = Non-intelligible or non-distinguishable words or passages
        [ ]      = Transcriber's comment(s).
        Uh huh = Affirmative response.
        Huh uh = Negative response.

146

x 1

| DEFENDANT: | WHITESIDES, KYLE | |
|---|---|---|
| INTERVIEWEE(s): | MCCOLLOUGH, KIM | 1 |
| INTERVIEW DATE: | 04-30-09 | |

TAPE NO.: E417-10

BEGIN TAPE E417-10

[Knocking]

A:    Sure.  I'm trying to see if I have a card from where he works, because (..?)

Q:    For where—

A:    It's M-E-S-I.

Q:    Oh, perfect, okay.

A:    That—

Q:    Perfect.

A:    Or M-S-E, that's—hold on a minute.

Q:    Okay.

A:    I'm moving on here.

Q:    That's all right.  Okay.

A:    It sounds like that, that's why I did that.

Q:    Okay.

A:    It's on Main.

Q:    And then, do you have your—can I see your ID also?  I just want to make sure I've got

the right information here.  Let's see here.

A:    It's in my—that's before.

Q:    Oh, you're from Missouri?

A:    I lived in Missouri for three years.

Q:    What do you like better, California or Missouri?

A:    I love California.  I wasn't raised or anything, I just went there for three years.

147

x2

| | | | |
|---|---|---|---|
| **DEFENDANT:** | **WHITESIDES, KYLE** | | **2** |
| **INTERVIEWEE(s):** | **MCCOLLOUGH, KIM** | | |
| **INTERVIEW DATE:** | **04-30-09** | **TAPE NO.: E417-10** | |

Q:    Where, where were you born?

A:    Um, California.

Q:    California, okay.

A:    I'm trying to—you don't know that place on Main, it's like a—

Q:    Um...

A:    —a mental—It says—

Q:    I might.

A:    M-S, M-S-A.  It's, it's, uh, it's for, um, people, just, they wait there after they get out of the Armory.

Q:    Okay.

A:    It's like around the—I can't find the card.

Q:    That's okay.

A:    I'll get the information for you.

Q:    I have the phone number, so...

A:    That was my, my (..?) sorry.

Q:    Wow, this said you were 288.  Is that a typo?  You've—you're not 288 anymore.

A:    No, I've lost—

Q:    Oh, yeah.

A:    I had a stomach bypass.

Q:    Oh, you did?

A:    Yeah.

Q:    Are you happy with it?

DEFENDANT:       **WHITESIDES, KYLE**
INTERVIEWEE(s):   **MCCOLLOUGH, KIM**       **3**
INTERVIEW DATE:   **04-30-09**

                                                          **TAPE NO.: E417-10**

A:    Yeah, it's simpler—

Q:    Good.

A:    —and I have 40 more to go. And I've lost 30 since—

Q:    Wow, great.

A:    The only good thing that happened, that I lost—not this, but having a breakdown, I lost 30 pounds.

Q:    Yeah, yeah, yeah. So, um, I'm going to ask you sensitive questions, I'm going to ask you personal questions.

A:    Uh huh.

Q:    I am a Sex Crimes Detective, and this is what I do all day in and day out. Um, people handle it different, you know, different ways. I'm not going to be embarrassed, um, if whatever words you use or whatever you tell me, I've heard it all before. So, um, you can be straightforward with me. Um, if some things are difficult, I understand. If you don't remember something, tell me you don't remember. If you don't know the answer to a question, it's okay to say "I don't know."

A:    Okay.

Q:    So, um, so now I've read the report. This report was made on March 3rd. And I guess the assault happened on, it was on a Friday night; is that right?

A:    Yes.

Q:    On February 13th?

A:    Yes.

Q:    So um, right now, you said you're living there with two roommates?

DEFENDANT:
INTERVIEWEE(s):      WHITESIDES, KYLE
INTERVIEW DATE:      MCCOLLOUGH, KIM                                    4
                     04-30-09
                                                        TAPE NO.: E417-10

A:    Uh huh.

Q:    Uh, I met Dana, right?  Dana is one of them?

A:    Yes, she's the blonde.

Q:    I met her the other day, when I dropped off the card.  And who is the other roommate who's there?

A:    Uh, she's Terri.

Q:    Who is she?

A:    She just got here, probably two weeks ago.

Q:    Okay, so she wasn't there at the time—

A:    Oh, no.

Q:    —that this happened.  Does Terri know anything about what happened?

A:    No.

Q:    Okay.  Who knows about what happened?

A:    Dana knows, but she wasn't there.

Q:    Right.

A:    I mean, she was, like, watching TV.

Q:    Okay.

A:    There was a stereo going in the back.

Q:    She said she was asleep or something, yeah.

A:    Yeah, she usually does sleep on the couch, off and on.

Q:    Okay.  Who else knows?  Your husband knows?

A:    Um, Lorenzo, which is, he was in the back.

x 5

150

| DEFENDANT: | WHITESIDES, KYLE | 5 |
| INTERVIEWEE(s): | MCCOLLOUGH, KIM | |
| INTERVIEW DATE: | 04-30-09 | |

TAPE NO.: E417-10

Q:     Who is, let's see, Lorenzo.  Who is Lorenzo?

A:     He's, uh, he used to live there.

Q:     Oh, he used to live there?  Okay.

A:     Yeah, it's, he's down the hall, on the left-hand side, his room was.

Q:     Okay.  Okay.  Do you know—

A:     And he'll—I'm sorry.

Q:     Do you know where he lives now?  Do you still stay in touch with him?

A:     No, but he's at Telecare, and they know where he's at.

Q:     Oh, okay, all right.  'Cause he knows what happened, right?

A:     He didn't see what happened, but he saw, I mean, at the after.

Q:     Okay.

A:     He knew I was crying in the bathroom.

Q:     Okay.  So, he was at the home?

A:     Yes.

Q:     At the time?  Okay.  All right.  And, so your—and what's your husband's name again?

A:     Charles McCollough.

Q:     Do you know what his date of birth is?

A:     Uh, February—excuse me, sorry.  Um, September 1st, 1959.

Q:     '59.  Okay.  And if he's not at the Armory, is he just out on the streets?

A:     He doesn't usually do that.  He usually—

Q:     Where is he?

A:     —stays at the Armory.  And I'm sure a lot of people know him, 'cause he's—

x6

**DEFENDANT:**
**INTERVIEWEE(s):**     **WHITESIDES, KYLE**                                              6
**INTERVIEW DATE:**     **McCOLLOUGH, KIM**
                       **04-30-09**

                                                         **TAPE NO.: E417-10**

Q:     Okay

A:     He's crazy.

Q:     Well, if I want to try and find him, what, what does he look like or where, where, if he's not at the Armory, where is he going to, where is he going to be, roughly?

A:     He's, um, I'm trying to think what he does.

Q:     Okay.

A:     I don't know, other than the Armory. Um, he wanders, like, kind of.

Q:     Okay.

A:     And he—

Q:     I've probably seen him, but I don't, I don't, obviously, I don't know who he is.

A:     You probably have. He's short, and he's got lot Einstein hair that sticks out like this.

Q:     Hmm. And what does he—

A:     Not real short, but—

Q:     Does he have a particular jacket or anything that he wears?

A:     Yes, he wears, like, a tan jacket.

Q:     Tan jacket, okay.

A:     And his clothes are usually baggy.

Q:     Okay. Does he, does he carry a backpack, a shopping cart?

A:     Backpack.

Q:     Backpack.

A:     And a bucket, sometimes, because he washes windows.

Q:     Okay. What color is the backpack?

DEFENDANT:
INTERVIEWEE(s):    WHITESIDES, KYLE                          7
INTERVIEW DATE:    MCCOLLOUGH, KIM
                   04-30-09

TAPE NO.: E417-10

A:    Uh, probably blackish-brown.

Q:    Okay.

A:    It's a darker color.

Q:    Does he usually push a shopping cart or no?

A:    No.

Q:    Okay. Okay. Does he have a walking stick or anything like that or…

A:    No. No.

Q:    Does he wear a particular hat?

A:    Yes. He usually wears like a baseball cap kind of thing, forward.

Q:    Do you know what color? Is it the same?

A:    It's different.

Q:    The baseball cap, I mean.

A:    The one he had last time was a tan one, with a dragon on it.

Q:    Okay. Okay. All right. Well, I'll just look for (..?). So, okay, so, let's go over again what, what happened, um, on, on February 13th, then.

A:    Well, after I had already—I had already been drinking—

Q:    Okay.

A:    —before, I was drinking some wine, before he got there.

Q:    And when you say, "he", this guy's name is?

A:    Kyle.

Q:    Kyle. Okay.

x 8

DEFENDANT:                    **WHITESIDES, KYLE**                              8
INTERVIEWEE(s):               **MCCOLLOUGH, KIM**
INTERVIEW DATE:               **04-30-09**
                                                           **TAPE NO.: E417-10**

A:     Yeah.  And I did have the wine.  And I poured, I poured myself another glass, and I was

       sitting on my bed, and he was sitting on the floor, and Rose was sitting across from—

       because her bed, our beds are like this.

Q:     In the same room?

A:     Yeah.

Q:     Okay, (..?)

A:     And he was in the center.

Q:     Okay.

A:     And um, I just, we just was laughing, and, and uh, talking.

Q:     Okay.

A:     And she went up, 'cause she's been homeless for three years, so she's got all these

       blankets that are rolled up on the shelf, because we, it's like a shelf straight across on the

       wall, it's got a shelf that has sleeping bags, she ties them up.  Well, she starts bringing out

       this stuff, and I'm thinking to myself, what, you know, why is she doing this.

Q:     Uh huh.

A:     And apparently I got, um, the idea that he was going to spend the night.

Q:     Okay.  So, she was laying the blankets on the floor?

A:     Right.

Q:     Okay.

A:     And he was laying on the blankets.  And I didn't really like the idea, but I, I still sat there

       and drank the wine and stuff.  And then he, he picked up his foot, and this is after I was

       probably a little bit more inebriated.

x 9

DEFENDANT:
INTERVIEWEE(s):      WHITESIDES, KYLE
                     MCCOLLOUGH, KIM                              9
INTERVIEW DATE:      04-30-09

TAPE NO.: E417-10

Q:    Okay.

A:    He could tell, I mean, you know?

Q:    Okay.

A:    And he took advantage of that. So, he picked up his foot and he put it in his crotch and he had his shoe off.

Q:    In your crotch, right?

A:    Right.

Q:    Okay.

A:    I don't, I don't, I didn't see him take his shoes off, because I was talking to Rose, I was laughing.

Q:    Okay.

A:    And I really got offended, I really didn't like him at first, so I tried to focus on Rose.

Q:    Okay.

A:    And I was laughing with her, and—

Q:    Okay.

A:    —doing that kind of thing. So, I kind of pushed it away, and then he put it on top of my knee and he did it again.

Q:    Okay.

A:    And I kind of moved over.

Q:    Uh huh.

A:    And um, at this point, he started, like, uh, he kept putting his foot there, kept pushing, like, in my crotch.

x 10

DEFENDANT:            WHITESIDES, KYLE
INTERVIEWEE(s):       MCCOLLOUGH, KIM                                          10
INTERVIEW DATE:       04-30-09
                                                          TAPE NO.: E417-10

Q:      In your crotch, okay.

A:      So, I, then I got, um, then I got uncomfortable.

Q:      Okay.

A:      And I left.

Q:      Okay.

A:      I got up and I left the room, and I went into the bathroom.

Q:      Okay.

A:      'Cause to me, I thought that would be a safe place.

Q:      Okay.

A:      I don't know. And I was inebriated, so I—it was a safe place. So, as far as everybody
        asking me if I locked the door, it's a habit that I don't lock the door.

Q:      Okay.

A:      The men know not to go in there, um, and to knock. But the females, if you're taking a
        shower, there's one bathroom for, at that time, there was like, Lisa was there too, so there
        was Lisa, Lorenzo, Rose, Dana, and there was all these people that have to use one
        bathroom.

Q:      Okay.

A:      So, there was more females, so I don't care, we didn't care if we were taking a shower
        and a female came in there and went to the bathroom.

Q:      Right.

A:      So, in my thinking, being a little inebriated, I left it unlocked.

Q:      Okay. And that's what you're used to?

156

x 11

DEFENDANT:
INTERVIEWEE(s):      **WHITESIDES, KYLE**                         **11**
INTERVIEW DATE:      **MCCOLLOUGH, KIM**
                     **04-30-09**
                                                    TAPE NO.: E417-10

A:    Right.

Q:    Okay.

A:    And so, I kind of, I felt a little sick, so I sat down in the corner, you know, like where the bathtub is, because it's really close to the toilet.

Q:    Okay.

A:    So, I sat there, thinking that I might get sick.

Q:    Okay. Meaning you were going to vomit?

A:    Yeah.

Q:    Okay.

A:    So, I moved over to the toilet, and my surgery does not, um, I absorb alcohol really fast, because I only have half of a stomach. They cut, they completely bypass it.

Q:    Okay.

A:    So, for some reason, I don't absorb nutrients, that's why, fluid even.

Q:    Right, right.

A:    That's why I'm anemic—

Q:    Okay.

A:    —all the time. So, whatever alcohol I have, it just, it powed me. It hit me.

Q:    Okay. How much alcohol do you think you had at that time?

A:    I would say three and a half glasses of wine.

Q:    Okay.

A:    And I'm being honest with you. Which would probably be almost the whole bottle

Q:    Okay. Do you remember, was it any particular kind of wine?

x 12

| | | |
|---|---|---|
| **DEFENDANT:** | | |
| **INTERVIEWEE(s):** | **WHITESIDES, KYLE** | **12** |
| **INTERVIEW DATE:** | **MCCOLLOUGH, KIM** | |
| | **04-30-09** | |

TAPE NO.: E417-10

A:    It was cheap.  It had a foot on it.  It's cheap.  You can get it at any store.  It's got, it's got a bare foot on it.

Q:    Okay.

A:    I mean, you can even walk down and you'll see it, if you ever go to the grocery store, it's in there.

Q:    White wine, red wine?

A:    It was red wine.

Q:    Okay.  Just some red wine.  Okay.  Um, and what do you, what time do you think he first—well, go ahead, and then we'll, I'll ask you back to that.

A:    Uh, I, the, the bathroom light was not on.

Q:    Okay.

A:    Okay?  I just went in there, stumbled in there, and—Well, I actually didn't stumble, I… But then the door opened, and I saw the hall light.

Q:    Okay.

A:    So, I scooted back against the bathtub.

Q:    Okay.

A:    And in my thinking, I thought it was Lorenzo offering me, to help me get up.

Q:    Okay.

A:    And I knew immediately it wasn't.

Q:    Okay.

A:    Because I could see the outline.  This guy, this guy's tall—

Q:    Okay.

x 13

DEFENDANT:               WHITESIDES, KYLE
INTERVIEWEE(s):          MCCOLLOUGH, KIM                                13
INTERVIEW DATE:          04-30-09
                                                    TAPE NO.: E417-10

A:    —and he's bald.

Q:    Okay.

A:    And um, okay, I thought, so, he's going to help me up. So, I grabbed his hand. And when I grabbed his hand, there's a sink approximately about that wide—

Q:    Okay.

A:    —that's directly from the, you know, the toilet's here, the sink's here, and the bathtub is here.

Q:    Okay. What I'm going to do is, when we go back, I'm going to get some photos, if you don't mind?

A:    Oh, I don't care.

Q:    Okay. Okay.

A:    And he jerked me up, and uh, pushed me forward. And I don't even know, I think he got me on my back. At the same time, he grabbed my hand and pushed like that—

Q:    Okay.

A:    —pushed me over the sink.

Q:    Okay.

A:    I had scrubs on.

Q:    Uh, scrubs, like—

A:    Ties, tie.

Q:    Uh, pants?

A:    Yeah—

Q:    Okay.

x.14

DEFENDANT:
INTERVIEWEE(s):    WHITESIDES, KYLE
INTERVIEW DATE:    MCCOLLOUGH, KIM                          14
                   04-30-09
                                                TAPE NO.: E417-10

A:    —because I'm a health care worker.

Q:    Oh, okay.

A:    And he reached his hand under there and untied the scrub thing.

Q:    Okay.

A:    And at this point, I couldn't even tell you, I mean, to tell you why I didn't call out.  I don't know.

Q:    Okay.

A:    You'd have to know my personality.  I've been with one man my whole life.

Q:    Uh huh.

A:    And that's my husband.  I haven't been with anybody else, as sexually, I haven't.  So, I kind of like, was in shock.

Q:    Uh huh.

A:    I was kind of like, what…  Until I felt, uh, coldness on my backside, because I knew he had pulled, pulled my things down, my pants down—

Q:    Okay.

A:    —and my scrubs.

Q:    Okay.

A:    They were like just below, they weren't to my knees or anything, because I could still feel it on the back of my legs.

Q:    Okay.

A:    Still.

Q:    Okay.

140                                                          ☓ 15

DEFENDANT:                   **WHITESIDES, KYLE**
INTERVIEWEE(s):              **MCCOLLOUGH, KIM**                           **15**
INTERVIEW DATE:              **04-30-09**
                                                        **TAPE NO.: E417-10**

A:      Um, I felt, um, this is terrible.  I felt, either it was a lubricated condom or he put

        something on it.

Q:      Okay.

A:      Because you know when, if you, you can feel something, you feel like almost like it's,

        there's a coldness, almost like alcohol.

Q:      Okay.

A:      Like they do in the hospital kind of thing.

Q:      Okay.

A:      It reminded me of like when I had an ultrasound and they put on.  Well, I fell that on my

        backside, like in that area.

Q:      Okay.  Well, now I'm going to ask you specifically. When you say backside, your butt?

A:      My rear end, that area in there too.  I mean, it was like on the side, my rear end.

Q:      Okay.  Your buttocks, your butt crack?

A:      Yeah.  So, I'm think—

Q:      Okay.

A:      Yeah, I'm thinking he's, it's not, he's putting it on, because if it was lubricated, I would

        only feel it, but I felt a little, a little bit on my rear end.

Q:      Okay.  When you say rear end, are you talking about inside your anus or outside?

A:      Like the crack.

Q:      Okay.

A:      And that's when he, um, inserted in my, um, my rear end.

Q:      Okay.

161                                                             x 16

| DEFENDANT: | WHITESIDES, KYLE | 16 |
| INTERVIEWEE(s): | MCCOLLOUGH, KIM | |
| INTERVIEW DATE: | 04-30-09 | TAPE NO.: E417-10 |

A:    And it was like painful.

Q:    Okay.

A:    'Cause I don't do that, it's exit only. I mean, I don't do that kind of thing.

Q:    Okay. He inserted his penis?

A:    Yeah.

Q:    Okay.

A:    And he pushed really hard.

Q:    Okay.

A:    Then, at the same time, he pushed my head down into the sink.

Q:    Okay.

A:    And I did say "Stop."

Q:    Okay.

A:    And when I pushed back, I've had four children, so I've got some problems up there,

        hemorrhoids, whatever you want to call it,—

Q:    Okay.

A:    So, when I pushed back, it hurt even more, so my instinct was, uh, I tried to bring my leg,

        like, I remember that you could stomp on the thing, which was kind of like a joke to me,

        because even bending my knee, it was like my legs were locked.

Q:    Uh huh, okay.

A:    He was pushing so hard, my legs were locked.

Q:    Okay. You're saying—and I don't mean to interrupt you. When you say push back,

        you're talking about with the muscles in your buttocks, right?

162

x17

| DEFENDANT: | | 17 |
| INTERVIEWEE(s): | WHITESIDES, KYLE | |
| INTERVIEW DATE: | MCCOLLOUGH, KIM | |
| | 04-30-09 | TAPE NO.: E417-10 |

A:     No, with my—

Q:     Oh, you're talking about from the sink?

A:     No, I didn't have my, um, it wasn't, it was just my, using this, like—

Q:     Okay.

A:     —pulling like that, trying to get back up.

Q:     Okay, got you.

A:     And it hurt, I mean, it—

Q:     Okay.

A:     And I said, "You're hurting me, stop."

Q:     Okay.

A:     And then he, I don't know how long this lasted. It was so painful. And I just—he pushed down and, so hard on my, it kind of like, his hand went over my mouth, so it's kind of, it was kind of fumbled, mumbled—

Q:     Uh huh, uh huh.

A:     —he knocked the, I have a pierce, so he—that was gone. I found later, he knocked it off. But I could feel him tear it off. Because the earring that I, the nose ring I had had, it was a nose ring, so it had a curl. I have some that aren't and some that are. So, for him to get it out, he would have to, it would have to be yanked.

Q:     Okay.

A:     Be pushed like this.

Q:     Okay.

163

x 18

| DEFENDANT: | WHITESIDES, KYLE | |
|---|---|---|
| INTERVIEWEE(s): | MCCOLLOUGH, KIM | **18** |
| INTERVIEW DATE: | 04-30-09 | |

TAPE NO.: E417-10

A:    So, I remember that.  I remember him, I don't know how long he did it, and then I don't even know if he completed, but then he inserted it in the other, which is my, um, vagina.

Q:    Okay.

A:    Um, and started pushing me back against the sink again and again.

Q:    Okay.

A:    And I don't know how long that went on.

Q;    Okay.

A:    And the last thing I remember, I kind of actually did block out, kind of.  I was standing over the sink.  He kind of bent over and whispered in my ear to get up, and I kind of yelled, snotty, said to him, "I am up."

Q:    Uh huh.

A:    You know?  And he, like, pulled back.  I kind of blacked out, he disappeared, and I was, I sat back on—I pulled my scrubs up and I sat back onto the bathtub.

Q:    Okay.

A:    And I was crying, I don't know how long, and, I guess the door was open a little bit, 'cause I saw the light.

Q:    Uh huh.

A:    So, Lorenzo came in and asked me what was wrong.  And you know what?  Jason lived there too, I'm so sorry.

Q:    Okay.

A:    And Jason, um, I started crying, and I told Lorenzo.

Q:    Uh huh.

x 19

DEFENDANT:              WHITESIDES, KYLE                                    19
INTERVIEWEE(s):         MCCOLLOUGH, KIM
INTERVIEW DATE:         04-30-09
                                                        TAPE NO.: E417-10

A:    So, Lorenzo disappeared.

Q:    Okay.

A:    And Jason came in asked me what happened.

Q:    Okay.

A:    And Jason's a schizophrenic. I mean, he, I told him, and he just kind of, like, left.

Q:    Okay.

A:    I don't think he was understanding me. So, uh, this is hearsay, according to Lorenzo, he went in there and kicked him and asked him what the hell he did.

Q:    He kicked, um…

A:    Or he pushed him or kicked him—

Q:    Kyle? Okay, okay.

A:    —or did something, to get him—he got mad and asked him what the hell he was doing.

Q:    Okay.

A:    And I guess Lorenzo believed him, that it was consensual or whatever—

Q:    Okay.

A:    —and he just kind of, like, oh, you know, walked away.

Q:    Okay.

A:    And he, I, you know, we talked later and he, he knows that's not true now.

Q:    Okay.

A:    But at the time he didn't.

Q:    Okay.

A:    And I kind of just wandered in the room and fell back asleep on the bed.

x 20

DEFENDANT:           WHITESIDES, KYLE                              20
INTERVIEWEE(s):      MCCOLLOUGH, KIM
INTERVIEW DATE:      04-30-09
                                                        TAPE NO.: E417-10

Q:    Uh huh.

A:    And Rose did not know until I told her in the morning.

Q:    Okay.

A:    And all I know is, when I laid down, this idiot said, "You're telling people stories?"

Q:    Was he, he was still in the room?

A:    Yes.

Q:    Okay.

A:    And I was actually, I was afraid. I mean, I'm a real, uh, kind of naïve, and I don't know. I don't even know, to tell you why I laid back down there.

Q:    Okay.

A:    I don't know. Um, I don't know if I thought I deserved it, or I thought I was drinking, and that kind of thing.

Q:    Right, right.

A:    I actually, in my mind, at the time, thought, you know what, I'm drinking, um, it happened because of that, and I laid back down. Until I woke up in the morning, and I, I still kind of believed it. And I—

Q:    You felt guilty?

A:    Yeah, I felt guilty, and I had been drinking.

Q:    Yeah, uh huh.

A:    And he was gone.

Q:    Okay.

A:    But yet, um, I told Rose, and she acted like she was real upset.

x 21

| DEFENDANT: | WHITESIDES, KYLE | 21 |
|---|---|---|
| INTERVIEWEE(s): | MCCOLLOUGH, KIM | |
| INTERVIEW DATE: | 04-30-09 | |

TAPE NO.: E417-10

Q:     Uh huh.

A:     And I told Dana, and Dana sat next to me, you know,—

Q:     Okay.

A:     —that kind of thing.  Kind of tried to talk to me.

Q:     Okay.

A:     And Rose started to beg me, don't call the police, don't tell anybody.  She was up for housing, which is the Diamond Apartments, they're beautiful.

Q:     Right.  I know where they are.

A:     I mean, they're nice.

Q:     Yeah.

A:     She was in for a brand new condominium.

Q:     Okay.

A:     And at the time I was friends with her.  I mean, I had been there.  I mean, I actually thought she was my friend.  And um, she was real upset, she acted like she was upset.

Q:     Okay.

A:     And she says, please don't call, because if you call, um, I won't get my, I won't get my voucher, you know, my thing.  So, that's why I didn't call the police.  But I—and I'm confused as to know if we—he went into Lisa's room, by the way,—

Q:     Okay.

A:     —and he tried to get in bed with Lisa—

Q:     Okay.

A:     —and Lisa kicked him.

x 22

DEFENDANT:
INTERVIEWEE(s):    WHITESIDES, KYLE                    22
INTERVIEW DATE:    MCCOLLOUGH, KIM
                   04-30-09
                                                       TAPE NO.: E417-10

Q:    Okay.

A:    Said no.

Q:    Okay.

A:    Lisa's a scrapper, I mean, she's tough.

Q:    Okay.  All right.

A:    I mean, she'll knock you out, I mean, she's like Rose.

Q:    Okay.

A:    You know, she'll punch and—my personality is, I'm not like that.

Q:    Okay.

A:    Anyway, um, the (..?)

Q:    So, you're saying you didn't say anything because—

A:    No, because I actually—

Q:    —you didn't want to jeopardize Rose?

A:    I actually—and when I called my daughter, and my daughter was real upset with me that I didn't call the police.

Q:    When did you call your daughter?

A:    I called Jacqueline, I'd say, the next day.

Q:    Okay.

A:    So, she knows about it.

Q:    Okay.

A:    Um, I told her about it.  Because I had, I have, I had nobody really to talk to.

Q:    Okay.

168

x23

DEFENDANT:
INTERVIEWEE(s):       WHITESIDES, KYLE
INTERVIEW DATE:       MCCOLLOUGH, KIM                      23
                      04-30-09
                                              TAPE NO.: E417-10

A:    And Rose, every time I tried to bring it up, she would just say, oh, please, don't, don't bring it up, don't call the police, they'll take it away, my life's ruined, I was homeless for three years.

Q:    Okay.

A:    And that's why I didn't do it.

Q:    Okay.

A:    And I'm confused as to know if, how this all came into fruition, how everybody found out about it. I don't know if—I know that Lisa told Susan, 'cause she was her care coordinator.

Q:    Okay.

A:    And I think I told, thinking that Lisa had told her, that Lisa had told her that he did something to me, but she didn't tell him what, I'm not sure, really, I'm not. Or she did tell him that he tried to get in bed with her, so she did tell Susan that. And I'm not sure, I just told Susan, thinking that Susan, because Susan called when I went in Telecare, Susan said, "What's the problem, what's going on? I heard something happened." So, I told her, thinking she already knew, and she, I don't think she knew. I don't really know the story behind that one.

Q:    That Susan, how this got reported?

A:    Right. In other words, I don't know if Lisa told Susan.

Q:    Uh huh.

A:    Or I thought, I thought Lisa told Susan—

Q:    Okay.

x 24

DEFENDANT:
INTERVIEWEE(s):        WHITESIDES, KYLE                                24
INTERVIEW DATE:        MCCOLLOUGH, KIM
                       04-30-09                              TAPE NO.: E417-10

A:      —and so I, when Susan said that, I automatically thought that that's what she was

        referring to—

Q:      Okay.

A:      —so I could tell her.

Q:      So, you weren't the one who actually called the police?

A:      No.

Q:      Okay.  I don't know who did.

A:      It was Susan.  I think it was Susan.

Q:      Okay.  I'll have to check on that.

A:      'Cause she said legally, I thought it was confidential, but she said, "Legally, I have to do

        that."

Q:      Um, in a sense, because it's support and care, yeah, so she may be a mandated reporter.

        Well, let me ask you, I mean, is this, do you want him prosecuted?  Do you want to go

        through with this, and do you want him punished?

A:      What I want is, I want him punished, but I, I don't want him to do, because got away with

        it—

Q:      Right.

A:      —I don't want him to do this to anybody else.

Q:      Sure, absolutely.

A:      Okay?  I, me, I'm actually, um, I'm having problems in my rear end.

Q:      Uh huh.

A:      I'm so embarrassed to even tell you.  I never had these problems before.

x25

DEFENDANT:
INTERVIEWEE(s):     WHITESIDES, KYLE
                    MCCOLLOUGH, KIM                          25
INTERVIEW DATE:     04-30-09

                                              TAPE NO.: E417-10

Q:    Okay.

A:    I bleed every time I go to the bathroom.

Q:    Okay.

A:    Never had that.

Q:    Did you go to the doctor?

A:    I did.

Q:    Okay.

A:    And the reason why his report is un—because I've had four children.

Q:    Okay.

A:    So, I'm going to have hemorrhoids.

Q:    Okay.  I'm going to get a copy, I'm going to go get a copy of the medical report, um…

A:    It's not helpful.

Q:    Well, one way or the other.

A:    It was a while after.

Q:    Let me see, um…  Um, where did you go?

A:    I went, um, that you get from Lisa.  It was the doctor right next to the pharmacy that I go to.  It's a—let me look and see.

Q:    Okay.

A:    I hope I brought something with me.  Because he, because I have had, and I understand, I've had four children.

Q:    Uh huh.  And it was, this was, you actually saw Joseph?

A:    Yes.

x 26

DEFENDANT:
INTERVIEWEE(s):    WHITESIDES, KYLE
INTERVIEW DATE:    MCCOLLOUGH, KIM    26
04-30-09

TAPE NO.: E417-10

Q:    Herrera (phonetic)?

A:    Yes.

Q:    Okay.

A:    There was damage, but—

Q:    Okay.

A:    —he still doesn't know if it's from having four children, so…

Q:    Okay.  Okay, thank you.  Um, now, you don't remember how long he, um, he assaulted you for.  Here it says for about ten minutes in your buttocks and about—

A:    I—

Q:    I'm sorry, not ten minutes, ten seconds, and about one minute vaginally.  Do you, you don't remember?

A:    That's how, I do, but it went on forever.  I don't know.

Q:    So, you don't—okay, that's fine.

A:    I, I'm trying to, I don't know.

Q:    Yeah, if you don't remember, you don't remember.  That's fine.

A:    And it might have been that short of time.

Q:    Okay.  Let's see.  Um, and you didn't report it because you didn't want to get, um—

A:    Rose.

Q:    —Rose in trouble.  And then it also says here that you didn't want to get kicked out either, for breaking the rules.

A:    Yes, because I don't want to go to—

Q:    Perceived—

x27

DEFENDANT:     **WHITESIDES, KYLE**                **27**
INTERVIEWEE(s):  **MCCOLLOUGH, KIM**
INTERVIEW DATE:  **04-30-09**

                                                             **TAPE NO.: E417-10**

A:     I don't want to go to the Armory. I would die.

Q:     Okay. Perceived of having had sex at the home, right?

A:     Alcohol.

Q:     If they thought—

A:     Alcohol.

Q:     Alcohol. Oh, so alcohol is not allowed?

A:     Which hasn't been there. I mean, I haven't done that.

Q:     Okay. Um, now, they had, the officers also said that you think Rose set this up?

A:     Oh, I know she did. But that's hearsay.

Q:     Okay, well, why? Why do you think Rose set this up?

A:     Because Lisa told me she overheard her tell him to go in the bathroom and get me.

Q:     Okay. Okay. So, Lisa said that. Okay.

A:     And my daughter, my daughter, uh, goes to, she's in college, so she goes to the Family Planning Clinic, and she just—I went to visit her, and just as, uh, and she knows that I'm not sexually active. She goes, just in case, mom, so she gives me, it was kind of a smiley thing, these condoms. And the thing that is, um, so I put them in my purse, and I gave the condoms to Rose.

Q:     Okay.

A:     What really is getting me, which, I mean, again, this is nothing I can prove, is what if she gave him the condom? How did he get the condom? That's the thing that makes me sick.

Q:     Do you know what he did with the condom, by chance?

x 28

DEFENDANT:                WHITESIDES, KYLE                               28
INTERVIEWEE(s):           MCCOLLOUGH, KIM
INTERVIEW DATE:           04-30-09                           TAPE NO.: E417-10

A:    I have no idea.

Q:    Okay.

A:    I even went back, um, the second day, and looked in the trash, thinking he'd be stupid

       enough to do something like that.

Q:    Uh huh, okay.

A:    But no, it wasn't there.

Q:    All right.  Okay.  Um, why do you think Rose would tell him to do that to you?

A:    Well, because Lisa told me she overheard her say that.  And one time, when Lisa, 'cause

       Lisa has a drug problem—

Q:    Okay.

A:    —they all know that, that she had been, she sleeps in her room all day, and she's really

       tired.  At the specific time, she has some guys that come over and give her things.

Q:    Lisa does?

A:    Yes.

Q:    Okay.

A:    So, she was in her room, and I guess one of them left, and Rose told me that they must

       have given her something, that, and then Lorenzo was there at the time, or, no, Jason, the

       schizophrenic.  She said, this is your time to take advantage of Lisa, go in there.  Try it.

       You know, this, try—

Q:    Rose told that to Jason?

A:    Yes, she did.  She did.

Q:    Okay.

x 29

DEFENDANT:
INTERVIEWEE(s):     WHITESIDES, KYLE                                29
INTERVIEW DATE:     MCCOLLOUGH, KIM
                    04-30-09
                                                    TAPE NO.: E417-10

A:    And so, that's where I'm getting that, where I heard that from Lisa.

Q:    Uh huh.

A:    And also, I thought, the reason that I'm real upset is because she would be talking and laughing on the phone with someone—

Q:    Rose would be?

A:    Yes. And I didn't know it was Kyle, until one day I walked by, and she said, "Kyle." And they were laugh, I mean, she was, she was laughing. And I thought to myself, oh, no, you know, this has to be—but just for shits and giggles, I turned around and I said, "Rose, is that Kyle?" So, and she said yes. So, apparently—

Q:    Okay.

A:    —that's, that's the—

Q:    The impression. Okay. And this was after the assault happened, she was—

A:    Right.

Q:    Okay. All right.

A:    So apparently—

Q:    You don't think Rose—

A:    —it didn't upset her.

Q:    Got you. Okay. Um, let's see here. Do you know if Rose was ever active, sexually active with—

A:    She said, she said, he said that he had sex with Rose.

Q:    Kyle did?

A:    Yes, he did say that.

175                                                    x 30

| | | |
|---|---|---|
| **DEFENDANT:** | **WHITESIDES, KYLE** | **30** |
| **INTERVIEWEE(s):** | **MCCOLLOUGH, KIM** | |
| **INTERVIEW DATE:** | **04-30-09** | **TAPE NO.: E417-10** |

Q:  When did he tell you that?

A:  I don't know.  He said, um, this is, he said, "This is okay, I've had sex with Rose."

Q:  When, was this before or after the assault?

A:  And this was after.

Q:  When?  When was that?

A:  Honey, I don't know.

Q:  Did you—

A:  But probably—

Q:  He told you that?

A:  Yes,  probably in the bathroom.

Q:  After the assault?

A:  Yes.

Q:  Right after the assault?

A:  Yeah, kind of like—

Q:  Okay.

A:  But he was out, and, but he did say that to me, but I don't know what, where I was standing or—but he did say that to me.

Q:  Okay, but after the assault that night?

A:  Yes, he said that.

Q:  Okay, okay.

x 31

DEFENDANT:            WHITESIDES, KYLE                                    31
INTERVIEWEE(s):       MCCOLLOUGH, KIM
INTERVIEW DATE:       04-30-09
                                                    TAPE NO.: E417-10

A:    And you know, Rose is, you know, Rose, um, said that she, you know, she was with him for a while.  And she didn't say she had sex, she just said she was with him.  I assumed that was sex, though, when we were talking.

Q:    Meaning dated Kyle?

A:    This was way before.

Q:    Okay, okay.

A:    But I didn't even know who Kyle was.

Q:    Okay.  Had he ever come over to the house before?

A:    No.

Q:    Okay, that's the first time you ever saw him?

A:    Yeah, first time.

Q:    Okay.  So, um, let me just go over.  When do you estimate, what time at night do you think it was when he first came over, roughly, or when the assault happened?

A:    I'm thinking it's, I don't even know.

Q:    Okay.

A:    I mean, it could be from—I felt it was later at night, 11, 10, 11, like around there.

Q:    Okay, here you initially said 9.

A:    Honey, I don't know.

Q:    9, 10, 11, okay.

A:    Maybe it was clearer then, but I don't know.

Q:    Okay.  Late at night.

A:    My daughter would know, because I told my daughter.

x32

DEFENDANT:            WHITESIDES, KYLE                                    32
INTERVIEWEE(s):       MCCOLLOUGH, KIM
INTERVIEW DATE:       04-30-09                          TAPE NO.: E417-10

Q:    How did you—

A:    At the time I was clearer, and I did tell my daughter.

Q:    Okay. You called her the next day?

A:    Yes.

Q:    Okay, all right, then I'll giver her a call. Um, give me your daughter's name.

A:    Jacqueline. And I'll give you her phone number.

Q:    Oh, okay.

A:    Because she keeps changing cell phones.

Q:    Okay. How do you spell Jacqueline?

A:    J-A-C-Q-U-E-L-I-N-E.

Q:    Okay. And what's her number?

A:    949-351-8406.

Q:    8406. What's her last name?

A:    McCollough, same.

Q:    Okay. Okay, let's see here. How long—you'd been living in the home about three

      months, you said, at that time?

A:    Uh, close to a little less time.

Q:    How less?

A:    Probably, almost two months, not quite.

Q:    So, in February—

A:    I'm thinking even a month and a half.

Q:    So, when did you move in, January, beginning of January, late December?

33

| DEFENDANT: | WHITESIDES, KYLE | |
|---|---|---|
| INTERVIEWEE(s): | MCCOLLOUGH, KIM | 33 |
| INTERVIEW DATE: | 04-30-09 | |

TAPE NO.: E417-10

A:    I have all my—I had all that information.  I have all that information, exactly when I was
       released—

Q:    Uh huh.

A:    —um, from Royale (phonetic), that was the same day.

Q:    Just rough.

A:    I think January.

Q:    Roughly, early January?

A:    Yes.

Q:    Okay, that's fine.  And um, had Rose, Rosemarie, been living there since you moved in?

A:    Yes.  And I just forgot to tell you, while we were sitting in there and talking, I was
       drinking, she was talking on the phone.

Q:    Okay.

A:    And I learned later it was Kyle.

Q:    Okay.  So, she invited him over?

A:    So, she invited him over.

Q:    Okay.  And what clothing, you told me you were wearing the scrubs, did you have
       underwear on?

A:    Yes.

Q:    Okay.  What did you have on your upper body?

A:    Just a T-shirt.  I had, uh, my Chuckie [phonetic] T-shirt.

Q:    Okay.  Did you have a bra on?

A:    Yeah.

x 34

Q:    Okay, all right.  Um, and the people that were living in the home at the time, you, Rose, Leonard, Lisa, Dana and Jason, okay?  How many bedrooms are in the home?

A:    Four bedrooms.

Q:    Four bedrooms.  So you—

A:    Five.

Q:    Five.

A:    The ones that people live in.  So, that would include the fifth one, which is towards the door, that's where the owners live.

Q:    Oh, the owners actually live there?

A:    Yeah.

Q:    Okay.  All right.  Okay.

A:    And at the time, I did, I did, didn't yell help, I—stop, everything was going on.  Lisa had her CD player on.

Q:    Okay.

A:    Lorenzo has a huge stereo.

Q:    Okay.

A:    It's a good stereo.

Q:    Okay.

A:    It was loud.  Dana had the TV on.

Q:    Okay, but she was sleeping?

A:    But Rose, I mean, I don't know what was going on back there at the time.

Q:    What Rose was doing.  And Jason, do you know where—Jason just—

✗ 35

| DEFENDANT: | WHITESIDES, KYLE | 35 |
|---|---|---|
| INTERVIEWEE(s): | MCCOLLOUGH, KIM | |
| INTERVIEW DATE: | 04-30-09 | TAPE NO.: E417-10 |

A:  Probably, he wanders around, he goes in and out with Lorenzo, kind of like the room.

Q:  Okay.

A:  But the door was open, because I could hear the music.

Q:  Okay. And um, when, when Kyle came into the bathroom, did he leave the door open, did he close it?

A:  Oh, no, he closed the door.

Q:  He closed it. Did he lock it or leave it?

A:  I heard a click.

Q:  Okay. So, you assumed he locked it.

A:  So, I assume he locked it.

Q:  Did he, um, threaten you, after he assaulted you, did he threaten you and tell you anything? Okay. Okay.

A:  He just, just told me, uh, "Get up," you know, from the position.

Q:  Okay.

A:  'Cause I guess I was still bent over, and he already, you know, backed up.

Q:  Okay.

A:  And then he leaned back over me—

Q:  Okay.

A:  —and whispered, or kind of, in my ear, kind of threatened me, but not—He didn't threaten me, you know, —

Q:  Okay. He just said, "Get up."

A:  He didn't threaten me bodily. Yeah, "Get up," but like in a nasty way.

x 36

Q:    Okay.  Okay.  Let me see if there's any more questions I have.

A:    And my husband did talk to the supervisor.  I never asked him to do that.  I didn't want him involved.

Q:    Whose supervisor?

A:    Uh, his supervisor.

Q:    Kyle's supervisor?

A:    Yeah.

Q:    Okay.

A:    I don't know what her name is.  He, he knows all that.

Q:    Okay.

A:    Um, I don't even think that, you know, if some—like, my husband's kind of a little nutty, so, I don't think she either took it seriously, I don't know.  He didn't tell me that.  She was concerned and kind of angry, but I, I, you know, I don't know what to believe.  So, he said he went over there.  And I told him specifically, stay out of it.

Q:    Okay.

A:    Um, same thing with my son.  My son is very upset and he wanted the address, but I knew that if I did that, my son would go to jail, because my son would probably do something to him.

Q:    Did your son talk to Kyle or the supervisor?  Or just your husband?

A:    No, I won't give—I just—as a matter of fact, my son doesn't even know his name.

Q:    Okay.

A:    I just know that he called me because Jacqueline told him.

x37

| | | |
|---|---|---|
| DEFENDANT: | WHITESIDES, KYLE | 37 |
| INTERVIEWEE(s): | MCCOLLOUGH, KIM | |
| INTERVIEW DATE: | 04-30-09 | |

TAPE NO.: E417-10

Q:    Okay.

A:    And now he's like—

Q:    He's pissed.

A:    He's pissed at me, he won't even talk to me, because I won't tell him.

Q:    Okay.

A:    He won't call me anymore.

Q:    Okay.  Rose, Rosemarie, knows there's a police report, right?

A:    Yeah, I think she does.

Q:    So, she's probably told Kyle that the police are involved?

A:    Oh, yeah, I'm sure she has.

Q:    Okay.  Um, and how, when did Rosemarie move out?

A:    I'm not sure.  Um, I am not really, I'm not even—time, to me—

Q:    Okay.

A:    I just take day by day.

Q:    Okay.

A:    'Cause I'm trying to get better.

Q:    Okay.

A:    She's probably in the condominium five weeks, maybe.

Q:    Okay.

A:    And it's a really, really nice place.

Q:    Okay.  All right.  So, um, the only people left at the home right now are you, Dana and who else?

| DEFENDANT: | | |
| --- | --- | --- |
| INTERVIEWEE(s): | WHITESIDES, KYLE | 38 |
| | MCCOLLOUGH, KIM | |
| INTERVIEW DATE: | 04-30-09 | TAPE NO.: E417-10 |

A:    And uh, Terry.

Q:    And Terry's new.

A:    But Terry's new, she's only been there for two weeks.

Q:    So, Jason, Lisa and Leonard are also gone?

A:    Yeah, Lisa's gone—

Q:    Okay.

A:    But you can find out—in fact, Lisa—

Q:    Through Telecare?

A:    Yeah, Lisa's her coordinator—

Q:    Okay.

A:    —and John is, John is Lorenzo's coordinator.

Q:    Okay. All right.

A:    Because I know John. John's the one that got me into Telecare. He interviewed me at, uh, Royale.

Q:    Okay.

A:    'Cause I barely qualified, because I don't have a substance abuse. I mean, I don't have a drug.

Q:    Right.

A:    Yes, I do drink, but I don't—like I said, I've drank once since that happened.

Q:    Where's—I'm sorry...

A:    No.

Q:    Where's Royale again?

x39

DEFENDANT:              WHITESIDES, KYLE                                    39
INTERVIEWEE(s):         MCCOLLOUGH, KIM
INTERVIEW DATE:         04-30-09                        TAPE NO.: E417-10

A:    It—I have a card.

Q:    You know, I've heard, it's on the tip of my, my brain.

A:    Yeah, it's Warner, I, it's diagnose—I had to get in there, 'cause they had to diagnose me. That's the only help you could get.

Q:    And remind me again, what do you suffer from? Depression? You had a nervous breakdown.

A:    Um, I have, I've been abused my whole life. I've been molested as a child.

Q:    Okay.

A:    That kind of thing.

Q:    Okay.

A:    Abuse by my, sexual abuse by my stepfather, like that. Never told my mother, so I have post traumatic stress syndrome.

Q:    Okay.

A:    Because I didn't, probably, tell my mother.

Q:    Right, PTSD, right.

A:    But I'm glad, because she died, and she didn't know, she doesn't know.

Q:    Okay.

A:    So, that's kind of a relief to me. Because she would kill—I mean, it would really, absolutely, devastate her. So, I'm glad. That's okay with me.

Q:    The, I can't remember the term that you used, but the caretaker, did you say, for Lorenzo, where are the caretakers—

A:    That's John. Every one in the—

x 40

DEFENDANT:
INTERVIEWEE(s):        **WHITESIDES, KYLE**                               40
INTERVIEW DATE:        **MCCOLLOUGH, KIM**
                       **04-30-09**
                                                      **TAPE NO.: E417-10**

Q:     Where are they based out of?

A:     Uh, Telecare.

Q:     Where is Telecare?

A:     Telecare is on Magnolia—wait a minute. I have their cards.

Q:     Awesome. You have all their cards? That helps.

A:     I'm sorry I didn't have—

Q:     That's okay.

A:     I even had Kyle's number.

Q:     Uh huh. I have it. I have it in the report.

A:     And I couldn't get through to it.

Q:     Okay. Is it his cell phone or his work phone?

A:     I think it's a cell phone, but then I backed off.

Q:     Okay.

A:     Because I thought, you know what, don't be doing this.

Q:     Um…

A:     I don't need to be talking to him. This is just, um, it may not be Susan, is it Sue's?

       That's just the nurse, but it's the same address.

Q:     That's fine.

A:     They all work there.

Q:     Oh, West Woodland Drive. Okay, I know where that is. Now um, yeah, I need to get—if

       this is Kyle's cell phone number, I'd like, I'd like to find out where he works. So, that

       way I can—

186

x41

DEFENDANT:
INTERVIEWEE(s):      WHITESIDES, KYLE
INTERVIEW DATE:      MCCOLLOUGH, KIM         41
                     04-30-09

TAPE NO.: E417-10

A:    You can even get that from Dana, what it's called.

Q:    Okay.

A:    It's called something, and it's on Main Street.

Q:    Okay.

A:    And all the homeless people go there.

Q:    Okay.

A:    And I think it's a, it helps them, um, with the medications and things, stuff like that.

Q:    Okay, I'll find out.

A:    Glasses, they even get, get them glasses.

Q:    Okay.

A:    It's like a help thing.

Q:    Okay. Let me think if I've got any more questions. Can you describe Kyle for me?

A:    All I remember of about him, he's extremely tall.

Q:    Okay.

A:    He's tan.

Q:    Okay.

A:    I don't think it's his natural color, he's just tan.

Q:    Okay.

A:    Bald.

Q:    Okay. Completely bald or?

A:    Uh, it looks to me like he shaves what's—I mean, he's balding, and she shaves it, kind of thing going.

x42

DEFENDANT:          WHITESIDES, KYLE
INTERVIEWEE(s):     MCCOLLOUGH, KIM                                    42
INTERVIEW DATE:     04-30-09

                                                    TAPE NO.: E417-10

Q:    Okay.  About how old is he?

A:    I would put him at 36, maybe.

Q:    Okay.  White?

A:    Yeah, he's white.

Q:    Does he have any tattoos?

A:    No, not that I know.  I didn't see any.

Q:    Okay.  Does he wear any particular jewelry, necklace, watch, uh, ear studs, earrings?

A:    No, he didn't have an ear stud.

Q:    No jewelry that you noticed?

A:    Not, he had a watch—

Q:    Okay.

A:    I know that.  And I know, I think it had, um, it was a leather type.

Q:    Leather style watch?

A:    Yeah.

Q:    Okay.  Does anything, like, does he have any particular facial features that stand out, like big nose?

A:    His nose is kind of bulbous, I think.

Q:    Bulbous nose?  Okay.  Okay.

A:    And his eyebrows are kind of, from what I remember, them being kind of slanted.

Q:    Okay.

A:    Kind of like—

Q:    Unibrow or?

x43

DEFENDANT:
INTERVIEWEE(s):
INTERVIEW DATE:

WHITESIDES, KYLE
MCCOLLOUGH, KIM
04-30-09

43

TAPE NO.: E417-10

A:    Not even, no, not even.

Q:    But slanted eyebrows?

A:    No, it's just—

Q:    Peculiar eyebrows?

A:    He's got rough features, kind of like mean features, kind of like, if you look at him.

Q:    Okay.

A:    He reminds me of a, of a, of a genie that—I know this sounds so stupid, a mean genie—

Q:    Okay.

A:    —that would be standing with his arm like this.  He's got those features.

Q:    I can picture that.  I mean, with the eyebrows, you're saying—

A:    Yeah, like that.

Q:    —and kind of balding.

A:    That's, that's what he looks like to me.

Q:    Does he have any facial hair, goatee, beard, moustache?

A:    Not at the time, he just had stubble.

Q:    Stubble, okay.  Any scars that you remember?  Okay.

A:    No.

Q:    And, okay, does he smoke or drink?  Do you know?

A:    He was drinking, okay?  He was drinking.  But as far as smoking, I didn't see him smoke.

Q:    Okay.  You don't know if he smokes?

A:    I know Rose does, but—

Q:    Okay.

x44

DEFENDANT:
INTERVIEWEE(s):    WHITESIDES, KYLE                    44
INTERVIEW DATE:    MCCOLLOUGH, KIM
                   04-30-09

TAPE NO.: E417-10

A:    —I didn't see him smoke.  Because to smoke you have to go outside—

Q:    Okay.

A:    —and I didn't see that sucker leave.

Q:    And do you remember what he was wearing, what kind of clothes he was wearing?

A:    He had like Dickeys on.

Q:    Okay.

A:    Because I know what Dickeys are.

Q:    Okay.

A:    And kind of a top with a vest, kind of like a khaki vest kind of thing over that.

Q:    Okay.

A:    It was plaid.  And that's all I remember.  And um, he had, um, it looked to be like brown working shoes.

Q:    Okay.

A:    Tie-up shoes, kind of leather.  I don't know if they were steel-toed.

Q:    Boots?  I mean, work boots?

A:    Not, they were closely—

Q:    Related?

A:    —related to Hush Puppy type things, kind of thing.

Q:    Okay, got you.  Okay, um...

A:    But they looked like work things to me, so...

Q:    Okay.

A:    Tan, kind of.

190

x45

DEFENDANT:
INTERVIEWEE(s):     WHITESIDES, KYLE
INTERVIEW DATE:     MCCOLLOUGH, KIM                                45
                    04-30-09

TAPE NO.: E417-10

Q:    Would you, would you be willing to make a phone call to him, that we would do it in this room, and if you're not comfortable with that, tell me. What the purpose of the phone call would be is, we would be in this room, I'd be in here. We'd go over what, I'd direct you what to say to him, we'd rehearse, you know, we'd kind of do that—you know, we'll get into that later.

Um, okay. I think that's all the questions I have for right now. Would you be able to identify him if you saw a picture of him?

A:    Yeah.

Q:    Okay. Give me just a minute, um, let me check on something, and I'll be right back.

[Det. Adham exits room]

[END OF RECORDING.]

x 46

9B

x47

## ANAHEIM POLICE DEPARTMEN
## GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

Follow Up Report(s)

Follow Up # 1
Assignment Information
   Assigned to A1219 - ADHAM, OMAR #466   Rank : Detective
   Org unit : SEX CRIMES
   Capacity : Lead Investigator
   Assigned on Mar-04-2009 (Wed.) 0749   by A0384 - HITTESDORF, TRACY S138
   Report due on Jun-02-2009 (Tue.)

   Submission Information
   Submitted on Dec-16-2009 (Wed.) 0746
   Checked by : A0384 - HITTESDORF, TRACY S138
   Approved on Dec-17-2009 (Thu.) by A0384 - HITTESDORF, TRACY S138
   Follow Up completed : YES

Related text page(s)


   Document: NARRATIVE
     Author: A1219 - ADHAM, OMAR #466
     Subject: (V) Doe supplemental
   Related date/time: Aug-26-2009 1516

     While working as a Detective in the Sex Crimes Detail, I was assigned
to this case for follow-up investigation. On April 30, 2009, at
approximately 1020 hours, I met with (V) Doe in an interview room at the
Anaheim Family Justice Center. I digitally recorded the interview and later
booked a DVD into property as evidence. I also submitted an audio file into
the DIMS system as evidence. The following is a summary of the interview.

     I verified (V) Doe's name, date of birth, and some other biographical
information. I told (V) Doe if she did not remember something or did not
know the answer to a question, to tell me so. (V) Doe moved into the
residence in January 2009. At the time, she was living with (W) Leonard,
(W) Lorenzo, "Jason", "Dana", and "Lisa". All of the residents are clients
of Telecare. Telecare is a company that assists mentally ill adults with
independent living options. Since the incident occurred, all of the
roommates have moved out, except for Dana. Dana told (V) Doe she did not
hear the assault, since she was watching television. (V) Lorenzo and Lisa
told (V) Doe they had their stereos playing and did not hear the assault.
Jason also told (V) Doe he was unaware of the assault. I later contacted
Telecare and left my phone number with them to have (W) Lorenzo, Jason, and
Lisa to call me. None of them ever contacted me.

     I asked (V) Doe what happened on February 13th. (V) Doe told me that
before (S) Whitesides arrived, she had been drinking wine. She was in her
room with (W) Leonard when (S) Whitesides came over. (W) Leonard's bed is
on one side of the room and (V) Doe's bed is on the other side of the room.
(S) Whitesides sat on the floor between both the beds. While they were
talking and laughing, (W) Leonard brought out some blankets and made a bed
on the floor for (S) Whitesides.

     As they continued to talk, laugh, and drink, (S) Whitesides placed his
bare foot into (V) Doe's genital area. (V) Doe said she felt drunk at this
point and (S) Whitesides knew she was drunk. (V) Doe pushed (S) Whitesides'
foot away. A few minutes later, he put his foot on (V) Doe's knee and again
touched her genital area. (V) Doe moved farther away this time. (S)
Whitesides persisted and touched (V) Doe's genital area again with his
foot. (V) Doe became uncomfortable and went to the bathroom.

For: A1219  Tuesday March 30, 2010

192

8

x48

## ANAHEIM POLICE DEPARTMEN
## GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

(V) Doe entered the bathroom and did not lock the door behind her. She said she normally did not lock the door so other female clients in the residence could use the bathroom if she was in the shower. (V) Doe sat down on the floor next to the bathtub and toilet. She was not feeling well and thought she might vomit. (V) Doe had stomach bypass surgery and therefore, according to her, it did not take much alcohol to get her drunk. (V) Doe estimated she drank almost one bottle of wine.

While she was sitting on the floor, the bathroom door opened. She saw the hall light on and thought it may have been her roommate, Lorenzo, coming to help her. She then realized it was (S) Whitesides. She held out her hand for help to get up, and (S) Whitesides jerked her up. (S) Whitesides placed his other hand against (V) Doe's back and pushed her face forward over the sink. (V) Doe was wearing pants similar to what surgeons wear in a hospital, a t-shirt, underwear, and a bra. (S) Whitesides untied (V) Doe's pants and pulled her pants and underwear down above her knees.

(V) Doe said she was in shock when she realized (S) Whitesides was sexually assaulting her. She does not know why she did not yell for help. (V) Doe felt either a condom with lubrication or lubrication on her buttocks. (S) Whitesides then penetrated (V) Doe's anus with his erect penis. (V) Doe said she felt a lot of pain. (S) Whitesides pushed against (V) Doe with his body and penis and pushed (V) Doe's head down into the sink. (V) Doe told (S) Whitesides, "Stop." (V) Doe tried to push back away from the sink with her body, but (S) Whitesides weight was too overwhelming for her. (V) Doe told (S) Whitesides, "You're hurting me. Stop."

After an unknown amount of time, (S) Whitesides removed his penis from (V) Doe's anus and penetrated her vagina with his penis. After an unknown amount of time, (S) Whitesides finished the assault. He leaned over and whispered into (V) Doe's ear to get up. (V) Doe said to him, "I am up." (V) Doe said she partially blacked out after this. She remembers pulling her pants up and sitting back down on the bathroom floor crying.

Lorenzo entered the bathroom and asked (V) Doe what happened. (V) Doe told Lorenzo what happened. Lorenzo then left. Next, Jason entered the bathroom and asked (V) Doe what happened. (V) Doe told Jason, but (V) Doe thinks Jason did not understand what happened due to his mental condition. Jason left shortly thereafter. Lorenzo later told (V) Doe he confronted (S) Whitesides and asked (S) Whitesides what happened. (S) Whitesides told Lorenzo he had consensual sex with (V) Doe. Lorenzo accepted that as a reasonable answer and left (S) Whitesides alone.

(V) Doe eventually went back to her bed and lay down. (W) Leonard was asleep. (S) Whitesides was in the room and asked (V) Doe if she was telling people stories. (V) Doe told me she is unsure why she stayed in the room with (S) Whitesides even though she was scared of him. Later in the morning, after (S) Whitesides left, (V) Doe told (W) Leonard and (W) Dana what happened. (W) Leonard asked (V) Doe not to report the sexual assault to the police because (W) Leonard was about to move into a new residence on HUD Housing assistance. I asked (V) Doe why she never reported the sexual assault to police. She said it was to protect (W) Leonard. (V) Doe also did not want to get kicked out of the residence for having alcohol there.

The next day, (V) Doe called her daughter, (W) Jacquelyn, and told her daughter about the sexual assault. (W) Jacquelyn was upset and wanted her mother to report the sexual assault. (V) Doe said she also spoke with her husband about (S) Whitesides and that he may have spoken to (S) Whitesides. (V) Doe is unsure where (W) Charles may be since he is homeless. (V) Doe thinks that one of the healthcare workers from Telecare, who monitors her and her roommates, notified police about the sexual assault.

9

x 49

### ANAHEIM POLICE DEPARTMEN
### GENERAL OFFENSE HARDCOPY

**GO 2009-31742 (OPEN)**

**261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC**

I asked (V) Doe why she thought (W) Leonard set her up for a sexual assault by (W) Leonard. (V) Doe told me that (W) Lisa told her that she overheard (W) Leonard tell (S) Whitesides to go into the bathroom and "get her". I asked (V) Doe why (W) Leonard would want (V) Doe to be sexually assaulted. She said because of what (W) Lisa overheard and because (W) Leonard continued to socialize with (S) Whitesides. (V) Doe said (W) Leonard had previously dated (S) Whitesides and thinks that at one time they had a romantic relationship.

It should be noted, the day after the assault, (V) Doe checked the trash can in the bathroom for any used condoms, but did not find any. (V) Doe said the night (S) Whitesides came over was the only time he has ever been to the residence. (V) Doe described (S) Whitesides as approximately 36 year old white male, tall, tanned, bald, a bulbous nose, slanted eyebrows, stubble on his face, a rough face, and features similar to a "genie". (S) Whitesides was wearing dickies, brown work shoes, a shirt, and a plaid vest. (V) Doe can identify (S) Whitesides if seen again. Shortly thereafter, I concluded the interview.

On May 13, 2009, I called the phone number listed on the police report for (S) Whitesides workplace. (V) Doe told me that he worked at the Mental Health Association in Santa Ana. I spoke with, (W) Leisniak, one of the directors of the facility. She confirmed that (S) Whitesides used to work at the facility and still frequented the facility to socialize with other clients. She provided me with his last name as well. With his full name, I conducted a records check and was able to positively identify him.

On May 13, 2009, at approximately 1330 hours, I met with (V) Doe at her residence. I had (V) Doe read a photographic admonishment form. She signed the form indicating she understood the admonishment. I showed her an Offendertrak generated photographic line-up with (S) Whitesides in the #2 position. She looked at the lineup and immediately pointed to (S) Whitesides. I asked her who that person was. She said it was, "Kyle", the person who assaulted her. I had her circle and initial the photograph. I later booked the line-up and admonishment into property as evidence. I also had (V) Doe complete a confidentiality form which I later booked into property as evidence. Shortly thereafter, I concluded my visit.

On May 20, 2009, at approximately 0959 hours, Detective S. Wang and I visited (W) Leonard at her residence. I asked (W) Leonard if we could come inside and speak with her regarding the incident involving (V) Doe and (S) Whitesides. She said we could. I digitally recorded my conversation with (W) Leonard and later booked a compact disc into property as evidence. The following is a summary of the conversation.

I confirmed (W) Leonard's name, date of birth, and some other biographical information. She moved into the residence on West Victoria Street in April 2008, and moved out on March 25, 2009. When (V) Doe lived at the residence, (V) Doe and (W) Leonard shared a room. I asked (W) Leonard what happened on February 13, 2009. She told me she called (S) Whitesides and invited him over. It was raining that day and (S) Whitesides is homeless.

(S) Whitesides arrived at the house while it was still light outside. (W) Leonard was unsure what time it was. (S) Whitesides joined (W) Leonard and (V) Doe in their room. While they were in their room talking, (W) Leonard drank vodka, (V) Doe drank wine, and (S) Whitesides drank beer. (V) Doe got a bucket with water and began to soak and massage (S) Whitesides feet. (V) Doe told (S) Whitesides how beautiful he and his feet were.

At an unknown time, (W) Leonard was ready to sleep. (W) Leonard and

10

194

X 50

ANAHEIM POLICE DEPARTMEN\
GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

(V) Doe's beds were on each side of the room adjacent to the walls. (W) Leonard made a bed of blankets on the floor next to her bed for (S) Whitesides. Both she and (S) Whitesides took their medication and went to sleep. (V) Doe was still awake and in another part of the house when (W) Leonard and (S) Whitesides went to sleep. (W) Leonard said (S) Whitesides had to be at work at 0430 hours in the morning in Santa Ana. She does not know what time he left since she did not wake up when he left.

At possibly between 0700-0800 hours, (W) Leonard woke up to (V) Doe crying in her bed. Several other roommates were around (V) Doe. About an hour later, (W) Leonard learned that (V) Doe was alleging (S) Whitesides sexually assaulted her. (W) Leonard did not hear anything while she slept that night. The next day, (W) Leonard phoned (S) Whitesides and asked him if he sexually assaulted (V) Doe. (S) Whitesides said he never had sex with (V) Doe. I asked (W) Leonard why (V) Doe would make an allegation of sexual assault against (S) Whitesides. (W) Leonard said she thought (V) Doe was making the allegations just to get attention. I asked (W) Leonard if she invited (S) Whitesides over with the intention of him having sex with (V) Doe. She said that was not true and until this allegation came up, she and (V) Doe were good friends. Shortly thereafter, I concluded the interview.

I was never able to locate or speak with (V) Doe's husband.


Document: NARRATIVE
  Author: A1219 - ADHAM, OMAR #466
  Subject: (S) Whitesides supplemental
Related date/time: Sep-22-2009 1247

This is a supplemental report to the original report. On September 9, 2009, at approximately 1020 hours, I met with (S) Whitesides in an interview room at the Anaheim Police Department. I digitally recorded the interview and later booked a DVD into property as evidence. I also submitted an audio file into the DIMS system. The following is a summary of the interview.

I told (S) Whitesides he was here voluntarily, he was not under arrest, and he was free to leave at any time. He said he understood. I obtained some of (S) Whitesides identifying information from his California Identification card. (S) Whitesides suffers from schizophrenia, bipolar disease, and post traumatic stress disorder. He takes medication for those conditions. (S) Whitesides gets assistance from the Mental Health Association in Santa Ana and volunteers there as well. The Mental Health Association treats individuals who are homeless and have mental illness. (S) Whitesides has been receiving assistance from MHA for about the last two years. (S) Whitesides is not a client of Telecare.

I told (S) Whitesides he already knew why he was here to speak with me. He agreed. I told him I wanted to hear his side of the story in regards to the sexual assault allegation by (V) Doe. (S) Whitesides said (V) Doe was trying to seek attention by making this allegation against him. I asked (S) Whitesides what happened that night in February when the incident allegedly occurred. He said he did not want to say anything. It should be noted, he did not ask to leave the interview room, so I continued questioning him. I told (S) Whitesides I would ask him questions and he could answer what he wanted to answer.

I asked (S) Whitesides why (V) Doe would make an allegation of sexual assault against him. He responded by saying he heard that she had done it before. (S) Whitesides said the night of the incident was the first time he

For: A1219  Tuesday March 30, 2010

195

Page: 11 of 21

x 51

## ANAHEIM POLICE DEPARTMENT
### GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

had met (V) Doe and the first time he had been to that residence. I asked (S) Whitesides if they had been drinking that night in February. He said they had been. (S) Whitesides said he drank beer and (W) Leonard and (V) Doe drank wine. (S) Whitesides said (V) Doe drank three bottles of wine. (S) Whitesides slept on the floor in (W) Leonard's and (V) Doe's bedroom that night. I asked (S) Whitesides why he spent the night. He did not answer the question.

I asked (S) Whitesides if (V) Doe had a friend (her husband) that called him. (S) Whitesides said he did not remember any phone calls from a male friend of (V) Doe's. I told (S) Whitesides that (V) Doe had a medical examination that showed some damage to her vagina or anus. I told him that medical examination supported (V) Doe's claims of sexual assault. I also told him that there were some other people in the house the night of the incident and that another person provided some supporting statements of what happened (a ruse). I asked (S) Whitesides what his response was to that evidence. He said he did not want to comment.

I asked (S) Whitesides for how long he has known (W) Leonard. He said he has known her for about two years. He continues to be friends with her and speaks with her periodically. I asked (S) Whitesides what (W) Leonard has told him about (V) Doe. He said (W) Leonard told him that (V) Doe is always into "drama" and often seeks attention. (S) Whitesides said that a few weeks after he slept over with (W) Leonard that night in February, he heard from (W) Leonard that (V) Doe went to Telecare to report the sexual assault. (W) Leonard told (V) Doe that no one believed (V) Doe. Sometime after (V) Doe went to Telecare, (V) Doe made a police report. I asked (S) Whitesides what details (W) Leonard had told him about the sexual assault. (S) Whitesides said he did not want to talk about the details.

I asked (S) Whitesides if he would provide a buccal swab. He said he would not. I took a short break and contacted Detective Sandoval. Detective Sandoval advised me that since (S) Whitesides is a sex registrant, he is required to provide a buccal swab when requested. I obtained a buccal swab and later booked it into property as evidence. Shortly thereafter, I concluded the interview.

HABEAS EX: 10 A-C

10 A —— Orange County Superior Court "Minutes"          ( 1 ps.)
         ( P.C. 243.3 )                                 ( x 1 )
            • Evidence of Acquittal
         _____

10 B —— "CRIMES" docket: E93943M                       ( 1 ps.)
         (P.C. 243.3)                                   ( x 2 )
          • Evidence of Acquittal
         _____

10 C —— Handwritten note (4-29-13) from                ( 1 pg.)
            Defense Counsel File                        ( x 3 )
         ( P.C. 243.3 )

            • Evidence of Acquittal
         _____


# EXHIBIT   10 A - C        (3ps.)

SUPERIOR COURT OF THE STATE OF CALIFORNIA,
COUNTY OF ORANGE

10A / x)

# MINUTES

**Case :** 10NF0718 F A
**Name :** Whitesides, Kyle Jason

| Date of Action | Seq Nbr | Code | Text |
|---|---|---|---|
| 04/29/13 | 20 | MOTION | Motion granted. |
| | 21 | TRTXT | Reasons as stated on record. |
| | 22 | MOTBY | Motion by People to introduce evidence per 1108 E.C. as to Amy D., forced oral copulation in 2/96. |
| | 23 | MOTION | Motion argued. |
| | 24 | MOTION | Motion granted. |
| | 25 | TRTXT | Reasons as stated on record. |
| | 26 | MOTBY | Motion by People to introduce evidence per 1108 E..C. as to Amy Heil 288(a) PC conduct. |
| | 27 | MOTION | Motion argued. |
| | 28 | MOTION | Motion denied. |
| | 29 | TRTXT | Reasons as stated on record. |
| | 31 | MOTBY | Motion by People to introduce evidence to per 1108 E.C. as to victim Kelley Higgason 243.3 P.C. conduct. |
| | 32 | MOTION | Motion argued. |
| | 33 | MOTION | Motion taken under submission. |
| | 34 | TRTXT | Reasons as stated on record. |
| | 35 | MOTBY | Motion by People to introduce 784.7 PC jurisdiction evidence/letter from Humboldt County District Attorney to Orange County District Attorney - filed as Court exhibit #1. |
| | 36 | MOTION | Motion granted. |
| | 37 | TRTXT | Reasons as stated on record. |
| | 38 | STRHRG | **Start of Exhibit List: for exhibit management purposes.** |
| | 39 | TREXI | **Court Exhibit # 1 ( Document(s) )- Letter from Humboldt County District Attorney to Orange County District Attorney, Dated March 19, 2010 marked for identification.** |
| | 40 | MOTBY | Motion by Defense to exclude defendant's conviction of 288(a) PC from 1999. |
| | 41 | MOTION | Motion argued. |
| | 42 | MOTION | Motion taken under submission. |
| | 44 | MOTBY | Motion by People to exclude Defendant's 1996 Felony conviction for sexual battery (243 P.C.) against Kelley Higgason for impeachment. |
| | 45 | MOTION | Motion argued. |

10 B / x2

## CRIMES docket

**Case No: APD  / 96-0379**                                                    **Docket: E93943M**

**Defendant: WHITESIDES        KYLE        JASON**                    **Booking #: 9600000897**

Custody Status: Released: Time Served
Atty of Record: MCGEE, GERRY W.

Arrest:        1 PC261        RAPE
                    D.O.V.:2/7/1996        Felony

Amend:        1 PC243.4        SEXUAL BATTERY
                    D.O.V.:1/28/1996        Felony
                    Action Date :4/2/1996        PLED GUILTY

Arrgn:        1 PC261(A)(2)        RAPE BY FORCE
                    D.O.V.:1/28/1996        Felony
                    Action Date :4/2/1996        ON MOTION OF PEOPLE

Sentce:        1 PC243.4        SEXUAL BATTERY
                    D.O.V.:1/28/1996        Felony
                    Action Date :6/20/1996        PLED GUILTY

2/7/1996        ARRESTED

2/8/1996        ARRAIGNMENT
                Prosecutor: NONE IN ATTENDANCE
                Defense:    CONNELL, WILLIAM C.

2/8/1996        D.A. ISSUED COMPLAINT

2/8/1996        COMPLAINT FILED

7/2/1996        SENTENCED

10 C / 3

4-29-13

(1) look @ 1108 discovery requirements which D.A. must follow

(2) ← Whiteside Chronology

re: Higginson

(1) Filed as rape

(2) D.A. asked for secret phone calls?

(3) reduced charge of 243.4

# HABEAS EX: 11 A-B

11A — Letter dated 8/1/17 Requesting Criminal File
        From   Public Defender
                                                    (1 pg.)
                                                    (×1)


11B — Letter dated 8/1/17 to Defense Counsel   (4 pgs.)
        Nisson  Requesting Criminal File,   (×2-×5)
      w/Notice of Intention to Commence Action

HABEAS

# EXHIBIT   11 A - B   (5 pgs.)

201

IIP

Kyle J. Whitesides AR1462
Mule Creek State Prison
P.O. Box 409040, Rm. B8-104up
Ione, CA  95640


August 1, 2017


Deputy Public Defender Frank Bittar
14 Civic Center Plaza
Santa Ana, CA  92701


Re.:  <u>People v. Kyle Jason Whitesides</u>, Superior Court
      for Orange County No. 10NF0718

Dear Mr. Bittar:

You represented me in the above case before private counsel
was retained by my parents.  Your representation was very
good.  You did more on my case than private counsel.  You
also believed in my innocence.

I am preparing a habeas petition based on newly discovered
evidence of ineffective assistance of the private counsel
that resulting in an innocent person, me, getting wrongfully
convicted.

If you have anything left in my file, please send it to me.

Thank you very much for everything you did for me on my
case.


                    Sincerely,


                    [signature]

11B

Kyle J. Whitesides AR1462
Mule Creek State prison
P.O. Box 409040, Rm. B8-104up
Ione, CA   95640


August 1, 2017


David M. Nisson
Attorney
17291 Irvine Boulevard, Suite 311
Tustin, CA   92780


Re.:  <u>People v. Kyle Jason Whitsides</u>, Superior Court for
      Orange County-Central Justice Center Case No.
      10NFO718, Request for return of entire case file.

Dear Mr. Nisson:

Please promptly return my entire case file.  You may do so
by either mailing my file to me at my above prison address
or arranging for my parents to come down to your office and
pick up my file.

My parents are Tom & Roz Whitesides.  They will telephone
your office within a week.  Please notify your secretary
as to whether you are mailing my file to me or my parents
can pick it up.  If the latter, advise them when to pick
my file up.

It is my understanding that there is a reasonable probability
that you will not return my file per this request.  Rule
3-700(D)(1) of the Rules of Professional Conduct of the State
Bar provides in mandatory language that a terminated attorney
shall "promptly release to the client, at the request of the
client, all the client papers and property, ... ."

I am concurrently serving you a NOTICE OF INTENTION TO
COMMENCE ACTION lest you do not return my file.  The person
doing my legal work sued former Orange County Deputy
District Attorney Michael Molfetta for failure to return
his client's file after he went into private practice.  The
case goes to trial January, 2018.  (See, <u>White v. Molfetta</u>
Orange County Superior Court No. 30-2015-00777735-CU-FR-
CJC.)

x2

I prefer getting my entire file back from you rather than winning a judgment against you for the cost of replacing my file and punitive damages should a jury find your actions in withholding my file amount to oppression or malice. (Code of Civil Procedure § 3294.)

As stated in my enclosed NOTICE OF INTENTION TO COMMENCE ACTION, should you not return my entire case file by September 3, 2017, I will commence a civil suit action against you.

Sincerely,

copy:  Tom & Roz Whitesides
       10459 Salinas River Circle
       Fountain Valley, CA  92708

       file

204

x3

Kyle J. Whitesides AR1462
Mule Creek State Prison
P.O. Box 409040, Rm. B8-104up
Ione, CA  95640

In Propria Persona


IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ORANGE

CENTRAL JUSTICE CENTER

| | | |
|---|---|---|
| KYLE WHITESIDES, | ) | No.: |
| Plaintiff, | ) | |
| | ) | NOTICE OF INTENTION |
| v. | ) | TO COMMENCE ACTION |
| DAVID NISSON, | ) | |
| Defendant. | ) | |

TO DAVID NISSON, PLEASE TAKE NOTICE THAT KYLE WHITESIDES
INTENDS TO BRING THE BELOW-DESCRIBED ACTION AGAINST YOU.

1.  Plaintiff inntends to sue you for $65,000 in actual
damages and for punitive damages for breach of your obligation
not arising from a contract to return Plaintiff's legal
file.

2.  The actual damages are calculated as follows:

(1)  Attorney's fees for replacing and recompiling
those portions of the file from existing records, estimated
$40,000;

205

y4

    (2)   Investigator's fee for locating and reinterviewing witnesses that had previously been interviewed and the interview reports were in Plaintiff's file, estimated $25,000;

    (3)   Punitive damages according to proof.

    TOTAL ACTUAL DAMAGES:   $65,000.

    NOTICE:  Plaintiff will be requesting treble damages under Civil Code § 3345, "Unfair or deceptive practices against senior citizens or disabled persons; treble damages" for all civil or other penalty, including punitive or exemplary damages because Plaintiff is/was mentally disabled at all relevant times.

    3.  Should Defendant David Nisson return Plaintiff's entire legal file less any work product by September 3, 2017, no action will be taken against him.

    4.  All responses to this notice shall be in writing addressed as follows:

                Kyle J. Whitesides AR1462
                Mule Creek State Prison
                P.O. BOx 409040, Rm. B8-104up
                Ione, CA  95640

Dated:  August  |  , 2017


_____
          Kyle J. Whitesides
          Pro Per Plaintiff

× 5

HABEAS EX: 12 A-C

12 A — Letter from Attorney Wastey; Listing Transcripts
        received from O.C.DA. on 1054.9 Motion
        *"Newly Discovered Evidence"                      (1pg)
        · Brady / Rebuttal Character Evidence            (x1)

12 A — Computer Screen Printout from District Attorney
        showing Transcripts provided from 1054.9 Motion   (1ps.)
        · BRADY                                            (x2)

12 B — Newly Discovered Evidence: Interview with
        Valerie R. (suppressed by the D.A.)               (11ps.)
        · BRADY/Rebuttal Character Evidence               (x3 - x13)

12 C — Anaheim P.D. Property Report                       (2ps.)
                                                          (x14 - x15)
        · No mention of "Valerie R." Interview
        as it was suppressed by D.A.

# EXHIBIT 12 A - C (15pgs)

12A                                                                                        x1

1520 E. Covell Blvd., #B5-233                LAW OFFICE OF                    (408)827-5024
Davis, CA 95616                  **KENDALL DAWSON WASLEY**        kendall@dawsonwasleylaw.com
                                 ─────────────────────────

                                      June 12, 2023

                      **Confidential Attorney-Client Communication**

Kyle J. Whitesides, CDCR# AR1462                           *Sent Via US Priority Mail*
Mule Creek State Prison
PO Box 409099
Ione, CA 95640

            Re:    Petition for Writ of Mandate
                   Case# G061663
                   Transcripts provided by District Attorney's Office

Dear Mr. Whitesides:

       Please find enclosed the eight transcripts the Orange County District Attorney emailed to my
office. Specifically, the following transcripts are enclosed:

   1. GT revised CD 1 - Transcript_for_01 Track 1 - Interview with RM Leonard - JLO edits.docx
   2. GT revised CD 2 - Transcript_for_A3FA2604 - Interview with Baber - JLO edits.docx
   3. GT revised DVD 1 - Transcript_for_VTS_01_1 - Interview with Jane Doe - JLO edits.docx
   4. GT revised DVD 1 - Transcript_for_VTS_01_2 - Interview with Jane Doe - JLO edits.docx
   5. GT revised DVD 2 - Transcript_for_VTS_01_1 - Interview with Suspect - JLO edits.docx
   6. GT revised DVD 2 - Transcript_for_VTS_01_2 - Interview with Suspect - JLO.docx
   7. GT revised, CD 3 - Transcript_for_Whitesides photo lineup with amy - JLO.docx
   8. GT revised, CD 4 - Transcript_for_Whitesides- Valerie R. interview 8-4-10 - JLO edits.docx

       Also enclosed is a print-out of the computer screen shot of the documents disclosed. Personal
information such as birthdates, email addresses, phone numbers, have been redacted from the transcripts
by the district attorney's office as provided by the trial court order. I have made no redactions.

                              Sincerely,

                              *[signature]*

                              KENDALL DAWSON WASLEY

Enclosed: as stated

x 2



209

12 B

×3

GT revised, CD4 Transcript for Whitesides
        Valerie R. Interview 8-4-10 - JLO edits.

Evidence Title: Whitesides- Valerie R. interview 8-4-10.WMA

Title: Interview with Valerie R. / Disc 4 / Interview of Valerie R. by OCDA Inv. C. Dodd

This transcript starts at May 2, 2023 10:29 AM -07:00 and is 21m 7s in length

[10:30 AM / 00:22]
**Speaker 1:** *Hello?*

[10:30 AM / 00:23]
**Speaker 2:** *Hi, um, is Valerie there?*

[10:30 AM / 00:25]
**Speaker 1:** *This is*

[10:30 AM / 00:25]
**Speaker 2:** *Valerie. My name is Corey Dodd, and I'm an investigator with the Orange County District Attorney's Office.*

[10:30 AM / 00:30]
**Speaker 1:** *Yes.*

[10:30 AM / 00:31]
**Speaker 2:** *I'm calling in regards to the email that was sent to the office.*

**Speaker 1:** *Mm-hmm. <affirmative>.*

**Speaker 2:** *And I was just wondering, um, I know that you received an email back, but yes. We just wanted to know, were you also a victim of Mr. Whitesides?*

[10:30 AM / 00:46]
**Speaker 1:** *Uh, I don't. I don't want to get involved in that <laugh> No, I'm gonna answer no to that. Uh, I just want to, um, just keep tabs, you know what I mean? Just to be safe mm-hmm. <affirmative>.*

[10:30 AM / 01:00]
**Speaker 2:** *Um, and I'm only asking because any other individuals who have also been victims mm-hmm. <affirmative>, it would assist in the prosecution in the current case.*

[10:31 AM / 01:13]
**Speaker 1:** *Yeah. Yeah. Well, I moved to [redacted] <laugh> mm-hmm. <affirmative>. So, um, you know, I wouldn't be able to travel out there for any kind of court proceedings or anything like that, you know what I mean? Um, but hold on, let me, I'm at work right now. Okay. So where I can, um, talk*

[10:31 AM / 01:35]
**Speaker 3:** *<affirmative>, so,*

[10:31 AM / 01:38]
**Speaker 1:** *Okay. Yeah. I figured that would come up <laugh>.*

[10:31 AM / 01:41]
**Speaker 2:** *I know. Um, you know.*

[10:31 AM / 01:42]
**Speaker 1:** *Yeah. No,*

[10:31 AM / 01:43]
**Speaker 2:** *We didn't want any other person to be victimized like the victims that,*

1

[10:31 AM / 01:47]
**Speaker 1:** *Nor do I Yeah. Nor do I, and when I, you know, we, when Kyle and I were dating*

**Speaker 2:** *mm-hmm. <affirmative>*

**Speaker 1:** *we had a mutual friend, and she tried to, she was, um, she was like 20 something years sober and she was trying to help him out in his sobriety and everything like that.*

**Speaker 2:** *Mm-hmm. <affirmative>.*

**Speaker 1:** *And, um, she and I became really good friends, and she's the one who notified me that he was incarcerated again. So I was like, okay. And then when I looked it up and saw that it was another, that type of offense, um, I was like, oh, crap. You know? Cause I don't know, back then it was like, um, it was just between you and me. Right. It's like, kind of off the record or whatever. Cause I don't wanna Right. Well,*

[10:32 AM / 02:30]
**Speaker 2:** *Unfortunately, anything that you do say, I, it, it's not off the record.*

[10:32 AM / 02:34]
**Speaker 1:** *[crosstalk] it's off the record. Okay. Um, well, anyway, I'm honest with*

[10:32 AM / 02:37]
**Speaker 2:** *You.*

[10:32 AM / 02:37]
**Speaker 1:** *Okay. that's fine. Thank you. Um, but nothing, nothing happened to me that I can say, oh, a law was broken.*

**Speaker 2:** *Mm-hmm. <affirmative>.*

**Speaker 1:** *But, um, things were like, like flirting, like gray area, you know what I mean? Like, there, I mean, we were romantically involved and everything like that. And, um, I, you know, it was never against my will or anything like that, you know what I mean?*

**Speaker 2:** *Mm-hmm. <affirmative>.*

**Speaker 1:** *Uh, but there were times when some things happened physically when I was like, oh, that's a little bit different. You know, everybody has their own way of doing things and the things they enjoy and the things they don't enjoy and that sort of thing. But there were some things where they kind of made me kind of cock my head and be like, well, that's a little different.*

**Speaker 2:** *Mm-hmm. <affirmative>.*

**Speaker 1:** *But it was never anything that I could say, but a law was broken or, you know, against my will.*

[10:33 AM / 03:33]
**Speaker 2:** *Something happened that you were in such fear that you moved out of state.*

[10:33 AM / 03:38]
**Speaker 1:** *Yeah. Yeah. Well, um, when he was incarcerated in February, when he, when he had that official parole violation.*

**Speaker 2:** *Uhhuh <affirmative>,*

**Speaker 1:** *um, he was, um, you know, he was not sober. So, um, during that time, there was a couple months there, I guess, um, where he was just doing some crazy things, just like crazy behavior. And I could tell I, I distanced myself from him. But, um, there was one night in particular, I had to call the police because, uh, you know, I had a young child. My, my son was two at the time*

212

2

**Speaker 2:** *mm-hmm. <affirmative>.*

**Speaker 1:** *And, um, he, and we lived in an apartment upstairs in Huntington Beach*

**Speaker 2:** *mm-hmm. <affirmative>.*

**Speaker 1:** *And, um, you know, you had the stairs were external, you had to go up the stairs to get the front door. And my bedroom window was like, if I looked down, I could see the walkway way down below, you know, on the side of the apartment.*

[10:34 AM / 04:30]
**Speaker 2:** *Uhhuh, <affirmative>,*

**Speaker 1:** *well, he was throwing stuff at my window, and my son and I slept in that room. I, like, he was gonna try to break that window. And, um, so I called the police and he kept the whole time that the police were outside, um, you know. looking to see who was out there. He was calling and leaving messages on my voicemail saying, oh, they can't find me. They can't find me. Ha ha ha. Like, you know*

**Speaker 2:** *mm-hmm. <affirmative>,*

**Speaker 1:** *uh, kind of, and just weird stuff like that, like, kind of freaked me out. so*

**Speaker 2:** *mm-hmm. <affirmative>.*

**Speaker 1:** *Um, and then in light of the, his past, I said, you know what? I can't trust this person, so*

**Speaker 2:** *mm-hmm. <affirmative>,*

**Speaker 1:** *um, it's really not, I can't say him. It's more the drug and the, you know, the lifestyle. I can't trust the, the, the sickness. Right. You know? Right. So, um, and especially for my son, I didn't wanna put my son in any kind of danger. So*

[10:35 AM / 05:23]
**Speaker 2:** *Now, and I'm, I'm actually, I'm only guessing here,*

**Speaker 1:** *Uhhuh,*

**Speaker 2:** *but like, are we talking about, and you're, I think you're talking about maybe he had fetishes. like sexual fetish*

[10:35 AM / 05:33]
**Speaker 1:** *Things*

[10:35 AM / 05:33]
**Speaker 2:** *He was into,*

[10:35 AM / 05:35]
**Speaker 1:** *Um, no. Or*

[10:35 AM / 05:36]
**Speaker 2:** *He would take it one step further. Like, I mean, you, you're saying it was consensual, but did he do an act that wasn't consensual?*

[10:35 AM / 05:44]
**Speaker 1:** *No, no. It was, it was always consensual.*

[10:35 AM / 05:47]
**Speaker 2:** *Okay.*

213

3

[10:35 AM / 05:48]
**Speaker 1:** *Yeah. Um, but you know how in a just, you know, in a couple relationship. you discuss the things that are interesting to you and the things that aren't <laugh>*

**Speaker 2:** *mm-hmm. <affirmative>,*

**Speaker 1:** *um, yeah. Uh, there, there were things that, I mean, I guess maybe I'm a little bit more traditional, not so, um, exploratory in <laugh>. I mean, there's some things that lots of people engage in that I wouldn't, you know. Right. And there, and I think he was just more exploratory,*

**Speaker 2:** *Uhhuh, <affirmative>.*

**Speaker 1:** *And I, and I just, you know, and I was just like, well, I mean, they're not, things, not, not like, oh, not things that are way out there. I mean, there are things that I'm sure half the population does that he was,*

[10:36 AM / 06:31]
**Speaker 2:** *And did anything involve kids?*

[10:36 AM / 06:34]
**Speaker 1:** *No. Okay. No. No. Oh, I. that would be a big red flag for me. Okay. If he ever brought up that situation with me, oh, God. [crosstalk] probably. Oh.*

[10:36 AM / 06:43]
**Speaker 2:** *Did you ever [unclear] porn or anything like that?*

[10:36 AM / 06:46]
**Speaker 1:** *Um, he did actually. Um, yes, that, um, I. I never engaged in any of that because I was not into that. But I believe that he, when he was, um, convicted of that parole violation, I believe they found magazines in the car.*

[10:36 AM / 07:04]
**Speaker 2:** *Okay.*

[10:36 AM / 07:05]
**Speaker 1:** *Uh, the Huntington Beach Police. I believe they did find something there. And that was, uh, a violation of his parole having, you know, having that in his possession. So, um, never anything that I was, that I saw or anything that I was around. I didn't, you know, it was just, that was the only time that I knew about when he was caught by the police.*

[10:37 AM / 07:30]
**Speaker 2:** *And do you know anyone else down here? I mean, you said that somebody else was helping him. anyone else that was possibly a victim?*

[10:37 AM / 07:37]
**Speaker 1:** *Um, not someone to talk to? Not to my knowledge. Not, um, but, you know, when he was arrested that time, um, I, you know, I wrote him in. when I was still living in California. I wrote him, um, while he was in prison, and I was trying to not, um, provoke any, you know, provoke him. So I was kind of trying to break up with him easily.*

**Speaker 2:** *Mm-hmm. <affirmative>*

**Speaker 1:** *through letters, you know, so just so he wouldn't come try to find me out here, but, um,*

[10:38 AM / 08:10]
**Speaker 2:** *Were you scared he was going to hurt you?*

[10:38 AM / 08:14]
**Speaker 1:** *I just wasn't. Was he violent*

214

4

[10:38 AM / 08:15]
**Speaker 2:** *Before?*

[10:38 AM / 08:18]
**Speaker 1:** *Uh, just kind of like, out of control? Um, like, like, um, I would say abusive with words.*

**Speaker 2:** *Uhhuh, <affirmative>,*

**Speaker 1:** *you know, like, like he would call me names and stuff, but it was, it was all the drugs talking, you know, it was drugs and alcohol. uh,*

**Speaker 2:** *uhhuh, <affirmative>*

**Speaker 1:** *it. Um, it was just, just like belligerent is, I guess, the best way that I can describe the behavior.*

**Speaker 2:** *Mm-hmm. <affirmative>,*

**Speaker 1:** *um, irrational, um, just, um, uninhibited, just crazy. Like, um, just, you know, just calling me, leaving me random voicemails like, "You cunt," or, you know*

**Speaker 2:** *mm-hmm. <affirmative>,*

**Speaker 1:** *but I didn't do anything, you know? Mm-hmm. <affirmative>. this, this cr craziness. So it was that I just couldn't trust the, the unpredictability. Right. You know? Okay. And then, so, and, and especially with having a child, I don't even wanna risk anything happening to my son. Right.*

[10:39 AM / 09:16]
**Speaker 2:** *So.*

[10:39 AM / 09:17]
**Speaker 1:** *Right.*

[10:39 AM / 09:17]
**Speaker 2:** *Uh,*

[10:39 AM / 09:18]
**Speaker 1:** *So we got the hell outta there <laugh>, but, um, okay. I don't know if that, if that helps you, but, um, but it definitely, if there were kids involved, I please know that I would not hesitate for one second to tell you about something that I knew because I, you know, I, I wanna protect kids as much as I can, you know?*

**Speaker 2:** *Mm-hmm. <affirmative>,*

**Speaker 1:** *I went to school to be a teacher, so, yeah. Um, you know, the kids are a big part of my heart, so, um,*

[10:39 AM / 09:46]
**Speaker 2:** *Okay.*

[10:39 AM / 09:46]
**Speaker 1:** *I would definitely tell you if there was something. I'm not trying to protect him. Um, I just, you know.*

[10:39 AM / 09:53]
**Speaker 2:** *Well, I have your email address here, and I'm gonna email you when I get off the phone so that you have mine, Uhhuh <affirmative>. And, um. if you can think of anything else, I'd love to hear from you. Um, if anything pops into your mind or if, you know, um, if you wanna think about, you know, possibly coming out, we would pay your. if you were a witness, we would pay your travel and expenses.*

215

[10:40 AM / 10:17]
**Speaker 1:** *Yeah. Um, I, I just. I don't feel like I could contribute to, I guess, what you guys are needing. Um, you know, uh, <laugh>,*

[10:40 AM / 10:28]
**Speaker 2:** *Do you. do you know anyone by the name of Kelly Higginson*

[10:40 AM / 10:31]
**Speaker 1:** *Kelly? Uh, no. I don't.*

[10:40 AM / 10:33]
**Speaker 2:** *Okay. That doesn't ring a bell. Mm-hmm. And how long were you guys involved? How many?*

[10:40 AM / 10:38]
**Speaker 1:** *Uh, that was the, let's see, it was while I worked at, at Wininger, um, February, 2004 through February, 2005. roughly.*

[10:40 AM / 10:52]
**Speaker 2:** *So about a year.*

[10:40 AM / 10:54]
**Speaker 1:** *Yeah. Uhhuh <affirmative>.*

[10:40 AM / 10:55]
**Speaker 2:** *Okay.*

[10:40 AM / 10:56]
**Speaker 1:** *Yeah. And his old, I. I can't recall his name, but his old probation officer or parole officer, uh. I met with him, you know, we had to get an okay for him to be able to date me*

**Speaker 2:** *mm-hmm. <affirmative>.*

**Speaker 1:** *and I had to sign like papers. So if you needed that, I think it's probably on record somewhere that, you know, we were dating. but, um, my son was not allowed to be around him and he wasn't, um, you know, I would get a babysitter for my son and then Kyle and I would, you know, we would date or whatever, so*

**Speaker 2:** *mm-hmm. <affirmative>.*

**Speaker 1:** *um, there were, there were stipulations in, in that whole parole thing for us to follow, like rules we had to follow so that he could, that we could date. But, um, so he was never really around my son. I can't say that he, you know, there was nothing that I could see, you know, him around kids.*

[10:41 AM / 11:47]
**Speaker 1:** *He was never around kids. Okay. When I was dating him. So, um, let's see. No, I'm trying to think, um, that name. I don't, I don't recall that name. I'm trying to think of people that, like, we may have known mutually. but, and nobody that we worked with. Kelly. there was a. no, I don't think her last name was Higginson, though. There was a Kelly who used to work at our job. I think she saw her last. Her Kelly was K e l l i.*

**Speaker 2:** *Mm-hmm. <affirmative>,*

**Speaker 1:** *but I don't know if her last name was Higginson. Okay. She was older. She was like probably in her like early forties.*

[10:42 AM / 12:26]
**Speaker 2:** *Okay.*

214

[10:42 AM / 12:26]
**Speaker 1:** *Um, but she used to work at Wininger, the, where we both worked.*

[10:42 AM / 12:33]
**Speaker 2:** *And what was that company?*

[10:42 AM / 12:35]
**Speaker 1:** *Uh, uh, JL Wininger, um, or Court Thomas Wininger. I guess they're doing business under Court Thomas Wininger.*

[10:42 AM / 12:41]
**Speaker 2:** *What kind of business was it?*

[10:42 AM / 12:43]
**Speaker 1:** *Water treatment. Okay. Well, we sold water treatment equipment. We, it was like customer service. Mm-hmm. <affirmative>. Um, but there was a Kelly that worked there prior to me working there. Uh. I just can't, like I said, I can't recall what her last name was. Um, she's a redhead. <laugh>. Does that help? <laugh>? Um, okay.*

[10:42 AM / 13:05]
**Speaker 2:** *Well, like I said, if you think of anything, I know that you're hesitant to ex to go into personal things, and I totally understand. Um, but we do have multiple victims on this case.*

[10:43 AM / 13:19]
**Speaker 1:** *Oh, okay.*

[10:43 AM / 13:20]
**Speaker 2:** *So just, um, you know, I, I don't see him getting out of custody anytime soon just to put you at ease.*

[10:43 AM / 13:27]
**Speaker 1:** *Okay. Yeah. See, that's what I was worried. I, I could see on there that he pled not guilty. So I was like, and he, I know he is off parole and I'm like, crap*

[10:43 AM / 13:33]
**Speaker 2:** *But every, everyone pleads not guilty. <laugh>.*

[10:43 AM / 13:36]
**Speaker 1:** *Okay. Okay.*

[10:43 AM / 13:37]
**Speaker 2:** *At first*

[10:43 AM / 13:39]
**Speaker 1:** *It just scared me when I saw all those charges. I was like, oh my gosh. And then if he gets out, oh my gosh, you know?*

**Speaker 2:** *Mm-hmm. <affirmative>.*

**Speaker 1:** *I've been so scared this whole time, cuz he is listed as transient on the offender site and Right. So, you know, there was rumors he was moving out of the state and all this stuff, and I was like, oh, please don't come to [redacted], please don't come to [redacted]. But, um. I haven't had any contact with him in years, so I don't, you know, but again, I don't trust that instability part of him, you know?*

**Speaker 2:** *Mm-hmm. <affirmative>,*

**Speaker 1:** *like, he might get a thought in his head and just go after it, you know?*

**Speaker 2:** *Mm-hmm. <affirmative>.*

217

**Speaker 1:** *Okay. That's totally irrational. So that's mainly why I contacted you. Um, but I appreciate you calling me and letting me know that, uh, I can rest assured now,*

[10:44 AM / 14:22]
**Speaker 2:** *<laugh>. Okay. Well, um. you take care and like I said, um, just email me if you have a thought that you want me to know.*

[10:44 AM / 14:29]
**Speaker 1:** *Okay. Are you wanting to know like conversations we had? Because, you know, when he*

[10:44 AM / 14:33]
**Speaker 2:** *Heard, I want for anything that, um, is, was violent in nature, um, or any that included sexual acts, anything that might be on the cusp like you explained.*

[10:44 AM / 14:45]
**Speaker 1:** *Okay. Um, but it would be with younger, a younger person? Um,*

[10:44 AM / 14:52]
**Speaker 2:** *No, no, with, with anyone. I mean, I, I was, I'm just talking about your knowledge. Just your personal knowledge as far as when you're, during your year relationship.*

[10:44 AM / 15:02]
**Speaker 1:** *Okay. Um, like, well, there was one time where there was a girl that we worked with, uh, she was like a receptionist, kind of a girl. Mm-hmm. <affirmative>. And, um, they went out to lunch one day. This is when Kyle and I were dating. They went out to lunch one day and I think he was driving and she was in his passenger seat, and he just like leaned over and like kissed her, like, like kind of got all over her and kissed her. And she was like, whoa, whoa, whoa. You know, she, she had a, a man that she lived with and they had a child together, a little baby. And Kyle was aware that she was involved with this another person, and, but he did that anyway. And he was dating me at the time too, and we all worked together. So that was kind of a weird situation.*

**Speaker 2:** *Mm-hmm. <affirmative>.*

**Speaker 1:** *you know, but it's not, and then she said, whoa, whoa, stop. You know, and he stopped. He got off of her. So it's not something like, like I said, nothing that I can think of breaking the law, but just stuff like makes you turn your head like, huh. You know? Right. Like, why would you do that, you know?*

**Speaker 2:** *Mm-hmm. <affirmative>.*

**Speaker 1:** *So, and it wasn't forceful, it wasn't violent, you know, we were all remained friends after that, but, um, but what was he thinking? Kind of odd, you know?*

[10:46 AM / 16:14]
**Speaker 2:** *Do you know her name?*

[10:46 AM / 16:17]
**Speaker 1:** *Um, oh, oh, what was her name? It's been so many years. Um, she worked at Wingert and she was a receptionist. She did kinda like data entry too. Shoot, what was her name? I bet if I think about it long enough, I, I'll probably remember.*

[10:46 AM / 16:33]
**Speaker 2:** *Okay.*

[10:46 AM / 16:34]
**Speaker 1:** *Yeah. Um, but yeah, she worked there during that same time. She would've been receptionist or, or, um, or, uh, the order entry*

**Speaker 2:** *mm-hmm. <affirmative>*

218

**Speaker 1:** *person. Okay. During that 2000, um, 2003, 2000, 2004 five during that year.*

[10:46 AM / 16:55]
**Speaker 2:** *Okay.*

[10:46 AM / 16:55]
**Speaker 1:** *At that time. Um, but, um, I don't know where I have, you said*

[10:46 AM / 17:04]
**Speaker 2:** *There was a friend that kept, that told you he was arrested, that's also keeping tabs on him. Who's that friend?*

[10:47 AM / 17:11]
**Speaker 1:** *Uh, well not keeping tabs on him, but she's, she's heard about it that he was arrested and she was like, Hey, Val, just wanted to let you know*

**Speaker 2:** *mm-hmm. <affirmative>,*

**Speaker 1:** *uh, you know, like heads up, but she didn't know anything about it. All she heard was he was arrested.*

**Speaker 2:** *Mm-hmm. <affirmative>.*

**Speaker 1:** *Uh, and then I'm the one who got online and was like, oh, crap. And I saw all that stuff. Um, what, um, her, what is her name? Um, Linda, her name is Linda. I don't know her last name.*

[10:47 AM / 17:42]
**Speaker 2:** *Do you have a telephone number for her or an email address?*

[10:47 AM / 17:45]
**Speaker 1:** *I can probably find it for you. Okay. Um, I can, I'll, I'll, I'll look. She called me, but I didn't save it in my phone, but I'll, I'll look for it.*

[10:47 AM / 17:53]
**Speaker 2:** *Yeah, if you could please. I would just, just wanna get a feel of who this person is. You know, the more background I get, the better it helps me.*

[10:47 AM / 18:01]
**Speaker 1:** *Yeah. Do my, okay. Are you the, are you the investigator for the case or?*

[10:47 AM / 18:05]
**Speaker 2:** *I'm in, I'm we are the lawyer, the district attorney's office. I work for the attorney. Gathering more statements, things like that.*

[10:48 AM / 18:12]
**Speaker 1:** *Okay. Okay. Well, yeah, no, I am not a, at all about like trying to protect a multiple offender <laugh> that I will, I'll, I'll try to think of stuff that happened. You know, it's not things that I've really thought about in a long time, but Right. Um, all the specific occurrences, but I will, um, do my best to help you guys. Okay.*

[10:48 AM / 18:35]
**Speaker 2:** *Thank you so much. I really appreciate you talking to me. Okay.*

[10:48 AM / 18:37]
**Speaker 1:** *All right. Thank you. Okay.*

[10:48 AM / 18:38]
**Speaker 2:** *You take care.*

219

[10:48 AM / 18:39]
**Speaker 1:** *Okay. Bye-Bye.*

**Speaker 2:** *Bye bye.*

220

x 14

# ANAHEIM POLICE DEPARTME.
## GENERAL OFFENSE HARDCOPY

**GO 2009-31742 (OPEN)**

**261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC**

## Related Property Report

### Report Information
Report Number : **356831**
Property case status : **SEIZED/EVIDENCE**
Submitted on **May-13-2009 (Wed.)** by **ADHAM, OMAR #466**
Authority for disposal : **ADHAM, OMAR #466**   Org unit : **SEX CRIMES**
Offense : **GO 2009-31742**
Related items : **6**

### Article - Evidence
Status:    **SEIZED**
Article:    **YPHOTOS - Photos, pictures,  photo line up, 6 pack**       Tag #:   **356831-1**
Make:
Model #:
                                                            # of Pieces:
Ser. #1:    UNKNOWN
Ser. #2:                                                    OAN:
Value:
Description:    **OFFENDERTRAK PHOTO LINE-UP**               Color:
Recovered Date:
Recovered Location:                                         Recovered Value:
Flags: *e

### Article - Evidence
Status:    **SEIZED**
Article:    **YDOCUME - Document(s) (papers, reports)**       Tag #:   **356831-2**
Make:
Model #:
                                                            # of Pieces:
Ser. #1:   UNKNOWN
Ser. #2:                                                    OAN:
Value:
Description:    **(V) DOE CONFIDENTIALITY FORM**             Color:
Recovered Date:
Recovered Location:                                         Recovered Value:
Flags: *e

### Article - Evidence
Status:    **SEIZED**
Article:    **YINTERV - Interview recording, CD, DVD, VHS, Audio**   Tag #:   **356831-3**
Make:
Model #:
                                                            # of Pieces:
Ser. #1:   UNKNOWN
Ser. #2:                                                    OAN:
Value:
Description:    **DVD OF (V) DOE INTERVIEW**                 Color:
Recovered Date:
Recovered Location:                                         Recovered Value:
Flags: *e

20

×15

# ANAHEIM POLICE DEPARTMEN
## GENERAL OFFENSE HARDCOPY

**GO 2009-31742 (OPEN)**

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

**Article - Evidence**
Status:     SEIZED
Article:    YSWAB - Swab or sample for anaylsis ( DNA, Bucca          Tag #:   356831-4
Make:
Model #:
                                                                    # of Pieces:
Ser. #1:   UNKNOWN
Ser. #2:                                                            OAN:
Value:
Description:     BUCCAL SWAB FROM (S) WHITESIDES                     Color:
Recovered Date:
Recovered Location:                                                 Recovered Value:
Flags: *e

**Article - Evidence**
Status:     SEIZED
Article:    YINTERV - Interview recording, CD, DVD, VHS, Audio       Tag #:   356831-5
Make:
Model #:
                                                                    # of Pieces:
Ser. #1:   UNKNOWN
Ser. #2:                                                            OAN:
Value:
Description:     CD OF (W) LEONARD INTERVIEW                         Color:
Recovered Date:
Recovered Location:                                                 Recovered Value:
Flags: *e

**Article - Evidence**
Status:     SEIZED
Article:    YINTERV - Interview recording, CD, DVD, VHS, Audio       Tag #:   356831-6
Make:
Model #:
                                                                    # of Pieces:
Ser. #1:   UNKNOWN
Ser. #2:                                                            OAN:
Value:
Description:     DVD OF (S) WHITESIDES INTERVIEW                     Color:
Recovered Date:
Recovered Location:                                                 Recovered Value:
Flags: *e

## ** END OF HARDCOPY **

2i

HABEAS   EX: 13A

13A — 12 Letters to Defense Counsel Nisson from   (29 pg.)
Petitioner Whitesides while incarcerated   (x1 - x30)
in County Jail.
+ One internal MEMO

_____

_____

_____

# EXHIBIT   13 A   (30 pgs)

X 1



USA FIRST-CLASS FOREVER

SANTA ANA CA 9527
03 AUG 2010 PM 2 L

Law Offices of David M. Nisson
17291 Irvine Blvd Ste 311
Tustin, CA.     92780

Kyle J. Whitesides #2566178
501 The City Drive
Orange CA 92868

*Legal Mail *

327804-2331

224

x 2

8/2/10

Dear Mr. Nisson,

Hello, my name is Kyle J. Whitesides and i
am hoping that i may retain you to represent
me in a criminal matter in court. I believe you
have spoken to my friend Charles Barbero concerning
my case and also your fee. Charles relayed to me
that you first wished to speak to me before you would take
my case, i am writing you because i have had no luck
reaching your office via the phone.

My preliminary hearing is scheduled for August 13th
and i would like to hire you prior to that date. If you
could arrange for a time to come to the jail for a
consultation with me and a short visit with Mr. Barbero
to arrange your fee it would be much appreciated.

Regards,

Kyle

P.D.

Frank
BITAR        714 834 2144

approval # 003412

# 253        approval code
Barbero    55-6    ("in force"
                    "OFF" "LINE")

Kyle J. Whitesides
# 2566178
501 The City Drive        LACY Front Lobby (714) 935 8210
Orange   CA  92868

WHITESIDES
25 K      #222    OK.
                  30K
                          5411 9520 0292 0910 GFP 01-12
                          225
                  5 K FOR CHAS. BARBERO -

x 3



Happy unHolidays
USPS.com

SEABISCUIT

SANTA ANA, CA 926
29 DEC 2010 PM 1

Kyle Whitesides #252660790
501 The City Dr,
Orange, CA 92868

Law offices of
Mr. David Nisson
17291 Irvine Blvd Ste 311
Tustin, CA 92780

226



RECEIVED DEC 3 0 2010   12-28-10

David,

    I just wanted to let you know that as far as i knew Charles had retained Eric Lampel to address the constitutional matters on my case. We were referred to Mr Lampel by Stephen DeSales who upon reviewing my case was under the impression it was not a trial case at all he thought Mr Lampel would be able to get the charges dismissed, due to the time restraints on the 1995 case.

    My public defender, Frank Bitter, also said that the 95' case was argueble due to time restraints. He had an apellate lawyer working on the case before we hired you he said he would be more than willing to share the work product he had with you, if you wanted to call him he can be reached at 714-834-9144. I would appreciate it if you would call him and go over what information he had on my case.

    If you would also contact Eric Lampel to find out if he'll be working on my case, i would also appreciate that, his number is 949-261-8877. As i said before Charles told me he hired him. I would really like to get this moving along. From speaking with the few people who have looked at my case i know I have a good chance of beating both charges. Mr Bitter guaranteed me

221

×5

absurd story the woman told. Her story is just not believable.

Dawid i have recently been blessed to have my son come back into my life, he is 17 and is a great kid. He comes to visit frequently and i also talk to him on the phone alots. It has been very uplifting to have him back in my life And it has also benefitted him, having contact with me has made a positive impact on him as well. His grades are up and he is happy, he often bugs his mother to bring him to see me. This case the DA is trying to sentence me to life in prison please don't let that happen Dawid. I do not deserve what i am being put through, I do not deserve to be charged with this nonsense, I have made mistakes in the past but I do not deserve this I know we haven't had a chance to talk much but i am a good person and i have turned my life around. I hope you'll be able to read through all the B.S. as my other attorney has and make this mess go away. I would appreciate it if you would talk with Charles and come to see me and let me know what's going on. I've been incarcerated for 9 months, i think its time to move forward with this. I appreciate your time and your help. i know you'll do your best. See you soon

V..1

x6

P.S.   If Charles is still willing to hire an appellate lawyer to assist on my case, would you please help him facilitate that. Trying to do it soley through collect calls is nearly impossible. If you could make some calls and help get someone on board to help it would be greatly appreciated.

Thanks again,

Kyle

×7



Kyle Whitesides #75260178
501 The City Drive
Orange CA. 92868

Law Offices of David Nisson
17291 Irvine Blvd. Ste. 311
Tustin   CA.   92780

230

RECEIVED
MAR 8 2011
Kyle
By Whitesides

xB

3/6/11

David,

    I was hoping to have seen you this past weekend as you indicated you would be coming to see me. This has happened several times now coupled with you not showing up for court and only seeing me one time in 7 months, I can't begin to describe to you how much stress this has added to an already stressful situation.

    I would like for you to call my sons mother, Mieeshiea Scott, and explain to her what is going on with my case. You may speak to her openly about my case. My parents, as well as i are very concerned about what's going on with everything. The D.A. was upset in court on the 25th about another delay and said she would oppose any further continuances. David, i need to know what is going on, i have been left in the dark for too long. My public defender was very positive about my chances and guaranteed an acquittal on this 2009 case. I need to know where you stand, what you've done so far, and what you think about my case, for starters. Please contact Ms. Scott @ 714-626-0838 and update her with your progress. And at your earliest convenience please come see me, i'm not doing so well.

Thank You    Kyle

x9



SANTA ANA CA 927

19 MAR 2011 PM 3

Law Offices of
David Nisson
17291 Irvine Blvd Ste 311
Tustin  CA  92780

927801331

Kyle Whitesides
#25T66178
501 The City Dr.
Orange CA 92868

232



X 10

David,

My daughters mother got our child taken by social services. I am forwarding you 2 pages from the report that show i am incarcerated for sodomy on a child under the age of 14. We both know this is not the case. This has come up before when i was searching to hire a lawyer. I spoke to a Peter Larkin who said that counts 3, 4, and 5 showed to all be on a minor. where he was looking i don't know but obviously somewhere where people are taking up my charges it is incorrect. If they are incorrect there are they incorrect with the court? If so i thought they would need to be dismissed and refiled If this was the case, i thought about how if they had to dismiss 3 charges and refile it may give us an opportunity to split the cases How the timing would go and how we would do that i don't know. I just wanted to throw that out to you and have you check into it. Please come to see me as soon as you can so we can go over my case together. Thanks David!

                                            Be Well!

                                                    Kyle

WHITESIDES


233

x11

| DPSS | RECORD CHECK | | | | |
|---|---|---|---|---|---|
| Dep. | Ward | RIVERSIDE COUNTY | | LAW ENFORCEMENT | |
| Active | | DEPARTMENT OF PUBLIC SOCIAL SERVICES | | Inv. # .......................... | |
| Dismissed J- ......................... | | | | | |
| DPSS # ......................... | | APPLICATION FOR JUVENILE COURT PETITION | | | |

| Child's True Name | First | Middle | Last | Sex | Birthdate | Birthplace |
|---|---|---|---|---|---|---|
| | Madeline | | Wainio | female | 4/1/10 | |

| Address | | | |
|---|---|---|---|
| 7470 CoCo Ct. Corona, CA | | Home Phone | |

| Father | DOB | Phone: | Mother | | DOB | Phone: |
|---|---|---|---|---|---|---|
| Kyle Whitesides | 4/20/72 | | Kimberly Wainio | | 1/3/88 | |

| Address | | Mother's Maiden Name |
|---|---|---|
| Booking # 256678 Theo Lacy Facility | Address 7470 CoCo Ct, Corona | |

| Step-Father | Phone: | Step-Mother | DOB | Phone: |
|---|---|---|---|---|
| 501 The City Drive Orange, CA 92868 | | | | |

| Address | | Address |
|---|---|---|

| Father's Employment | SS# / / | Phone: | Mother's Employment | SS# / / | Phone |
|---|---|---|---|---|---|

| Child lives with (if not parent) | | Phone: | School | | Grade | Yrs. in State | Co. | Phone |
|---|---|---|---|---|---|---|---|---|

Reason for Referral:    W&IC   300(a)   300(b) ) 300(c)   300(d)   300(e)   300(f)   ( 300(g) ) 300(h)   300(i)   300(j)

| Date Occurred | Time and Date taken in Custody | Arresting Officer | Department |
|---|---|---|---|
| 3/3/11 | 7:00pm    3/3/11 | | |

Statement of Facts:  (Include specific details necessary, showing place, time, date, and alleged acts.)
State facts clearly.  DO NOT MERELY REFER TO OTHER REPORTS ACCOMPANYING APPLICATION.  ATTACH INVESTIGATION REPORTS.

The mother has a history of mental health issues. On 2/25/11 she was placed on a 5150 hold. On 3/2/11 she was placed on a 5150 hold after an attempted overdose of pills in the presence of the child. The family has failed to benefit from CPS involvement.

The father is currently incarcerated and awaiting trial for PC 286(c) Sodomy w/ minor under 14 and PC 286(c)(2) Sodomy by means of force and PC 261(a)(2) Rape; duress, menace.

| Does parent admit allegations? | ☐ YES ☐ NO | Does child agree with the statement of facts? | ☐ YES ☐ NO |
|---|---|---|---|
| Child remains with parents | | Shelter Home | |

| Time & Date the arresting officer notified the parents per 308 W&IC | No. of previous contacts | Ward of Juvenile Court? | Dependent Child? |
|---|---|---|---|

☑ I hereby request the DPSS Director to file a Juvenile Court Petition on behalf of the above-named child. I hereby certify that the facts contained herein are true to the best of my knowledge; I will testify to these facts in court if required.

☐ I hereby request the DPSS Director to file a Juvenile Court Petition on behalf of the above-named child. I hereby certify I have reasonable cause to believe the above child is a person described within Section 300 upon information supplied by Child Protective Services and believe that such information is correct.

Date:   3/3/11

Signature   X   p.1

Department   DPSS/CPS

DPSS J132A (REV. 4/03) APPLICATION FOR JUVENILE COURT PETITION

White Copy – DPSS   Yellow Copy – Applicant's   Pink Copy – Shelter Home
Page 1 of 2

x 12

| CHILD'S NAME: | | JV-121 |
|---|---|---|
| Madeline Jane Wainio | CASE NUMBER: | |

## FAILURE TO PROTECT
### § 300(b)

The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness,

[X] as a result of the failure or inability of his or her parent or legal guardian to supervise or protect the child adequately

[ ] as a result of the willful or negligent failure of the child's parent or legal guardian to supervise or protect the child adequately from the conduct of the custodian with whom the child has been left.

[X] by the willful or negligent failure of the parent or legal guardian to provide the child with adequate food, clothing, shelter, or medical treatment.

[X] by the inability of the parent or legal guardian to provide regular care for the child due to the parent's or legal guardian's mental illness, developmental disability, or substance abuse.

*(State supporting facts concisely and number them b-1, b-2, b-3, etc.):*

b-1    The mother suffers from mental health issues, suicidal ideation, Bi-Polar Disorder and has been hospitalized on psychiatric holds pursuant to 5150 of the Welfare and Intuitions Code. Further, the mother obtains various medications from different physicians.

b-2    The alleged father, Kyle Whitesides has a criminal history including, but not limited to, Sexual Battery, 288/Child Molestation, PC 261 (a) Rape, Duress, Menace, PC 286 (c) Sodomy with a minor under 14, PC 286 (c) (2) Sodomy by means of force and the alleged father remains incarcerated.

Approved for Optional Use
Judicial Council of California
JV-121 [Rev. January 1, 2007]
CWS Case Management System

§ 300(b)

Page 3 of 4

235

x13



Kyle Whitesides #25C06178
501 The City Dr,
Orange CA 92868

Law Offices of David Nissan
17291 Irvine Blvd. Ste. 311
Tustin CA 92780

92780+2931

236

x14

4 - 3 - 11

David,

I am at a loss for words and can't even begin to understand what i have done to deserve this. Please come to the jail to see me, it has been a week short of 8 months since you last came.

Thank you

4-5-11
File ASAP

RECEIVED
APR 5 2011
By

237

x 15



FIRST-CLASS FOREVER

Kayla Whitesides #2586017B
541 City Drive
Orange CA. 92868

David Nisson
17291 Irvine Blvd Ste 311
Tustin CA. 92780

92780+2331

x/16

David,

I just got off the phone with you and didn't want to call back again so i thought i would write. I'd like to go ahead with the preliminary hearing on the 23rd if it is at all possible. IF you really need to postpone again i understand. Its just that i've been in here for 2 years now and would like to get things moving. David seemed pretty sure that he could get the old charges dismissed and he said what transpires at the prelim could only help us with the motion. Hopefully you'll be able to go ahead & be ready for the 23rd. Hope this letter finds you well.

                                        Regards,
                                        Kyle Whitesides

k17



USA FIRST-CLASS
FOREVER

30 MAR 2012 PM 2 1

David Nisson
17291 Irvine Blvd. ste. 311
Tustin CA. 92780

92780293185

Kyle Whitesides #25000178
501 The City Drive
Orange CA 92868

240

x18

APR   1 2012                    3/29/12

David,

        This is just a follow up from our phone
conversation about the request for a copy
of my file. I would like a copy of everything,
police reports, interviews, and transcripts of
the preliminary hearing. The one thing i would
like you to leave out are the police reports
from my 99' case, the 288A. I would like
a copy of everything else though so i may
prepare for trial. Thank you again for all
your help.

                            Regards,

                            Kyle Whitesides

241





USA FIRST-CLASS FOREVER

SANTA ANA, CA 926
11 APR 2022 PM 3 L

David Nisson
17291 Irvine Blvd Ste 311
Tustin CA 92780

92780029931 85

Kyle Whitesides #125060178
501 The City Drive
Orange CA 92868

242

x 20

David,                                                    4/11/12

I am writing to request a copy of my file again, i was hoping you can either mail it to me or bring it by the jail next week. I would like to read through it, make notes and then discuss everything with you before we start moving forward in court. I'm going a little stir crazy after 2 years and really would like to put some weit in on my case instead of sitting on my hands. So if you could please send me a complete copy of my file i would greatly appreciate it. Hopefully we can get things moving in court soon. Thanks again for all your help. Regards,

                                        Kyle Whitney Jong

4-19-12
Please make (1)
extra complete
copy of file (no STAPLES)

243

x 21



SANTA ANA CA 926

05 JUL 2012 PM 11

USA
FIRST-CLASS
FOREVER

FWD

Kris Whitesides
115601 78
501 City Dr.
Orange CA 92868

David Nisson
17291 Irvine Blvd, Ste. 311
Tustin CA, 92780

92780180918 01

244

x22

7-4-12

Dave,

Thank you for coming down and bringing me my paperwork. I had hoped it would have been everything because i want to go through everything and make notes and write out everything that happened. I have concerns, as you can understand, about having this sort of material in my possession. I wanted to get all the paperwork, make my notes, then return everything to you within a few weeks. So i would really appreciate it if you could bring me the following:

1. Police report from Anaheim (2008 case)

2. Interviews with Kim McClean, there should be "2". (2008 case)(recorded)

3. Interview recorded with Miss Burns (Anaheim 2008 case)

4. My interview with Anaheim PD (recorded)(2008 case)

— If you would Dave, please do try in a timely manner the items. It is necessary to me to go

WHITESIDES 7-16-12
Danielle - canyon
Find left/right
items ASAP?

245

x23

in my cell indefinitely. I want to study over everything
and make notes for you so when we get a chance
to talk about everything i can speak intelligently
about my actions. So please if you could deliver
this stuff within the week or you could send
it "legal mail" whichever would be quicker
for you to get it to me so i can do what i need
to do. Trial is coming up next month and we
need to get going on my defense. I would really
appreciate a timely response this time David.
I'll call you next week and see whats going on
Hope this letter finds you well.

Much love, Jack.

246

x24



USA
FIRST-CLASS
FOREVER

23 JUL 2012 PM 12 L

David Nisson
17291 Irvine Blvd. Ste 311
Tustin, CA 92780

Kyle Whitesides
#25-60173
501 The City Drive
Orange CA 92868

7-30-12
Danielle - do we have
these? (File is
on my desk) dn

↑

"notes attached to
LeHer" - "Recieved
Jul 24 2012"

↓



247

x25

David,

    Reading through the prelim again i found a few other interviews that i did not request from you. So if possible i would like a copy of the following at your earliest convenience...

1. Interview with McCullough (audio tape) transcripts

2. Interview with Leonard (audio tape) transcripts

3. Interview with myself (audio tape) transcripts

4. Interview with M's Baker (audio tape) transcripts

5. Interview with Gutierez (audio tape?) transcripts

6. Copy of Police report from Anaheim P.D.

7. Copy of interview from DA investigator M's Dodd 3 Amy Dale (1915 case)

If you could please bring those down to me, hopefully by the end of the month, i would really appreciate it. Thanks for your time.

                  Be well,

                     Kyle Whitesides

x240

| | | |
|---|---|---|
| Anaheim PD | Police Report | ✓ |
| Arcata PO | Police Report | ✓ |
| DA Investigator | Recorded Int. w/ Dale | |
| Interview w/ Leonard | | ✓ |
| " w/ Gutierrez | | |
| " w/ McCullagh | | ✓ |
| " w/ myself | | ✓ |
| " w/ Baber | | ✓ |
| Prelim Transcripts | | ✓ |
| Public Defender int w/ Rose (Biller) | | |

Dave,

    I still need copies of the unchecked interviews.

               Thanx,

                  Kyle



# Memo

To:        David

From:      Danielle

CC:

Date:      7/31/2012

Re:        Kyle Whitesides

I have all the items referenced in Kyle's most recent letter except for item #5 and #7. These are the documents we do have. Regarding item #7, there is a document in the file that references a conversation between Ms. Dodd and Amy Dale wherein Ms. Dodd contacts Dale in order to e-mail her a line-up of possible suspects, but no transcript. Did you want me to make copies of the documents we do have?

-Danielle

7 - 31 -12
YES, PLEASE
#5 Guiterez Int
#7 Dodd/Dale transcripts

1

250

x28



USA
FIRST-CLASS
**FOREVER**

SANTA ANA CA 926
30 AUG 2022 PM 12 L

David Nisson
17291 Irvin Blvd. Ste. 311
Tustin CA, 92780

9278020316 86

Kyle Whitesides
#2526078
501 City Dr.
Orange CA 92868

x29

9.16.12
I visited him
on 9.3.12
:(

David,

I don't know what else to do so, I thought I would write you a letter. I just simply wanted to tell you how disconcerting it is that you haven't come to see me after telling me so many times that you would. I can't even begin to relay to you how much stress this adds to an already stressfilled situation. I just want a copy of my file so i can begin to do some work on my defense. I began asking for this stuff over 3 months ago. Time is beginning to be even more critical now because I absolutely do not want to continue to postpone this case. Hopefully this will prompt you to begin doing some work on my case, its been 2½ years since this all began and I am anxious for it to move forward. Literally anxious, I've been having anxiety attacks about twice a week for the past month. Not fun. I'm just coming to the end of my rope with this place, i need to make some progress on my case. If you plan on doing any investigative work sending someone to interview these women I would really appreciate the effort. Thanks for your time David, i'd really appreciate a visit, some paperwork on all those interviews i requested and a few hours of your time.

252                    Be Well,

x 30

RECEIVED

JUN 14 2014

Per _____

6/11/14

Dear David,

Would you please give David Scharph
my address and ask him to get ahold
of me as soon as possible. I was hoping
he would take a look at my case and file
a brief for me. I don't have much money
and my folks are done paying for me. I have
about $600 in my bank account, hopefully
that will be enough. He is my last chance.
Enclosed is the brief my appellate lawyer
submitted, if you could forward it to David and
ask him to write me i would appreciate it.
Here is my address...

Kyle Whitesides AR1462
Mule Creek State Prison
PO Box 409040
Ione CA 95640

Hope this letter finds you well, thank you for
all your help.

Regards, Kyle Whitesides
253

HABEAS  EX: 14

# EXHIBIT COVER PAGE

EXHIBIT

14

❖ Description of this Exhibit:

Due Dilligence Efforts

- pg x 12 shows letter sent out to over one dozen atterny's and legal orgeneations

❖ Number of pages in this Exhibit: __15__ total pages.

❖ JURISDICTION: (Check only One)

☐ U.S. Supreme Court

☐ U.S. Court of Appeals

☐ United States District Court

☐ CA State Supreme Court

☐ CA Appellate Courts

   Superior Court

☐ Municipal Court

☐ County Grand Jury

x1

8/17/2021

LOOKUP BY CDC

| LASTNAM | CDCNO | YRHOUSI | Date | OI | FROM | TO | COMMENTS | INMSIG |
|---|---|---|---|---|---|---|---|---|
| WHITESI DES | AR1462 | B 7-133 | 05/30/2014 | F | ATTY D. KELLY, 1307 N ST, BKRSFLD CA | | | |
| WHITESI DES | AR1462 | B 7-133 | 06/02/2014 | F | ATTY D. KELLY, 1307 N ST, BKRSFLD CA | | | |
| WHITESI DES | AR1462 | B 7-133 | 06/10/2014 | F | CRT APPLS, 601 W. SNTA ANA BLVD, SNTA ANA CA | | | |
| WHITESI DES | AR1462 | B 7-133 | 06/12/2014 | F | ATTY D. KELLY, 1307 N. ST, BKRSFLD CA | | | |
| WHITESI DES | AR1462 | B 7-133 | 07/17/2014 | F | CRT APPLS, 601 W. SNTA ANA BLVD, SNTA ANA CA | | | |
| WHITESI DES | AR1462 | B 7-133 | 08/14/2014 | F | ATTY KELLEY 1307 N ST BAKERSFIELD CA | | | |
| WHITESI DES | AR1462 | B 7-133 | 10/17/2014 | F | CRT APPLS, 601 W. SANTA ANA BLVD, SNTA ANA CA | | | |
| WHITESI DES | AR1462 | B 7-133 | 05/20/2015 | T | | ATTY D. LETARTE, 1080 PRK BLVD, SD CA | | |
| WHITESI DES | AR1462 | B 7-133 | 06/03/2015 | F | ATTY D. LETARTE, 1080 PRK BLVD, SD CA | | | |
| WHITESI DES | AR1462 | B 7-133 | 06/12/2015 | T | | ATTY K. RUTLEDGE, 7960 SOQUEL DR, APTOS CA | | |
| WHITESI DES | AR1462 | B 7-133 | 04/19/2016 | F | ATTY B. ZUCKER, 401 WILSHRE BLVD, SNTA MNCA, CA | | | |
| WHITESI DES | AR1462 | B 7-133 | 06/16/2016 | F | ATTY B. ZUCKER, 401 WILSHRE BLVD, SNTA MNCA, CA | | | |

255

8/17/2021

LOOKUP BY CDC

| LASTNAM | CDCNO | Y/HOUSI | Date | OI | FROM | TO | COMMENTS | INMSIG |
|---|---|---|---|---|---|---|---|---|
| WHITESI DES | AR1462 | B 7-133 | 06/27/2016 | F | INNCE PRJCT, J BROOKS, 225 CEDAR ST, SD CA | | | |
| WHITESI DES | AR1462 | B 7-133 | 06/27/2016 | F | ACLU, 915 15TH ST, WASH DC | | | |
| WHITESI DES | AR1462 | B 7-133 | 06/28/2016 | F | ATTY D. LETARTE, 1080 PRK BLVD, SD CA | | | |
| WHITESI DES | AR1462 | B 7-133 | 07/26/2016 | F | PRSN LW, DAVIS CA | | | |
| WHITESI DES | AR1462 | B 8-132 | 08/22/2017 | F | D. NISSON ATTY IRVINE BLVD STE 154 TUSTIN 92780 | | | |
| WHITESI DES | AR1462 | B 8-132 | 08/31/2017 | F | PLO, SQ CA | | | |
| WHITESI DES | AR1462 | B 8-122 | 02/27/2018 | F | ATTY B. STONESIFER 1540 MRKT SF, CA | | | |
| WHITESI DES | AR1462 | B 8-122 | 03/20/2018 | F | PRI LW OFF SN QNTN, CA | | | |
| WHITESI DES | AR1462 | B 8-132 | 03/28/2018 | F | ATTY TOTTEN 3325 WLSHR LA, CA | | | |
| WHITESI DES | AR1462 | B 8-132 | 04/04/2018 | F | ATTY STONESIFER 1540 MRKT SF, CA | | | |
| WHITESI DES | AR1462 | B 8-132 | 04/10/2018 | F | PRI LW OFF SN QNTN, CA | | | |
| WHITESI DE | AR1462 | B 8-132 | 08/07/2018 | F | ATTY SUN 39 DRUMM SF, CA | | | |

256

x3

# DAVID M. NISSON
### ATTORNEY AT LAW
17291 IRVINE BOULEVARD, SUITE 154
TUSTIN, CALIFORNIA 92780
TELEPHONE (714) 730-2171
FAX (714) 730-2195
EMAIL: DAVIDMNISSON@SBCGLOBAL.NET

August 17, 2017

**Legal mail**
Kyle Whitesides
Mule Creek State Prison
P.O. Box 409040, Rm. B8-104up
Ione, CA 95640

Re:   People v. Kyle Whitesides, Superior Court
      10NF0718

Dear Mr. Whitesides :

Enclosed please find a copy of a letter signed by Rosalind Whitesides confirming that we delivered the file to her on August 16, 2017. She has your complete criminal file as you instructed in your letter dated August 1, 2017.

Should you ever need to speak with me, you can probably call me collect at 714-264-2619 to discuss any further issues. I trust that I have satisfied delivery of this file to your parents as instructed in your letter of August 1, 2017.

Sincerely,

DAVID M. NISSON
Attorney at Law

DMN:mep
enclosure

x4

# DAVID M. NISSON
### ATTORNEY AT LAW
17291 IRVINE BOULEVARD, SUITE 154
TUSTIN, CALIFORNIA 92780
TELEPHONE (714) 730-2171
FAX (714) 730-2195
EMAIL: DAVIDMNISSON@SBCGLOBAL.NET

I, _Rosalind Whitesides_ step- parent of Kyle Whitesides, confirm that on this date I received the complete criminal file for Kyle Whitesides for the jury trial which occurred in the Central Justice Center. I understand that Attorney Nisson is not retaining any copies of this file so this is the only record of this file and I will be certain that Kyle Whitesides is advised that Mr. Nisson turned over his entire file as instructed by Kyle Whitesides.

Dated: _8/16/17_                     _[signature]_

x 5



PRISON LAW OFFICE
P.O Box 4745 - Davis, CA. 95616
Telephone (530) 752-6943 • Fax (530) 752-0822
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Susan Christian
Rebekah Evenson
Steven Fama
Penny Godbold
Megan Hagler
Alison Hardy
Kelly Knapp
Millard Murphy
Lynn Wu

**Mr. Kyle Whitesides, AR-1462**
**Mule Creek State Prison**
**B-8-122**
**P.O. Box 409040**
**Ione, CA  95640**

Dear Mr. Whitesides,

We received your letter on March 20, 2018 requesting legal assistance.  We have processed your letter and we are returning your letter to you.  Moreover, the returning of your letter does not mean that we are negating our services or taking your case.  We just do not have the storage capabilities to house your material while we are reviewing your request for assistance.

We wish you the best in your pursuit of justice.

Sincerely,


Prison Law Office Staff

Board of Directors    *259*
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Honorable John Burton • Felecia Gaston • Christine Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts



**Equal Justice Initiative**

122 Commerce Street
Montgomery, Alabama 36104
334.269.1803

x6

April 9, 2018

Kyle Whitesides, AR1462
Mule Creek State Prison
PO Box 409040
Ione, CA 95640

Dear Kyle Whitesides:

Thank you for contacting the Equal Justice Initiative (EJI). We get many requests for legal assistance from people who are incarcerated. We have very limited resources and will not be able to provide direct assistance to most people. However, we want you to know that we have received your letter, and if there is anything we can do to provide assistance, we will get in touch with you as soon as we can. **Please do not send additional materials or original documents as we are not able to maintain physical copies of materials we receive. Materials sent to our office will not be maintained or returned.** We regret that our ability to take on new cases is so limited because we recognize that your rights may have been violated and you are dealing with a difficult situation. However, we appreciate your taking the time to contact us and we hope that you find the assistance you need.

Thank you again for your letter.

Sincerely,

Abigail Gellman
Intake Department



x 7

## CONFIDENTIAL AND PRIVILEGED

June 27, 2018

Mr. Kyle Whitesides, CDCR AR1462
Mule Creek State Prison, Facility B, Building 8, Cell 122
P.O. Box 409099
Ione, CA 95640

Dear Mr. Whitesides:

I am writing in response to a letter you sent to the Loyola Law School Project for the Innocent asking for our assistance. Loyola Law School's Project for the Innocent is a law school clinic staffed primarily by law students who work under the supervision of attorneys trained to investigate claims of actual innocence by inmates incarcerated in California state prisons. Our evaluation process starts when an inmate writes a letter requesting help establishing a claim of wrongful conviction. Our goal is to carefully review each inquiry and respond to every letter. Because we receive so many inquiries and letters from inmates, it helps us in our evaluation to have as much of the following information as possible.

1. Date and county of conviction.
2. Charges you were convicted of and sentence received.
3. Trial court case number.
4. Trial Attorney's name.
5. Date of appeal, if you appealed.
6. Appellate case number.
7. Appellate attorneys name.
8. Dates of any habeas petitions you might have filed.
9. Records of appeal and the original trial.
10. If you are making a claim of innocence please provide details as to what went wrong at your trial, or what investigation you think needs to be conducted to prove your claim of innocence.
11. Please explain what evidence you think is out there to prove your innocence and whether that evidence has already been reviewed by a court or whether it is newly discovered.
12. Trial transcripts from your trial.
13. Any other useful information or materials you have regarding your case.

Please send your responses to:

Loyola Law School
Project for the Innocent
919 Albany St.
Los Angeles, CA 90015

Please, do not send any documents with your response. We will ask for your court papers when we feel they are needed. Because we receive so many inquiries and letters from inmates, you may not receive a response from us for many months.

919 Albany Street, Los Angeles, CA 90015-1211 | t 213.736.8141 | f 213.736.8139 | e adam.grant@lls.edu | w www.lls.edu

x8



Under a federal law called AEDPA, there is a very strict deadline to file a federal habeas case. If you do not file on time, you essentially lose the right to ever file it.  Please understand that because the deadline is for a federal filing and the Loyola Law School Project for the Innocent litigates almost exclusively state court cases in California, we cannot file any pleadings on your behalf in connection with your federal case.

In other words, even if you are waiting for us to evaluate your case, you are responsible for meeting your federal deadline.

Please understand that we take very few cases and that by sending you these questions, Loyola's Project for the Innocent is not agreeing to represent you. No Attorney-client relationship is created by submitting answers to the above questions. Unless and until you receive a letter from us indicating our acceptance of your case, Loyola's Project for the Innocent shall not be considered your representative.

Thank you for reaching out to us and good luck.

Sincerely,

Arianna Price
Post-Graduate Fellow
Loyola Law School Project for the Innocent

AP: lm
LLS#16189

CONFIDENTIAL/PRIVILEGED 262

x 9

June 10, 2019

Root & Rebound
Attn: Farde Perez (Attorney at Law)
1730 Franklin St., Suite 300
Oakland, CA 94612

Re: legal files of Kyle Whitesides

Dear Ms. Perez

Kyle Whitesides (AR1462), a prisoner at Mulecreek State Prison in Ione, CA asked that I mail these legal files to you.  He says that you are assisting him in filing an appeal on his case.  He also asked that I send a check for $75 dollars to cover costs of processing the file.  I have enclosed a check for that amount.  This is the only financial contribution that I will be making to this effort.  I do not mean to sound harsh. However, his father is very ill and will require very expensive care for the rest of his life.  That has to be my first priority.

He also indicated that you would be sending the files back to me.  Please note and understand, I do not want the files sent back to me, and I will not accept the package if they are sent here.  They were sent to me in the first place because Kyle told his previous lawyer to send them here without consulting me first.

I hope that you are able to help Kyle.  If he was wrongly treated by the court system, that should be addressed and corrected.  Also, if that is the case, I would hope that the State would provide him some compensation for the misjustice so that he can start his life anew.

Sincerely,

Rosalind Whitesides
roz_who@yahoo.com

Legal File For Kyle Whitesides AR1462

Received 7/1/19

x10



**US POSTAGE AND FEES PAID**
JUN 26 2019    Mailed from ZIP 94612
PM Large Flat Rate Box
Commercial Base Price

endicia.com/mac          071M01037658

## PRIORITY MAIL 2-DAY™

KATHERINE KATCHER-SBN 295448
ROOT & REBOUND
300
1730 FRANKLIN ST
OAKLAND CA 94612

B900    0022



Legal Mail

**Ship To:**

KYLE WHITESIDE AR1462
MULE CREEK STATE PRISON
PO BOX 409099
IONE CA 95640-9099

---

**USPS TRACKING #**



9405 5102 0079 3099 9370 62

264





ORANGE COUNTY
**SHERIFF'S DEPARTMENT**

SHERIFF-CORONER DON BARNES

August 22, 2019

Kyle Whitesides – CDCR# AR1462
Facility: E - Bldg.: 19 Cell: B201
PO BOX 409090
Ione, CA 95640

Re:      Visiting Records Requested

To Whom It May Concern:

We are unable to fulfill your request for the visiting logs from 2010-2013. Visiting logs are kept for 5 years with a start date December 1, 2013.

Sincerely,

Angela Lore
Assistant Records Manager, Inmate Records

265

Integrity without compromise | Service above self | Professionalism in the performance of duty | Vigilance in safeguarding our community

v 12

Prison Law Office                                    4/10/19
Attn: Donald Speeter
Po Box 4745
Davis, CA     95617-4745

My name is Kyle Whitesides and I am currently serving a 100 year
to life sentence at Mule Creek State Prison.  The sexual assault charges
that I was convicted of, I am factually innocent.  I was sentenced
under California's "Two Strike" law.

I fully confessed to my prior indiscretions and accepted full
responsiblilty for my prior strike.  I served my time and ended up
homeless do to my registration requirements.

I am seeking your assistance to get to the truth and finally
my exoneration.

Here are some of the problems that are relevant to my case:

· My attorney, Mr. Nisson was ineffective throughout my
  entire case.

Originally, Mr. Nisson was retained for me by another inmate
in the County Jail.  Mr. Charles Barbero paid attorney Nisson
$25,000.00 and roughly one month later, unbeknownst to me, voided
this payment.  I believe this was the basis for Mr. Nisson's continued
prejudice.  Understandably Mr. Nisson was upset but my Father later
paid Mr. Nisson $5,000.00 twice for my representation.  (A receipt
for $25,000.00 from Charles Barbero is attached).

Mr. Nisson's ineffectiveness is memorialized below:

· Failure to object to an Unconstitutional Jury Instruction.
  Within the jury instructions under 1191  Evidence of
  Uncharged Sex Offense, the jury was instructed to use evidence

266

x13

in prior uncharged acts under the "Preponderance of Evidence" standard to determine if the uncharged acts occurred and use that evidence, in turn, to convict (defendant) of charged acts.  See Gibson v. Ortiz,(9th Cir 2004) 387 F.3d 812
* Jury Instructions - Cover Page and 1191 (attached)

· Failure to file for a Motion For Discovery
On 1/6/12, roughly 16 months after Mr. Nisson agreed to represent me, an Informal Motion For Discovery was sent to the D.A.  The document listed the incorrect defendant and case number.  Throughout my file there are several mentions of evidence Mr. Nisson never received according to his own handwritten notes. "Informal Motion for Discovery is Attached"

· Failure to Request a Competency Hearing
It is noted in Probation Report defendant was on Psychotropic Medication throughout his incarceration.  Also noted was that there were "no mitigating factors", clearly contradictive.

· Failure to Present Evidence
The lead detective interviewed one Rose Leonard who verified the chain of events as they happened just as defendant did and knew alleged victim to be a liar.  The day trial began Mr. Nisson asked me incourt if I knew how to get ahold of Rose — Leonard, this was after 3 years of preparation time for trial. The D.A. advised Mr. Nisson that the main defense witness was deceased.  The recorded interview was admissable under several evidenciary codes and hearsay exception rules.  Mr. Nisson could not request this because a posponement would have to have been requested the day of trial showing Mr. Nisson's extreme lack of readiness.

· Failure to Call Witnesses
Mr. Nisson called no witnesses but the defendant.  A medical examination was done but not presented by the D.A. or Defense as it showed nothing. No expert witness was called or several other witnesses that would have helped defense.  Documentation and statements are available to support innocense throughout the discovery.

· Failure to Investigate
Mr. Nisson relied only on the few items provided by the D.A. He made no attempt to interview any other witnesses, of which there were many, and never even interview myself, his very own client for the 3 years leading up to trial.  I was advised of my 200 year to life exposure 1 week before trial.

2 cases

· Trial Ineffectiveness
Mr. Nisson had multiple chances to impeach alleged victim of prior inconsistent statements.  Additionally he did not even question alleged victim on statements in interview such as, her roommate "Set up" the entire incident.  A witness

who spoke to both the victim and defendant at the time of the incident indicated in the police interview that the victim was lying and the defendant was not guilty. This witness was never interviewed by defense or called as a witness.

Much more can be added after a complete review of the discovery that was provided and potentially more with the discovery that has yet to be turned over. This all together shows a cumulative and complete failure on Mr. Nisson's part to represent his client, assuredly innefective assistance of counsel.

It is also important to point out that all this happened in Orange County under the District Attorney Tony Ruckauckas, who has since been dismissed.

In closing I would like to again state that I am factually innocent. The most important thing to me is to finally have all the evidence provided and gone over by an honest person who can paint a clear picture of what really happened so I may show my family that I am not guilty and was only accused because of my past. Being exonerated and released from prison is secondary to this. My story needs to be heard.

Thank You for your time and consideration,

Respectfully,

Kyle Whitesides    CDC # AR1462
Mule Creek State Prison
PO Box 409090
Ione, CA  95640

268



NORTHERN CALIFORNIA
**Innocence
Project**

x 15

November 20, 2019

Kyle Whitesides, AR1462
PO Box 409090
Ione, CA 95640

Dear Mr. Whitesides:

Our project is the Northern California Innocence Project. We are involved in screening claims of innocence for convictions obtained in trial courts in Northern California only. Since you are interested in challenging a conviction from Southern California, I am forwarding all of your material to the California Innocence Project. You can write to them at:

California Innocence Project
Attn: Justin Brooks, Executive Director
California Western School of Law
225 Cedar Street
San Diego, CA 92101-3090

Good luck.

Sincerely,

Aaron Aguas-Rao
Intake Attorney

AAR:cm
cc: CIP with enclosures

500 El Camino Real, Santa Clara, CA 95053    tel: 408.554.4790    fax: 408.554.5440    www.ncip.scu.edu



**SANTA
CLARA
LAW** est. 1911

HABEAS  EX: 15A

# EXHIBIT COVER PAGE

EXHIBIT

15A

❖ <u>Description of this Exhibit</u>:

- Letter from Appellate Attorney David L. Kelly
stating "No appealable issues"    (4pgs)
                                   ( x1 - x4 )

❖ <u>Number of pages in this Exhibit</u>: __4__ total pages.

❖ <u>JURISDICTION</u>: (Check only One)

☐ U.S. Supreme Court

☐ U.S. Court of Appeals

☐ United States District Court

☐ CA State Supreme Court

☐ CA Appellate Courts

Superior Court

☐ Municipal Court

☐ County Grand Jury

# L w Office of David L. Kelly

1307 "N" Street
Bakersfield, CA 93301
ph: (661) 615-3364 fax: (661) 379-6714

May 27, 2014

Mr. Kyle J. Whitesides AR1462
P.O. Box 409099
Ione, CA 95640     **CONFIDENTIAL LEGAL MAIL**

Dear Mr. Whitesides:

I have carefully reviewed the transcripts in your appeal, and your transcripts have been re-viewed by staff attorneys at Appellate Defenders, Incorporated. I am sorry to inform you that I have found no issues that offer any hope of success on appeal. The issues of speedy trial and the statute of limitations were mooted by the fact that the jury hung on the 1995/1996 counts, and those counts were dismissed. Also, the Penal Code permits charging certain cases (like rape) at *any time*, where the punishment is life:

> Penal Code section 799: Prosecution for an offense punishable by death or by imprisonment in the state prison for life or for life without the possibility of parole, or for the embezzlement of public money, may be commenced **at any time**....

Penal Code section 667.61, subdivision (a) provides that:

> Except as provided in subdivision (j), (l), or (m),
> any person who is convicted of an offense specified
> in subdivision (c) under one or more of the
> circumstances specified in subdivision (d) or under
> two or more of the circumstances specified in
> subdivision (e) shall be punished by imprisonment
> in the state prison for **25 years to life**.

Subdivision (b) provides that "... any person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for **15 years to life**." Subdivision (e)(4) provides that a current conviction for any enumerated offense committed against more than one victim is subject to a life term: " The defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim." Subdivision (d) provides another circumstance under which a defendant may be punished with a life sentence: " (1) The defendant has been previously convicted of an offense specified in subdivision (c)...." [which includes conviction under Penal Code section 288, subdivision (a)].

Section 667.71 provides for a life sentence for habitual sex offenders:

> (a) For the purpose of this section, a habitual sexual offender is a

person who has been previously convicted of one or more of the offenses specified in subdivision (c) and who is convicted in the present proceeding of one of those offenses.

(b) A habitual sexual offender shall be punished by imprisonment in the state prison for **25 years to life**.

Read together, these provisions permitted charging you to for the 1995 offense against Amy D. (See, e.g., *People v. Perez* (2010) 182, Cal.App.4th 231, 242 [prosecution for 1995-1996 offenses not time-barred by 8-year statute of limitations].) Again, your jury could not return verdicts on these 1995 "stale" counts. A mistrial was declared, and count 3 and 4 were dismissed. So, whether one looks at this as a speedy trial issue (with no actual showing of prejudice), or a statute of limitations issue, there is nothing to raise on appeal.

The same holds true ass to Evidence Code section 1108 evidence. Prior to trial, your trial counsel moved to exclude the evidence concerning Kelly Higgason, primarily because the police had lost tape recordings of pretext calls between appellant and Higgason. He also objected to the evidence as stale, and because appellant had not been provided adequate notice under Evidence Code section 1108. The court excluded any reference to the pretext phone calls (which would have been very damaging), but permitted Higgason to testify about the sexual assault under Evidence Code section 1108. The jury was properly instructed under CALCRIM 1191 [Evidence of Uncharged Sex Offense] (CT p. 422.) In any event, Higgason's testimony was not enough to carry the day for the prosecution, because the jury hung on counts 3 and 4 (Amy D.), thereby rendering moot any issue regarding those counts.

I also determined that the sentencing was proper: The court properly struck the "multiple victim" allegations under Penal Code section 667.61, and used the "alternate sentencing scheme" under section 667.71 [habitual offender]. The trial court imposed consecutive 25-to-life sentences for counts 1 and 2, then doubled each term to 50-years-to-life under the "3-strikes" law, totalling 100 years to life. Application of both the alternative scheme provided in Penal Code section 667.71 and the 3-strikes provisions is proper. (See *People v. Murphy* (2001) 25 Cal.4th 136. In *Murphy*, the California Supreme Court first held that section 667.71 permits a separate term of 25-to-life for each new conviction. (*Murphy, supra*, 25 Cal.4th at pp. 149-155.) The Court went on to hold specifically that the "3-strikes" provisions must also be applied:

...[W]e find that the statutes disclose a legislative intent that the Three Strikes law apply *in addition* to section 667.71. Subdivision (f)(1) of section 667 provides that "[n]otwithstanding any other law," the Three Strikes law *"shall be applied in every case* in which a defendant has a prior felony conviction as defined in subdivision (d)." (Italics added.) Moreover, subdivision (e) of section 667 provides that "*in addition* to any other enhancement or punishment provisions which may apply," the sentencing provisions of the Three Strikes law "*shall* apply where a defendant has a prior felony conviction." (Italics added.) Through this

section, the Three Strikes law "declares itself to 'apply' not
exclusively, but rather 'in addition to any other ... punishment
provisions which may apply' [citations]...." (*People v. Alvarez*
(1996) 14 Cal.4th 155, 247, 58 Cal.Rptr.2d 385, 926 P.2d 365.)
Thus, the Legislature has expressly indicated that where a
defendant has a qualifying prior felony conviction, the sentencing
provisions of the Three Strikes law not only *must* be applied, they
*must* be applied *in addition* to any other punishment provisions. "
'It is difficult to interpret the language of the statute in any other
manner.' [Citations.]" (*People v. Dotson*, supra, 16 Cal.4th at p.
554, 66 Cal.Rptr.2d 423, 941 P.2d 56; see also *White Eagle, supra,*
48 Cal.App.4th at pp. 1517-1518, 56 Cal.Rptr.2d 749 [single prior
conviction requires both alternate sentencing under § 666 for petty
theft with a prior and doubling under Three Strikes law].)

(*Murphy, supra,* 25 Cal.4th at p. 157, italics in original.)  Accordingly, there is no appellate issue
to raise as to the sentence.

    I have filed known as a "*Wende*" brief.  *People v. Wende* (1979) 25 Cal.3d 436 is a
California Supreme Court case which says that the appellate court must review **everything** in all
the transcripts and any other material in the appellate record to see if there is anything there that I
have missed.  I sent a copy of this brief under separate cover.  In the brief I set out a summary of
what happened in the trial court, and I ask the Appellate Court to review the entire record on its
own.  Although the Appellate Court will carefully review the record for arguable issues, based on
my research and careful review of the record, I do not believe there is any reason to think the
court will find an issue.  However, you do have rights in connection with a *Wende* brief.  Please
read these carefully:

    1. **You have the right to file a supplemental brief of your own directly with the
court.** If you have anything you would particularly like the court to look for, you may
raise that issue in your brief.  Your brief does not have to be as formal as the opening
brief that I file.  The court will understand that you cannot get brief covers and other
materials that would be used in a law office.  The brief should have at least the name of
the case and the court's case number on it.  Since the court will review the entire record,
you do not have to do much more than let it know what issues you think I should have
raised on your behalf.  If the court agrees with you, it will order me to brief the issues
more fully for you.  Your brief must be filed within 30 days of the date that mine is filed.

    2. **The court only provides one set of transcripts to you during the appeal and that
copy was sent to me.**  You have the right to have your copy of the transcripts in order to
help you prepare your own brief, which includes citations to the record.  Whether or not
you file your own brief, the court may find some issues that it wants me to address in
another brief.  For that reason, I am going to hold on to the transcripts for now.  If you
want them immediately, however, I will send them.  Just let me know.

3. **You have the right to ask the court to relieve me as your attorney.** The court may or may not do so, and if you feel that there is a good reason why it should, you should tell the court those reasons when you ask for a new attorney. I want you to know that I am willing to continue working for you on this case, but you do have the right to ask the court to relieve me if you feel that it is in your best interests.

4. **After the court receives the brief, it will wait for the Attorney General to file anything he or she feels is needed and for you to file a supplemental brief, should you opt to do so.** The court will then review the case on its own. If it identifies an issue, it will either tell me to file another brief discussing the question it has, or it will decide the case and notify us. If it does not finding anything, it will decide the case and notify us. I will review whatever it does, if I have not been relieved, and write you again at that time.

One final issue. Permitting the Court to review your case under *People v. Wende* could possibly expose you to adding 5 years to the determinate portion of your sentence. Under Penal Code section 667, subdivision (a), a trial court must impose a five-year term for every serious or violent felony which is proven, even where it was not alleged. Here, the court imposed the "strikes" sentence, but failed to impose the five-year term under Penal Code section 667, subdivision (a). In reviewing the case, the Court of Appeal may discover this (just as I did), and choose to impose the additional five years. The only way to avoid this is to ask the Court to dismiss your appeal before the Attorney General or the Court can thoroughly review the entire case. If you choose to do this, please notify me immediately, and I will draft the appropriate documents.

Please understand that whether we agree with what happened in the trial court or not, this means of reviewing the case is what the law provides. If you have any questions, please contact me as soon as possible.

Sincerely,

**David L. Kelly**

encls:

HABEAS   EX: 16A

# EXHIBIT COVER PAGE

EXHIBIT

16A

❖ <u>Description of this Exhibit:</u>

- Petitioner Mental Health Records    (4 pgs)
  (x1 - x4)

❖ <u>Number of pages in this Exhibit:</u>  __5__ total pages.

❖ <u>JURISDICTION</u>: (Check only One)

☐ U.S. Supreme Court

☐ U.S. Court of Appeals

☐ United States District Court

☐ CA State Supreme Court

☐ CA Appellate Courts

☒ Superior Court

☐ Municipal Court

☐ County Grand Jury

275

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION
GAVIN, NEWSOM, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 409099
iONE, CA 95640



## Declaration of Custodian of Records
## Department of Corrections and Rehabilitation,

### MULE CREEK STATE PRISON
*(Facility)*

I Samuel Hutter <u>HEALTH RECORDS TECH. I,</u> am the duly authorized custodian of medical records
and/or other qualified witness for the Department of Corrections and Rehabilitation.

A medical file is maintained on each inmate housed in the California Department of Corrections and
Rehabilitation. The file is maintained by the medical department of the institution housing the inmate,
and transferred with the inmate to any other institution.

Documents relating to an inmate's medical examinations, treatment and care are maintained in the
medical file. The contents enclosed represent the latest information received in written form. It may be
outdated as the result of new or revised information, which has not yet been received or filed. The
documents and entries in documents pertaining to an inmate are prepared at or near the time of the
examination, treatment or care of an inmate by persons with personal knowledge of the examination,
treatment or care of the inmate.

The copies of the Unit Health Record presented herein, contain the true documents that represent current
information received in written form, for inmate:

<u>Whitesides, Kyle</u>                    <u>AR 1462</u>
Name of Inmate/Patient                    CDC Number

and maintained in the regular course of business by the California Department of Corrections and
Rehabilitation.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and
correct to the best of my knowledge and belief.

<u>HRT I    Samuel. Hutter</u>                    _Samuel Hutter_
Print Name and Title                         Signature

                                             <u>2/27/23</u>
                                             Date

x 2

State of California
**Mental Health Placement Chrono**                                   Department of Corrections and Rehabilitation
CDCR 128-MH3 (Rev. 10/12)

Inmate Name: Whitesides, Jason          CDCR Number: AR1462      Housing: B3-120UP          Institution: WSP-RC

This Inmate has received a Mental Health Evaluation with the following results [Check box(es) below]:

A. ☐ **Does not meet** criteria for inclusion in the Mental Health Services Delivery System (MHSDS)
B. ☐ **Meets** inclusion criteria for the MHSDS. Check Level of Care (LOC) below.
   ☐ Qualifying mental disorder    **OR**
   ☐ Inclusion is for Medical Necessity (obtain Chief of Mental Health signature below)
C. ☒ **Currently included** in MHSDS. Check new or continuing LOC below.

LOC: ☐ Clinical Case Management (CCCMS)   ☒ Enhanced Outpatient Program (EOP)   ☐ Outpatient Housing Unit (OHU)   ☐ Crisis Bed (MHCB)*
*If LOC is MHCB, was inmate admitted for danger to others? ☐ Yes ☒ No        Referral to: ☐ ICF  ☐ APP

Level of Functioning Assessment (GAF Score): 48        Psychotropic Medication Prescribed: ☒ Yes  ☐ No

Behavior Alerts: _____

T. Richard                          _T. Richard_
CLINICIAN'S NAME (Print)            CLINICIAN'S SIGNATURE              CHIEF OF MENTAL HEALTH or DESIGNEE SIGNATURE

                                                                     09/18/13
IDTT LEADER SIGNATURE               TIME                             DATE

Distribution: White - Unit Health Record; Canary - Inmate; Pink - Central File

*Amended  5/2/17*    x3

State of California
INTERDISCIPLINARY TREATMENT TEAM - LEVEL OF CARE DECISION
CDCR MH-7388-B (Rev. 11/14)

Department of Corrections and Rehabilitation

Page 1 of 2

**PART I: IDTT INFORMATION**

| CDCR Institution: MCSP | Current Housing: GP | | Date of IDTT: 3/13/2017 |
|---|---|---|---|
| Type of IDTT: Initial | If other, reason for IDTT: | | LOC before IDTT: EOP |
| LOC after IDTT: CCCMS | Inmate referred to ICF/Acute LOC | ☐ Yes ☒ No | If yes, level referred to: |
| Date of ICF/Acute LOC Referral: | If referred to DSH, is the inmate-patient clinically suitable for dormitory housing? | | ☐ Yes ☐ No |

**PART II: LEVEL OF CARE CONSIDERATION**

*SECTION A - applies to all levels of care*

| | | |
|---|---|---|
| 1. As a result of a major mental disorder, the inmate-patient is unable to adequately function at the current level of care. | ☐ Yes | ☒ No |
| 2. The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder; serious to major impairment of functioning in most life areas; ritualistic or repetitive self-injurious/suicidal behavior; or refractory psychiatric symptoms. | ☐ Yes | ☒ No |
| 3. The inmate-patient demonstrates chronic psychiatric symptoms (e.g., disturbed emotions, perceptions, thought processes, and/or impaired cognitions) that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning. | ☐ Yes | ☒ No |
| 4. The inmate-patient is currently in a MHCB and has been in a MHCB for at least 10 days. | ☐ Yes | ☒ No |
| 5. The inmate-patient has had 3 or more MHCB placement requests initiated during the last 6 months (includes all MHCB placement requests regardless of where the inmate-patient was housed when the request was initiated, e.g., OHU, alternative housing or overflow beds). | ☐ Yes | ☒ No |
| 6. The inmate-patient has had 3 or more CDCR 115-MH evaluations completed during the last 3 months. | ☐ Yes | ☒ No |

*Reason for Non-Referral to a Higher Level of Care:*

1-6 A. If "Yes" was selected for any of the 1-6 considerations AND a referral to a higher level of care is NOT made, explain why the referral was NOT made.

1-6 B. If "Yes" was selected for any of the 1-6 considerations AND a referral to a higher level of care is NOT made OR if the inmate-patient was referred to a DSH program and is on the DSH pending-admission list, summarize the specific treatment modifications that are documented in the treatment plan to improve the inmate-patient's ability to function.

Date: 03/02/2017

| INTERDISCIPLINARY TREATMENT TEAM - LEVEL OF CARE DECISION CDCR MH-7388-B (Rev. 11/14) Confidential Inmate-Patient Information | Last Name: WHITESIDES |
|---|---|
| | First Name: KYLE        MI: F. |
| | CDCR #: AR1462 |
| | DOB: 04/20/1972 |

**Submitted to HIM**

**MAY 0 2 2017**

Confidential Printed 2017/05/17 11:35:39 -07'00'

278    RECEIVED MAY 0 2 2017

State of California
INTERDISCIPLINARY TREATMENT TEAM - LEVEL OF CARE DECISION
CDCR MH-7388-B (Rev. 11/14)

Department of Corrections and Rehabilitation

Page 2 of 2

**SECTION B: Complete only if the 2014-III level of care is EOP or MHCB**

7. On average and in the last 3 months, has the inmate-patient participated in less than the minimum number of structured treatment hours per week (minimums per week are 5 hours for EOP inmate-patients, 2.5 hours for RC-EOP inmate-patients, and 50% of scheduled hours for inmate-patients on modified treatment plans)?   ☒ Yes  ☐ No  ☐ NA

*B groups assigned*

7-A. If "Yes" was selected for consideration 7 AND a referral to a higher level of care is NOT made, explain why the referral was NOT made.

7-B. If "Yes" was selected for consideration 7 AND a referral to a higher level of care is NOT made OR if the inmate-patient has been referred to a DSH program and is on the DSH pending-admission list, summarize the specific treatment modifications that are documented in the treatment plan to improve the inmate-patient's ability to function.

**PART III: SIGNATURES**

| Treatment Team Members | Name (Print) | Signature |
|---|---|---|
| Primary Clinician | E. Branman, LCSW | |
| Psychiatrist | J. KNOWLES, MD | J. Knowles |
| Correctional Counselor | K.Richardson, CCI | CCI |
| Other: | B. Romano, PsyD | BR PsyD |
| Other: | M. O'Meara, LCSW | M. O'Meara, LCSW |
| Date of IDTT: 3/13/2017 | | |

Inmate-patient attended IDTT:   ☒ Yes  ☐ No   If no, enter reason for not attending:

INTERDISCIPLINARY TREATMENT TEAM -
LEVEL OF CARE DECISION
CDCR MH-7388-B (Rev. 11/14)

Confidential Inmate-Patient Information

Last Name: WHITESIDES
First Name: KYLE   MI: F.
CDCR #: AR1462
DOB: 04/20/1972

Submitted to HIM

MAY 0 2 2017

Confidential 2017.04.27 00:09 -07'00'

RECEIVED MAY 0 2 2017

279

x 5

STATE OF CALIFORNIA
**MENTAL HEALTH PLACEMENT CHRONO**                    DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDCR 128-MH3 (REV. 08/11)

Inmate Name: Whitesides, Kyle    CDC Number: AR1462    Institution: MCSP    Housing: 18.108

**THIS INMATE HAS RECEIVED A MENTAL HEALTH EVALUATION WITH THE FOLLOWING RESULTS [check box(s) below]:**

a) ☐ Does not meet criteria for inclusion in the Mental Health Services Delivery System (MHSDS).

b) ☒ Meets inclusion criteria for the MHSDS. Check Level of Care (LOC) below.
   ☒ Qualifying mental disorder **or**
   ☐ Inclusion is for Medical Necessity (obtain Chief of Mental Health signature below).

c) ☐ Currently included in the MHSDS. Check new or continuing LOC below.

LOC: ☒ Correctional Clinical Case Management Services (CCCMS)  ☐ Enhanced Outpatient Program (EOP)  ☐ Mental Health Crisis Bed (MHCB)

If LOC is MHCB, was inmate admitted for danger to others? ☐ Yes    ☐ No

Referral to DMH: ☐ ICF  ☐ APP

Level of Functioning Assessment (GAF Score): 60    Psychotropic Medication Prescribed: Yes ☒ No ☐

Behavior Alerts: _____

E Brannan LCSW    _____    J. Knowles MD
CLINICIAN'S NAME (Print)    CLINICIAN'S SIGNATURE    CHIEF OF MENTAL HEALTH or DESIGNEE SIGNATURE

B Romano PsyD    _____    03-14-17
IDTT LEADER SIGNATURE    DATE

Distribution: Pink - Central File; Blue - Unit Health Record; White - MH File, Inmate

RECEIVED MAR 1 5 2017

280

HABEAS EX: 17A

# EXHIBIT COVER PAGE

EXHIBIT

17A-B

❖ Description of this Exhibit:

(A) Private Investigator Report showing undisclosed criminal background of Witness McCollough
1 copy
2 Clarification copies

(B)
Order denying Habeas

❖ Number of pages in this Exhibit: __3__ total pages.

❖ JURISDICTION: (Check only One)

☐ U.S. Supreme Court

☐ U.S. Court of Appeals

☐ United States District Court

☐ CA State Supreme Court

☒ CA Appellate Courts

☐ Superior Court

☐ Municipal Court

☐ County Grand Jury

| Print Requester | Booking # | Request Date | Requested Ink | Room | Location |
|---|---|---|---|---|---|
| KYLE WHITESIDES | AR1462 | 11/20/23 10:27 PST | Black/White | E-19 | MCSP,Facility E,E 019B2-202004L |

From: David Phillips on 10/28/23 14:10 PDT

4:07 ⊘ ◻ ◻ ●                    ⏱ LTE ◢ ▮

← Background report.pdf      ◱  △+  ⋮



## M.W. THOMPSON INVESTIGATIVE SERVICES
1500 K. EL CAMINO AVENUE, SUITE #568
SACRAMENTO, CA 95833
CA PM 24651

### BACKGROUND INVESTIGATION

A criminal and civil background investigation was conducted on Kim Louise McCollough. The results of the background investigation were as follows.

#### RIVERSIDE COUNTY

**Criminal Division**

No criminal cases were found for Kim Louise McCollough in Riverside County.

**Civil Division**

No civil cases were found for Kim Louise McCollough in Riverside County.

#### ORANGE COUNTY

**Criminal Division**

The following 3 criminal cases were found for Kim Louise McCollough in Orange County.

Case Name: People vs. Kim Louise McCollough
Case #:    04052SK
Filing date: 8/2/2003
Case type:  Kim Louise McCollough was charged with an infraction.
Orange County Superior Court was unable to provide any other information regarding this case.

Case Name: People vs. Kim Louise McCollough
Case #:    109663
Filing date: 9/29/1999
Case type:  Kim Louise McCollough was charged with a misdemeanor.
Orange County Superior Court was unable to provide any other information regarding this case.

Case Name: People vs. Kim Louise McCollough
Case #:    98XVUG0233
Filing date: 6/18/1996
Case type:  Kim Louise McCollough was charged with a misdemeanor.
Orange County Superior Court was unable to provide any other information regarding this case.

**Civil Division**

The following 1 civil case was found for Kim Louise McCollough in Orange County:

Case Name: Western National Securities vs. Kim Louise McCollough
Case #:    30-2008-00222923-CL-UD-NJC
Filing date: 11/18/2008
Case type:  Unlawful detainer/Eviction
Orange County Superior Court was unable to provide any other details regarding this case.

#### COLE COUNTY (Missouri)

**Criminal Division**

No criminal cases were found for Kim Louise McCollough in Cole County.

**Civil Division**

No civil cases were found for Kim Louise McCollough in Cole County.

End of report

# M.W. Thompson Investigation Services

1500 W. El Camino Avenue, Ste. #382
Sacramento, CA    95833
CA. P.I.# 24051
(916)719-9752

## BACKGROUND INVESTIGATION

A criminal and civil background investigation was conducted on Kim Louise McCollough. The results of the background investigation were as follows:

### RIVERSIDE COUNTY

#### Criminal Division

No criminal cases were found for Kim Louise McCollough in Riverside County.

#### Civil Division

No civil cases were found for Kim Louise McCollough in Riverside County.

### ORANGE COUNTY

#### Criminal Division

The following 3 criminal cases were found for Kim Louise McCollough in Orange County.

Case Name: People vs Kim Louise McCollough
Case #: 84052SK
Filing Date: 8/2/2003
Case Type: Kim Louise McCollough was charged with an infraction. Orange County Superior Court was unable to provide any other information regarding this case.

Case Name: People vs Kim Louise McCollough
Case #: 109663
Filing Date: 9/29/1999
Case Type: Kim Louise McCollough was charged with a misdemeanor. Orange County Superior Court was unable to provide any other information regarding this case.

Case Name: People vs Kim Louise McCollough
Case #: 98WM06233
Filing Date: 6/18/1998
Case Type: Kim Louise McCollough was charged with a misdemeanor. Orange County Superior Court was unable to provide any other information regarding this case.

283

<u>Civil Division</u>

The following 1 Civil case was found for Kim Louise McCollough in Orange County:

Case Name : Western National Securities vs Kim Louise McCollough
Case # : 30-2008-00222923-CL-UD-NJC
Filing Date : 11/18/2008
Case Type : Unlawful Detainer / Eviction
Orange County Superior Court was unable to provide any other details regarding this case.

<u>Cole County</u> (Missouri) ...

    <u>Criminal Division</u>

No criminal charges were found for Kim Louise McCollough in Cole county.

    <u>Civil Division</u>

No Civil cases were found for Kim Louise McCollough in Cole County.

END OF REPORT

Superior Court Order

Deny Habeas # M-20800

# EXHIBIT 17 B

285

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE

OCT 2 3 2023

DAVID H. YAMASAKI, Clerk of the Court

BY _____ D. IBARRA _____, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

| | |
|---|---|
| In re KYLE WHITESIDES, | Orange County Superior Court |
| Petitioner | Case Number: M-20800 |
| | (10NF0718) |
| ON HABEAS CORPUS | **ORDER DENYING** |
| | **HABEAS CORPUS** |

TO THE OFFICE OF THE ORANGE COUNTY DISTRICT ATTORNEY AND PETITIONER:

HAVING REVIEWED THE ABOVE CAPTIONED PETITION FOR WRIT OF HABEAS CORPUS AND EXHIBITS SUBMITTED IN SUPPORT THEREOF, THE COURT ISSUES THE FOLLOWING ORDER:

I.

On May 13, 2013, a jury found petitioner guilty of forcible rape [Pen. Code, § 261(a)(2)] and forcible sodomy [Pen. Code, § 286(c)(2)]. Additional charges of forcible rape and sodomy involving a second victim were ordered dismissed on the prosecution's motion after the jury was unable to agree on a verdict resulting in a mistrial as to those counts. On June 14, 2013, the trial court found petitioner had sustained a prior strike conviction that also rendered petitioner a habitual sex offender [Pen. Code, § 667(d)(e)(1)/§ 667.71(a)]. On August 9, 2013, petitioner was sentenced to an indeterminate term of 100 years to life in state prison with the possibility of parole. The judgment was affirmed on appeal.

1

In February 2009 Kim M. was living at a board and care facility with two roommates in Anaheim.[1] That evening, Kim M. and Rose, one of her roommates, were sharing wine in the room, despite the fact wine was not permitted in the facility. After being invited by Rose, petitioner came to the room.

The first time Kim M. realized petitioner was planning on spending the night was when Rose pulled a sleeping bag out of the closet and placed it on the floor between beds. At a time when petitioner was sitting or laying back on the floor and the three of them were talking, petitioner touched Kim M.'s vaginal area over her clothes with his foot three or four times. Each time, Kim M. pushed his foot away. After the fourth time, Kim M. got up and went into the bathroom. Six people at the board and care share one bathroom; therefore, pursuant to the routine at the facility, Kim M. did not lock the bathroom door.

Kim M. was feeling nauseous and was sitting on the edge of the bathtub when the door opened. Petitioner pulled her up and bent her over the sink, untied her scrubs and pulled her scrubs and underpants down to her knees. Kim M. said: "I felt penetration. My rear end." She clarified that meant her anus was penetrated by petitioner's penis. It hurt her, but when she tried to back up, it hurt more. Petitioner pushed her head into the sink. Kim M. explained her circumstance: "My position was—I waved my arms in the back, but being pinned with your—over with your face in the sink and your chest, it's like in a dip position. I had a hard time moving my arms."

She told him to stop and he did not stop. She again told him to stop and that he was hurting her. She was unable to move him off her. Petitioner withdrew his penis

---

1  The statement of facts is derived from the appellate opinion affirming the judgment of conviction. (*People v. Whitesides* (Aug. 6, 2014, G048833) [nonpub. opn.].)

1    and, while she was in the same position, with her face and upper chest still in the

2    bathroom sink, he inserted his penis into Kim M.'s vagina. Kim M. continued to tell

3    petitioner "no," and was unable to fight him off.

4

5        With regard to petitioner's prior, tried by the court in a bifurcated trial, a prison

6    packet was admitted into evidence. It included a complaint alleging that on February

7    20, 1999, petitioner committed a lewd act upon a child in violation of Penal Code section

8    288, subdivision (a). Another document in the packet is a guilty plea form, signed by

9    petitioner and his lawyer on November 19, 1999, has the following handwritten

10   statement of facts: "On or about February 20, 1999 in Orange County I willfully,

11   unlawfully & lewdly committed a lewd and lascivious act on & with the body of Jane

12   Doe, a child under the age of 14 years who was not related to me, with the intent of

13   arousing, appealing to & gratifying the lust, passions & sexual desires of myself." For

14   that crime, defendant was sentenced to three years in prison.

15

16                                        II.

17

18       By way of habeas corpus, petitioner, in pro per, challenges the validity of the

19   judgment of conviction and sentence claiming:

20   1.   The prosecution engaged in impermissible selective prosecution of petitioner in

21        violation of his constitutional right to equal protection.

22   2.   The prosecution withheld exculpatory evidence from the defense consisting of a

23        recorded pretext call between petitioner and a victim of a prior sex offense

24        attributed to petitioner as well as an interview of petitioner's former girlfriend by

25        law enforcement.

26

27   3.   The trial court erred in limiting the cross-examination by the defense of the victim

28        of a prior sex offense attributed to petitioner with information from a recorded

                                           3

288

pretext call between petitioner and the victim that contradicts the victim's trial testimony.

4.  The defense was erroneously deprived of favorable character witnesses.

5.  The jury was erroneously instructed on the law pertaining to evidence of prior uncharged sex offenses attributed to petitioner.

6.  The evidence was insufficient to sustain the jury's verdict of guilt.

7.  Petitioner's state prison sentence is grossly disproportionate to petitioner's culpability for the offenses he stands convicted of in violation of constitutional proscriptions against cruel and/or unusual punishment.

8.  Ineffective assistance by counsel who prejudicially did not subject the prosecution's case to meaningful adversarial testing when he failed to a) adequately investigate the case, b) secure discovery from the prosecution, c) regularly consult with petitioner about the case, d) make an opening statement, e) contact and subpoena favorable witnesses for the defense, and f) adequately cross-examine and impeach prosecution witnesses.

9.  Ineffective assistance by appointed appellate counsel who failed to challenge on appeal the trial court's erroneous instruction to the jury on the law pertaining to evidence of prior uncharged sex offenses attributed to petitioner.

10. Premature destruction of the reporter's notes of petitioner's trial adversely affects petitioner's right to pursue collateral relief.

III.

"A habeas corpus petitioner bears the burden of establishing that the judgment under which he or she is restrained is invalid." (*In re Cox* (2003) 30 Cal.4th 974, 997.) "For purposes of collateral attack, all presumptions favor the truth, accuracy, and

4

289

1    fairness of the conviction and sentence; defendant thus must undertake the burden of

2    overturning them.  Society's interest in the finality of criminal proceedings so demands."

3    (*In re Roberts* (2003) 29 Cal.4th 726, 740-741.)  "Because a habeas corpus petition is a

4    collateral attack on a presumptively valid judgment, the petitioner bears a heavy burden

5    initially to plead sufficient grounds for relief, and then later to prove them."  (*In re*

6    *Champion* (2014) 58 Cal.4th 965, 1006-1007.)  "To satisfy the initial burden of pleading

7    adequate grounds for relief, an application for habeas corpus must be made by petition,

8    and if the imprisonment is alleged to be illegal, the petition must also state in what the

9    alleged illegality consists.  The petition should both (i) state fully and with particularity

10   the facts on which relief is sought as well as (ii) include copies of reasonably available

11   documentary evidence supporting the claim, including pertinent portions of trial

12   transcripts and affidavits or declarations.  Conclusory allegations made without any

13   explanation of the basis for the allegations do not warrant relief, let alone an evidentiary

14   hearing."  (*People v. Duvall* (1995) 9 Cal.4th 464, 474-475.)

15       A court, when presented with a petition for writ of habeas corpus, "must first

16   determine whether the petition states a prima facie case for relief-that is, whether it

17   states facts that, if true, entitle the petitioner to relief-and also whether the stated claims

18   are for any reason procedurally barred."  "If the court determines that the petition does

19   not state a prima facie case for relief or that the claims are all procedurally barred, the

20   court will deny the petition outright, such dispositions being commonly referred to as

21   'summary denials.'"  When a habeas corpus petition is sufficient on its face (that is, the

22   petition states a prima facie case on a claim that is not procedurally barred), the court is

23   obligated by statute to issue an order to show cause.  An "order to show cause has a

24   limited function."  It does not "establish a prima facie determination that petitioner is

5

1   entitled to the relief requested."  Rather, it signifies a "preliminary determination that the

2   petitioner has made a prima facie statement of specific facts which, if established,

3   entitle petitioner to habeas corpus relief under existing law." (*Board of Prison Terms v.*

4   *Superior Court* (2005) 130 Cal.App.4th 1212, 1233-1234.)

5

6                                             IV.

7        The petition is denied on the following separate and independent grounds:

8        The petition is denied on grounds it is not submitted on the required Judicial

9   Council form.  A petition for writ of habeas corpus must be on the mandatory Judicial

10  Council form.  (Cal. Rules of Court, rule 4.551(a)(1).)

11

12       The petition is also denied on grounds there is no proof of service of the habeas

13  petition on the Office of the Orange County District Attorney.  (Pen. Code, § 1475.)

14       The petition is also denied on grounds it is untimely.  Petitioner does not

15  adequately explain and justify the over ten-year delay in seeking collateral review of his

16  claims of error.  Merely alluding to periodic bouts of mental illness and belated efforts to

17  retrieve petitioner's client file from trial counsel as well as post-conviction discovery from

18  the People does not sufficiently account for petitioner's lack of diligence.  "A criminal

19  defendant mounting a collateral attack on a final judgment of conviction must do so in a

20  timely manner.  It has long been required that a petitioner explain and justify any

21  significant delay in seeking habeas corpus relief." (*In re Reno* (2012) 55 Cal.4th 428,

22  459 superseded by statute on another ground as stated in *In re Friend* (2021) 11

23  Cal.5th 720.)  Unreasonable delay "bars consideration of a petition for writ of habeas

24  corpus under the doctrine of laches." (*In re Douglas* (2011) 200 Cal.App.4th 236, 245.)

25       The petition, with respect to petitioner's third, fifth, sixth, and seventh claims of

26  error, is also denied on grounds petitioner's contentions were considered and rejected

27

28

                                              6

1  on appeal.  On appeal, petitioner's appointed appellate counsel filed a brief advising the

2  appellate court no arguable issues on petitioner's behalf were found.  "The constitutional

3  right to assistance of counsel entitles an indigent defendant to independent review by

4  the Court of Appeal when counsel is unable to identify any arguable issue on appeal."

5  (*People v. Kelly* (2006) 40 Cal.4th 106, 119.)  "Following the filing of a *Wende* brief, an

6

7  appellate court is required to independently review the record for error.  In this context,

8  the reviewing court must don two hats—the one as a neutral arbiter, the other as an

9  advocate looking for reversible error."  (*People v. Richardson* (2021) 65 Cal.App.5th

10  360, 368 [citations omitted].)  After appellate counsel filed his brief indicting no issues

11  were found to argue on petitioner's behalf, petitioner was afforded an opportunity to file

12

13  written argument on his own behalf.  Petitioner did not take advantage of this

14  opportunity.  (*People v. Whitesides* (Aug. 6, 2014, G048833) [nonpub. opn.].)  By virtue

15  of the appellate court's independent review of the record and determination no arguable

16  issues were found (*Ibid.*), the referenced four claims of error were necessarily

17  considered on direct appeal and implicitly found to be without merit.  Issues raised and

18

19  rejected on appeal cannot be renewed and considered via habeas corpus.  (*In re Reno*

20  (2012) 55 Cal.4th 428, 477 citing *In re Waltreus* (1965) 62 Cal.2d 218, 225.)

21         The petition, with respect to petitioner's first, second, fourth, eighth, ninth, and

22  tenth claims of error, is also denied on grounds it does not set forth a prima facie case

23  warranting habeas corpus relief.

24  Claim # 1

25

26         Petitioner alleges he was subjected to selective prosecution in violation of his

27  constitutional right to equal protection because he was treated more harshly than other

28  similarly situated defendants permitted to plead guilty to lesser charges and receive

1    reduced terms of imprisonment.  Petitioner maintains the prosecution's actions

2    constitute outrageous governmental misconduct.

3        Improper governmental conduct warrants dismissal of charges "only if it is so

4    grossly shocking and so outrageous as to violate the universal sense of justice."

5    (*People v. Watts* (1999) 76 Cal.App.4th 1250, 1260–1261.)  "Conscious selective

6    enforcement of a penal statute, however, is not per se a denial of equal protection.  The

7    selectivity must be deliberate and must also be based on an invidious or unjustifiable

8    standard."  (*People v. Garner* (1977) 72 Cal.App.3d 214, 216–217 [citations omitted].)

9

10       Petitioner's contention is without merit.  Petitioner does not establish a violation

11   of his right to equal protection based on selective prosecution.  Petitioner stands

12   convicted of multiple forcible sex offenses and was sentenced to a lengthy

13   indeterminate term of imprisonment based on his status as a habitual sex offender.

14   Different dispositions reached in other cases involving sex offenses committed by other

15   defendants alone do not establish impermissible selective prosecution and/or

16   outrageous government misconduct absent a showing offenders are sufficiently similarly

17   situated and the alleged selective enforcement of the law in petitioner's case was based

18   on impermissible criterion.

19

20   Claim # 2

21

22       Petitioner accuses the prosecution of withholding exculpatory evidence from the

23   defense consisting of a recorded pretext call between petitioner and a victim of a prior

24   sex offense attributed to petitioner as well as an interview of petitioner's former girlfriend

25   by law enforcement.  Petitioner deems the error significant because no forensic

26   evidence tied him to the offenses and the victim's mental health issues rendered her

27   prone to "delusions" and "fabrications."

28

293

With respect to the recorded pretext call, petitioner contends such evidence could have been used to impeach the trial testimony of Kelly Higgason and demonstrate that she committed perjury. Specifically, petitioner claims Ms. Higgason falsely testified she did not play pool with petitioner and agreed to give petitioner a ride home per his request on the night of the alleged offenses. Petitioner contends the recorded pretext call would have shown that Higgason in fact did play pool with petitioner with a wager that the loser would serve as a sex slave for a day and offered to give petitioner a ride home.

With respect to the interview of petitioner's former girlfriend, Valerie R., by law enforcement, petitioner contends such evidence would have established his good character and that he did not violate her during their relationship.

In *Brady v. Maryland* (1963) 373 U.S. 83, 87, "the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused (United States v. Agurs (1976) 427 U.S. 97, 107), that the duty encompasses impeachment evidence as well as exculpatory evidence (United States v. Bagley (1985) 473 U.S. 667, 676), and that the duty extends even to evidence known only to police investigators and not to the prosecutor (Kyles v. Whitley (1995) 514 U.S. 419, 438). Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different ... The term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is,

1    to any suppression of so-called 'Brady material'—although, strictly speaking, there is

2    never a real 'Brady violation' unless the nondisclosure was so serious that there is a

3    reasonable probability that the suppressed evidence would have produced a different

4    verdict.  There are three components of a true Brady violation:  The evidence at issue

5    must be favorable to the accused, either because it is exculpatory, or because it is

6    impeaching; that evidence must have been suppressed by the State, either willfully or

7    inadvertently; and prejudice must have ensued. (Strickler v. Greene (1999) 527 U.S.

8    263)  Prejudice, in this context, focuses on the materiality of the evidence to the issue of

9    guilt and innocence ... Materiality, in turn, requires more than a showing that the

10   suppressed evidence would have been admissible, that the absence of the suppressed

11   evidence made conviction 'more likely' ... or that using the suppressed evidence to

12   discredit a witness's testimony might have changed the outcome of the trial.  A

13   defendant instead must show a 'reasonable probability of a different result.'" (People v.

14   Salazar (2005) 35 Cal.4th 1031, 1042-1043.)

15       Petitioner's contention is without merit.  Petitioner does not establish Brady error

16   by the prosecution.  At the start of trial, defense counsel informed the trial court that,

17   based on his communication with counsel for Humboldt County, there were no

18   recordings or transcripts of the interview between Kelly Higgason and petitioner.  As a

19   result, no suppression of evidence pertaining to the victim of a prior sex offense

20   attributed to petitioner by the prosecution is shown.  Assuming arguendo that the

21   interview of petitioner's former girlfriend by law enforcement was favorable and withheld

22   by the prosecution as claimed by petitioner, such action is not shown to have been

23   demonstrably prejudicial in view of the evidence presented at trial.  While evidence of a

24   defendant's good character is generally admissible (Evid. Code, § 1102(a)), it does not

1    conclusively establish that petitioner could not have committed the charged offenses.

2    Claim # 4

3        Petitioner appears to contend that he was erroneously deprived of favorable

4    character witnesses who could have helped counter the prosecution's evidence.

5    Specifically, petitioner claims the victim's roommate, Rose Leonard, could have been

6    called to testify to her belief that the victim fabricated the charges to garner attention.

7    Petitioner also claims his former girlfriend, Valerie R., could have been called to testify

8    to petitioner's good character.

9

10        Petitioner's contention is without merit.  Petitioner should have been aware of his

11    former girlfriend's existence and exhibits submitted in support of the petition

12    demonstrate the defense was aware of and contacted Rose Leonard.  These

13    circumstances refute petitioner's suggestion that these potential witnesses were

14    somehow improperly withheld from the defense by the prosecution and/or the trial court.

15    Claim # 8

16        Petitioner believes he was abandoned by trial counsel.  Petitioner claims he was

17    afforded ineffective assistance by counsel who prejudicially did not subject the

18    prosecution's case to meaningful adversarial testing when he failed to a) adequately

19    investigate the case, b) secure discovery from the prosecution, c) regularly consult with

20    petitioner about the case, d) make an opening statement, e) contact and subpoena

21    favorable witnesses for the defense, and f) adequately cross-examine and impeach

22    prosecution witnesses.

23        "In reviewing an ineffective assistance of counsel claim, courts do not generally

24    second guess counsel's tactical decisions.  Judicial scrutiny of counsel's performance

25    must be highly deferential.  It is all too tempting for a defendant to second guess [sic]

26

27

28

11

1  counsel's assistance after conviction or adverse sentence, and it is all too easy for a

2  court, examining counsel's defense after it has proved unsuccessful, to conclude that a

3  particular act or omission of counsel was unreasonable.  A fair assessment of attorney

4  performance requires that every effort be made to eliminate the distorting effects of

5  hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

6  evaluate the conduct from counsel's perspective at the time. Because of the difficulties

7  inherent in making the evaluation, a court must indulge a strong presumption that

8  counsel's conduct falls within the wide range of reasonable professional assistance; that

9  is, the defendant must overcome the presumption that, under the circumstances, the

10  challenged action might be considered sound trial strategy." (*In re Alcox* (2006) 137

11  Cal.App.4th 657, 665 citing Strickland v. Washington (1984) 466 U.S. 668, 689.)

12  "A defendant claiming ineffective representation bears the burden of proving by a

13  preponderance of the evidence both (1) that counsel's performance was deficient, i.e.,

14  that the representation fell below an objective standard of reasonableness, and (2) that

15  there is a reasonable probability that, but for counsel's unprofessional errors, the result

16  would have been more favorable to defendant, i.e., a probability sufficient to undermine

17  confidence in the outcome." (*In re Lucas* (2004) 33 Cal.4th 682, 721.) "To establish

18  prejudice, it is not enough to show that the errors had some conceivable effect on the

19  outcome of the proceeding.  To show prejudice, defendant must show a reasonable

20  probability that he would have received a more favorable result had counsel's

21  performance not been deficient.  A reasonable probability is a probability sufficient to

22  undermine confidence in the outcome.  The likelihood of a different result must be

23  substantial, not just conceivable." (*People v. Rogers* (2016) 245 Cal.App.4th 1353,

24  1367.)

12

297

1    "In any case, when considering a claim of ineffective assistance of counsel, a

2    court need not determine whether counsel's performance was deficient before

3    examining the prejudice suffered by the defendant as a result of the alleged

4    deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack

5    of sufficient prejudice, which we expect will often be so, that course should be followed.

6    A defendant must prove prejudice that is a 'demonstrable reality,' not simply

7    speculation." (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

8

9         As presented, petitioner's contention is without merit.  Petitioner does not meet

10   his burden of setting forth a prima facie case showing that trial counsel's representation

11   of petitioner fell below an objective standard of reasonableness.  Most of petitioner's

12   allegations are largely conclusory in nature.  Petitioner has not sought to independently

13   corroborate his allegations by submitting a copy of the trial transcript in support of the

14   habeas petition.  Moreover, petitioner does not demonstrate that the errors and

15   omissions attributed to trial counsel were demonstrably prejudicial in view of the

16   evidence presented at trial.  Absent such a showing, there is no basis upon which

17   habeas corpus relief can be granted based on a claim of ineffective assistance of

18   counsel.

19

20        To the extent petitioner contends prejudice should be presumed because of

21   counsel's representation or lack thereof, petitioner's contention is unpersuasive.

22   Counsel actively litigated the case subjecting the prosecution's case to meaningful

23   adversarial testing.  Counsel moved for pre-trial dismissal of select charges on more

24   than one occasion.  Counsel moved to exclude evidence of prior sex crimes attributed

25   to petitioner.  Counsel examined jurors during voir dire.  Counsel cross-examined

26   prosecution witnesses.  At the close of the prosecution's case, counsel moved for entry

27

28

13

1   of judgment of acquittal based on insufficient evidence.  Contrary to petitioner's claim,

2   counsel gave an opening statement prior to the defense's case in chief and made

3   closing arguments at the conclusion of the case.  Under these circumstances, there is

4   no basis upon which to presume prejudice stemming from trial counsel's representation

5   of petitioner.  Presumed prejudice is limited to those few situations where counsel's

6   failure is complete.  "When we spoke in *Cronic* of the possibility of presuming prejudice

7   based on an attorney's failure to test the prosecutor's case, we indicated that the

8   attorney's failure must be complete.  We said if counsel entirely fails to subject the

9   prosecution's case to meaningful adversarial testing."  (*Bell v. Cone* (2002) 535 U.S.

10  685, 697 see also *In re Avena* (1996) 12 Cal.4th 694.)

11  Claim # 9

12      Petitioner faults appointed appellate counsel for failing to challenge on appeal the

13  trial court's erroneous instruction to the jury on the law pertaining to evidence of prior

14  uncharged sex offenses attributed to petitioner.

15      To establish a claim of ineffective assistance of appellate counsel, a petitioner

16  must show that counsel unreasonably failed to raise arguable issues on appeal and that

17  such failure was prejudicial.  Prejudice is established by showing a reasonable

18  probability that, but for counsel's failures, petitioner would have prevailed on his appeal.

19  (*Smith v. Robbins* (2000) 528 U.S. 259, 285-286; see also *People v. Osband* (1996) 13

20  Cal.4th 622, 664.)

21      Petitioner's contention is without merit.  Petitioner does not demonstrate that

22  appellate counsel unreasonably failed to raise an arguable issue on appeal.  On appeal,

23  the appellate court independently reviewed the record and determined there were no

24  arguable issues to raise on appeal.  (*People v. Whitesides* (Aug. 6, 2014, G048833)

14

1    [nonpub. opn.].)

2    Claim # 10

3          Petitioner claims entitlement to a new trial based on the premature destruction of

4    the trial transcript in 2020 approximately seven and a half years after his 2013

5    conviction.  Petitioner alleges this error adversely affects his right to pursue collateral

6

7    relief.

8          Petitioner's contention is without merit.  Petitioner, through appointed appellate

9    counsel, was provided with a complete copy of the record on appeal for purposes of

10   litigating petitioner's direct appeal.  Under these circumstances, a premature destruction

11   of the trial transcript as alleged by petitioner is not shown to be demonstrably

12   prejudicial.

13

14                                              V.

15         No prima facie case for relief is established.  An order to show cause will issue

16   only if petitioner has established a prima facie case for relief on habeas corpus.

17   (*People v. Duvall, supra,* 9 Cal.4th at 475.)

18

19         The petition for writ of habeas corpus is DENIED.

20

21   Dated: _U\22\23_                    _____

22                                       Judge of the Superior Court

23

24

25

26

27

28

HABEAS

# Exhibit

18 A (12 pgs)

Kyle Whitesides
Po Box 409090
Ione, CA    95640

In Pro Per

California Court of Appeal
Fourth District, Division Three

| | | |
|---|---|---|
| The People of the State of California, | S | No. G063468 |
| plaintiff | S | Motion For Leave to File Supplemental Pleading to Habeas Petition |
| Kyle Whitesides, | S | [CCP 464(a)] |
| defendant | S | |

To the Court, the Attorney General, and the District Attorney of Orange County:

## MOTION

Petitioner Whitesides hereby requests permission to supplement his habeas petition with the following facts discovered after submission, on ground that CCP 464(a) so allow such supplemental pleadings.

## SUPPLEMENTAL INFORMATION

Since the habeas petition was filed Petitioner has discovered that alleged victim Kim McCollough had a criminal record/history as uncovered by Petitioner's private investigator, (Exhibit B). The court in those cases in Exhibit B indicated the records had been purged or destroyed, (Exhibit C), but no specification of when or why they were destroyed, and by whose order. Also included

1      302

is a Declaration by Kayla Roberts, (a Corrections Officer in the state of Indiana). This declaration shows that Ms. McCollough had a history of reporting sexual assaults to law enforcement, (Exhibit A), both before and after 2009.

In so far as the Court may take Judicial Notice of P.C. 1054.9 records in its own court, (case # GCCO16603), and of the instant Habeas Petition, information therein also shows that a Ms. Baber informed the police that Kim McCollough had a history of community disturbances and of making 911 and other troublesome calls. The information in Exhibit "A", "B", and "C" was available to the prosecution at trial in 2013, and throughout their investigation beginning in 2009, and pertinent to defense counsel's investigation of McCollough had it been revealed or a basic records check were done by defense counsel individually. These facts prevented petitioner's trial counsel from focussing his investigation and trial tactics on the attached, impeachable information, which he could have called the governments case into doubt if even for one juror and change the trial results had he known about the favorable 'Brady' material before trial.

In In Re Jenkins, 14 Cal. 5th 493 (2023), the California Supreme Court held that the state, ie; the Attorney General, has an ethical and constitutional duty of disclosure of the above 'Brady' Material at the time of the filing of the Habeas Petition, originally Dec. 2023.

## LAW SUPPORTING THE MOTION

Supplemental motion/pleading, with permission of court, may be filed when facts occur after

the filing of the original pleading that must be included, CCP 464 (a). A supplemental pleading is only authorized for the purpose of bringing before the court facts material to the case occuring after the former complaint or answer, and it is not an amendment to a pleading, as it leaves the former pleading intact. Giddings v. 76 Land & Water Co. (Cal. 1895) 109 Cal. 116

## PRAYER

As the above information discovered after the filing of the habeas petition in this court is pertinent to the consideration of Petitioner's habeas petition, Petitioner respectfully asks the court to grant leave to file this motion.

Petitioner declares the foregoing is true and correct.

Respectfully Submitted,

(s) _[signature]_

Kyle J. Whitesides

dated: 4/30/24

In Pro Per

Pg. #1 : Declaration of Kayla J. Roberts of proof
        of Ms. McCollaghs history of reporting rape.

EXHIBIT _____ A ___ (pg.)

305

## DECLARATION OF KAYLA J. ROBERTS

In 2019, at the request of my father, David Roberts (CDCR # P85944), I did an internet search for his friend Kyle Whitesides (CDCR # AR1462). Mr. Whitesides was accused of raping Kim Louise McCollough (DOB 2/26/1958) in 2009, Orange County (Case # IONF0718). I ran Ms. McCollough information through BeenVerified.com which showed that prior to 2009, Ms. McCollough had reported to law enforcement that she had been sexually assaulted on a number of different occasions. The report also showed that after her accusation of Mr. Whitesides, Ms. McCollough continued to report more rapes to law enforcement. Subsequently, all of this information was somehow removed from public record. I have previously attempted to get this declaration to Mr. Whitesides but we believe CDCR intercepted it and destroyed it.

I do under penalty of perjury declare that the above facts are true and correct and hope these records will be released to Mr. Whitesides in the interest of justice.

Date: 3/29/24

Kayla J. Roberts

Kayla Joy Roberts

600 Elk Drive # 2

Kokomo, IN 46902

email: robertskaylajoy@gmail

5          306

Pg. # 1-2: Background report from Private Investigator
        Matt Thompson  Cal P.I. # 24051 - reporting
        Ms. McCollaughs criminal background.

# EXHIBIT ___B___ (2pgs)

307

# M.W. THOMPSON INVESTIGATIVE SERVICES

1500 W. EL CAMINO AVENUE, SUITE #352
SACRAMENTO, CA 95833
CA PI# 24051

## BACKGROUND INVESTIGATION

A criminal and civil background investigation was conducted on Kim Louise McCollough. The results of the background investigation were as follows:

## RIVERSIDE COUNTY

### Criminal Division

No criminal cases were found for Kim Louise McCollough in Riverside County.

### Civil Division

No civil cases were found for Kim Louise McCollough in Riverside County.

## ORANGE COUNTY

### Criminal Division

The following 3 criminal cases were found for Kim Louise McCollough in Orange County:

Case Name: People vs. Kim Louise McCollough
Case #:      84052SK
Filing date:  8/2/2003
Case type:   Kim Louise McCollough was charged with an infraction.
Orange County Superior Court was unable to provide any other information regarding this case.

Case Name: People vs. Kim Louise McCollough
Case #:      109663
Filing date:  9/29/1999
Case type:   Kim Louise McCollough was charged with a misdemeanor.
Orange County Superior Court was unable to provide any other information regarding this case.

308

Case Name: People vs. Kim Louise McCollough
Case #:      98WM06233
Filing date:  6/18/1998
Case type:   Kim Louise McCollough was charged with a misdemeanor.
Orange County Superior Court was unable to provide any other information regarding this case.

### Civil Division

The following 1 civil case was found for Kim Louise McCollough in Orange County:

Case Name: Western National Securities vs. Kim Louise McCollough
Case #:      30-2008-00222923-CL-UD-NJC
Filing date:  11/18/2008
Case type:   Unlawful detainer/Eviction
Orange County Superior Court was unable to provide any other details regarding this case.

## COLE COUNTY (Missouri)

### Criminal Division

No criminal cases were found for Kim Louise McCollough in Cole County.

### Civil Division

No civil cases were found for Kim Louise McCollough in Cole County.

End of report

309

Pg. #1: Letter written after Matt Thompson's Report to Orange County Superior Court, seeking further information on Ms. McCollough's criminal background.

Pg. #2: Orange County Superior Court Records response.

# EXHIBIT _____ C _____ (2 pgs.)

310

9

Clerk of the Court
Orange County Superior Court
700 Civic Center Drive West
Santa Ana, CA
                    92701

Dear Clerk of the Court:

    I am writing to request the dispositions for misdeam misdemeanor cases # 109663 -(1999) and # 98WM06233, (1998) both titled "People v. Kim Louise McCollough." I am interested a copy of any verdict or judgment in the above cases. Please waive copy fee as I am indigent.    Regards,

                    Kyle J. Whitesides        11/14/23

Kyle Whitesides AR1462
Mule Creek State Prison
PO Box 409090
Ione, CA       95640

311

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
JUSTICE CENTER:
☒ Central - 700 Civic Center Dr. West, Santa Ana, CA 92701-4045
☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701-4512
☒ Harbor - 4601 Jamboree Rd., Newport Beach, CA 92660-2595
☐ Lamoreaux - 341 The City Drive, Orange, CA 92868-3205
☒ North - 1275 N. Berkeley Ave., P. O. Box 5000, Fullerton, CA 92838-0500
☒ West - 8141 13th Street, Westminster, CA 92683-4593

# RECORD SEARCH RESULTS
## ☒ AND CERTIFICATION

A search for court records for: ☐ Unlimited Civil  ☐ Limited Civil  ☐ Small Claims  ☐ Family Law  ☐ Probate
☐ Juvenile  ☐ Traffic  ☒ Criminal has been completed for the above marked Justice Center.

All databases and indexes were searched and produced the following information:

Name: _____Kim McCollough_____   DOB: _____   CA Driver's License: _____

☒ Records search for: _01/01/1998_ through _12/31/1999_
☐ No record(s) found.
☐ The records you are requesting have been destroyed in accordance with Government Code §68152.
☐ The following court records have been found:

| FILE/VIOLATION/ ISSUE DATE | CASE NUMBER | SHORT TITLE OR CHARGE(S) |
|---|---|---|
| 08/24/1999 | 109663 | CASE HAS BEEN PURGED/DESTROYED |
| 05/21/1998 | 98WM06233 | CASE HAS BEEN PURGED/DESTROYED |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ See attachment for additional court records.

Date: _11/27/2023_

**CLERK'S CERTIFICATION**

DAVID H. YAMASAKI, Clerk of the Court

By: _____
DEPUTY CLERK
K. Seedborg

I certify the foregoing information is a true and correct finding of the records searched as listed above.

Date: _11/27/2023_



312

DAVID H. YAMASAKI, Clerk of the Court

By: _____
DEPUTY CLERK
K. Seedborg

## PROOF OF SERVICE BY MAIL

STATE OF CALIFORNIA      )
                           ) SS

County of _AMADOR_     )

[C.C.C. §§446, 2015.5; 28 U.S.C. §1746]

I, _Kyle Whitesides_ , am a resident of the State of California and am over the age of eighteen years and am not a party to the above action. My address is listed below. PO BOX 409090
Ione, CA     95640

On _4/30/24_ , I served the following documents:
Motion for Leave to File Supplemental Pleading to Habeas Petition
[ CCP 464 (a) ]

by placing a true copy thereof enclosed in a sealed envelope with First Class postage thereon fully prepaid in the United States mail by delivering to prison officials for processing through the Institution's internal legal mail system at Ione, California, addressed as follows:

Office of the Atty. General     | Orange County District Atty
PO BOX 85266             | PO BOX 808
San Diego, CA   92816-5266 | Santa Ana, CA
                                   | 1138-92702

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in the County of Amador, California on _4/30/24_ .

_Kyle J. Whitesides._

Pursuant to the holding of the United States Supreme Court in Houston v Lack 108 S.Ct. 2379, 487 U.S. 266, 101 L.Ed.2d 245 (1988) and FRAP, Rule 4(c) inmate legal documents are deemed filed on the day they are delivered to prison staff for processing and mailing vial the Institution's internal legal mail procedures.

313

4th Appellate Court
Order Denying
Habeas # G063468

**EXHIBIT** 18 B

314

Court of Appeal, Fourth Appellate District, Division Three
Brandon L. Henson, Clerk/Executive Officer
Electronically FILED on 6/27/2024 by M. Castaneda, Deputy Clerk

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re KYLE WHITESIDES | G063468 |
| on Habeas Corpus. | (Super. Ct. No. 10NF0718) |
| | O R D E R |

THE COURT:*

    Petitioner's motion for leave to file "supplemental pleading to habeas petition" is GRANTED.

    The petition for a writ of habeas corpus is DENIED.

MOORE, ACTING P. J.

* Before Moore, Acting P. J., Goethals, J., and Motoike, J.

EXHIBIT  18 C

316

SUPREME COURT
FILED

DEC 1 1 2024

Jorge Navarrete Clerk

Deputy

S286159

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

In re KYLE JASON WHITESIDES on Habeas Corpus.

The petition for writ of habeas corpus is denied.

GUERRERO

*Chief Justice*

# HABEAS

# EXHIBIT

# COVER PAGE



## Exhibit

Description of exhibit "Petition For Review" of
1054.9 Motion For Post-Conviction Discovery

Number of pages to this exhibit _____

Kyle Whitesides
P.O. Box 409090
Ione, CA 95640


CALIFORNIA SUPREME COURT

| | | |
|---|---|---|
| Kyle Whitesides, | ) | No. |
| Petitioner, | ) | |
| | ) | PETITION FOR |
| V. | ) | REVIEW |
| | ) | |
| Superior Court of | ) | (4th App. Dist No. |
| Orange County, | ) | #G0601663 |
| Respondent | ) | |
| | ) | |

//

//

(continued next page)


12/6/24

To the Court;

   Following these 2 pages is an outline of the history of what was filed in this case, beginning with the 1054.9 Motion that was granted in the OC Superior Court (Ex. A3). The Orange County District Attorney convinced the 4th App. Ct. that all discovery was on "Electronic Format", therefor appointed counsel to petitioner would only represent petitioner on electronic discovery and nothing further. The appellate courts premature dismissal of the writ of mandate (Ex. F2), which was filed soley because the Orange County District Attorney refused to answer <u>three</u> Superior Court orders to respond. Petitioner now wishes this court to review his 1054.9 Motion for Post-Conviction Discovery and as it was granted by the Superior Court help enforce the order in its entirety. There is still outstanding discovery listed here in petitioner requests that the OCDA provide statements signed under oath specifically stating whether any searches were done for documents they allege do not exist, and if so where was the search done and by whom. Thus far the OC District Attorney's continued refusal to provide sufficient specificity when producing

or not producing documents has not allowed for the court and petitioner to determine whether there was due dilligence and reasonable inquiry in searching for documents. If the search for documents does not reveal responsive materials, the OCPA should provide sufficient information for petitioner and court, to be satisfied that the investigation was adequate. Simply stating a document is not being produced because it was not found or maintained does not provide sufficient information. Exhibits show clearly that Kim M. was a chronic 911 caller, liar, and drama queen. The history of community disturbances is well documented. Understandably the current District Attorney has not found this exculpatory evidence in defendant's file. The prosecuting DDA Ms. Nichols would not have left incriminating evidence of her cover up of discovery in favor of defense in the file. Investigating Detective Aldham was told and stated he did an investigation into Kim M's history of filing Police reports. Of course the DDA hid them or she would not got her precious conviction. The Orange County District Attorney has failed to comply with this court order since May, 04, 2022. I declare that the above is true and correct to the best of my knowledge. under penalty of perjury.

12/6/24

Kyle J. Whitesides

1054.9 Post Conviction Discovery : JOURNEY / OUTLINE

7/7/21 : 1054.9 Filed in O.C. Superior Court on 7/7/21.
* Exhibit A3 *

8/9/21 : OC Sup Ct. ordered the OCDA to respond to motion within 30 days (see order)
* Exhibit C1 *

11/3/21 : Petitioner filed "Writ of Mandate" in 4th App. Div. 3 due to OCDA failing to respond to 8/9/21 Court order

11/10/21 : After receiving copy of "Writ of Mandate" filed in 4th App. on 11/3/21 OC Sup Ct. acknowledged OCDA failed to respond to 8/9/21 order and "on its own motion" granted the OCDA 21 more days from 11/10/21 to respond to 1054.9 Motion. (see order)
* Exhibit C2 *

11/24/21 : 4th App. Div. 3 denied "Writ of Mandate" filed on 11/3/21 based on Sup. Ct. granting OCDA more time to respond to 1054.9 Motion on its 11/10/21 order. (see order)
* Exhibit F2 *

12/8/21 : After OCDA failed to respond to 1054.9 Motion for the second time (21 days from 11/10/21 / see order). Petitioner filed a "Request for Judicial Notice" pointing out OCDA failed to follow Court order for second time.
* Exhibit C3 *

12/28/21 : Petitioner filed "Motion for Summary Adjudication of Defendant's 1054.9 Motion, Notice of Motion, and Memorandum"
* Exhibit C4 *

322

: For the first 3 months of 2022 there was no word from the OCDA or OC Sup. Ct.

3/2/22 : After failing to comply with 2 court orders, (① 8/9/21 and ② 11/10/21), OCDA files response to 1054.9 Motion.

3/15 15th /22 : Petitioner files Defendant's P.C. 1054.9 Reply to the People's Answer and memorandum in Opposition.

5/4/22 : OC Sup. Ct. responds to 1054.9 Motion in Court order "GRANTING" the Motion, with Listed outstanding Discovery (see order) (see outstanding discovery list) ※
**Exhibit A 2 **

7/1/22: OCDA Mails discovery to Petitioner @ MCSP including;
A) BATES STAMPED DOCUMENTS # 1-94.
B) 4 CD's w/witness interviews (1)Rose Learned/2) Barber /3) Amy /4)Val)
C) 2 DVDS w/ witness interviews (1) Kim M. / 2) Whitesides)
notes: * Clearly not all 'Electronic Discovery'
* Mail pkg. opened by MCSP outside of inmates presence, did not log the mail, then returned all mail to OCDA (even paper docs Never advised inmate W. of OCDA pkg delivery

7/18/22 : Petitioner not knowing OCDA sent above discovery package to him, Filed "Writ of Mandate" asking DA to comply.

8/5/22 : 4th App. Div 3 Orders OCDA to file informal letter stating whether they have complied with MAY, 04, 2022 OC Sup. Ct. Order

8/15/22 : OCDA sends letter to 4th App explaining that discovery was returned by MCSP

/3

8/9/22: OCDA sends petitioner transcripts of all interviews
on CD & DVD, as well as Bates Stamped
pages # 1 - 94. (NOT all discovery is on Electronic Format).
Through Attorney Wasley.
✳ Exhibit D1 ✳

8/18/22 : Petitioner files "Request for Judicial Notice" with 4th App. Ct. showing that OCDA was missing much "ordered" discovery in their compliance to May 4, 2022 order. (see Outstanding Discovery List).
✷ Exhibit D2 ✷

8/25/22 : Petitioner filed a "Request for Additional Order under P.C. 1054.9" asking for order to have Anaheim P.D. turn over all the listed discovery on order, in their possession. IE: Criminal Backgrounds of Witnesses (felony/misdemeanor) Field Notes from investigation about witness statements never turned over and 911 calls & police reports including rape claims by Kim M. Also, Arcata P.D. pretextual call. (see Outstanding Discovery List). ✷Exhibit D3✷

8/30/22 : OCDA sends Petitioner letter stating No field notes/No criminal convictions/No false reports by Kim M. (Much "Ordered" discovery is in "Bates Stamped" pages (still not 'Electronic Discovery'), and No transcripts. ALL LIES ✷ Exhibit D4 ✷

10/12/22 : OC Sup Ct. orders OCDA to respond to defendant's "Request for Additional Order" within 45 days. OCDA never responds to this 10/4/22 order (see order) ✷ Exhibit D5 ✷

2/2/23 : 4th App Ct "Order" that OCDA turn over all outstanding discovery listed and notes that some discovery IS on paper docs. ✷ Exhibit D6 ✷

2/7/23 : Petitioner files "Motion for Sanctions" about OCDA failing to respond to 10/12/22 Order. Making this the 3rd Court Order that the OCDA neglected to answer or honor.
  ✱ Exhibit D7 ✱

3/13/23 : 4th App., Div. 3, Court files "Order" granting Order to Show cause of petitioner's motion for post-judgement discovery. The court states specifically in the order that all, "postjudgement discovery of records currently only available in an Electronic Format" ✱Absolutely false ✱ (see Outstanding Discovery List) (see order) ✱Exhibit A4 ✱

3/21/23   OC Sp Ct files: "Order" showing that on Oct 67, 2022 the Court Requested a Response from the OCDA within 45days Concerning "Additional Order" among other things. Orders for ( Additional Discovery ), ( Motion for Contempt /Sanctions ) all denied on grounds they are premature. Due to ongoing litigation in 4th App Ct. (see order)
  ✱Exhibit D8 ✱

6/6/23 : Petitioner now with Court Ordered Representation: Kendall Dawson Wasley SBN # 252294, files "Reply to Return to Order to Show Cause."
  ✱It should be noted that per a conversation between petitioner and attorney Wasley that Counsel will only represent petitioner on "Outstanding Electronic Discovery" even though that is not the case. Petitioner insists Wasley comments on Outstanding Law Enforcement Discovery (not in electronic format)   ✱ Exhibit A1 ✱
  (see Outstanding Discovery List)   326

6/12/23    Attorney Wasley sent Petitionee verified and corrected transcripts of all interviews on CD & DVD. Note: DA cover up of Kim M. question

7/13/23 : 4th App. Ct files "Order" vacating oral arguments while Att. Wasley verifies transcripts and content. <u>* Exhibit D9 *</u>

9/1/23 : Attorney Wasley files, "Response to July 13, 2023 Court Order; Review of Transcripts And Why This Petition Is Not Moot". Lists corrections on interview transcripts, as well as pointing out there is much missing/ordered discovery from Law Enforcement. (See Outstanding Discovery List) <u>* Exhibit B *</u>

9/13/24 : Petitioner was provided an old Laptop by CDCR and allowed to view the CD/DVD interviews.

9/24/24 : Phone call with Atty. Wasley and petitioner about confirmation of access to Electronic Discovery, as well as discussion about "Outstanding Discovery" (see Outstanding Discovery List).

9/24/24 : Att. Wasley files, "Counsel for Petitioner's statement of Compliance with Aug. 28, 2024 Court Order" (Atty Wasley reiterates that there is still outstanding Law Enforcement Discovery unaccounted for. <u>* Exhibit E *</u>

OUTSTANDING DISCOVERY                              1054.9

As it pertains to the Orange County Superior Court's May 04, 2022 "ORDER" on Post-Conviction Discovery,

The Office of the District Attorney was ordered to turn over discovery in six categories, each category is numbered and missing discovery is explained below.

Category 1: "CD and transcripts of Recorded interview with Amy D." "by investigator Dodd, including" all handwritten notes that may exist of the recorded interview.

  * Petitioner's Response: As Exhibit B1 of 1054.9 Motion for Post Conviction Discovery states Ms. Dodd makes clear that she does in fact take notes when interviewing Amy D., Dodd also admits speaking to Amy D. about the alleged incident in 1996. The CD interview turned over with transcripts does not include this part of the conversation Dodd admitted to speaking about. It can be gleaned that the transcripts & recordings beginning is not the actual beginning of the recorded call. Petitioner requests audio recording & transcripts of Dale interview never released by the District Attorney. Ms Dodd also makes clear she does in fact have notes on the call.
  Petitioner requests these "notes" also be turned over as ordered.

Category 2: "All records of Kim M.'s reports" to police including sexual assault."

  * Petitioner's Response: As Exhibit B2 of 1054.9 Motion For Post Conviction Discovery states, Detective Adham admits to doing a "Records Check" on Kim M. to see if she had previous reports to police. Detective Adham

evades answering the outcome of his background check, he only answers that he did do the check. Also included in Exhibit B2 was an interview with Susan Baber who told Detective Adham that Kim M. had called the police (Anaheim P.D.) to her house numerous times since her residency began, (up to this point Kim M. had only lived at this Anaheim address for 6 weeks. Every time a 911 call or a police officer was sent to this house, (of Kim M., and by Kim M.) there would have been an incident report made. Detective Adham certainly would have also gathered these reports during his investigation. Petitioner Requests all 911 calls made by Kim M., all police reports filed by Kim M., which both clearly exist be turned over to petitioner as ordered. As post conviction discovery covers all time up to this date Petitioner would like, as well, all police reports filed, all rape reports filed by Kim M. after Feb, of 2009. Detective Adhams investigation only covered a small time frame, Kim M. continued to report rapes after the original investigation.

   Category 3: "All notes from Anaheim Police Dept collected from interviews with Telecare employees Eric Burke and Susan Baber" which include all statements made by Ms. Baber and Mr. Burke."

   * Petitioners Response: Although an interview by Detective Adham with Susan Baber was turned over, nothing else was. Detective Adham states he will interview Mr. Burke as he is a key witness in this investigation, yet not a single word of or

329

or about Mr. Burke is turned over to petitioner.
Petitioner requests Detective Adham be ordered to
once again turn all his findings over to defendant.
All Detective Adhams notes with everyone he spoke
to about Kim M., Eric Burke, Telecare employees;
"Lisa" and "John" who he stated he would interview
and also the owner of the home Kim M. lived, a
woman named "Amy", who "got tired of her (Kim)
calling the police", according to Ms. Baber. Detective
Adham also spoke with another of Kim M's room-
mates named "Dana", according to Witness Leonard
in her interview with Detective Adham. Petitioner
requests ordered discovery because it clearly
exists and is clearly favorable to defense.
Detective Adham did a thorough investigation
and the old Deputy District Attorney Nichols hid
it all, or Detective Adham did a severely
biased investigation. The current district attorney
claims not to possess this evidence. Assuredly
DDA Nichols did not leave incriminating evidence
in petitioner's file. Please retrieve discovery from
law enforcement.

Category 4: "All handwritten/field notes" pertaining to investigation of defendant's case generated by the Anaheim Police Department by detectives and officers".

* Petitioner's Response: This category pertains to field notes by Officer Candyce McMorris and all detectives. 1054.9 Motion for Post Conviction Discovery shows clearly in Exhibit B4 that many people were interviewed by Anaheim P.D. One Charles David McCollough's statement was taken and never turned over, the same goes for one Laura Lesniak. Evidence shows these people were interviewed and there statements were buried. Petitioner requests all field notes, especially those outright named in "General Offense Hard Copy." The cover up at this point is obvious.

Category #5: "All records of felony convictions of all witnesses and victims who testified at trial".

* Petitioner requests Kim M.'s criminal background both misdemeanor and felony that have been purged by the OCDA including up to the current date.

Category #6: "All police reports, handwritten/ field notes and CD with transcripts of interview conducted of Kelly Higgason by" the Arcata Police Department in 1995."

Petitioner's Response: Though the police reports were disclosed the CD of pretexted call with Higgason and Petitioner was not, nor transcripts. The Arcata Police Department offered no documentation on the requested/ordered discovery. Please retrieve ordered discovery from Arcata P.D.

## PROOF OF SERVICE BY MAIL

STATE OF CALIFORNIA          )

                                    ) SS

County of _AMADOR_       )

[C.C.C. §§446, 2015.5; 28 U.S.C. §1746]

I, _Kyle Whitesides_____, am a resident of the State of California and am over the age of eighteen years and am not a party to the above action. My address is listed below.

        Kyle Whitesides #AR1462
        PO Box 409090
        Ione, CA     95640

On _12/6/24_____ I served the following documents:

" _Petition For Review_ "

by placing a true copy thereof enclosed in a sealed envelope with First Class postage thereon fully prepaid in the United States mail by delivering to prison officials for processing through the Institution's internal legal mail system at Ione, California, addressed as follows:

① California Supreme Court
350 McCallister St.
San Francisco, CA 94102-4797

② Orange County D.A.
300 N. Flower St.
Santa Ana, CA 92703

③ California 4th Appellate Division 3
601 W. Santa Ana, CA 92701

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in the County of Amador, California on _____.

_12/6/24_____

_Kyle J. Whitesides_____

Pursuant to the holding of the United States Supreme Court in Houston v Lack 108 S.Ct. 2379, 487 U.S. 266, 101 L.Ed.2d 245 (1988) and FRAP, Rule 4(c) inmate legal documents are deemed filed on the day they are delivered to prison staff for processing and mailing vial the Institution's internal legal mail procedures.

# EXHIBIT COVER PAGE

19 | A | 1-4

### Exhibit

Description of exhibit A1: "Reply to OSC" (pgs 1-19)
A2: Superior Court "Order" Granting 1054.9 Motion (pgs 20-26)
A3: "1054.9 Motion for Post Conviction Discovery (pgs 27-60)
A4: 4th App. Ct. "Order" on Order to Show Cause (pgs 61-63)

Number of pages to this exhibit ___63 pgs.___

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT, DIVISION 3

6/6/23

KYLE JASON WHITESIDES

        Defendants and Petitioner,

v.

SUPERIOR COURT OF ORANGE
COUNTY,

        Respondent.

PEOPLE OF THE STATE OF
CALIFORNIA,
        Real Party in Interest

No. G061663

Orange County Superior Court, Case No. 10NF0718
The Honorable Cheri Pham, Judge

**REPLY TO RETURN TO
ORDER TO SHOW CAUSE**

Kendall Dawson Wasley, SNB 252294
1520 E. Covell Blvd., B5-233
Davis, CA 95616
(408)827-5024  kendall@dawsonwasleylaw.com

1

## TABLE OF CONTENTS

Table of Authorities ..........................................................................3

Introduction.....................................................................................4

Traverse to Real Party In Interest's Return ....................................6

Verification ....................................................................................11

Memorandum of Points and Authorities for Why This Petition
Should be Granted ........................................................................12

   I.   "REASONABLE ACCESS" MANDATES MR. WHITESIDES
       HAVE ACCESS TO THE ACTUAL RECORDINGS............12

     A. The Writ Should be Granted and the Matter Remanded
       with Orders that An Investigator be Appointed.. ...........12

     B. Real Party's Efforts to Provide the Electronic Discovery
       to Appointed Writ of Mandate Counsel Does Not Solve
       the Problem ......................................................................... 14

CONCLUSION................................................................................16

CERTIFICATE OF COMPLIANCE ..............................................17

ATTORNEY'S CERTIFICATE OF SERVICE ...............................18

Exhibit C.......................................................................................19

Exhibit D ......................................................................................61

Exhibit E.......................................................................................64

336

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Steele*
    (2004) 32 Cal.4th 682 ......................................................... 8, 13, 15

**Statutes**

Penal Code section 1054.1 ................................................................12

Penal Code section 1054.9 ......................................................*passim*

**Other Authorities**

Cal. Rules of Court, rule 2.1040 ....................................................10

California Rules of Professional Conduct, rule 1.2 .........................15

3

TO:   **THE HONORABLE PRESIDING JUSTICE AND THE ASSOCIATE JUSTICES OF THE COURT OF APPEAL, FOURTH APPELLATE DISTRICT, DIVISION 3:**

## INTRODUCTION

Petitioner filed this writ of mandate petition seeking production of the post-conviction discovery the superior court ordered on May 4, 2022 in response to petitioner's pro per Penal Code section 1054.9 motion.

Central to this writ petition is the logistics of providing petitioner/defendant, an inmate in CDCR custody and a pro per litigant on the 1054.9 motion, "reasonable access" to digital discovery on CDs and DVDs, which he is prohibited from receiving in prison.

This logistic question was narrowed by this Court in a February 2, 2023 order to the Attorney General:

> The Attorney General is ordered to file ...an informal letter which offers solutions for the People to comply with the order filed by respondent court granting petitioner's motion for postjudgment discovery which includes a record in an electronic format not accessible in an institutional setting. The Attorney General should also address whether the CDCR or the prison's litigation coordinator is able to provide assistance or supervision while petitioner reviews any part of an electronic record. Copy of order mailed to appellant.

(See online docket, https://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=43&doc_id=2390261&doc_no=G061663&req

uest_token=NiIwLSEmLkw5WzBVSSNNUENJQFw7UFxbJSJOX zxTQCAgCg%3D%3D [6/5/2023].)

The Attorney General filed an informal brief noting the limits of the prison facility and suggested transcripts be prepared. As of May 17, 2023, Real Party prepared and produced the transcripts.

But as argued in the April 10, 2023, supplemental brief, the transcripts alone do not solve the problem. Penal Code section 1054.9 requires reasonable access to the discovery. The actual recordings are the discovery, not the transcripts. Based on the limits of the prison facility, the most efficient and reasonable procedure to give defendant/petitioner the statutorily required reasonable access to the electronic discovery is to remand the matter to the superior court with orders that an investigator be appointed to receive and show the electronic discovery to defendant/petitioner.

Real Party's efforts to provide appointed writ attorney the digital discovery does not solve the problem but instead shifts the burden to appointed counsel. Counsel is appointed by this Court on this writ of mandate petition. The appointment does not include counsel continuing to provide defendant/petitioner "reasonable access" to the digital discovery, as to allow him to prepare and file a habeas petition. Real Party's argument would require counsel's appointment to continue past the writ of mandate proceedings, and it would blur the lines of representation, which is not reasonable nor permitted under the California Rules of Professional Conduct.

5

## TRAVERSE TO REAL PARTY IN INTEREST'S RETURN

Petitioner, by and through his attorney Kendall Wasley, makes this Traverse to Real Party in Interest's Return to Order to Show Cause and allege as follows:

1.

Petitioner asserts that attached as Exhibit C is a copy of the "Notice and Amended Motion for Post-Conviction Discovery Pursuant to Penal Code 1054.9 With Memorandum" filed on July 21, 2021 by petitioner pro per.

Petitioner does not have information to admit or deny that Real Party "did not receive a service copy of the motion" as asserted in paragraph II of the Return.

2.

Petitioner asserts a November 10, 2021 Orange County Superior Court minute order states:

> On August 9, 2021, the Court requested from the Office of the Orange County District Attorney a written response to defendant's Amended Motion for Post-Conviction Discovery made pursuant to Penal Code section 1054.9 within 30 days from the date of the order. Court records indicate no response from the People has been filed to date.
>
> ***
>
> The Court, on its own motion, extends the time afforded to the People to file a written response to defendant's motion.

6

According to the minute order, the minute order was forwarded to the Office of the Orange County District Attorney – Writs and Appeals Unit on November 10, 2021. (Exhibit D.)

3.

Petitioner admits the allegations in paragraph IV of the Return.

4.

Petitioner admits paragraph V of the Return.

5.

Petitioner denies paragraph VI of the Return to the extent that Real Party alleges the May 4, 2022 discovery order has been satisfied.

Petitioner admits Real Party mailed him the August 9, 2022 letter, including the non-digital discovery, bates pages 1-94. (Exh. 1 to Return.)

Petitioner further admits that Real Party mailed writ of mandate appointed counsel the digital discovery as alleged on page 9, paragraph VI of the Return.

6.

Petitioner denies that appointed counsel attempted "to disassociate herself from receipt of those outstanding discovery items" as alleged in Paragraph VII of the Return.

Petitioner asserts appointed counsel mailed the digital discovery back to Real Party and that Exhibit 3 to the Return is a copy of the letter mailed with the digital discovery. Petitioner further asserts that counsel emailed counsel for Real Party on

7

341

April 19, 2023, prior to returning the discovery, which is Exhibit E.

7.

Petitioner admits Real Party provided petitioner transcripts as asserted in paragraph IX of the Return.

8.

Petitioner asserts that Real Party's August 30, 2022 letter to petitioner states several of the items ordered to be produced do not exist. (Exhibit 4 to Return; see also, p. 23.) Real Party references discovery items in its possession.

Petitioner asserts that Real Party has not asserted or declared that it has confirmed with law enforcement agencies that the discovery items do not exist. Petitioner alleges that Real Party's duties and obligations to produce the discovery items extends beyond what is in Real Party's possession, but also includes what is in the possession of law enforcement.

Penal Code section 1054.9 covers discovery in the possession of the prosecution and law enforcement, as well as discovery that the defendant was entitled to at the time of trial. (See *In re Steele* (2004) 32 Cal.4th 682, 695, 697.) Petitioner asserts that Real Party reviewing and producing materials in its own possession is not enough; the same must also be done with law enforcement.

9.

Petitioner denies that Real Party has fully complied with the trial court's discovery order and "sufficiently provided petitioner with the 'reasonable access' to post-conviction discovery

8

342

mandated by section 1054.9" as alleged in paragraph IV of the
Return.

10.

Petitioner asserts that Real Party's attempt to produce
electronic discovery (CDs and DVDs) to petitioner's Court of
Appeal appointed writ of mandate counsel does not provide
reasonable access to post-conviction discovery to
petitioner/defendant.

11.

Petitioner denies the allegations in paragraph XII of the
Return. Petitioner asserts the proper remedy to allow for
"reasonable access" is for the matter to be remanded to the
superior court with orders an investigator be appointed to receive
and show the electronic discovery to petitioner/defendant, who is
a pro per litigant in the superior court.

12.

Petitioner denies that production of the "transcripts
constitutes the 'reasonable access to discovery' contemplated by
section 1054.9" as alleged in paragraph of the XII (page 13) of the
Return.

Petitioner denies that the appointment of an investigator
constitutes "absolute access" as alleged in paragraph XII of the
Return.  Absent defendant/petitioner listening and watch the CDs
and DVDs, he will not have access to the actual evidence, which is
contained on the CDs and DVS.  The transcripts are not the
discovery, but an aid.

13.

9

Petitioner asserts that transcripts of the audio recording are aids, and not the actual evidence. (See Cal. Rules of Court, rule 2.1040.)

14.

Petitioner incorporates by reference and makes part of this reply his original petition for writ of mandate and exhibits attached thereto, the allegations and facts asserted in "Petitioner's Supplemental Request and Argument" and declaration in support thereof filed on April 10, 2023, the below memorandum of points and authorities, and attached exhibits.

15.

Except as expressly admitted petitioner denies, specifically and generally, each allegation of the Return.

THEREFORE, petitioner respectfully requests that this Court:

1. Take judicial notice of all records and pleadings filed in this case from July 2021 to the present, Orange County Superior Court Case No. 10NF0718;

2. Issue a writ of mandate;

3. Order an investigator be appointed to receive and show the electronic discovery to petitioner as to allow reasonable access to the digital discovery in preparing his petition for writ of habeas.

4. Grant such other relief as deemed appropriate in the interest of justice.

Respectfully submitted.

Dated: June 6, 2023        _/s/ Kendall Dawson Wasley_
                          KENDALL DAWSON WASLEY

10

344

## VERIFICATION

I, Kendall Dawson Wasley, declare:

    I am an attorney licensed to practice in California and I have my office in Davis, California. I am appointed counsels for petitioner and I am authorized to file this traverse.  Petitioner is unable to make this verification because he resides outside the county in which I practice. For that reason, I make this verification on petitioner's behalf.

    I have read the foregoing reply and to the best of my knowledge the contents thereof are true. I declare that all the facts contained therein are true to the best of my knowledge, supported by the record in this case.

    I declare under penalty of perjury that the foregoing is true and correct and this verification was executed on June 6, 2023 at Davis, California.

                /s/ Kendall Dawson Wasley
                KENDALL DAWSON WASLEY

11

## MEMORANDUM OF POINTS AND AUTHORITIES FOR WHY THIS PETITION SHOULD BE GRANTED

### I.

### "REASONABLE ACCESS" MANDATES MR. WHITESIDES HAVE ACCESS TO THE ACTUAL RECORDINGS

**A.    The Writ Should be Granted and the Matter Remanded with Orders that An Investigator be Appointed.**

On May 4, 2022, the superior court granted defendant/petitioner's motion for post-conviction discovery and ordered the Orange County District Attorney's Office (OCDAO) to provide six categories of discovery to petitioner/defendant. (Exhibit A to Petition.)

Part of the six categories included electronic discovery contained on CDs and DVDs. Unfortunately, defendant/petitioner cannot receive these materials in prison, nor does Mule Creek State Prison have the capability to allow defendant/petitioner to view the materials. (See AG Informal Letter, 3/3/2023.)

Transcripts of the electronic materials will allow defendant/petitioner to keep and process a copy of the material in preparing his petition for writ of habeas, but it does not solve the issue. Reviewing the actual recordings, which is the discovery, is necessary. (See Pen. Code, §§ 1054.1, 1054.9.) Transcripts are only an aid to following and understanding the actual recordings. The transcript may not be complete or correct, or there may be a difference of opinion in what is said. Without reasonable access to

12

the actual electronic discovery, there is no way for defendant/appellant to review the accuracy of the transcripts, or if a non-verbal communication was made. Consequently, a review of the actual recordings is necessary.

Penal Code section 1054.9, subdivision (a) provides that "the defendant be provided reasonable access" to the discovery. Because CDCR and Mule Creek State Prison will not allow petitioner/defendant to receive the CDs and DVDs, the appointment of an investigator to receive the CDs and DVDs, and then to meet with and show Mr. Whiteside the recordings on the CDs and DVDs is necessary to achieve "reasonable access."

The purpose of post-conviction discovery under section 1054.9, is to allow aid to a defendant preparing a petition for writ of habeas; the statute entitles the defendant "to discovery to assist in stating a prima facie case for relief." (*In re Steele* (2004) 32 Cal.4th 682, 691.) Reasonable access must allow for access and use in preparing a habeas petition. Thus, reasonable access would require more than a mere single showing, defendant/petitioner may need to review of the materials several times.

Remand to the superior court to appoint an investigator is the proper remedy. It is similar to appointing an investigator to assist a criminal defendant representing themselves in a criminal case, there must be some way for a pro per litigant to view the discovery. Orange County Superior Court likely as panel of licensed investigators, some of which are "eligible to receive pro per appointment" like Los Angeles County Superior Court

13

347

maintains. (See https://www.lacourt.org/division/criminal/
pdf/investigator.pdf [6/5/2023].)

Because petitioner/defendant will not have continuous access to the recordings, the transcripts are still necessary. Combining the transcripts and viewing the recordings with the assistance of an investigator will allow petitioner/defendant reasonable access to the discovery to prepare and file his petition for writ of habeas. (See Pen. Code, § 1054.9, subd. (a).)

**B.    Real Party's Efforts to Provide the Electronic Discovery to Appointed Writ of Mandate Counsel Does Not Solve the Problem**

Real Party asserts that its efforts to produce the electronic discovery to appointed counsel on this writ of mandate satisfies its burden and the obligations under Penal Code section 1054.9. (Return, p. 21-22.)  This is not correct.

Petitioner filed the motion for post-conviction discovery pro per, and the Superior Court issued discovery in pro per proceedings in the lower court. This Court appointed counsel on this writ petition on March 16, 2023, ten months after the discovery order was issued.

Shifting the burden to appointed counsel on this writ petition does not solve the problem of petitioner having "reasonable access" to the discovery. The purpose of post-conviction discovery under section 1054.9, is to allow aid to a defendant preparing a petition for writ of habeas; the statute

14

entitles the defendant "to discovery to assist in stating a prima facie case for relief." (*In re Steele, supra*, 32 Cal.4th at 691.)

If this matter proceeds as Real Party asserts, then the Court of Appeal appointed counsel would have a continuing duty to give access to petitioner/defendant to the electronic discovery. Counsel would face an unreasonable scope of representation in defendant/petitioner preparing his habeas petition, the scope of representation would easily be blurred. Under California Rules of Professional Conduct, rule 1.2, the scope of representation may be limited only if it is "reasonable." This would not be reasonable.

Moreover, Real Party's argument that counsel's appointment by this Court included receiving the electronic discovery and carrying the burden of giving "reasonable access" to defendant/petitioner under section 1054.9, thereby making the writ moot lacks logic and efficiency. (See Return, p. 28-30.) Such an order could have been achieved by appointment of counsel in the superior court, or the issuance of an alternative writ directing the superior court to appoint counsel.

Further, if Real Party thought counsel should be appointed to provide reasonable access under section 1054.9, then it should have notified the superior court in August of 2022, when it discovered the digital discovery could not be received by petitioner/defendant at Mule Creek State Prison. (See Exhibit 1 to Return.) Rather, Real Party only notified defendant/petitioner of the problem and took no steps to notify the superior court.

Counsel's scope of appointment on this writ petition does not include continuing representation to provide access to post-conviction discovery.

## CONCLUSION

Petitioner respectfully requests this Court grant this writ and the relief requested.

Dated: June 6, 2023

/s/ *Kendall Dawson Wasley*

Kendall Dawson Wasley
Attorney for Petitioner

350

## CERTIFICATE OF COMPLIANCE

Pursuant to California Rule of Court, I certify that the above reply is proportionately spaced, has a typeface of 13 points and contains 2460 words, excluding the cover, tables, and this certificate.

Dated: June 6, 2023                 /s/ *Kendall Dawson Wasley*
                                    Kendall Dawson Wasley

351

ATTORNEY'S CERTIFICATE OF ELECTRONIC SERVICE
AND SERVICE BY MAIL
(Code Civ. Proc., § 1013a, subd. (2); Cal. Rules of Court, rules 8.71(f) and 8.77)

I, Kendall Dawson Wasley, certify:

I am an active member of the State Bar of California and am not a party to
this cause.  My electronic service address is kendall@dawsonwasleylaw.com
and my business address is 1520 E. Covell Blvd., #B5-233, Davis, CA, 95616.
On April 10, 2023, I served the persons and/or entities listed below by the
method checked.  For those marked "Served Electronically," I transmitted a
PDF version of the REPLY TO RETURN TO ORDER TO SHOW CAUSE by
TrueFiling electronic service to the e-mail service address(es) provided below.
For those marked "Served by Mail," I deposited in a mailbox regularly
maintained by the United States Postal Service at Davis, CA, a copy of the
above document in a sealed envelope with postage fully prepaid, addressed as
provided below.

| | |
|---|---|
| Office of the Attorney General<br>sdag.docketing@doj.ca.gov<br><br>  X   Served Electronically<br>___ Served by Mail<br><br>Orange County District Attorney's Office<br>Appellate@da.ocgov.com<br><br>  X   Served Electronically<br>___ Served by Mail<br><br>Orange County District Attorney's<br>Office<br><br>X   Served Electronically | *Eservice-court@adi-sandiego.com*<br>Appellate Defenders, Inc.<br>555 West Beech Street, Suite 300<br>San Diego, CA 92101<br>__X_ Served Electronically<br>___ Served by Mail<br><br>Kyle J Whitesides, #AR1462<br>Mule Creek State Prison<br>PO Box 409099<br>Ione, CA 95640<br>_X_ Served by Mail |

I declare under penalty of perjury under the laws of the State of
California that the foregoing is true and correct.  Executed on June 6,
2023, Davis, California.

/s/ *Kendall Dawson Wasley*
Kendall Dawson Wasley
DECLARANT, SBN 252294

18

352

# Exhibit C

Reply to Return

*In re Whitesides*, G061663

353

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 0 4 2022

DAVID H. YAMASAKI, Clerk of the Court

BY:_____ E. FLORES _____DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | Orange County Superior Court Case Number:   10NF0718 |
| Plaintiff, | |
| v. | ORDER |
| KYLE JASON WHITESIDES, | |
| Defendant. | |

TO:   THE OFFICE OF THE ORANGE COUNTY DISTRICT ATTORNEY AND DEFENDANT:

HAVING REVIEWED DEFENDANT'S AMENDED MOTION FOR POST-CONVICTION DISCOVERY (Pen. Code, § 1054.9), THE PEOPLE'S RESPONSE, DEFENDANT'S REPLY, AND TAKEN THE MATTER UNDER SUBMISSION, THE COURT RULES AS FOLLOWS:

I.

On May 13, 2013, a jury found defendant guilty of forcible rape [Pen. Code, § 261(a)(2)] and forcible sodomy [Pen. Code, § 286(c)(2)].  On June 14, 2013, the trial court found defendant had sustained a prior strike conviction that also rendered defendant a habitual offender [Pen. Code, § 667(d)(e)(1)/§ 667.71(a)].  On August 9, 2013, defendant was sentenced to an indeterminate term of 100 years to life in state prison with the possibility of parole.  The judgment was affirmed on appeal.

1

354

II.

Defendant seeks post-conviction discovery from the prosecution of existing materials he claims he would have been entitled to receive at the time of trial and now deems necessary to prepare and file a petition for writ of habeas corpus that will assert factual innocence. Defendant represents he undertook and has exhausted good faith efforts to obtain discovery from trial counsel and the prosecution which allegedly have gone unfulfilled. Defendant specifically seeks discovery from the Office of the Orange County District Attorney of the following six categories of materials:

1.  "CD and transcripts of recorded interview with Amy" D. "by D.A. Investigator Dodd, including all handwritten notes."

2.  "All records of Kim" M.'s "many reports to police including sexual assault."

3.  "All notes from Anaheim Police Department collected from interviews with Telecare employees Eric Burke and Susan Baber, who had made notes with" with Kim M. "about her report of sexual assault. This includes all statements made by Ms. Baber and Mr. Burke."

4.  "All handwritten/field notes of Anaheim Police Department, both Detective and Police officers."

5.  "All records of misdemeanor or felony convictions of all witnesses and victims who testified at trial, which also was never turned over by the District Attorney, and are standard to investigation."

6.  "All police reports, handwritten/field notes, and CD with transcripts of interview conducted by Kelly Higgason by Arcata Police Department in 1995."

The People oppose the motion principally on grounds defendant has not shown that he has filed or is in the final stages of filing a petition for writ of habeas corpus or

2

355

motion for post-conviction relief that sets forth specific grounds for relief nor demonstrated how the requested discovery is relevant and material to such grounds for relief. The People further maintain that defendant is not entitled to access personal identifying information of victims and witnesses that may be reflected in discovery absent a showing of good cause.

III.

"In a case in which a defendant is or has ever been convicted of a serious felony or a violent felony resulting in a sentence of 15 years or more, upon the prosecution of a postconviction writ of habeas corpus or a motion to vacate a judgment, or in preparation to file that writ or motion, and on a showing that good faith efforts to obtain discovery materials from trial counsel were made and were unsuccessful, the court shall, except as provided in subdivision (b) or (d), order that the defendant be provided reasonable access to any of the materials described in subdivision (c) ...." (Pen. Code, § 1054.9(a).) "For purposes of this section, "discovery materials" means materials in the possession of the prosecution and law enforcement authorities to which the same defendant would have been entitled at time of trial." (Pen. Code, § 1054.9(c).)

Section 1054.9's purpose is to allow defendants to receive materials they have reason to believe are missing. (*Barnett v. Superior Court* (2010) 50 Cal.4th 890, 899-900.) Section 1054.9 provides for discovery both before as well as after a post-conviction petition for writ of habeas corpus is filed. (*In re Steele* (2004) 32 Cal.4th 682, 691.) Section 1054.9 requires that a trial court, upon a proper showing of a good faith effort to obtain the materials from trial counsel, to order the discovery of specific materials currently in the possession of the prosecution or law enforcement authorities involved in the investigation or prosecution of the case, that the defendant can show

3

356

either 1) the prosecution did provide at the time of trial but have since become lost to the defendant; 2) the prosecution should have provided at the time of trial because they came within the scope of a discovery order the trial court actual issued at that time, a statutory duty to provide discovery, or the constitutional duty to disclose exculpatory evidence; 3) the prosecution should have provided at the time of trial because the defense specifically requested them at that time and was entitled to receive them; or 4) the prosecution had no obligation to provide at the time of trial absent a specific defense request, but to which the defendant would have been entitled to at the time of trial had the defendant specifically requested them. (*In re Steele, supra*, 32 Cal.4th at 688, 693-697.) "Because section 1054.9 provides only for specific discovery and not the proverbial "fishing expedition" for anything that might exist, defendants seeking discovery beyond recovering what the prosecution had provided to the defense before trial must show a reasonable basis to believe that specific requested materials actually exist. But they do not additionally have to show that they are material within the meaning of *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (*Brady*) and its progeny." (*Barnett v. Superior Court, supra*, 50 Cal.4th at 894.)

Defendant establishes entitlement to post-conviction discovery of specific materials defendant would have been entitled to at the time of trial pursuant to Penal Code § 1054.9. Defendant is serving an indeterminate term of 100 years to life in state prison with the possibility of parole imposed upon his conviction for forcible rape and sodomy which are offenses statutorily classified as serious and violent felonies. (Pen. Code, § 667.5(c)(3)(4); § 1192.7(c)(3)(4).) The sought after discovery is not overbroad, does not appear to be privileged, and comes within the scope of specific materials the prosecution a) provided to the defense at the time of trial but have since become lost to

the defendant, b) had a statutory duty to disclose to the defense (Pen. Code, § 1054.1(a)(e)(f)), and/or c) would have had to provide to the defense had a request for such discovery been made at the time of trial. Defendant has also made a plausible showing that he has undertaken good faith, informal efforts to obtain discovery from trial counsel and the People which have allegedly gone unanswered and unfulfilled (Motion – Exhibit C). Defendant seeks discovery in order to prepare and file a petition for writ of habeas corpus that will assert factual innocence. "A section 1054.9 motion may be filed by an inmate who has already filed a habeas corpus petition, or who is preparing to file such a petition." (*Rubio v. Superior Court* (2016) 244 Cal.App.4th 459, 469.)

Defendant's motion identifies or sets forth a reasonable basis from which to believe that the sought after discovery exists and is possessed by the prosecution. Categories 1, 2, and 6 of discovery sought generally pertain to police reports referencing statements made to police by the two named victims, Amy D. and Kim M. as well as reports made by prosecution witness Kelly Higgason who testified to uncharged sexual acts attributed to the defendant as allowed under Evidence Code § 1108. Category 3 of discovery pertains to witness statements made to police in which one of the two identified witnesses (Susan Baber) testified at trial as a prosecution witness. Category 4 of discovery generally pertains to police reports generated during the investigation of the offenses. Category 5 of discovery generally pertains to the criminal history of prosecution witnesses. In its written response to defendant's motion, the People give no indication the requested discovery does not exist and/or is not in the prosecution's possession. Defendant need not demonstrate the materiality of the requested information in order to be entitled to post-conviction discovery under Penal Code § 1054.9. (*Barnett v. Superior Court, supra,* 50 Cal.4th at 894.)

5

IV.

The Amended Motion for Post-Conviction Discovery is GRANTED. The Office of the Orange County District Attorney is ordered to provide defendant with the following six categories of post-conviction discovery within sixty (60) days from the date of this order.

1.  "CD and transcripts of recorded interview with Amy" D. "by Investigator Dodd, including" all handwritten notes that may exist of the recorded interview.

2.  "All records of Kim" M.'s reports "to police including sexual assault."

3.  "All notes from the Anaheim Police Department collected from interviews with Telecare employees Eric Burke and Susan Baber" which include all statements made by Ms. Baber and Mr. Burke.

4.  "All handwritten/field notes" pertaining to the investigation of defendant's case generated by the Anaheim Police Department by detectives and officers.

5.  The existence of any felony convictions pertaining to prosecution witnesses who testified at trial.

6.  "All police reports, handwritten/field notes and CD with transcripts of interview conducted of Kelly Higgason by" the "Arcata Police Department in 1995.

\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\

Prior to disclosure, the People are further ordered to redact and exclude from discovery personal identifying information pertaining to all victims, witnesses, and all other individuals referenced in the discovered materials. (Pen. Code, § 1054(d); § 1054.2(a)(1), (b), and (c).) Defendant does not oppose redaction of personal identifying information from the requested discovery. It is so ordered.

Dated:    May 04, 2022

Judge of the Superior Court    CHERI PHAM

7

360

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**JUL 21 2021**

DAVID H. YAMASAKI, Clerk of the Court

BY: ___E. FLORES___ DEPUTY

1  Kyle Whitesides (In Pro Per)

2  PO BOX 409090

3  Ione, CA    95640

4  Superior Court of California Orange County

5

6  The People of the State of California, ) No. 10NF0718

7  Plaintiff                              ) Notice and Amended Motion for

8          V.                             ) Post-Conviction Discovery

9  Kyle Jason Whitesides                  ) Pursuant to Penal Code 1054.9

10 Defendant                              ) With Memorandum

11

12 To the District Attorney of Orange County:

13

14        Notice is hereby given that on the date for this matter to

15 be heard in court can take up or schedule the above matter, Defendant

16 Whitesides with this motion, will move the court for a 1054.9 discovery

17 order for copies of all documentations of all items listed below on

18 grounds that these are materials to which defendant was entitled at the

19 time of trial and are needed currently as Petitioner is in the process

20 of preparing a writ of habeas corpus based on

21 Factual Innocense to be filed upon the receipt

22 of FUll Discovery as sought within this motion pursuant

23 to P.C. 1054.9. Petitioner has provided reasonable

24 basis that the documents exist. Filing a Habaes

25 Corpus is not a prerequisite to this court granting

26 discovery. So long as petitioner is in the process

27 of filing, of preparing filing of a Habaes Corpus. 1054.9(a)

20

28

1  specifically states, in cases in which a defendant is or has ever
2  been convicted of a serious felony or a violent felony resulting in a
3  sentence of 15 years or more, upon prosecution of a post-conviction
4  writ of habeas corpus or a motion to vacate judgement, or
5  "in preparation to file that writ" or motion and on showing good
6  faith efforts to obtain discovery materials from trial counsel were made
7  and were unsuccessful, the court shall, except as provided in
8  Subdivision (b) or (d), order that the defendant be provided reasonable
9  access to any of the materials described in subdivision (c).
10     AB 1989 amended PC 1054.9. In its consideration of the
11  amendments the legislature made absolutely no requirement that a
12  petitioner/defendant have a reasonable belief that documents exist
13  rendering California Supreme Court rulings in Barnett moot. Had the
14  legislature intended to add provisions or the requirements it would
15  have conclusively put these provisions in the law. Moreover any
16  relation to timeliness or reasonable time to file are moot. Specifically
17  when amending 1054.9 adding the 15 years provision would mean
18  that any petitioner is seeking discovery 15 years after the conviction
19  in most cases. Accordingly any and all court cite requirements
20  have been rendered moot since the enactment of the changes to P.C.
21  1054.9 in 2019.
22     Petitioner pleads with the court to stop the mental torment with
23  continuous denials and in the spirit of the legislatures clear provisions
24  provide petitioner with all requested Post-Conviction Discovery so he may
25  reconstruct his file. All documents requested are actively and constructively
26  In the possession of law enforcement by way of P.C. 1054.1 and these
27  documents through the ordinary course of criminal investigation to the
28  extent that the _____

1  requested documents, notes, recordings, reports, etc., are associated

2  administrative records of the investigation under P.C. 1054.1 and are

3  non-testimonial evidence (P.C. 1054.3) to which Defendant is entitled

4  under the requirement of reciprocity of discovery contained in California

5  Constitution, Article I, Section 30 (c), which was glaringly and

6  obviously not met by prosecution.

7     Discovery being sought was requested by Defense Counsel (Exhibit A1)

8  (albeit one of the requests as turned over by counsel shows that it was

9  for someone named 'Mark Heers', the wrong name). All of the

10  materials were not turned over and defense counsel never did bring

11  any formal motion to compel. The materials that were turned

12  over include a small allotment of Arcata Police Department records from

13  1995 without the transcripts or tapes of a recorded/pretexted phone

14  call from a witness who testified to uncharged offenses in this trial,

15  (Kelly Higgason). As to which, Defense counsel was unaware of her

16  involvement throughout all of the time before trial, (Exhibit A2). Anaheim

17  Police Department interviews were amongst the small amount of discovery

18  provided due to them being listed on Defense counsels cover letter in

19  Exhibit A1, several others were never provided. A copy of the Public

20  Defender Interview with key witness Leonard was provided, but the page

21  was copied askew and showed a small fraction of a following page, also

22  not provided to defendant (Exhibit A3). As such, Defendant has

23  no possession of any other discovery and hereby seeks to reconstruct

24  the lost and withheld discovery.

25     Wherefore copies of documentation of the following items

26  are hereby requested:

27  //

28  (continued next page)

22

3

363

1. CD and transcripts of recorded interview with Amy Dale by D.A. Investigator Dodd, including all handwritten notes. As requested by the court in the denial of this motion previously, Petitioner provides proof of this discovery existing with transcripts from Preliminary Hearing, (Page 75, lines 10-26), (Page 76, lines 1-26), (Page 77, lines 1-6), enclosed as Exhibit B1.

2. All records of Kim McCollough's many reports to police including sexual assault. Petitioner has included proof of this discovery existing with transcripts from Preliminary Hearing, (Page 66, line 9-14) enclosed as Exhibit B2. Further proof is shown in transcripts from interview with Susan Baber (Page 4), within Exhibit B3.

3. All notes from Anaheim Police Department collected from interviews with Telecare employees Eric Burke and Susan Baber, who had made notes with Ms. McCollough about her report of sexual assault. This includes all statements made by Ms. Baber and Mr. Burke. Petitioner has included proof of this discovery existing with transcripts from a recorded interview between Anaheim Police Department and Ms. Baber (Pages 2-5) enclosed as Exhibit B3.

4. All handwritten/field notes of Anaheim Police Department, both Detective and Police officers. Petitioner has included proof of this discovery existing with a copy of "Anaheim Police Department's General Offense Hard Copy", enclosed as Exhibit B4. This shows statements taken by Lorenzo Gutierrez, Rose Leonard, Charles David McCollough, and Laura Leisniak, none of these notes were ever turned over in full or at all.

5. All records of misdemeanor or felony convictions of all witnesses and victims who testified at trial, which also was never turned over by the District Attorney, and are standard to investigation.

6. All police reports, handwritten / field notes, and CD with transcripts of interview conducted by Kelly Higgason by Arcata Police Department in 1995.

     This motion is based on this notice of motion, on the grounds set forth, on the verification below, on all the records before the court including attached exhibits, as well as any other evidence that Defendant may additionally offer hereafter.

     Defendant also declares that in his effort to seek the above discovery he had written his trial attorney, David Nisson, who only turned over a portion of his case file, which included in part, Exhibit A1, a cover letter and informal request for discovery, with the main body of the request in the wrong name and wrong case number. The only discovery Defendant has to this day is the few items requested on the Cover Page in "Exhibit A1" & a small allotment of Arcata Police Department records from 1995. The District Attorney only provided discovery that was on the Cover Page of the letter from Mr. Nisson dated January 6, 2012 (Exhibit A1). Petitioner has viewed no other discovery to this day.

     In February of 2021, both the District Attorney, Defense Carsel, and Orange County Public Defender were sent request letters unto which none provided the additional discovery, these are attached as Exhibit C.

//

(continued next page)

CV-127 (09/99)          PLEADING PAGE FOR A SUBSEQUENT DOCUMENT

365

1  Verification: I, Kyle J. Whitesides, declare under penalty of

2  perjury that statements of fact above are true and correct. Where

3  statements are made on information and belief, I believe them

4  to be true.

5      Executed on the date below in Amador County, California.

6

7

8  Dated: 7/7/21.              (s) _____

9                              Kyle J. Whitesides

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CV-127 (09.09)          PLEADING PAGE FOR A SUBSEQUENT DOCUMENT

366

# EXHIBIT COVER PAGE

EXHIBIT

A

❖ <u>Description of this Exhibit</u>:

1) Letter from Attorney Nisson dated Jan. 6, 2012 attached to Informal request for Discovery w/wrong defendant # case #. (5pages)

2) Handwritten note from Mr. Nisson concerning witness who testified to uncharged crimes (1 page)

3) Copy of page 1 of Leonard interview from Public Defender, incomplete. (1 page)

❖ <u>Number of pages in this Exhibit</u>:   8   total pages.

❖ <u>JURISDICTION</u>: (Check only One)

☐ U.S. Supreme Court

☐ U.S. Court of Appeals

☐ United States District Court.

☐ CA State Supreme Court

☐ CA Appellate Courts

☒ Superior Court

☐ Municipal Court

☐ County Grand Jury

26

367

# DAVID M. NISSON

ATTORNEY AT LAW

17291 IRVINE BOULEVARD, SUITE 154
TUSTIN, CALIFORNIA 92780
TELEPHONE (714) 730-2171
FAX (714) 730-2195

January 6, 2012

Attn:  Cindy Nichols
Sexual Assault Unit
District Attorney's Office
Orange County Superior Court
Central Justice Center
401 Civic Center Drive West
Santa Ana, CA  92701

Re:   My Client:   Kyle Whitesides
       Case No.:     10NF0718

Dear Ms. Nichols:

Enclosed please find an Informal Request for Discovery pursuant to Penal Code §1054 per 1054.5(a)(b).  The following items in bold type are our primary objectives in this informal discovery request.  **We need a copy of the DVD interview of victim Mccollough, a copy of the audio tape of Leonard, the digital recording of the Whitesides interview for the 2009 incident, a copy of the digital recording of the interview of witness Baber for the 2009 incident, a duplicate copy of all 911 tapes, duplicate copies of all color photographs, and any additional audio or video tapes prepared in connection with this case.**

Please contact me at (714) 730-2171 if you have any questions regarding the above request. Pursuant to PC §1054.5(b) opposing counsel must respond within 15 days from the date of the request.

Thank you for your courtesy and cooperation in this regard.

Very truly yours,

DAVID M. NISSON
Attorney at Law

DMN:mep
Enclosure

a9HF0192

368

1 | David M. Nisson, Esq.        SBN 109075
Attorney at Law
2 | 17291 Irvine Boulevard, Suite 154
Tustin, California  92780-3147
3 | (714) 730-2171
(714) 730-2195 FAX
4 | Attorney for Defendant

5

6

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11 | THE PEOPLE OF THE STATE OF          ) Case No.:      11NF0718
CALIFORNIA,                          )
12 |                                      )
              Plaintiff,               ) INFORMAL REQUEST FOR DISCOVERY
13 |     vs.                             )
                                       )
14 | MARK HEERS,                          )
                                       )
15 |           Defendant.                )
                                       )
16 |                                      )
                                       )
17 |                                      )

18 |     TO THE COUNTY OF ORANGE AND ITS REPRESENTATIVE, THE DISTRICT ATTORNEY:

19 |     Notice is hereby given, pursuant to Penal Code §§ 1054 per 1054.5, subdivision (b), that

20 | the above-named defendant is requesting disclosure and production of the following materials

21 | and information:

22 |     1.    All statements of the defendant regarding this case, whether oral, written,

23 | videotaped, or tape-recorded, and any transcriptions of such oral, videotaped, or tape-recorded

24 | statements.

25 |     2.    The names and addresses of persons the prosecutor intends to call as witnesses

26 | at trial.

27 |     3.    The existence of a felony conviction of any material witness whose credibility is

28 | likely to be critical to the outcome of trial.

28

1

4.   Any exculpatory evidence.

5.   Relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at trial, including any reports or statements of experts made in conjunction with this case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at trial.

In addition to the above listed information, defendant is requesting disclosure and production of the following materials and information, which defendant asserts is exculpatory and/or material to the defense of the case:

6.   All statements made, shown, read, or played to the defendant during any conversation regarding this case in which the defendant participated or was present.

7.   Any photographs taken or sketches made of the defendant, if any, or any portion of the defendant's body which were shown, or will be shown, to any potential witness in this case.

8.   All photographic "line-ups," if any, shown to any person during the investigation of the alleged crimes, whether or not the defendant's photograph was placed among such photographs.

9.   The names of and addresses of each witness shown the photographs and the results of any such showing referred to in Item No. 8, above.

10.   Dates, times, and locations of any physical examination or viewing of any portion of the defendant's body pursuant to the investigation of the alleged crimes.

11.   Identities, including names, addresses, phone numbers, badge numbers, and present assignments of all persons, if any, who physically examined or viewed any portion of the defendant's body pursuant to the investigation of the alleged offenses.

12.   Any substance taken from the defendant's person, if any, including, but not limited to, specimens of hair, blood, tissue, breath or urine.

13.   Any samples of personal characteristics, including, but not limited to, fingerprints, voiceprints, and handwriting samples, if any, which were obtained by law enforcement for use in establishing the identity of the perpetrator of the offenses charged by the People in this case.

2

370

14.    Any items of clothing and personal effects worn by the defendant at the time of the alleged crime or at the time of his arrest or otherwise seized, if any, by law enforcement pursuant to the investigation of the alleged crimes.

15.    Any books, papers, documents, photographs or tangible objects which the People intend to use in the trial or which were obtained from or belong to the defendant.

16.    The defendant's arrest and conviction record (i.e., "rap sheet"), if any.

17.    All police, arrest, and crime reports prepared by the People or their agents in relation to the investigation and prosecution of this case.

18.    The names and addresses of all witnesses to the alleged crime, whether or not the prosecution intends to call them at trial.

19.    All statements regarding this case, whether written or oral, made by potential witnesses in this case, whether or not the prosecution intends to call them at trial.  The contents of any such oral statements must be disclosed only to the extent that they are not presently contained in police reports given to the defendant or in the preliminary examination transcripts, but the People must disclose all additions to, deletions from, and denials, explanations, and clarifications such statements contained in the police reports and preliminary examination transcripts.

20.    All notes, if any, made by police officers regarding their conversations, interviews with witnesses in the present case and any written reports based on those conversations and interviews.

21.    All police officer's notes, if any of their activities, observations, and investigation of this case.

22.    All notes, if any, made by prospective witnesses relating to matters covered in their testimony at trial.

23.    All photographs and/or diagrams of the scene of the crime prepared by the People.

24.    All relevant real evidence seized or obtained as part of the investigation of the offense(s) charged.

///

30

3

25.     Latent fingerprints lifted in the investigation of this case and photographs of such latent fingerprints, if any.

26.     The known exemplars of fingerprints, if any, used for comparison with latent fingerprints lifted during the investigation of the alleged offense.

27.     Names and addresses of all persons detained or arrested as suspects in the investigation of this case.

28.     The statements of all persons interviewed as potential suspects in this case.

29.     All photographs taken by the people or law enforcement agencies in this case of the alleged victims or otherwise relating to the investigation of this case.

30.     All tangible evidence which relates to this case, whether or not the prosecution intends to introduce the evidence at trial.

31.     All exhibits the People intend to present at the trial.

32.     Any relevant material or information which has been provided by an informant.

33.     Any electronic surveillance (including wiretapping), if any, of conversations to which the accused was a party or of his premises.

34.     Any information favorable to the defense in that it tends to exonerate the defendant, minimize his probable sentence or constitutes information that the defense might use to impeach or contradict prosecution witnesses.

35.     All requests, whether in writing or oral, for analysis of physical evidence between or amongst the named parties to this order, excluding work product.

36.     All names, addresses, and reports of all expert witnesses consulted by the People in preparation for trial or during trial.

37.     All prior felony convictions of witnesses whether or not resulting in a state prison commitment which the People intend to introduce in their case in chief or for purposes of impeachment; whether any prospective witness is on probation/parole or has pending charges at the time of trial; whether any prospective witness was on probation/parole or had any pending charges at the time of the alleged offense/events that render witness status; whether any witness has suffered prior felony conviction, or an misdemeanor conviction of a moral turpitude crime.

4

1       38.     Investigation reports, whether written or oral, by District Attorney investigators.

2       39.     The names and addresses of all persons who were present when interviews were

3    conducted relating to this prosecution and any of the questions or answers which were not written

4    or recorded.

5       40.     All records pertaining to chemical tests administered to defendant.

6       The accused is asking not only for that information which is in the possession of the

7    prosecuting attorney or known by the prosecuting attorney to be in the possession of the

8    investigating agency, but for all above-described information in the possession of the investigating

9    agencies which the prosecuting attorney should know about.

10      Defendant is requesting the above items be provided to the defense within three days of

11   receipt of this request. This document was served on a District Attorney for the County of Orange

12   on this date.

13

14                                                          LAW OFFICE OF DAVID M. NISSON

15

16   DATED:  1 - 6 - 12

17                                                          DAVID M. NISSON
                                                            Attorney for Defendant

18

19

20

21

22

23

24

25

26

27

28
                                          32
                                           5

402

## HIGGASON

WHY IS IT THAT PROSECUTION HAS NEVER PROVIDED ANY INFORMATION TO DEFENSE THAT THEY HAVE EVER BEEN IN CONTACT WITH HILGASON — NO REPORTS OF CONTACT NO UPDATED CONTACT INFO — NOTHING.

BOTTOM LINE = NO TAPES — NO TESTIMONY.

## IMPEACHMENT PRIORS

WHICH PRIOR CONVICTIONS WILL DA SEEK TO INTRODUCE FOR IMPEACHMENT IF △ TESTIFIES?

243.4? = MISDEMEANOR = NOT ADMISSIBLE
                FACTS ARE 352 ~~AND OTHER~~

288(a) = 352 / SANITIZE

ONCE DA HAS STATED WHICH PRIORS THEY ARE SEEKING TO INTRODUCE WE WILL BRIEF ISSUE

## 1108

① Fresh Complaint - Kim. m. - admitted —

② Amy D. Forced Cop — admitted —

③ Infant in crib - Masturbation[33] - excluded .

③ Higgason 243[4] misd -



hut a "drama queen." She's seen
~ttention wasn't on her, she

'ehr

# OFFICE OF THE PUBLIC DEFENDER
# INVESTIGATION REPORT

ATTORNEY:
INVESTIGATOR:
CASE NAME:
CASE#:
CHARGES:
COURT DATE:

FRANK BITTAR
LORRIE DELGADILLO
PEOPLE VS. KYLE WHITESIDES
10NF0718
261(a)(2)X2; 286(c)(2); 286(c);288a(c)
JUNE 30, 2010

WITNESS:

ROSE MARIE LEONARD-DOB: 8/19/67
1310 W. Diamond Street #305
Anaheim, CA 92804
(714) 808-9678-Home Phone
(714) 226-9888-Work Phone

On Friday, June 25, 2010 at approximately 3:30 PM, I conducted an interview with Rose Marie Leonard in the recreation room of her apartment complex. I complied with CA Penal Code § 1054.8 by identifying myself as an Investigator for the Public Defenders Office and handed her my business card. I informed her that we are representing Kyle Whitesides. Rose told me the following:

She first met Kyle Whitesides in Santa Ana approximately 2 years ago when they were both homeless and loitering around the homeless area. She described Kyle as a nice, responsible guy· who was never violent or temperamental. He was a "sweetheart," and even though he drank a lot of beer and would get drunk, he never became violent, ~ ~east not to her knowledge.

Rose never had a romantic relationship with Kyle. Some unknown time ~' they were both hanging out. Kyle bought a bottle of vodka for Rose. P ~ drunk and had sexual intercourse. The sex was a "hit and run" and This was the first and only time they had sex in the two years th other. They remained friends after that encounter.

Rose was living at a room and board house on Victoria S1 when she met Kim McCollough. Rose was living at the h rived. She showed Kim around and became her roo~ 1ple of months" before moving to her current apar

34

· on
comi
3 aske{
1ght a1
: and rap

,1e wouldn
wanted atte

375

# EXHIBIT COVER PAGE

EXHIBIT

B

❖ Description of this Exhibit:

1. Transcripts from Preliminary hearing (pages 75-77). (3 pages)

2. Transcripts from Preliminary hearing (Page 616) (1 page)

3. Transcripts from recorded interview with Susan Baber, (pages 2-5). (4 pages)

4. Copies of Anaheim Police Department - General Offense Hard Copy (5 pages)

❖ Number of pages in this Exhibit: 13 total pages.

❖ JURISDICTION: (Check only One)

☐ U.S. Supreme Court

☐ U.S. Court of Appeals

☐ United States District Court

☐ CA State Supreme Court

☐ CA Appellate Courts

☒ Superior Court

☐ Municipal Court

☐ County Grand Jury

75

1    AND T-SHIRT.

2         Q.   THE RECORD WILL REFLECT THE WITNESS HAS

3    IDENTIFIED THE DEFENDANT.

4              SO JANE DOE NUMBER 2 IDENTIFIED THE DEFENDANT AS

5    THE PERSON WHO ASSAULTED HER IN 1995 AND IN 1996.

6         A.   CORRECT.

7              MS. NICHOLS:  I HAVE NOTHING FURTHER.

8              THE COURT:  MR. SCHARF?

9                        CROSS-EXAMINATION

10        Q.   BY MR. SCHARF:  DURING YOUR CONVERSATION WITH

11   JANE DOE NUMBER 2, DID YOU DISCUSS WITH HER ANYTHING

12   ABOUT THE CASES THAT WERE HAPPENING DOWN HERE?

13        A.   NO DETAILS, NO.

14        Q.   OKAY.  DID YOU ASK HER TO CORROBORATE ANY OF THE

15   STATEMENTS SHE HAD MADE BACK IN 1996 TO SPECIAL AGENT

16   PARKS?

17        A.   IT HAS BEEN A WHILE SINCE I'VE LISTENED TO MY

18   INTERVIEW.  I DO BELIEVE I DID ASK HER QUESTIONS

19   REGARDING THE INCIDENT.

20        Q.   SO DID YOU AUDIO RECORD THIS INTERVIEW?

21        A.   I AUDIO RECORDED THE PHOTO LINEUP, YES.

22        Q.   OKAY.  DID YOU AUDIO RECORD ALSO THE INTERVIEW

23   THAT YOU MADE WITH HER REGARDING THE INCIDENT?

24        A.   I WOULD HAVE TO CHECK MY RECORDS.

25        Q.   OKAY.  DID YOU TELL HER ANYTHING ABOUT THE CASES

26   DOWN HERE?

                            36

1      A.   JUST THAT THERE WAS A PENDING CASE.

2      Q.   OKAY.  DID YOU TELL HER THAT MR. WHITESIDES WAS

3  ACCUSED OF ANOTHER SEXUAL ASSAULT?

4      A.   MOST LIKELY, YES.

5      Q.   OKAY.  WHY DID YOU TELL HER THAT?

6          MS. NICHOLS:  OBJECTION, RELEVANCE.

7          THE COURT:  YES.  SUSTAINED.

8      Q.   BY MR. SCHARF:  WELL, DURING THIS INTERVIEW, IS

9  IT FAIR TO SAY YOU WERE ATTEMPTING TO OBTAIN HER

10  COOPERATION?

11      A.   YES.

12      Q.   OKAY.  AND IN ORDER TO OBTAIN HER COOPERATION,

13  DID YOU TELL HER THAT THERE WAS A SEXUAL ASSAULT CASE

14  THAT MR. WHITESIDES WAS ACCUSED OF AS OCCURRING IN ORANGE

15  COUNTY RECENTLY?

16      A.   I WOULD HAVE PUT IT THAT THERE IS A PENDING

17  SEXUAL ASSAULT CASE.

18      Q.   AND DID YOU ASK HER -- WELL, STRIKE THAT.  DID

19  YOU DOCUMENT IN ANY REPORT THIS CONVERSATION THAT YOU HAD

20  WITH JANE DOE NUMBER 2 REGARDING THE FACTS AND

21  CIRCUMSTANCES OF THE INCIDENT THAT OCCURRED IN 1995 AND

22  '6?

23          MS. NICHOLS:  OBJECTION, LACK OF FOUNDATION.

24          THE COURT:  YES.  SUSTAINED.  I THINK SHE SAID

25  SHE DIDN'T TALK ABOUT ANY DETAILS OF THAT.

26      Q.   BY MR. SCHARF:  OKAY.  WHAT DID YOU TALK ABOUT

37

77

1    WITH JANE DOE NUMBER 2 WHEN YOU HAD THE CONVERSATION WITH

2    HER REGARDING THE PHOTO LINEUP?

3         A.    IT IS ON THE TAPE.   AND I APOLOGIZE, I DON'T

4    HAVE MY FILE WITH ME.   IT IS IN SANTA ANA.

5         Q.    SO YOU DON'T RECALL THE EXACT --

6         A.    I DON'T RECALL DETAILS, I APOLOGIZE.

7              MR. SCHARF:   I HAVE NOTHING FURTHER.

8              THE COURT:   ANYTHING ELSE?

9              MS. NICHOLS:   NO.

10             THE COURT:   THANK YOU FOR YOUR TESTIMONY.

11   YOU'RE EXCUSED.

12             MS. NICHOLS:   I HAVE NOTHING FURTHER.

13             THE COURT:   PEOPLE REST?

14             MS. NICHOLS:   YES.

15             THE COURT:   FOR THE DEFENSE?

16             MR. SCHARF:   NOT AT THIS TIME.

17             THE COURT:   MOTION?

18             MS. NICHOLS:   THANK YOU.

19             THE PEOPLE WOULD ASK THE DEFENDANT BE HELD TO

20   ANSWER ON COUNTS 1 THROUGH 4 AND THE ALLEGATIONS ALLEGED

21   TO COUNTS 1 THROUGH 4.

22             THE PEOPLE ARE NOT ASKING THAT HE BE HELD TO

23   ANSWER ON COUNT 5.

24             THE COURT:   ALL RIGHT.

25             MR. SCHARF:   YOU'VE STOLEN MY THUNDER NOW.   BUT

26   CERTAINLY, UNDERSTANDABLE.

38

66

1  OF TIME.

2      Q.  HOW LONG WAS THAT TIME?

3      A.  IT IS UNKNOWN.

4      Q.  WELL, WHEN SHE CAME OUT OF THE BATHROOM, SHE

5  WENT IN THE BEDROOM WHERE MR. WHITESIDES WAS, CORRECT?

6      A.  CORRECT.

7      Q.  AND SHE WENT TO BED, CORRECT?

8      A.  CORRECT.

9      Q.  DID YOU MAKE ANY -- I'M SORRY.  DID YOU MAKE ANY

10  INVESTIGATION TO DETERMINE WHETHER OR NOT JANE DOE NUMBER

11  1 HAD MADE PRIOR FALSE ALLEGATIONS OF SEXUAL ASSAULT?

12      A.  I CONDUCTED A RECORDS CHECK AND RAN HER NAME,

13  THAT KIND OF THING, TO SEE IF SHE WAS AN INVOLVED PARTY

14  IN SOMETHING PREVIOUSLY.

15      Q.  DURING YOUR INVESTIGATION, I BELIEVE THAT YOU

16  INTERVIEWED A SUSAN BARBER, CORRECT?

17      A.  YES.

18      Q.  AND MISS BARBER INDICATED TO YOU THAT SEVERAL

19  WEEKS AFTER THE REPORTED INCIDENT SHE HAD SPOKEN TO JANE

20  DOE NUMBER 1 ABOUT THE INCIDENT, CORRECT?

21      A.  CORRECT.

22      Q.  AND MISS BARBER TOLD YOU THAT WHEN JANE DOE

23  NUMBER 1 DESCRIBED THE INCIDENT TO HER, SHE SAID THAT SHE

24  WAS BENT OVER THE TOILET; IS THAT CORRECT?

25          MS. NICHOLS:  OBJECTION, HEARSAY.

26          MR. SCHARF:  IF I MAY?

39

| DEFENDANT: | WHITESIDES, KYLE | 2 |
| INTERVIEWEE(s): | BARBER. SUSAN | |
| INTERVIEW DATE: | 03/10/10 | CD NO: E-419-10 |

Q: Okay. Um, um, do you remember what she told you when she came to you and told you about that?

A: It was um, it was actually two us I believe um, Eric...

Q: Okay.

A: Eric um, he's there --

Q: Okay.

A: -- um, Eric, what was his name. [laughs] My co-worker Eric.

Q: Your, okay.

A: Oh God, Eric Burke. Okay.

Q: Burke. Okay.

A: He was involved and we had given police report.

Q: Right. [various background noises & static]

A: And uh, she stated she had been sodomized by one of, like an outsider.

Q: Okay.

A: He was not a part of the room and board at the time.

Q: Okay.

A: And um, she was, he had came into the bathroom --

Q: Okay.

A: -- uh and there was a lot of stuff going on, loud music and so no one heard her.

Q: Okay.

A: In the bathroom with him. He had forced himself into the bathroom.

| DEFENDANT: | WHITESIDES, KYLE | 3 |
| INTERVIEWEE(s): | BARBER. SUSAN | |
| INTERVIEW DATE: | 03/10/10 | CD NO: E-419-10 |

Q:    Okay. So he had, he had forced himself into the bathroom um --

A:    She had went into the bathroom to I guess um, puke.

Q:    Okay.

A:    From the alcohol or whatever.

Q:    Okay.

A:    And um, he forced her, he forced himself in the bathroom --

Q:    Okay.

A:    -- upon her.

Q:    Okay and what, when she told you about this how long um after, how long before --

A:    How long after?

Q:    Yeah, exactly.

A:    Uh, gosh it's been so long ago.  [laughs]

Q:    I know, I know.

A:    Um, [various background noises & static] I believe it was like maybe a week after.

Q:    A week after, roughly.  Okay.

A:    Uh...

Q:    Do you know if you have, do you have any notes or does Tele Care have any notes on when, do you guys take any notes when spoke with her about it.  [various background noises & static]

A:    I think um, 'cuz the person that had her before me --

Q:    Uh huh.

41

DEFENDANT:              WHITESIDES, KYLE                    4
INTERVIEWEE(s):         BARBER. SUSAN
INTERVIEW DATE:         03/10/10              CD NO: E-419-10

A:    -- Eric, I think he has the note on her.

Q:    Okay perfect.

A:    Um, I don't think I wrote any notes and if I did it would be [various background noises & static] I can't even remember where they'd be.

Q:    Right, right. It, it was awhile ago.

A:    Yeah, I remember him doing the crisis because she was originally under him and then because he couldn't deal with the sensitive situation --

Q:    Okay.

A:    It got changed to me.

Q:    Okay, gotcha. Um, and was, was she believable when she, when she told you about it?

A:    Yes, she was (?).

Q:    Okay. Um, let me think of what else. And did she say why she waited to report it? Why, why she didn't report it right away?

A:    Because she had felt that um, room and board operator had gotten tired of the police involvement at the house --

Q:    Uh huh.

A:    -- and um, um, she was scared that [various background noises & static] it would jeopardize her housing.

Q:    I'm sorry [various background noises & static] that it would what?

A:    It would jeopardize her housing.

Q:    Oh, okay, okay.

DEFENDANT:              WHITESIDES, KYLE                           5
INTERVIEWEE(s):         BARBER. SUSAN
INTERVIEW DATE:         03/10/10            CD NO: E-419-10

A:    And she was she was just 'cuz she kept about calling the police over to the house.

Q:    Okay.

A:    And so that's why I think we had the meeting and then she had a warrant or two so she was

      scared of being, being arrested. And at, at the time.

Q:    Okay.

A:    She was scared of being.

Q:    Okay.

A:    And um, and jeopardizing her housing.

Q:    Okay. Alright. I think that pretty much covers everything. Is there anything um; is there

      anything I didn't ask you that you thinks important for me to know about, about it?

A:    Um, generally, no um, you said that she was believable, you know. She didn't appear to be

      uh, suspicious on this.

Q:    Okay. Uh, had she ever, the reason why I asked you that is because um, one of the other

      witnesses said she was a drama queen. You know she created a lot of drama but had she ever

      lied to you um about anything you know of this, of this --

A:    Of this nature, no.

Q:    Okay.

A:    No, not of this nature. But other natures, yeah. [laughs]

Q:    Okay.

A:    But uh, but this no I, I wouldn't think that she would just falsify a statement.

Q:    Okay. And when, when she spoke with you and Eric what was her state? Was she crying,

                                  43

                                  384

## ANAHEIM POLICE DEPARTMENT
### GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)                                           261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

## General Offense Information

Operational status : OPEN
Reported on : Mar-03-2009 (Tue.) 1829
Occurred on : Feb-13-2009 (Fri.) 1829
Approved on : Mar-03-2009 (Tue.) by : A0233 - RAULSTON, RICHARD #S93
Report submitted by : A1864 - MC MORRIS,CANDYCE #720 (Resigned)
Org unit : PATROL TEAM SIX
Accompanied by : A1039 - CHRISTY, PAUL #184
Location : 2019 W VICTORIA AVE
Municipality : ANAHEIM County : ORANGE
District : 1 Beat : 15 Grid : 1720
Felony/Misdemeanor : F
Bias : None (No Bias)
Gang involvement : No
Family violence : NO

## Offenses (Completed/Attempted)

Offense : #1  261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC - COMPLETED
Location : Residence/Home
Offender suspected of using : Not Applicable
Weapon type : None

## Related Event(s)

CP    2009-31742

## Related Person(s)

Victim #1: MCCOLLOUGH, KIM LOUISE
(Case Specific Information)

Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Feb-26-1959
Address : 2019 W VICTORIA AVE , ANAHEIM , California 92804-
Phone Numbers: Home : (714)635-5940
Place of birth : California
Occupation : UNEMPLOYED
Marital status : Separated
Language(s) spoken: English
Citizenship : American
Height : 5'8
Weight: 229 lbs
Hair color : BROWN
Eye color : BLUE

Master Name Index Reference
Victim #1: MCCOLLOUGH, KIM LOUISE
Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Feb-26-1959

Linkage factors
Resident status : Resident                              44

<center>

**ANAHEIM POLICE DEPARTMENT**
**GENERAL OFFENSE HARDCOPY**

</center>

GO 2009-31742 (OPEN)                    261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

Statement taken : YES
Type of injury : None
Access to firearm : NO
Victim of :
  261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC - COMPLETED

Victim's Relationship to Offender: Victim Was Acquaintance
Person's role : Suspect  # 1
Person's name : WHITESIDES, KYLE JASON

Suspect #1: WHITESIDES, KYLE JASON
(Case Specific Information)

Sex : MALE
Race : WHITE
Ethnicity : White
Date of birth : Apr-20-1972
Address : 10459 SALINAS RIVER CIRCLE , FOUNTAIN VALLEY , California 92708-
Phone Numbers: Business : (800)701-0131
Place of birth : California
Occupation : FOOD PREPARER
Employer : MENTAL HEALTH ASSOCIATION  SANTA ANA
Marital status : Single
Language(s) spoken: English
Citizenship : American
Height : 6'4
Weight: 210 lbs
Build : Medium
Hair color : BROWN
Hair style : Receding,Shaved/Bald
Eye color : BROWN

Master Name Index Reference
Suspect #1: WHITESIDES, KYLE JASON
Sex : MALE
Race : WHITE
Ethnicity : White
Date of birth : Apr-20-1972

Linkage factors
Resident status : Nonresident
Statement taken : YES
Access to firearm : NO

Case Specific Clothing Details

Witness #1: GUTIERREZ, LORENZO
(Case Specific Information)

Sex : MALE
Race : WHITE
Ethnicity : Hispanic/Latino/Mexican
Date of birth : Feb-22-1974
Address : 2019 W VICTORIA AVE , ANAHEIM , California 92804-
Height : 5'7

For: A1219  Tuesday March 30, 2010               386               Page: 2 of 21

## ANAHEIM POLICE DEPARTMENT
### GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)                     261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

Weight: 170 lbs
Hair color : BLACK
Eye color : BROWN

Master Name Index Reference
Witness #1: GUTIERREZ, LORENZO
Sex : MALE
Race : WHITE
Ethnicity : Hispanic/Latino/Mexican
Date of birth : Feb-22-1974
Aliases     : GUTIERREZ, LENCHO
            : GUTIERREZ, VICTOR DANIEL
            : RIZO, LOUIE

Linkage factors
Resident status : Resident
Statement taken : YES
Access to firearm : NO

Witness #2: LEONARD, ROSE MARIE
(Case Specific Information)

Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Aug-19-1967
Address : 1310 W DIAMOND ST  Apt: 305 , ANAHEIM , California 92804-
Phone Numbers: Home : (714)533-9702
Occupation : UNEMPLOYED
Marital status : Single
Language(s) spoken: English
Height : 5'7
Weight: 205 lbs
Hair color : RED OR AUBURN
Eye color : BROWN

Master Name Index Reference
Witness #2: LEONARD, ROSE MARIE
Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Aug-19-1967

Linkage factors
Resident status : Resident
Statement taken : YES
Access to firearm : NO

Witness #3: MCCOLLOUGH, CHARLES DAVID
(Case Specific Information)

Sex : MALE
Race : WHITE
Ethnicity : White
Date of birth : Sep-02-1959
Address : TRANSIENT

46

3

For: A1219  Tuesday March 30, 2010                              Page: 3 of 21

## ANAHEIM POLICE DEPARTMENT
## GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

Occupation : UNEMPLOYED
Marital status : Separated
Language(s) spoken: English
Height : 5'10
Weight: 160 lbs
Hair color : BROWN
Eye color : BLUE

Master Name Index Reference
Witness #3: MCCOLLOUGH, CHARLES DAVID
Sex : MALE
Race : WHITE
Ethnicity : White
Date of birth : Sep-02-1959

Linkage factors
Resident status : Resident
Statement taken : YES
Access to firearm : NO

Witness #4: MCCOLLOUGH, JACQUELINE MARIE
(Case Specific Information)

Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Mar-17-1983
Address : 1830 16TH STREET  Apt: R101 , NEWPORT BEACH , California 92663-
Language(s) spoken: English
Height : 5'7
Weight: 112 lbs
Hair color : BROWN
Eye color : BLUE

Master Name Index Reference
Witness #4: MCCOLLOUGH, JACQUELINE MARIE
Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Mar-17-1983

Linkage factors
Resident status : Nonresident
Access to firearm : NO

Case Specific Clothing Details

Witness #5: LEISNIAK, LAURA MJ
(Case Specific Information)

Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Sep-11-1964
Address : 11921 LAMPSON , GARDEN GROVE , California 92840-
Phone Numbers: Business : (714)668-1530 Cellular : (714)234-9103

ANAHEIM POLICE DEPARTMENT
GENERAL OFFENSE HARDCOPY

GO 2009-31742 (OPEN)

261 - 1 261(A)(2)RAPE-THREAT VIOL/FORC

Occupation : DIRECTOR
Employer : MENTAL HEALTH ASSOCIATION 2416 S MAIN ST, #B, SANTA ANA
Language(s) spoken: English
Height : 5'4
Weight: 145 lbs
Hair color : BROWN
Eye color : HAZEL

Master Name Index Reference
Witness #5: LEISNIAK, LAURA MJ
Sex : FEMALE
Race : WHITE
Ethnicity : White
Date of birth : Sep-11-1964

Linkage factors
Resident status : Nonresident
Statement taken : YES
Access to firearm : NO

Witness #6: BABER, SUSAN ELIZABETH
(Case Specific Information)

Sex : FEMALE
Race : WHITE
Ethnicity : Black
Date of birth : Dec-06-1974
Address : 151 E 73RD STREET , LOS ANGELES , California 90003-
Phone Numbers: Cellular : (323)742-9395
Language(s) spoken: English
Height : 5'02
Weight: 150 lbs
Hair color : BROWN
Eye color : BROWN

Master Name Index Reference
Witness #6: BABER, SUSAN ELIZABETH
Sex : FEMALE
Race : WHITE
Ethnicity : Unknown
Date of birth : Dec-06-1974

Linkage factors
Resident status : Nonresident
Statement taken : YES
Access to firearm : NO

48

5.

# EXHIBIT COVER PAGE

EXHIBIT

C

❖ <u>Description of this Exhibit</u>:

Letters of request for post-conviction discovery to:
Defense Counsel Nisson, Orange County Public Defender,
and Orange County District Attorney

❖ <u>Number of pages in this Exhibit</u>: __6__ total pages.

❖ <u>JURISDICTION</u>: (Check only One)

☐ U.S. Supreme Court

☐ U.S. Court of Appeals

☐ United States District Court

☐ CA State Supreme Court

☐ CA Appellate Courts

☒ Superior Court

☐ Municipal Court

☐ County Grand Jury

Whitesides, K
e19-8202-20
C-207

## DECLARATION OF SERVICE BY MAIL

CASE NAME: People v. Whitesides          CASE NO: 10NF0718

I, _Kyle J Whitesides_, am a resident of the State of California, Mule Creek State Prison (MCSP) at Ione, County of Amador, California, and am at least 18 years of age, and am party to the within action. My mailing address is P.O. Box 409000, Ione, California 95640-9000.

On _2-14-21_, I served a true and correct copy of the following document(s):

_Informal Request for Discovery Under P.C. 1054.9_

On each party listed below by placing it in a sealed envelope, with adequate postage or provided, and depositing said envelope in the institutional mail box, or turned said envelope to custodial personnel for the United States Mail at Mule Creek State Prison, P.O. Box 409000, Ione, California 95640-9000. Each party to the action has been duly served.

This copy is being mailed to:

David M. Nisson
attorney at law
17291 Irvine Blvd., Ste. 154
Tustin, CA       92780

I have mailed additional copies to:

Orange County Public Defender
Frank Bittar
14 Civic Center Drive West
Santa Ana, CA       92701

There is regular service by the United States Mail between the above place of mailing and the parties listed.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this date: _2-14_, 20_21_, at Ione, California

Signed: _____, CDCR No: _ARV462_

## MCSP MAILROOM ACKNOWLEDGEMENT OF MAILING

DATE: _2/16/21_     SIGNED: _____

50

391

February    , 2021

Kyle Whitesides
AR1462
PO Box 409090
Ione, CA 95640

David M. Nisson
attorney at law
17291 Irvine Blvd, Ste. 1154
Tustin, CA    92780

RE: Informal Request for Discovery Under Penal Code section 1054.9,
    People v. Whitesides, Orange County Superior Court docket number 10NF0718

    This is an informal request for discovery under Penal Code section 1054.9.
I am requesting materials that are in the actual and constructive possession of
your Office to which I would have been entitled to at trial under Brady v.
Maryland, and should have been provided with the initial discovery.

    In particular, I am seeking 1) Police reports and transcripts of all
interviews conducted with Kelly Higgason; 2) All reports and transcripts of
the interview of Amy Dale, conducted by D.A. investigator Courtney Dodd; 3) All
record of misdemeanor or felony convictions of all witnesses and victims that
testified at trial; 4) All hand written/field notes turned over by the Anaheim
Police Department, both detectives and police officers; 5) Report and transcript
of interview of witness Lorenzo Guiterrez, conducted by Anaheim Police Officer
Candyce McMorris, badge number A1864.

    Thank you for your time and compliance. I look forward to hearing back from
you or your Office.

Regards,

Kyle Whitesides          Dated: 2-14-21          .

*whitesides, K*
*e19 - Bzez zo*
*c-201*

## DECLARATION OF SERVICE BY MAIL

CASE NAME: People v. Whitesides          CASE NO: 10NF0718

I, Kyle J. Whitesides , am a resident of the State of California, Mule Creek State Prison (MCSP) at Ione, County of Amador, California, and am at least 18 years of age, and am party to the within action. My mailing address is P.O. Box 409000, Ione, California 95640-9000.

On 2-14-21 , I served a true and correct copy of the following document(s):

Informal Request for Discovery Under P.C. 1054.9

On each party listed below by placing it in a sealed envelope, with adequate postage or provided, and depositing said envelope in the institutional mail box, or turned said envelope to custodial personnel for the United States Mail at Mule Creek State Prison, P.O. Box 409000, Ione, California 95640-9000. Each party to the action has been duly served.

This copy is being mailed to: Orange County Public Defender
Frank Bittar
14 Civer Center Drive West
Santa Ana, CA          92707

I have mailed additional copies to: David M. Nisson
attorney at law
17291 Irvine Blvd., Ste. 154
Tustin, CA      92780

There is regular service by the United States Mail between the above place of mailing and the parties listed.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this date: 2-14 , 20 21 , at Ione, California

Signed: _____ , CDCR No: AR1462

## MCSP MAILROOM ACKNOWLEDGEMENT OF MAILING

DATE: 2/16/21   SIGNED: _____

February    , 2021

Kyle Whitesides
AR1462
PO Box 409090
Ione, CA 95640

Orange County Public Defender
Frank Bittar
14 Civic Center Drive West
Santa Ana, CA 92701

RE: Informal Request for Discovery Under Penal Code section 1054.9,
    People v. Whitesides, Orange County Superior Court docket number 10NF0718


    This is an informal request for discovery under Penal Code section 1054.9.
I am requesting materials that are in the actual and constructive possession of
your Office to which I would have been entitled to at trial under Brady v.
Maryland, and should have been provided with the initial discovery.

    In particular, I am seeking 1) Police reports and transcripts of all
interviews conducted with Kelly Higgason; 2) All reports and transcripts of
the interview of Amy Dale, conducted by D.A. investigator Courtney Dodd; 3) All
record of misdemeanor or felony convictions of all witnesses and victims that
testified at trial; 4) All hand written/field notes turned over by the Anaheim
Police Department, both detectives and police officers; 5) Report and transcript
of interview of witness Lorenzo Guiterrez, conducted by Anaheim Police Officer
Candyce McMorris, badge number A1864.

    Thank you for your time and compliance. I look forward to hearing back from
you or your Office.


Regards,

Kyle Whitesides              Dated: 2-14-21          .

394

e19-B702-20

## DECLARATION OF SERVICE BY MAIL

CASE NAME: People v. Whitesides    CASE NO: 10NF0718

I, Kyle J. whitesides_____, am a resident of the State of California, Mule Creek State Prison (MCSP) at Ione, County of Amador, California, and am at least 18 years of age, and am party to the within action. My mailing address is P.O. Box 409000, Ione, California 95640-9000.

On 2/28/21_____, I served a true and correct copy of the following document(s):

Informal Request For Discovery under Penal Code section 1054.9

On each party listed below by placing it in a sealed envelope, with adequate postage or provided, and depositing said envelope in the institutional mail box, or turned said envelope to custodial personnel for the United States Mail at Mule Creek State Prison, P.O. Box 409000, Ione, California 95640-9000. Each party to the action has been duly served.

This copy is being mailed to:

Orange County District Attorney (10NF0718)
401 Civic Center Drive West
Santa Ana          CA
                  92701

I have mailed additional copies to:

There is regular service by the United States Mail between the above place of mailing and the parties listed.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this date: 2/28_____, 20 21, at Ione, California

Signed: _____, CDCR No: AR1462

## MCSP MAILROOM ACKNOWLEDGEMENT OF MAILING

DATE: 3/1/21_____ SIGNED: _____

395

February 28, 2021

Kyle Whitesides
AR-1462
P. O. Box 409090
Ione, CA 95640


Orange County District Attorney
401 Civic Center Drive West
Santa Ana, CA 92701


RE: Informal Request for Discovery Under Penal Code section 1054.9,
    People v. Whitesides, Orange County Superior Court, Docket # 10NF0718


To: District Attorney of Orange County

        This is an informal request for discovery under Penal Code section 1054.9.
I am requesting materials that are in the actual or constructive possession of
your Office to which I would have been entitled to at trial under Brady v.
Maryland, and should have been provided with the initial discovery.

        In particular, I am seeking the following items:

    1) All police reports and/or transcripts of the interview conducted with
Kelly Higgason;
    2) All reports and/or transcripts of the interview of Amy Dale, conducted by
D.A. investigator Courtney Dodd;
    3) All record of misdemeanor or felony convictions of all witnesses and
victims who testified at trial;
    4) All records of Kim McCollough's *many* reports to police including sexual
assaults;
    5) All hand written/field notes turned over by the Anaheim Police Department,
both detective and police officers;
    6) Report and transcripts of interview of witness Lorenzo Guiterrez,
conducted by Anaheim Police Officer Candyce McMorris, badge number A1864;
    and
    7) Record and transcript of statement made by Charles McCollough to Anaheim
Police Department.

        I have requested the above from my defense counsel, David M. Nisson and the
Orange County Public Defender. Both requests were unfruitful. Thank you in
advance for your time and compliance. I look forward to hearing from your
office.

Regards,


Kyle Whitesides                         Dated: 2/28/21
                                        55

396

Memorandum In Support of Motion for Post-Conviction Discovery

    The California Supreme Court explained that PC 1054.9 materials include materials the prosecution provided at trial but had since been lost or materials to which the defendant was actually entitled. In re Steele, Cal. 4th 682, 695-697. This includes, among other things, materials which were specifically requested and materials that were not requested but both of which, requested and non-requested materials, the prosecution was obligated to provide. Id. Furthermore, the legislative intent of 1054.9 was to enable defendant's to efficiently reconstruct defense attorney's trial files that had become lost or destroyed.

    As evidenced by Defendant Whitesides' declaration in the verification portion of this motion, Defendant had made a good faith effort under the requirements of : PC 1054.9 to request both defense counsel and the prosecution for the lost discovery as originally requested by defense counsel (with the wrong name and case number) in his informal request for discovery (Exhibit A1) and as evidenced by the attached letters in Exhibit C.

    Wherefore, the Court should grant the motion and order the prosecution to turn over all items requested and any other discovery not requested that was required by the California Constitution, Article I, section 30 (c).

Dated: 7/7/21           Respectfully Submitted,

Kyle J. Whitesides
Defendant in pro per

36
Page Number

CV-127 (09/98)    PLEADING PAGE FOR A SUBSEQUENT DOCUMENT

DECLARATION

I, Kyle J. Whitesides, declare under penalty of perjury that the letters contained within "Exhibit C" are true copies that represent my diligent effort to obtain the requested discovery to trial attorney, the District Attorney's office, and other state actors and law enforcement to no avail, including the Public Defenders office.

Executed on the date below in Ione, Amador County, California.

Date: 7/7/21         (s) _____

                     Kyle J. Whitesides

37

Page Number

CV-127 (09. J9)          PLEADING PAGE FOR A SUBSEQUENT DOCUMENT

Proof of Service by Mail

[Case Name and Court Number]

I declare that:

I am a resident of ___Ione___ in the county of ___Amador___

California. I am over the age of 18 years. My residence address is:

___4001 Hwy 104 , Ione , CA    95640___

On _____. I served the attached __1054.9 Motion for Post-Conviction Discovery__ on the

__Orange County Superior Court__ in said case by placing a true copy thereof enclosed in a

sealed envelope with postage thereon fully paid. in the United States mail at

__Mule Creek State Prison__

addressed as follows:

__Orange County Superior Court__

__700 Civic Center Drive__

__Santa Ana, CA    92701__

_____

I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct. and that this declaration was executed on th date .

of ___7/7/21___ at ___Ione___. California.

__Kyle J. Whitesides__
[Type or Print Name]

_____
[Signature]

58

399



Orange County Superior Court
700 Civic Center Drive
Santa Ana, CA  92701

RECEIVED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
JUL 13 2021
DAVID H. YAMASAKI, Clerk of the Court
BY:_____ DEPUTY

**★ Confidential ★**
**★ LEGAL ★**
**★ MAIL ★**

from

Ione, CA

59

400



401

# Exhibit D

Reply to Return

*In re Whitesides*, G061663

402

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 3/13/2023 by Sandra Mendez, Deputy Clerk

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

KYLE JASON WHITESIDES,

    Petitioner,

      v.

THE SUPERIOR COURT OF ORANGE
COUNTY,

    Respondent;

THE PEOPLE OF THE STATE OF
CALIFORNIA,

    Real Party in Interest.

G061663

(Super. Ct. No. 10NF0718)

O R D E R

THE COURT:*

    GOOD CAUSE APPEARING, it is hereby ordered that real party in interest
SHOW CAUSE before this court, located at 601 W. Santa Ana Blvd., Santa Ana,
California, why a writ of mandate should not issue granting relief based on the People's
failure to comply with the order granting petitioner's motion for postjudgment discovery
of records currently only available in an electronic format.

    The clerk of this court is directed to send a copy of the petition and the informal
responses filed by the Orange County District Attorney's Office on August 15, 2022, and

the Attorney General on March 3, 2023, to Appellate Defenders, Inc., and Appellate Defenders, Inc. is directed to recommend within 10 days from the date of this order, the appointment of counsel to represent petitioner in this proceeding.

Counsel for petitioner is invited to file any supplemental petitions, documents, declarations, or any other documents counsel deems appropriate no later than April 10, 2023.

Real party is ordered to file a return no later than May 10, 2023. Petitioner shall file a reply no later than May 26, 2023. (Cal. Rules of Court, rule 8.487.) Once briefing is complete, the clerk is directed to place the matter on the next available oral argument calendar and the parties will be notified of the date and time of oral argument.

GOETHALS, ACTING P. J.

* Before Goethals, Acting P. J., Sanchez, J., and Delaney, J.

404

# EXHIBIT
# COVER PAGE



### Exhibit

Description of exhibit "Response To July 13, 2023
Court Order; Review of Transcripts and Why
This Petition Is Not Moot"

Number of pages to this exhibit    8

405

9/1/23

COPY

KENDALL DAWSON WASLEY, SBN 252294
1520 E. Covell Blvd., #B5-233
Davis, California 95616
(408) 827-5024 kendall@dawsonwasleylaw.com

Attorney for Petitioner

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
FOURTH APPELLATE DISTRICT, DIVISION THREE

_____

| | | |
|---|---|---|
| KYLE JASON WHITESIDES, | ) | |
| | ) | |
| Petitioner, | ) | No.: G061663 |
| | ) | |
| v. | ) | Superior Court |
| | ) | No. 10NF0718 |
| THE SUPERIOR COURT OF ORANGE | ) | |
| COUNTY, | ) | |
| | ) | |
| Respondent; | ) | |
| | ) | |
| THE PEOPLE OF THE STATE OF | ) | |
| CALIFORNIA, | ) | |
| | ) | |
| Real Party in Interest. | ) | |

**RESPONSE TO JULY 13, 2023 COURT ORDER;
REVIEW OF TRANSCRIPTS AND WHY THIS
PETITION IS NOT MOOT**

I. **ERRORS, OMISSIONS, MISREPRESENTATIONS, OR
DISCREPANCIES IN THE TRANSCRIPTS PREPARED
BY REAL PARTY AS FOUND THROUGH APPELLATE
COUNSEL'S REVIEW.**

406

Below is identification of the discrepancies and errors found
by appellate counsel[1] in the transcripts provided by Real Party.

A.    **Interview with RML, CD 1**
- Page 2 (bottom) at 02:14: "okay" should be attributed to Speaker 1, not Speaker 2.

- Page 3 at 03:12: "okay" should be attributed to Speaker 1, not Speaker 1.

- Page 5 at 05:33: "he said nothing. Didn't, so nothing happened" and "okay" should be attributed to Speaker 1, not Speaker 1.

- Page 5 at 05:39: "okay" should be attributed to Speaker 1, not Speaker 2.

- Page 7 at 07:53: "For attention? I don't, I just," the question mark is not accurate, and should not be included.

B.    **Interview with Valerie R., CD 4**
- The recording starts with phone ringing.

- Page 1 at 01:00: the "<affirmative>" is by Speaker 1, not Speaker 2.

- Page 2 at 02:34: the speakers within the cross talk are not properly identified. Speaker 2 stated, "I'm honest with…" not Speaker 1.

- Page 4, at end of 07:30 and 07:37, there is crosstalk. At 07:37 the "someone to talk to?" should be attributed to Speaker 2, not Speaker 1.

- Bottom page 4, at 08:14: "Was he violent" should be Speaker 2, not Speaker 1.

- Page 5 at 09:53: the "Uh.huh <affirmative>" should be attributed to Speaker 1, not Speaker 2.

---

[1] Appellant counsel is not familiar with the facts, investigation, or procedural history of the underlying case.

2

407

- Page 7 at 12:43:  "Okay" should be attributed to Speaker 2 not Speaker 1. The "Mm-hmm <affirmative>" should be attributed to Speaker 2, not Speaker 1.

- Page 7 at 13:39: "Right" on the third paragraph should be attributed to Speaker 2, not Speaker 1.

- Page 8, first paragraph at 15:05: "Mm-hmm <affirmative>" should be attributed to Speaker 2, not Speaker 1.

- Page 8, fifth paragraph at 15:02: there is crosstalk and the "but what was he thinking?" should be attributed to Speaker 2, not Speaker 1.

- Page 9 at 18:05: there is crosstalk "the lawyer" should be attributed to Speaker 1, not Speaker 2.


C.    **DVD 1 Jane Doe, track 1**
- The time stamp is off; the time reflected on the video recording starts at 10:20:50 a.m., and stops at 10:50:55 a.m.

- Page 1 at 00.53: "Lets see here" should be Speaker 2, not Speaker 1.

- Page 1` at 01:09: the second "California" should be Speaker 2, not Speaker 1.

- Page 2, paragraph 4, under 01:20, "I'll get the information for" should be Speaker 1, not Speaker 2.

- Page 12 between 15:38 – 17:27: Jane Doe is hand gesturing with her statements.


D.    **DVD 1, Interview of Jane Doe, track 2**
- The timestamp on the transcripts is off. Based on the time stamp reflected on the video, it starts at 10:50 a.m., ends at 11:07 a.m./

- Page 6, sixth paragraph at 10:56:46, when Jane Doe is asked "Did he threaten you and tell you anything? Okay.

3

Okay. Um," Jane Doe shakes her head no, which is not reflected in the transcript.

- Page 7, 16th paragraph at 10:58:29, the first "he's pissed" is Speaker 2, not Speaker 1.

- Page 15, after last statement, detective leaves the room at 11:07:10, and then the video cuts off at 11:07:29.

E.    **DVD 2, Interview of Whiteside, track 1**
- Last line on page 2, "so both of those" should be attributed to Speaker 1, not Speaker 1. Time is 10:23:59

- Second to last line on page 3, it should be "volunteer" not "voluntary".

- Last line page 4, "you said Ability" should be attributed to Speaker 2, not Speaker 1

- Page 8 line 2, at 10:30:40 "okay" should be attributed to Speaker 1, not Speaker 2.

- Page 9, line 7 at 10:32:54, there is crosstalk and the "after, after, after, after" is both Speaker 1 and Speaker 2

- Page 16, second to last paragraph, the detective leaves the room at 10:41:00 and returns at 10:43:23. Returns at 10:43:23 and states, "Okay. I just got off the phone with, um, one of my partners who does handle our two 90 s, our sex registrants. She said it is part of your ..." which is reflected on the last paragraph of page 16 of the transcript.

## II.    THIS PETITION IS NOT MOOT

This petition is not moot for two reasons. First, regardless of appellate writ counsel's review of the transcripts, petitioner only having the transcripts is insufficient to satisfy the "reasonable access" requirement of Penal Code section 1054.9. Second,

electronic discovery is not the only outstanding issue. As raised in the Traverse, no information has been put forth on what materials law enforcement agencies have or do not have in response to the Superior Court's May 4, 2022 discovery order.

### 1. The Transcripts Do Not Satisfy Reasonable Access

The purpose of post-conviction discovery under Penal Code section 1054.9 is to allow aid to a defendant preparing a petition for writ of habeas; the statute entitles the defendant "to discovery to assist in stating a prima facie case for relief." (*In re Steele* (2004) 32 Cal.4th 682, 691.) Penal Code section 1054.9, subdivision (a) provides that "the defendant be provided reasonable access" to the discovery. Reasonable access must allow for access and use in preparing a habeas petition.

Transcripts of the electronic materials will let petitioner keep and process a copy of the material in preparing his petition for writ of habeas, but more is needed to solve the issue. Reviewing the actual recordings, which is the discovery, is necessary. (See Pen. Code, §§ 1054.1, 1054.9.) Transcripts are only an aid to following and understanding the actual recordings. Without reasonable access to the actual electronic discovery, petitioner cannot review the speakers' tone of voice, voice inflection, and regarding the DVD videos, the hand gestures, and non-verbal communications.

The appointment of an investigator to receive the CDs and DVDs, and then to meet with and show Mr. Whiteside the recordings on the CDs and DVDs is necessary to achieve

"reasonable access." Appointed writ counsel reviewing the electronic recordings for errors and omissions is not sufficient.

Accordingly, remand to the superior court to appoint an investigator is the proper remedy.

## 2. Outstanding Law Enforcement Discovery

Petitioner filed this writ after a lack of compliance with the Superior Court's May 4, 2022 discovery order. Electronic discovery is one part of the discovery order. As asserted in the Traverse, Real Party has not established that all discovery items have been produced or are not in the possession of Real Party or law enforcement.

As put forth in Paragraph 8 of the Traverse, Real Party's August 30, 2022, letter to petitioner references discovery items in its possession and states several items ordered to be produced do not exist. (Exhibit 4 to Return; see also, p. 23.) Specifically, Real Party states:

1. There are no handwritten notes by investigators from Anaheim Police Department;
2. There are no criminal convictions pertaining to trial witnesses;
3. There are no false reports made by Kim M;
4. All discovery relating to witnesses Baber, Burek and Higgason are including [sic] in the reports sent to you previously. All information relating to Baber and Burke is found in Bates stamped pages 1-21. All information relating to Higgason is found in Bates stamped pages 22-41.
5. There are no transcripts of witness interviews, nor of the interview the police conducted with you.

6

Importantly, Real Party has not asserted or declared that it has confirmed with investigating law enforcement agencies that the discovery items do not exist. Nor has Real Party stated what steps it took to determine the discovery items do not exist.

Penal Code section 1054.9 covers discovery in the possession of the prosecution and law enforcement, as well as discovery that the defendant was entitled to at the time of trial. (See *In re Steele, supra,* 32 Cal.4th at 695, 697.) The *Steele* Court explained that Penal Code section 1054.9, subdivision (b) covers materials "the prosecution itself possesses" and also materials "law enforcement authorities possess.... law enforcement authorities who were involved in the investigation or prosecution of the case." (*Id.* at 696.)

Accordingly, Real Party's duties and obligations to produce the discovery items on the May 4, 2022, order extends beyond what is in Real Party's possession but also includes what is in the possession of law enforcement. Real Party reviewing and producing materials in its own possession is not enough; the same must also be done with law enforcement.

## CONCLUSION

This writ petition is not moot. Petitioner respectfully requests this Court grant this writ, and remand the matter to the Superior Court with directions to hold a hearing on the compliance with the May 4, 2022 discovery order and to appoint an investigator.

Dated: September 21, 2023          /s/ *Kendall Dawson Wasley*
                                   Kendall Dawson Wasley
                                   Attorney for Petitioner

412

*Whitesides v. Superior Court*                          Case No.: G061663

## ATTORNEY'S CERTIFICATE OF ELECTRONIC SERVICE
## AND SERVICE BY MAIL
(Code Civ. Proc., § 1013a, subd. (2); Cal. Rules of Court, rules 8.71(f) and 8.77)

I, Kendall Dawson Wasley, certify:

I am an active member of the State Bar of California and am not a party to this cause.  My electronic service address is kendall@dawsonwasleylaw.com and my business address is 1520 E. Covell Blvd., #B5-233, Davis, CA, 95616. On September 21, 2023, I served the persons and/or entities listed below by the method checked.  For those marked "Served Electronically," I transmitted a PDF version of the RESPONSE TO JULY 13, 2023 COURT ORDER; REVIEW OF TRANSCRIPTS AND WHY THIS PETITION IS NOT MOOT by TrueFiling electronic service to the e-mail service address(es) provided below.  For those marked "Served by Mail," I deposited in a mailbox regularly maintained by the United States Postal Service at Davis, CA, a copy of the above document in a sealed envelope with postage fully prepaid, addressed as provided below.

| | |
|---|---|
| Office of the Attorney General<br>sdag.docketing@doj.ca.gov<br><br>__X__  Served Electronically<br>___ Served by Mail | Eservice-court@adi-sandiego.com<br>Appellate Defenders, Inc.<br>555 West Beech Street, Suite 300<br>San Diego, CA 92101<br>__X_ Served Electronically<br>___ Served by Mail |
| Orange County District Attorney's Office<br>Appellate@da.ocgov.com<br>George Turner,<br>Deputy District Attorney<br>George.Turner@ocdapa.org<br><br><br>__X__  Served Electronically<br>___ Served by Mail | Kyle J Whitesides, #AR1462<br>Mule Creek State Prison<br>PO Box 409099<br>Ione, CA 95640<br>_X_ Served by Mail |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on September 21, 2023, Davis, California.

/s/ *Kendall Dawson Wasley*
Kendall Dawson Wasley
DECLARANT, SBN 252294

413

# EXHIBIT COVER PAGE



19 C 1-4

### Exhibit

Description of exhibit _____

C1: 1st Court "Order" OCDA failed to answer (pg 1)

C2: 2nd Court "Order" OCDA failed to answer (pgs 2-3)

C3: "Request for Judicial Notice" (12-8-21) (pgs 4-6)

C4: "Motion for Summary Adjudication..." (12-20-21) (pg 7-8)

Number of pages to this exhibit _____ 8

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE

# MINUTE ORDER

Case Number   10NF0718 F A

People Vs Whitesides, Kyle Jason

Report Request Criteria
1. Docket Date Range      : >= 08/09/2021 00:00:00 and <= 08/09/2021
2. Sequnce Number Range : No sequence number range specified
3. Docket Category          : Minute Order

| Docket Dt | Seq | Text |
|---|---|---|
| 8/9/2021 | 1 | Hearing held on 08/09/2021 at 09:00 AM in Department C5 for Chambers Work . |
| | 2 | Judicial Officer: Cheri T Pham, Judge |
| | 3 | Clerk: M. Rahn |
| | 4 | No Court Reporter present at proceedings. |
| | 5 | No appearance by parties. |
| | 6 | Having received and reviewed defendant's Amended Motion for Post-Conviction Discovery pursuant to Penal Code Section 1054.9 filed on July 21, 2021, the Court issues the following order: |
| | 8 | The Court requests a written response to the motion from the Office of the Orange County District Attorney within thirty (30) days from the date of this order. The written response shall be filed in Department C5 of the Orange County Superior Court. Defendant may file a written reply to the People's response within thirty (30) days from the date of service of the People's written response. |
| | 9 | Copy of Minute Order mailed to Kyle Jason Whitesides, AR1462, P.O. Box 409099, Ione, California 95640. |
| | 10 | Copy of Minute Order forwarded to Orange County District Attorney Writs and Appeals Unit via email.. |
| | 11 | Minutes of 08/09/2021 entered on 08/10/2021. |

Name:  Whitesides, Kyle Jason
Page 1 of 1

415
MINUTE ORDER

Case: 10NF0718 F A
Report Date: 08/10/2021 14:22

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE

# MINUTE ORDER

**Case Number  10NF0718 F A**

<u>**People Vs Whitesides, Kyle Jason**</u>

```
┌─────── Report Request Criteria ───────────┐
│ 1. Docket Date Range     : Date filter     │
│ 2. Sequnce Number Range : Sequence filter  │
│ 3. Docket Category       : Category filter  │
└────────────────────────────────────────────┘
```

| Docket Dt | Seq | Text |
|---|---|---|
| 11/10/2021 | 1 | **Hearing held on 11/10/2021 at 02:00 PM in Department C5 for Chambers Work .** |
| | 2 | Judicial Officer: Cheri T Pham, Judge |
| | 3 | Clerk: T. Ebbert |
| | 4 | No Court Reporter present at proceedings. |
| | 5 | No appearance by parties. |
| | 6 | Having received defendant's ex parte Notice and Request for Ruling filed October 4, 2021, the Court issues the following order:<br><br>On August 9, 2021, the Court requested from the Office of the Orange County District Attorney a written repsonse to defendant's Amended Motion for Post-Conviction Discovery made pursuant to Penal Code Section 1054.9 within 30 days from the date of the order. Court records indicate no response from the People has been filed to date.<br><br>Defendant now requests that the court grant his motion without delay.<br><br>The Court declines to entertain defendant's request. The request lacks proof of service of the same on the Office of the Orange County District Attorney. A "motion generally means an application made to a court or judge for the purpose of obtaining a rule or order directing some act to be done in favor of the applicant." Notice must be given of any application where the rights of an adverse party are affected. (People v. Hazle (2007) 157 Cal.App.4th 567, 574-575.)<br><br>The Court, on its own motion, extends the time afforded to the People to file a written response to defendant's motion. The Office of the Orange County District Attorney shall file a written response to defendant's Amended Motion for Post-Conviction Discovery within twenty-one (21) days from the date of this order. The written response shall be filed in Department C-5 of the Orange County Superior Court. Defendant may file a written reply to the People's response within thirty (30) days from the date of service of the People's written response |
| | 7 | The clerk of the court shall serve a copy of this order on the Office of the Orange County District Attorney and the defendant. The clerk of the court shall also forward a copy of defendant's Amended Motion to the Office of the Orange County District Attorney |

Name:  Whitesides, Kyle Jason                                            Case: 10NF0718 F A
Page 1 of 2                          MINUTE ORDER                Report Date: 11/10/2021 14:59

416

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE

# MINUTE ORDER

**Case Number  10NF0718 F A**

**People Vs Whitesides, Kyle Jason**

| ┌─ Report Request Criteria ─┐ |
| --- |
| 1. Docket Date Range    : Date filter |
| 2. Sequnce Number Range : Sequence filter |
| 3. Docket Category      : Category filter |

| Docket Dt | Seq | Text |
| --- | --- | --- |
| 11/10/2021 | 8 | Copy of this minute order: Amended Motion  forwarded to Office of the Orange County District Attorney - Writs and Appeals Unit. |
| | 9 | Certified Copy of this minute order mailed to Kyle Whitesides #AR1462 E-19-B2L P. O. Box 409090 Ione, CA 95640. |

I hereby certify the foregoing instrument consisting of ___ page(s)
is a true and correct copy of the original on file in this court.

ATTEST: (DATE)  11-10-2021
DAVID H. YAMASAKI, EXECUTIVE OFFICER AND CLERK OF THE
SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

BY _____ , DEPUTY

Name:  Whitesides, Kyle Jason
Page 2 of 2

63

MINUTE ORDER

Case: 10NF0718 F A
Report Date: 11/10/2021 14:59

417

Kyle Whitesides AR1462
PO Box 409090
Ione, CA 95640

In Pro Per

State of California
Fourth District Court of Appeal

Kyle Whitesides,                          §      No. 10NF0718
                 Petitioner,              §
                                          §      Request for Judicial
         v.                               §      Notice
                                          §
Superior Court of Orange                  §
County,                                   §
                 Respondent.              §
                                          §
                                          §

Petitioner Whitesides respectfully requests the Court
to take judicial notice of the following:

        On 11-10-2021, after Respondent court was
served with the Petition for Writ of Mandate in
this case, it effected an order allowing 21 days
for Orange County D.A. to respond to Petitioner's
PC 1054.9 Motion. That date has passed without
any response.

<u>Verification</u>:   Petitioner Whitesides declares under penalty of perjury that the above is true & correct.

　　　Executed on the date below in Ione, California.


DATED : 12/8/21　　　　　　　By: [signature]

　　　　　　　　　　　　　　　　KYLE WHITESIDES
　　　　　　　　　　　　　　　　In Pro Per

Proof of Service

I, prisoner pro per, declare under oath that I personally mailed a copy of the attached Request for Judicial Notice to:

①  Orange County District Attorney's Office
Address: 401 Civic Center Drive West
         Santa Ana, CA      92701

②  Superior Court of California
        County of Orange
    700 Civic Center Drive West
    Santa Ana, CA      92702

Executed under penalty of perjury on the date below in Ione, CA.

DATED: 12/8/21                By: [signature]

                              Kyle Whitesides

Kyle Whitesides AF1462
PO Box 409090
Ione, CA 95640

      In Pro Per

         Superior Court of California
            Orange County

| The People of the State of California,<br>Plaintiff,<br><br>v.<br><br>Kyle Whitesides,<br>Defendant. | § § § § § § | No. 10NF0718 F A<br><br>Motion for Summary Adjudication on Defendant's PC 1054.9 Motion;<br>Notice of Motion; and Memorandum |
| --- | --- | --- |

To the District Attorney of Orange County:

    Notice is hereby given that as soon as it is practicable for the Court to take up this matter, Defendant Whitesides hereby, with this written motion, moves the Court for summary judgment on Defendant's PC 1054.9 Motion/Petition pursuant to CCP 437c(a) on ground that the People did not dispute and provided no defense or answer.

421

## MEMORANDUM

Based on the fact that the People in this case, by virtue of their failure to dispute the 1054.9 Petition or any material facts therein as evidenced by their choosing to not answer the Petition as twice ordered by the Court, Defendant Whitesides is thereby entitled under U.S. Supreme Court precedents to summary Judgment in this case. See Anderson v. Liberty Lobby (1986) 477 US 242, 251-52; Celotex Corp. v. Catrett (1986) 477 US 317, 325.

WHEREFORE, Defendant Whitesides respectfully requests the Court to enter summary Judgment in Defendant's favor and ORDER the PEOPLE to turn over all requested items in the 1054.9 Petition.

VERIFICATION: I, Kyle Whitesides, Defendant prisoner pro per, declare under penalty of perjury as executed on the date below in Ione, CA, that all above statements of fact are true and correct to the best of my Knowledge and belief.

DATED: 12/26/21                    By: _____

                                   Kyle Whitesides
                                   In Pro Per

# EXHIBIT
# COVER PAGE

19 D 1-9

### Exhibit

Description of exhibit D1: OCDA Letter of Discovery items (ps 1-2)

D2: 8/18/22 "Request For Judicial Notice"        (pgs 3-5)

D3: 8/25/22 "Request For Additional Order"        (pg 6)

D4: 8/30/22 OCDA Letter of discovery denial        (pg 7-8)

D5: 10/12/22 OC Sp Ct. "Order"        (pg 9)

D6: 2/2/23 4th App Ct. "Order"        (pg 10-12)

D7: 2/7/23 Petitioner Files "Motion for Sanctions"        (pg. 13)

D8: 3/21/23 OC Sp.Ct "Order"        (pgs 14-15)

D9: 7/13/23 4th App Ct. "Order"        (pgs 16-19)

Number of pages to this exhibit _____ 9 _____

OFFICE OF THE

# DISTRICT ATTORNEY

## ORANGE COUNTY, CALIFORNIA

### TODD SPITZER

August 9, 2022

Kyle Whitesides, CDCR #AR-1462
Mule Creek State Prison
4001 Highway 104
Ione, California 95640

*Sent via FedEx*

RE: Post-conviction discovery in *People v. Whitesides,* Orange Cty Sup. Ct Case No. 10NF0718

Mr. Whitesides:

Pursuant to your request for post-conviction discovery and the May 4, 2022, order of the superior court, the Office of the District Attorney of Orange County (OCDA) provides you with the following:

1) The information from the case
2) The superior court's May 4, 2022, order
3) Written reports comprising Bates stamped pages 1-94

On July 1, 2022, OCDA mailed the above items to you, as well as:

1) CD 1, the recording of the interview of witness Leonard
2) CD 2, the recording of the interview of witness Baber
3) CD 3, the recording of the lineup with Amy D.
4) CD 4, the recording of the interview of Valerie R.
5) DVD 1, the recording of the interview of Kim M.
6) DVD 2, the recording of your interview

The entire package was returned weeks later by employees of the prison, as CDCR prohibits inmates' receiving compact discs, thumb drives, or other forms of electronic media. Since you cannot possess items 1-6, listed directly above, OCDA cannot send the discs to you. We can, however, send them to your attorney or other representative to receive on your behalf. Your attorney or representative can arrange to have the recordings transcribed or communicate the substance of the recordings to you.

---

REPLY TO: ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE                                                                                        WEB PAGE: http://orangecountyda.org/

☒ MAIN OFFICE          ☐ NORTH OFFICE          ☐ WEST OFFICE          ☐ HARBOR OFFICE          ☐ JUVENILE OFFICE          ☐ CENTRAL OFFICE
300 N. FLOWER ST.       1275 N. BERKELEY AVE     8141 13TH STREET       4601 JAMBOREE RD.        341 CITY DRIVE SOUTH      300 N. FLOWER ST.
SANTA ANA, CA 92703     FULLERTON, CA 92832      WESTMINSTER, CA 92683  NEWPORT BEACH, CA 92660  ORANGE, CA 92868          SANTA ANA, CA 92703
P.O. BOX 808 (92702)    (714) 773-4480           (714) 896-7261         (949) 476-4650           (714) 935-7624            P.O. BOX 808 (92702)
(714) 834-3600                                                                                                             (714) 834-3952

424

If you wish your attorney or representative to receive the digital discovery mentioned, you may communicate that desire by return correspondence, identifying the person to whom you wish the recordings sent.

Sincerely,


/s/ *Matthew Lockhart*


Matthew Lockhart
Senior Deputy District Attorney
Writs & Appeals Unit
Office of the District Attorney of Orange County

425

Kyle Whitesides AR1462
PO BOX 409090
Ione, CA     95640

In Pro Per

Appellate  Division
Superior  Court  of Orange  County

Kyle Whitesides,                     S       No.
          Petitioner,               S
                                    S       Request for Judicial
     V.                             S       Notice
Orange County District              S
Attorney, Respondent                S
                                    S

     This  request  is  subsequent  to  a  Petition  for  Writ
of  Mandate  mailed  on  or  about  7/18/22.
     Petitioner  requests  the  Court  to  take  Judicial  Notice
of  the  attached  letter  by  the  D.A.'s  Office,  dated  8/9/22
(Exhibit A)  wherein  the  CD's  sent  by  the  D.A.  were
apparently  returned  by  the  prison  and  only  included
discovery  already  possessed  by  defendant  and  nothing
ordered  by  Superior  Court  Judge  (Exhibit B)  who also
ordered  transcripts  of  the  C.D.'s.

     In  particular,  there  was  no  handwritten
notes  from  field  investigations;  no  criminal  background,

including misdemeanors that detail further community disturbances, along with numerous 911 calls and additional false reports to police including sexual assault in multiple counties by Kim M.; and no discovery on witnesses Baber or Burke or Higgason as ordered in the P.C. 1054.9 motion in the trial court for which the trial court order (Exhibit B) covered and which Petitioner is entitled to under P.C. 1054.9.

Date: 8/18/22

By: [signature]

Kyle J. Whitesides
In Pro Per

## PROOF OF SERVICE BY MAIL

STATE OF CALIFORNIA                    )
                                       ) SS
County of _Amador_                     )

[C.C.C. §§446, 2015.5; 28 U.S.C. §1746]

I, _Kyle J. Whitesides_, am a resident of the State of California and am over the age of eighteen years and am not a party to the above action. My address is listed below. 4001 HWY 104
Ione, CA    95640

On _8/18/22_, I served the following documents:

_Request for Judicial Notice_

by placing a true copy thereof enclosed in a sealed envelope with First Class postage thereon fully prepaid in the United States mail by delivering to prison officials for processing through the Institution's internal legal mail system at Ione, California, addressed as follows: Office of the District Attorney
Orange County
300 N. Flower Street
Santa Ana, CA    92703

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in the County of Amador, California on _____.

_8/18/22_

_Kyle J. Whitesides_.
a _[signature]_

Pursuant to the holding of the United States Supreme Court in Houston v Lack 108 S.Ct. 2379, 487 U.S. 266, 101 L.Ed.2d 245 (1988) and FRAP, Rule 4(c) inmate legal documents are deemed filed on the day they are delivered to prison staff for processing and mailing vial the Institution's internal legal mail procedures.

428

Kyle Whitesides

P.O. Box 409090

Ione, CA 95640

Superior Court of California

Orange County

| | |
|---|---|
| The People | No. 10NF0718 |
|     Plantiff, | Request for Additional |
| v. | Order under P.C. 10549 |
| Kyle Whitesides | |
|     Defendant. | |

To the Honorable Judge Cheri Pham,

    Where the D.A. office indicated they do not have field notes and 911 calls requested, and where Prop. 8 passed in 1982 abrogated Evidence Code 786 and 787 to allow for disclosure of misdemeanor records, Defendant requests the Court to make an additional order requesting Anaheim Police Dept. to turn over all field notes of <u>all</u> witnesses, as well as misdemeanor and felony records of all witnesses. Petitioner seeks detectives list of results of his investigation into Kim M.'s previous reports of rape, none of which were ever prosecuted. All 911 calls made by Kim M. as well as     reports of crimes to multiple police agencies including Anaheim P.D. itself as stated by Ms. Baber in her interview with Detective Adham. Defendant asks that the Arcala Police Department turn over all field notes as well as recorded pretexted calls, including transcripts. The Orange County D.A. contends they never received all of this discovery. Please review exhibits in P.C. 1054.9 amended motion for detailed proof of this discovery's existence and it becomes clear why all this discovery was kept from defendant.

Date: 8/25/22

By: Kyle J. Whitesides-In Pro Per

OFFICE OF THE

# DISTRICT ATTORNEY

ORANGE COUNTY, CALIFORNIA

TODD SPITZER

August 30, 2022

Kyle Whitesides, CDCR #AR-1462
Mule Creek State Prison
4001 Highway 104
Ione, California 95640

RE: Your request for judicial notice in *People v. Whitesides*, Orange County Sup. Ct Case No. 10NF0718

Mr. Whitesides:

The Office of the District Attorney of Orange County (OCDA) is in receipt of your letter dated August 18, 2022, requesting the superior court take judicial notice of our letter to you dated August 9, 2022. Your request for judicial notice is not authorized by Evidence Code sections 451 and 452, nevertheless, your concerns are addressed as follows.

In your letter, you complain to the court that you have not received the following from OCDA:

1) Handwritten notes from field investigators;
2) Criminal backgrounds;
3) False reports made by Kim M.;
4) Discovery on witnesses Baber, Burke, and Higgason; and
5) Transcripts of the recorded interviews of the witnesses

As to each request, be advised:

1) There are no handwritten notes by investigators from Anaheim Police Department;
2) There are no criminal convictions pertaining to trial witnesses;
3) There are no false reports made by Kim M;
4) All discovery relating to witnesses Baber, Burke, and Higgason are including in the reports sent to you previously. All information relating to Baber and Burke is found in Bates stamped pages 1-21. All information relating to Higgason is found in Bates stamped pages 22-41.
5) There are no transcripts of witness interviews, nor of the interview the police conducted with you.

---

REPLY TO: ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE                                          WEB PAGE: http://orangecountyda.org/

☒ MAIN OFFICE         ☐ NORTH OFFICE         ☐ WEST OFFICE           ☐ HARBOR OFFICE         ☐ JUVENILE OFFICE        ☐ CENTRAL OFFICE
300 N. FLOWER ST.      1275 N. BERKELEY AVE.   8141 13TH STREET         4601 JAMBOREE RD.        341 CITY DRIVE SOUTH     300 N. FLOWER ST.
SANTA ANA, CA 92703    FULLERTON, CA 92832     WESTMINSTER, CA 92683    NEWPORT BEACH, CA 92660  ORANGE, CA 92868         SANTA ANA, CA 92703
PO. BOX 808 (92702)    (714) 773-4480          (714) 896-7261           (949) 476-4650           (714) 935-7624           PO. BOX 808 (92702)
(714) 834-3600                                                                                                            (714) 834-3952

430

You should also be advised that while the court ordered the production of transcripts of the interviews of the witnesses and you pursuant to Penal Code section 1054.9, such order is predicated on two things: 1) That such transcripts are in OCDA's possession; and 2) That you would have been entitled to them at the time of trial. (See Penal Code section 1054.9, subdivision (c).)

Transcripts of interviews are required to be prepared and given to the opposing party only if a party seeks to enter the recordings of the interviews into evidence. (See California Rules of Court, rule no. 2.1040, subdivision (b).) As you know, no electronic recordings were introduced into evidence at any hearing prior to or during your trial. As such, you were not and are not entitled to a transcription of any of the interviews, whether or not OCDA is in possession of them, as section 1054.9(c) only authorizes you to obtain evidence you would have been entitled to at time of trial.

While you were not entitled to possession of transcriptions at time of trial, since you cannot now possess electronic media in prison, had OCDA transcribed the interviews, as a matter of comity, we would provide the transcriptions to you. However, OCDA has not ever transcribed them and we are under no obligation now to do so on your behalf.

As stated in the previous letter to you, should you hire an attorney or other representative, OCDA can provide the recordings to that person on your behalf.


Sincerely,


/s/ *Matthew Lockhart*

Matthew Lockhart
Senior Deputy District Attorney
Writs & Appeals Unit
Office of the District Attorney of Orange County

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE

# MINUTE ORDER

**Case Number   10NF0718 F A**

<u>People Vs Whitesides, Kyle Jason</u>

**Report Request Criteria**

1. Docket Date Range        : Date filter
2. Sequnce Number Range : Sequence filter
3. Docket Category           : Category filter

| <u>Docket Dt</u> | <u>Seq</u> | <u>Text</u> |
|---|---|---|
| 10/6/2022 | 1 | **Hearing held on 10/06/2022 at 04:00 PM in Department C5 for Chambers Work .** |
|  | 2 | Judicial Officer: Cheri T Pham, Judge |
|  | 3 | Clerk: T. Ebbert |
|  | 4 | No Court Reporter present at proceedings. |
|  | 5 | No appearance by parties. |
|  | 6 | Having received and reviewed defendant's Request for Additional Order made pursuant to Penal Code Section 1054.9 filed on September 1, 2022, the Court issues the following order: |
|  |  | The Court requests a written response to the request from the Office of the Orange County District Attorney within forty-five (45) days from the date of this order. The written response shall be filed in Department C5 of the Orange County Superior Court. Defendant may file a written reply to the People's response within forty-five (45) days from the date of service of the People's written response |
|  | 7 | The clerk of the court shall serve a copy of this order on the Office of the Orange County District Attorney and the defendant |
|  | 8 | Minutes of 10/06/2022 entered on 10/12/2022. |

I hereby certify the foregoing instrument consisting of ___ page(s) is a true and correct copy of the original on file in this court.

ATTEST: (DATE) __10-12-2022__

DAVID H. YAMASAKI, EXECUTIVE OFFICER AND CLERK OF THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

BY _____ , DEPUTY

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 2/2/2023 by Sandra Mendez, Deputy Clerk

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

KYLE WHITESIDES,

    Petitioner,

       v.

THE SUPERIOR COURT OF ORANGE
COUNTY,

    Respondent;

THE PEOPLE OF THE STATE OF
CALIFORNIA,

    Real Party in Interest.

G061663

(Super. Ct. No. 10NF0718)

O R D E R

On May 4, 2022, respondent court granted petitioner's amended motion for post-conviction discovery pursuant to Penal Code §1054.9. The order required real party in interest the Orange County District Attorney to provide petitioner with the following discovery within 60 days: "1. 'CD and transcripts of recorded interview with Amy' D. 'by Investigator Dodd, including' all handwritten notes that may exist of the recorded interview. [¶] 2. 'All records of Kim' M.'s reports 'to police including sexual assault.' [¶] 3. 'All notes from the Anaheim Police Department collected from interviews with Telecare employee Eric Burke and Susan Baber' which include all statements made by Ms. Baber and Mr. Burke. [¶] 4. 'All handwritten/field notes' pertaining to the investigation of defendant's case generated by the Anaheim Police Department by detectives and officers. [¶] 5. The existence of any felony convictions pertaining to prosecution witnesses who testified at trial. [¶] 6. 'All police reports, handwritten/field

notes and CD with transcripts of interview conducted of Kelly Higgason by' the 'Arcata Police Department in 1995."

According to the "Notice Re: Service of Post Conviction Discovery" filed by real party on July 1, 2022, petitioner was served with the following post-conviction discovery "via certified mail:" "Order filed on May 4, 2022, Information, bate [sic] stamp pages one through ninety-four, CD: Interview of witness Leonard, CD 2: Interview with witness Baber, CD 3: Photographic Lineup (Amy D.), CD 4: Interview of Valerie R., DVD 1: Interview of Kim M., DVD 2: Interview of suspect Whitesides."

On August 5, 2022, petitioner filed a petition for writ of mandate. Real party was ordered to file an informal letter advising this court whether it complied with the order filed by the trial court on May 4, 2022. Real party was also ordered to file the proof of service signed under penalty of perjury verifying the discovery materials were transmitted to petitioner.

On August 15, 2022, real party filed a letter and proofs of service verifying that it complied with the superior court's order and transmitted post-conviction discovery to petitioner, which included a collection of police reports and "four compact discs containing interviews with various witnesses and two DVDs consisting of witness interview and the police's interview of defendant."

According to real party, it received confirmation from Mule Creek State Prison that the post-conviction discovery had been received, but it was later returned on July18, 2022, "with a stamped notation from the prison stating prisoners are not allowed to possess compact discs."

On August 10, 2022, real party "sent anew to defendant the written material, which he is allowed to possess in prison . . . [but] did not send the six discs containing the recorded statements of witnesses and defendant as prison employees will not allow defendant to possess them and presumably will again refuse delivery of everything." According to real party, "There is no way to transmit electronic recordings to a state prison inmate pursuant to rules from the California Department of Corrections and Rehabilitation [CDCR]."

The Attorney General is ordered to file no later than 30 days from the date of this order, an informal letter which offers solutions for the People to comply with the order

filed by respondent court granting petitioner's motion for postjudgment discovery which includes a record in an electronic format not accessible in an institutional setting.  The Attorney General should also address whether the CDCR or the prison's litigation coordinator is able to provide assistance or supervision while petitioner reviews any part of an electronic record.


Sanchez, Acting P.J.
_____
SANCHEZ, ACTING P. J.

Kyle Whitesides
PO Box 409090
Ione, CA 95640

    In Pro Per

<br>

SUPERIOR COURT OF CALIFORNIA

ORANGE COUNTY

| | | |
|---|---|---|
| The People of the State of California, | ) | No. 10NF0718 F A |
| | ) | |
| Plaintiff, | ) | MOTION FOR SANCTIONS |
| v. | ) | |
| Kyle Jason Whitesides, | ) | [CCP 177.5, GC 11455.10] |
| Defendant. | ) | Hon. Cheri T. Pham |

NOTICE OF MOTION AND MOTION:

To the District Attorney of Orange County, notice is hereby given that as soon as it is practicable for the Court to hear this matter, and Defendant Whitesides is hereby requesting the Court to schedule this matter for hearing, Defendant prisoner pro per will, with this written notice and motion, move the Court for order of sanction and contempt against the attorney of record for the People on ground that he, without justification, failed to obey the Court's 10-12-2022 order to respond.

MEMORANDUM

The only determination the Court has to make is whether the party violated the order without valid excuse. People v. Aguirre (2021) 64 Cal.App.5th 652,668. In addition to CCP 177.5, the Court may also hold Plaintiff in contempt for failure to obey a lawful order (GC 11455.10(a)) and failure to comply with discovery request. Id. subd. (e). Defendant requests judicial notice of the above order on record.

PRAYER

Wherefore, Defendant respectfully requests the Court to grant the motions.

Defendant declares that the foregoing is true and correct.

DATED: 2|7|23

               By: _Kyle W_

                      Kyle Whitesides
                      Defendant in pro per

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE

# MINUTE ORDER

Case Number  **10NF0718 F A**

**People Vs Whitesides, Kyle Jason**

| Report Request Criteria | |
|---|---|
| 1. Docket Date Range | : Date filter |
| 2. Sequnce Number Range : Sequence filter | |
| 3. Docket Category | : Category filter |

| Docket Dt | Seq | Text |
|---|---|---|
| 3/21/2023 | 1 | **Hearing held on 03/21/2023 at 09:00 AM in Department C5 for Chambers Work .** |
| | 2 | Judicial Officer: Jonathan Fish, Judge |
| | 3 | Clerk: T. Williams |
| | 4 | No Court Reporter present at proceedings. |
| | 5 | No appearance by parties. |
| | 6 | Having reviewed defendant's Request for Additional (Discovery) Order filed on September 1, 2022 and Motion for Sanctions filed on February 16, 2023, the Court issues the following order: |
| | 7 | On May 4, 2022, the Court granted defendant's Penal Code section 1054.9 motion for post-judgment discovery. On July 1, 2022, the Office of the Orange County District Attorney filed with the Court, notice of their compliance with the discovery order. |
| | 8 | On September 1, 2022, defendant filed a request seeking additional discovery. On October 6, 2022, the Court requested a written response from the People within 45 days. |
| | 9 | On February 16, 2023, defendant filed a motion seeking a hearing and ultimately a court order holding the People in contempt and subject to sanctions due their alleged unjustified failure to comply with the Court's October 6, 2022 order as well as with defendant's discovery request. |
| | 10 | Having reviewed the court file, the Court takes judicial notice (Evid. Code, section 452(d)) of court records indicating defendant has filed a petition for writ of mandate with the Fourth District Court of Appeal, Division Three, seeking compliance by the People with the Court's May 4, 2022 discovery order. (Court of Appeal case number: G061663) |
| | 11 | The request for additional discovery and motion for contempt/sanctions against the People for alleged non-compliance with court orders are denied on grounds they are premature. Defendant is presently litigating before the Fourth District Court of Appeal, Division Three, the People's alleged non-compliance with the Court's May 4, 2022 order affording defendant post-conviction discovery under Penal Code section 1054.9. Defendant's request for additional discovery and contempt proceedings and/or imposition of sanctions must await final adjudication of relevant proceedings before the Court of Appeal. There are no grounds warranting initiation of contempt proceedings or imposition of sanctions under these circumstances. |

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE

# MINUTE ORDER

**Case Number   10NF0718 F A**

**People Vs Whitesides, Kyle Jason**

| Report Request Criteria | |
| --- | --- |
| 1. Docket Date Range | : Date filter |
| 2. Sequnce Number Range | : Sequence filter |
| 3. Docket Category | : Category filter |

| Docket Dt | Seq | Text |
| --- | --- | --- |
| 3/21/2023 | 12 | The request for additional order and motion for sanctions are DENIED. |
| | 13 | The clerk of the court is directed to serve a copy of this order on the Office of the Orange County District Attorney and the defendant. |
| | 14 | Copy of Minute Order forwarded to Office of the Orange County District Attorney. |
| | 15 | Copy of Minute Order forwarded to Kyle Jason Whitesides, Defendant. |
| | 16 | Minutes of 03/21/2023 entered on 03/29/2023. |

Court of Appeal-Fourth Appellate District, Division Three
Brandon L. Henson, Clerk/Executive Officer
Electronically FILED on 7/13/2023 by Alex Reynoso, Deputy Clerk

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KYLE WHITESIDES, | |
| Petitioner, | |
| v. | G061663 |
| THE SUPERIOR COURT OF ORANGE COUNTY, | (Super. Ct. No. 10NF0718) |
| Respondent; | O R D E R |
| THE PEOPLE OF THE STATE OF CALIFORNIA, | |
| Real Party in Interest. | |

On August 5, 2022, petitioner filed a petition for a writ of mandate seeking an order directing real party, the Orange County District Attorney's Office, to comply with the order filed by respondent court on May 4, 2022, granting petitioner's motion for postjudgment discovery pursuant to Penal Code section 1054.9. After ordering real party to file informal opposition, real party advised this court that it complied with the order of respondent court, but that discovery in the format of four CDs and two DVDs (hereinafter referred to as electronic discovery) had been rejected and returned by Mule Creek State Prison, the institution where petitioner is incarcerated.

In February 2023 this court ordered the Attorney General to file an informal letter that offered solutions that provided for the transmission of court-ordered electronic discovery to an institutional setting. In response to this court's order, the Attorney General filed a letter stating Mule Creek State Prison does not currently have the

capability to allow petitioner to view the electronic discovery in its current format, but technological updates in the near future may resolve the issue if discovery is provided in a format other than CDs and DVDs.

On March 13, 2023, this court filed an order to show cause before this court why relief should not be granted based on real party's failure to comply with respondent court's order to transmit postjudgment discovery to petitioner at Mule Creek State Prison. This court also appointed counsel to represent petitioner in this proceeding and invited counsel to file any additional supplemental petitions, documents, or declarations that counsel deemed appropriate.

In April 2023 counsel filed a "Supplemental Request and Argument" and a declaration by counsel which requests that an investigator be appointed to receive the CDs and DVDs and play the recordings for petitioner at Mule Creek State Prison.

In May 2023 real party filed a return to the petition which states that real party transmitted the electronic discovery to appointed counsel with a letter suggesting that counsel seek court funding to prepare transcripts of the electronic discovery to facilitate petitioner's access to the discovery ordered by respondent court. The return also states that counsel returned the electronic discovery to real party. According to the return, real party "independently prepared transcripts that accurately and fully reflect the content of the outstanding electronic discovery items" and transmitted a copy of the transcripts to counsel.

This court is considering vacating the order to show cause filed on March 13, 2023, on the basis the issue is moot. No later than 10 days from the date of this order real party is ordered to transmit to counsel the electronic discovery that counsel returned to real party in April 2023. Counsel is ordered to review the electronic discovery and the transcripts of the electronic discovery transmitted to counsel in May 2023, and advise this court in writing no later than 70 days from the date of this order whether there are any substantive errors, omissions, misrepresentations, or discrepancies in the transcripts of the electronic discovery prepared by real party. Any errors, omissions, misrepresentations, or discrepancies identified by counsel shall include the time stamp of the electronic discovery and the corresponding page number in the transcript.

Real party is further ordered to transmit the electronic discovery in the format of a flash drive to the deputy appearing on behalf of the Attorney General's Office in this

9

case. In the event that discovery in the format of a flash drive becomes an acceptable and accessible format of discovery once the California Department of Corrections and Rehabilitations installs the software in the "recently obtained new inmate-approved laptops" commonly referred to as *Olson* computers identified in the letter from the Attorney General, the Attorney General is ordered to transmit the flash drive to the litigation coordinator at Mule Creek State Prison.

Oral argument scheduled for August 21, 2023, is VACATED.

Petitioner's request for judicial notice of the record in superior court case number 10NF0718 generated after July 2021 is GRANTED. (Evid. Code, §§ 452, 459.) Any further requests for judicial notice shall comply with rule 8.252 of the California Rules of Court, and shall be filed as a "separate motion" with the matter or matters to be noticed attached to the motion. (Cal. Rules of Court, rule 8.252(a)(1), (3).)


O'Leary, P.J.
_____
O'LEARY, P. J.

441

1520 E. Covell Blvd., #B5-233
Davis, CA 95616

LAW OFFICE OF
**KENDALL DAWSON WASLEY**

(408)827-5024
kendall@dawsonwasleylaw.com

July 18, 2023

**Confidential Attorney-Client Communication**

*Sent Via USPS*

Kyle J. Whitesides, CDCR# AR1462
Mule Creek State Prison
PO Box 409099
Ione, CA 95640

Re:    Petition for Writ of Mandate
       Case# G061663
       COA 7/13/2023 Order

Dear Mr. Whitesides:

Please find enclosed a copy of the Court of Appeal's July 13, 2023 order. As you can see oral argument has been vacated. (I got notice of oral argument on July 10, and then this order issued a few days later.) I will receive the CDs and DVDs from the prosecution, and then listen to the recordings. If you have any notes or comments regarding the transcripts and audio recordings, please to write me. (Please send a paper letter, not a message via gettingout.com.)

Sincerely,

KENDALL DAWSON WASLEY

Enclosed: as stated

442

# EXHIBIT
# COVER PAGE



### Exhibit

Description of exhibit Letter dated 9/24/24 from
Atty. Wasley with 3 attachments.  (pg 1-15)

Number of pages to this exhibit ____15____

443

1520 E. Covell Blvd., #B5-233      **KENDALL DAWSON WASLEY**     (408)827-5024
Davis, CA 95616            Attorney at Law        kendall@dawsonwasleylaw.com

September 24, 2024

**Confidential Attorney-Client Communication**

Kyle J. Whitesides, #AR1462
Mule Creek State Prison
PO Box 409099
Ione, CA 95640

      Re:    Petition for Writ of Mandate
            Case# G061663

Dear Mr. Whitesides:

     Consistent with our telephone conversation today, enclosed are the following documents:

1. Court of Appeals, Order to Show Cause, Issued March 13, 2023
2. Attorney General's Nonstatutory Motion to Reconsider August 28, 2024 Order
3. Counsel for Petitioner's Statement of Compliance with August 28, 2024 Court Order

            Sincerely,

            *Kendall Wasley*

            KENDALL DAWSON WASLEY

444

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 3/13/2023 by Sandra Mendez, Deputy Clerk

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

KYLE JASON WHITESIDES,

    Petitioner,

      v.

THE SUPERIOR COURT OF ORANGE COUNTY,

    Respondent;

THE PEOPLE OF THE STATE OF CALIFORNIA,

    Real Party in Interest.

G061663

(Super. Ct. No. 10NF0718)

O R D E R

THE COURT:*

    GOOD CAUSE APPEARING, it is hereby ordered that real party in interest

SHOW CAUSE before this court, located at 601 W. Santa Ana Blvd., Santa Ana,

California, why a writ of mandate should not issue granting relief based on the People's

failure to comply with the order granting petitioner's motion for postjudgment discovery

of records currently only available in an electronic format.

    The clerk of this court is directed to send a copy of the petition and the informal

responses filed by the Orange County District Attorney's Office on August 15, 2022, and

445

the Attorney General on March 3, 2023, to Appellate Defenders, Inc., and Appellate

Defenders, Inc. is directed to recommend within 10 days from the date of this order, the

appointment of counsel to represent petitioner in this proceeding.

Counsel for petitioner is invited to file any supplemental petitions, documents,

declarations, or any other documents counsel deems appropriate no later than April 10,

2023.

Real party is ordered to file a return no later than May 10, 2023.  Petitioner shall

file a reply no later than May 26, 2023.  (Cal. Rules of Court, rule 8.487.)  Once briefing

is complete, the clerk is directed to place the matter on the next available oral argument

calendar and the parties will be notified of the date and time of oral argument.

GOETHALS, ACTING P. J.

* Before Goethals, Acting P. J., Sanchez, J., and Delaney, J.

446

KENDALL DAWSON WASLEY, SBN 252294
1520 E. Covell Blvd., #B5-233
Davis, California 95616
(408) 827-5024 kendall@dawsonwasleylaw.com

Attorney for Petitioner

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
FOURTH APPELLATE DISTRICT, DIVISION THREE

KYLE JASON WHITESIDES,      )
                            )
       Petitioner,          )       No.: G061663
                            )
v.                          )       Superior Court
                            )       No. 10NF0718
THE SUPERIOR COURT OF ORANGE COUNTY, )
                            )
       Respondent;          )
                            )
THE PEOPLE OF THE STATE OF CALIFORNIA, )
                            )
       Real Party in Interest.  )
                            )
                            )

## COUNSEL FOR PETITIONER'S STATEMENT OF COMPLIANCE WITH AUGUST 28, 2024 COURT ORDER

TO THE HONORABLE PRESIDING AND ASSOCIATE JUSTICES OF THE CALIFORNIA COURT OF APPEAL, FOURTH APPELLATE DISTRICT, DIVISION THREE:

On August 28, 2024, this Court issued an order pertaining to electronic discovery and access for petitioner. Below is a declaration of petitioner's counsel's compliance with the August 28, 2024 order. As set forth in the below declaration, petitioner has been provided access to and has viewed the discovery contained in electronic format.

1

While the electronic aspect of the discovery has been addressed, as put forth in prior briefing, it is respectfully requested that this matter be remanded to the Superior Court with directions to hold a hearing on the compliance with the Superior Court's May 4, 2022, discovery order and specifically the discovery addressed on pages 6-7 of petitioner's "Response to July 13, 2023 Court Order; Review of Transcripts and Why this Petition Is Not Moot" filed on September 21, 2023.

Respectfully submitted.

Dated: September 24, 2024

/s/ Kendall Dawson Wasley

Kendall Dawson Wasley
Attorney for Petitioner

### DECLARATION OF COUNSEL FOR PETITIONER

I, Kendall Dawson Wasley, declare as follows:

1.    I am licensed to practice law in the state of California and appointed counsel for Mr. Whitesides in this writ petition matter, case number G061663.

2.    On September 24, 2024 I had a CDCR authorized legal telephone call with petitioner Kyle Whitesides. During the telephone call, Mr. Whitesides confirmed he was provided access to the electronic discovery on September 13, 2024, and he represented he had sufficient time to review the electronic discovery.

3.    On June 12, 2023, I mailed Mr. Whitesides the transcripts for the eight CD/DVDs provided to me by the Orange County District Attorney's office via United States Priority Mail.

4.    On September 21, 2023, I mailed Mr. Whitesides a copy of the Response to July 13, 2023 Court Order ; Review of Transcripts and Why This Petition is Not Moot, that I filed in this Court on September 21, 2023, and

448

contained a detailed description of discrepancies and errors I found between the transcripts and the electronic recordings.

5.     Outside the transcripts and electronic discovery (referenced above) I have not received any other discovery from the Orange County District Attorney's Office in this matter.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, executed on September 24, 2024 in Davis, California.

*Kendall Wasley*

Kendall Dawson Wasley

3

449

Whitesides v. Superior Court                    Case No.: G061663

**ATTORNEY'S CERTIFICATE OF ELECTRONIC SERVICE
AND SERVICE BY MAIL**
(Code Civ. Proc., § 1013a, subd. (2); Cal. Rules of Court, rules 8.71(f) and 8.77)

    I, Kendall Dawson Wasley, certify:

I am an active member of the State Bar of California and am not a party to this cause. My electronic service address is kendall@dawsonwasleylaw.com and my business address is 1520 E. Covell Blvd., #B5-233, Davis, CA, 95616. On September 24, 2024, I served the persons and/or entities listed below by the method checked. For those marked "Served Electronically," I transmitted a PDF version of the COUNSEL FOR PETITIONER'S STATEMENT OF COMPLIANCE WITH AUGUST 28, 2024 COURT ORDER by TrueFiling electronic service to the e-mail service address(es) provided below. For those marked "Served by Mail," I deposited in a mailbox regularly maintained by the United States Postal Service at Davis, CA, a copy of the above document in a sealed envelope with postage fully prepaid, addressed as provided below.

| | |
|---|---|
| Office of the Attorney General<br>sdag.docketing@doj.ca.gov<br><br>  X   Served Electronically<br>___ Served by Mail<br><br>Orange County District Attorney's Office<br>Appellate@da.ocgov.com<br>Matthew Vernon Lockhart<br>Deputy District Attorney<br>matt.lockhart@ocdapa.org<br><br>  X   Served Electronically<br>___ Served by Mail | Eservice-court@adisandiego.com<br>Appellate Defenders, Inc.<br>555 West Beech Street, Suite 300<br>San Diego, CA 92101<br>__X_ Served Electronically<br>__ Served by Mail<br><br><br>Kyle J Whitesides, #AR1462<br>Mule Creek State Prison<br>PO Box 409099<br>Ione, CA 95640<br>_X_ Served by Mail |

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 24, 2024, Davis, California.

                               /s/ Kendall Dawson Wasley
                               Kendall Dawson Wasley
                               DECLARANT, SBN 252294

450

No. G061663

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT, DIVISION THREE

———————————

KYLE WHITESIDES,

*Petitioner,*

v.

THE SUPERIOR COURT OF ORANGE COUNTY,

*Respondent;*

THE PEOPLE OF THE STATE OF CALIFORNIA,

*Real Party in Interest.*

———————————

Orange County Superior Court, Case No. 10NF0718
The Honorable Kathleen E. O'Leary, Judge

———————————

**NONSTATUTORY MOTION TO RECONSIDER
AUGUST 28, 2024 ORDER**

———————————

ROB BONTA (SBN 202668)
*Attorney General of California*
SARA J. ROMANO (SBN 227467)
*Senior Assistant Attorney General*
*AMANDA J. MURRAY (SBN 223829)
*Supervising Deputy Attorney General*
600 West Broadway, Suite 1800
San Diego, CA 92101
P.O. Box 85266
San Diego, CA 92186-5266
Telephone: (619) 738-9084
Fax: (619) 645-2044
Amanda.Murray@doj.ca.gov
*Attorneys for Third Party California
Department of Corrections and
Rehabilitation*

September 18, 2024

*ocument received by the CA 4th District Court of Appeal Division 3.*

451

TO THE HONORABLE PRESIDING AND ASSOCIATE JUSTICES OF THE CALIFORNIA COURT OF APPEAL, FOURTH APPELLATE DISTRICT, DIVISION THREE:

Under California Rules of Court, rule 8.54, third party California Department of Corrections and Rehabilitation respectfully requests this Court reconsider and modify its August 28, 2024 order requiring, among other things, that Mule Creek State Prison facilitate Kyle Whitesides's viewing of post-conviction audio and video discovery provided by the district attorney on a flash drive.  Unfortunately, that flash drive is not a viable option here.  The prison's ability to accommodate third-party flash drives on *Olson* and CDCR computers is strictly limited, burdensome, and poses serious safety and security concerns.  To expedite this litigation, however, counsel's office transferred the discovery from the flash drive to a DVD that was sent to the prison's litigation coordinator and that Whitesides viewed on an *Olson* computer on September 13, 2024. Accordingly, CDCR respectfully requests this Court reconsider and modify its August order to reflect that CDCR allowed Whitesides to view the discovery via DVD, which has already happened.[1]

---

[1] CDCR is not a party to this litigation.  (See Ct.App. Dock. [identifying parties and attorneys].)  Rather, Whitesides filed a petition for writ of mandate seeking to compel the Orange County District Attorney's office to comply with a superior court order to provide him with post-conviction discovery as required under Penal Code section 1054.9, subdivision (a).  This Court asked for CDCR's input because Whitesides is in CDCR's custody.

This motion is supported by the attached memorandum of authorities, declarations, and exhibit.

Respectfully submitted,

ROB BONTA
  *Attorney General of California*
SARA J. ROMANO
  *Senior Assistant Attorney General*

*/S/ AMANDA J. MURRAY*
AMANDA J. MURRAY
  Supervising Deputy Attorney General

*Attorneys for Third Party*
*California Department of Corrections*
*and Rehabilitation*

September 18, 2024

ocument received by the CA 4th District Court of Appeal Division 3.

453

## MEMORANDUM OF POINTS AND AUTHORITIES

## ARGUMENT

This Court has inherent authority to reconsider and modify its August 24, 2024 order. (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1107.) This inherent authority, which is derived from the California Constitution, article VI, section 1, and not dependent on any statute, allows courts to carry out their duties and ensure the orderly administration of justice. (*People v. Castello* (1998) 65 Cal.App.4th 1242, 1247-1248.) A court, on its own motion, or based on a party's request, may exercise its inherent authority to reconsider "its prior interim orders so that it may correct its own errors." (*Le Francois v. Goel*, at p. 1107; see also *Castello*, p. 1249 ["a court could not operate successfully under the requirement of infallibility in its interim rulings"].)

Here, the court should exercise its inherent authority and reconsider and modify its order because CDCR's use of third-party flash drives—including the one provided by the district attorney—is strictly limited, burdensome, and poses safety and security concerns. (Exh. A, Decl. of Z. Duvall at ¶4.)[2] The prison's *Olson* and CDCR computers have encrypted flash drive capabilities, but their use is primarily limited to CDCR or Board

_____

[2] In CDCR's March 3, 2023 letter to this Court, CDCR advised that it might be able to accommodate Whitesides's viewing of the audio / video discovery files on an *Olson* computer via CD or DVD in the future, but made no mention of flash drives. (Exh. B at ¶2.) It is unclear why the court ordered the district attorney to provide the discovery in that format or that CDCR use the flash drive to show Whitesides the discovery. (*Ibid.*)

ocument received by the CA 4th District Court of Appeal Division 3.

of Parole Hearings-owned encrypted flash drives for internal use.[3] (*Id.* at ¶6.) For example, when an incarcerated person conducts their *Olson* review (*In re Olson* (1974) 37 Cal.App.3d 783, 790-791), CDCR staff working at the Board's desk places the person's central file on a flash drive, which is encrypted by a password only known to prison staff. (*Ibid.*) Staff then inserts the encrypted / password protected flash drive into the *Olson* laptop (a laptop that is not connected to CDCR's network), which allows the incarcerated person to independently review it.[4] (*Ibid.*) The incarcerated person is not allowed to have the flash drive, which is prohibited by regulation (Cal. Code Reg., tit. 15, § 3006, subd. (c)(20); see also Dept. Operations Manual, § 49020.18.3), and cannot otherwise access the flash drive because it is protected by a password only known to prison staff (exh. A at ¶6).

Additionally, the prison will not transfer data from third party flash drives, CDs, DVDs, or other electronic media to CDCR or Board-owned encrypted flash drives for use on an *Olson* or CDCR computer. (Exh. A at ¶7.) These transfers unnecessarily expose CDCR to liability for human error, accusations about manipulating data, and allegations that staff failed to provide all material from the original source. (*Ibid.*) Accordingly, the

---

[3] These flash drives are limited in number and often re-used. (Exh. A at ¶6.)

[4] *Olson* computers, which are owned by the Board, are not connected to CDCR's network and is one of the security controls implemented so that incarcerated persons can use them. (Exh. A at ¶5.)

ocument received by the CA 4th District Court of Appeal Division 3.

prison's use of flash drives is generally limited, with one exception below. (*Ibid.*)

CDCR has a rarely used workaround for using third party flash drives, but it is burdensome and raises institutional safety and security concerns. (Exh. A at ¶8.) The workaround, called whitelisting, allows prison staff to seek approval from CDCR headquarters so that a flash drive may be used on any *Olson* or CDCR computer without restriction in perpetuity. (*Ibid.*) This type of flash drive is particularly concerning in the institutional environment because if an incarcerated person has access to it, they would be able to use it without restriction and possibly for nefarious purposes, including on CDCR's network-connected computers. (*Ibid.*) For example, prison staff have found incarcerated persons with flash drives containing drug or gambling debt lists, escape plans, and pornography. (*Ibid.*)

To avoid these issues and to expedite the case's resolution, counsel's office transferred the flash drive files to a DVD and sent a copy to the prison's litigation coordinator (as well as the district attorney and Whitesides's appellate counsel) to see if the DVD would work with an *Olson* computer. (Exh. B at ¶3.) Fortunately, the litigation coordinator found the only remaining *Olson* computer at the prison that had a DVD option and that was compatible with the DVD. (*Ibid.*) The prison then allowed Whitesides to view the DVD on September 13, 2024 for

ocument received by the CA 4th District Court of Appeal Division 3.

approximately two hours and twenty minutes.[5]  (*Id.* at ¶ 4; Exh. C, Documentation of Viewed Discovery.)  Accordingly CDCR respectfully asks the court to reconsider and modify its order to reflect that CDCR allowed Whitesides to view the discovery via DVD.

---

[5] Prison staff was unaware this *Olson* laptop would be compatible with DVDs until the litigation coordinator tried it. (Exh. B at ¶ 3.)  Staff also advised the computer no longer receives CDCR updates because it is old and that the prison has newer, updated computers.  (*Ibid.*)  Thus, while the computer worked in this instance, it may not be available for future use; that is, the prison will dispose of the laptop once it stops working. (*Ibid.*)

Moreover, although the court's order only contemplates Whitesides viewing the discovery once (order at p. 2), if future viewings are contemplated, CDCR agrees with Whitesides's counsel's suggestion that the superior court or Court of Appeal appoint Whitesides an investigator (or counsel) if appropriate (reply to return at pp. 12-14).

ocument received by the CA 4th District Court of Appeal Division 3.

## CONCLUSION

CDCR respectfully asks the court to reconsider and modify its August order.

Respectfully submitted,

ROB BONTA
    *Attorney General of California*
SARA J. ROMANO
    *Senior Assistant Attorney General*


/S/ *AMANDA J. MURRAY*
AMANDA J. MURRAY
    Supervising Deputy Attorney
    General

*Attorneys for Third Party*
*California Department of Corrections*
*and Rehabilitation*


September 18, 2024

AJM:odc
SD2023300721
84740962.docx

ocument received by the CA 4th District Court of Appeal Division 3.

# EXHIBIT
# COVER PAGE



19 F 1-2

### Exhibit

F1:
Description of exhibit _Communications from Atty Wasley_
_about Witness' Criminal Background Not Being "Relevant" and_
_Redacted "Request for Judicial Notice"   (pgs 1-18)_
_F2: "Petition For Writ of Mandate" (11/3/21) (19-23)_

Number of pages to this exhibit  23

LAW OFFICE OF
# KENDALL DAWSON WASLEY

1520 E. Covell Blvd., #B5-233
Davis, CA 95616

(408)827-5024
kendall@dawsonwasleylaw.com

November 18, 2023

### Confidential Attorney-Client Communication

*Sent Via USPS*

Kyle J. Whitesides, CDCR# AR1462
Mule Creek State Prison
PO Box 409099
Ione, CA 95640

Re:    Petition for Writ of Mandate
       Case# G061663

Dear Mr. Whitesides:

I received your two GettingOut.com messages sent on November 15, 2023(12:50pm and 1:47pm.) Please know that I now seldom check gettingout.com, and request that you communicate with my office via letter or phone call. I am not currently communicating with the Orange County District Attorney's office. I did communicate via telephone with David Phillips on November 13, 2023

As for legal mail, I cannot send you materials provided to me by third parties. Mr. Thompson was not hired by my office, and I cannot send you materials I received from his office via the legal mail system, and I am not sending materials from a third party via the regular mail system.

As for using the "Background Investigation" report in your pending Court of Appeal writ, this is not information verified by my office and I do not see it as beneficial or relevant to the narrow legal issue in the writ petition. I reviewed this issue with a staff attorney at Alternate Defenders, Inc., and she agreed.

Once I receive information or an order from the Court of Appeal, I will mail you a copy and an update letter.

Sincerely,

KENDALL DAWSON WASLEY

LAW OFFICE OF

1520 E. Covell Blvd., #B5-233          **KENDALL DAWSON WASLEY**          (408)827-5024
Davis, CA 95616                                                        kendall@dawsonwasleylaw.com

December 15, 2023

**Confidential Attorney-Client Communication**

*Sent Via USPS Priority Mail*

Kyle J. Whitesides, CDCR# AR1462
Mule Creek State Prison
PO Box 409099
Ione, CA 95640

Re:    Petition for Writ of Mandate
       Case# G061663
       Your Request for Judicial Notice

Dear Mr. Whitesides:

I received your November 28, 2023 letter. The Court of Appeal did not file your Request for Judicial Notice; the original was mailed to my office. When you are represented by counsel, the Court of Appeal will not accept filings directly from the petitioner. In an effort to have your request for judicial notice filed, I submitted, via TrueFiling the enclosed letter, with your request attached.

As for your request for "for a complete copy of the corrected transcripts." I have one copy of transcripts, provided by the District Attorney's office. I mailed you a complete set of those transcripts on June 12, 2023, and it was confirmed delivered to the Mule Creek State Prison on June 13, 2023. The errors and/or omissions in the transcripts that are referenced in the September 2023, filing are not reflected in a transcript, those references are based off me listening to the recordings and reviewing the transcripts. I have no "corrected transcripts."

Please do not take my silence to your claims against me in your Request for Judicial Notice and in your November 28, 2023 letter as an admission or agreement. I submitted your Request for Judicial Notice to the Court of Appeal as a courtesy to you as you feel strongly about it.

Sincerely,

*Kendall Wasley*

KENDALL DAWSON WASLEY



LAW OFFICE OF
### KENDALL DAWSON WASLEY

1520 E. Covell Blvd., #B5-233
Davis, CA 95616

(408)827-5024
kendall@dawsonwasleylaw.com

December 15, 2023

*Sent Via TrueFiling*

The Honorable Janet Adriana Gamboa
Assistant Clerk Administrator
Fourth Appellate District, Division Three
601 W. Santa Ana Blvd.
Santa Ana, California 92701

Re:    *Whitesides v. The Superior Court of Orange County*
Superior Court No. 10NF0718
Court of Appeal Case No. G061663

Dear Clerk Administrator Gamboa:

It is respectfully requested that petitioner's redacted[1] Request for Judicial Notice, attached hereto, be filed; this was originally sent directly to the Court of Appeal from petitioner, and undersigned counsel received it from the Court. As reflected in the attached Request for Judicial Notice, petitioner believes there is a criminal history of a witness, which was not produced consistent with the May 4, 2022 Superior Court discovery order. As put forth in the Traverse and Petitioner's September 21, 2023, filing (in response to this Court's July order), petitioner filed this writ petition after a lack of compliance with the Superior Court's May 4, 2022 discovery order. Real Party has not established that all discovery items have been produced or are not in the possession of Real Party or law enforcement.

Petitioner respectfully requests this Court grant this writ and remand the matter to the Superior Court with directions to hold a hearing on the compliance with the Superior Court's May 4, 2022 discovery order.

Sincerely,

KENDALL DAWSON WASLEY
SBN252294

---

[1] Name and identifying information have been redacted as marked by the black boxes.

462

Page 2 of 2
*Whitesides v. The Superior Court of Orange County*
Superior Court No. 10NF0718
Court of Appeal Case No. G061663



<div style="text-align:center">

*Whitesides v. Superior Court*          Case No.: G061663

**ATTORNEY'S CERTIFICATE OF ELECTRONIC SERVICE**

**AND SERVICE BY MAIL**

</div>

(Code Civ. Proc., § 1013a, subd. (2); Cal. Rules of Court, rules 8.71(f) and 8.77)

I, Kendall Dawson Wasley, certify:

I am an active member of the State Bar of California and am not a party to this cause. My electronic service address is kendall@dawsonwasleylaw.com and my business address is 1520 E. Covell Blvd., #B5-233, Davis, CA, 95616. On December 15, 2023, I served the persons and/or entities listed below by the method checked. For those marked "Served Electronically," I transmitted a PDF version of the DECEMBER 15, 2023 LETTER by TrueFiling electronic service to the e-mail service address(es) provided below. For those marked "Served by Mail," I deposited in a mailbox regularly maintained by the United States Postal Service at Davis, CA, a copy of the above document in a sealed envelope with postage fully prepaid, addressed as provided below.

| | |
|---|---|
| Office of the Attorney General<br>sdag.docketing@doj.ca.gov<br><br>_X_ Served Electronically<br>_ Served by Mail<br><br>**Orange County District Attorney's Office**<br>Appellate@da.ocgov.com<br>George Turner,<br>Deputy District Attorney<br>George.Turner@ocdapa.org<br><br><br>_X_ Served Electronically<br>_ Served by Mail | *Eservice-court@adi-sandiego.com*<br>Appellate Defenders, Inc.<br>555 West Beech Street, Suite 300<br>San Diego, CA 92101<br>_X_ Served Electronically<br>_ Served by Mail<br><br>Kyle J Whitesides, #AR1462<br>Mule Creek State Prison<br>PO Box 409099<br>Ione, CA 95640<br>_X_ Served by Mail |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on December 15, 2023, Davis, California.

_Kufas Wasly_
Kendall Dawson Wasley

Kyle Whitesides AR1462
Po Box 409090
Ione, CA      95640
       In pro per



       California Court of Appeals
        Fourth Appellate District

Kyle Whitesides,              )      No. G0601663
        Petitioner,           )
                              )
   V.                         )      Request for Judicial Notice
                              )      (Pursuant to Evid. Code 452)
                              )
                              )

To the Court,
       Petitioner Whitesides respectfully requests the Court to take
Judicial Notice of the attached printout of paid Private
Investigator's Report showing the criminal background
of alleged victim K▮▮▮▮▮▮▮ M▮▮▮▮▮▮▮ gathered from
the Orange County Superior Courts records by Private
Investigator Matthew Thompson License #24051,
see exhibit pages (1-3). P.I. Thompson mailed petitioner
a copy of the report at Mule Creek State Prison where
it was confiscated by prison staff OSS II Gibbs,
stating a persons criminal background is not, "public
information". Pending the release of that document by
CDCR petitioner requested P.I. Thompson forward the
report/evidence to court appointed attorney Kendall
Wasley. As per the Court's order in this case #.G0601663,
criminal backgrounds of trial witnesses is one of the
listed items of outstanding Post-Conviction discovery items
the OCDA was ordered to turn over to petitioner. The
OCDA's office previously claimed that there were,

"no criminal convictions pertaining to trial witnesses", (please see exhibit pages 5-6). Upon receiving the P.I.'s Report Attorney Wasley sent the Petitioner the enclosed letter, (see exhibit page 4), stating she would not forward it to her client (petitioner), nor was it "relevant" to the ongoing case. Leaving petitioner to hope that since counsel has discharged her responsibility to inform the Court, the Court would graciously accept the information and provide petitioner with all of Orange County's records concerning these cases as well as the rest of the outstanding discovery. As can be seen clearly in this cases records the OCDA claimed all outstanding discovery was in only electronic format, this is clearly not true. Petitioner has again requested Attorney Wasley relinquish petitioner's newly discovered evidence as seen in (exhibit pages 10-11).

Petitioner requests also, that the court take Judicial Notice of all exhibits including petitioner's 11/28 letter to Wasley (ex.pgs. 10-11), spelling out her duties of care under Rule 1.3 and 1.4 of the State Bar.

Petitioner verifies under penalty of perjury that the attached letters and exhibits are received from noted parties and as written by Petitioner in the case of his 11/28 letter and clarified P.I. Report.

Petitioner declares the foregoing is true and correct.

Dated: 11/29/23

Respectfully Submitted,

Kyle Whitesides
Petitioner Pro Per

465

Exhibit A : Pages 1-11



Pg 1 ) Transmission Copy of Private Investigator's Report

Pg 2-3) Clarified / Handwritten Copy of Report

Pg 4 ) Letter dated 11/18/23 from Attorney Wasley

Pg 5-6) Letter dated 8/30/22 from OCDA

Pg 7-9 ) Court order for Case #G0616663

Pg 10-11 ) Letter from Petitioner to Atty Wasley dated 11/28/23

# EXHIBIT _____A_____

466

| Print Requester | Booking # | Request Date | Requested Ink | Room | Location |
|---|---|---|---|---|---|
| KYLE WHITESIDES | AR1462 | 10/29/23 06:28 PDT | Black/White | E-19 | MCSP,Facility E,E 019B2-202004L |

From: David Phillips on 10/28/23 14:10 PDT



SACRAMENTO, CA 95603
CA PH 24031

**BACKGROUND INVESTIGATION**

A ███████ ████ background investigation was conducted on ██ ████ ███████. The results of the background investigation were as follows:

**RIVERSIDE COUNTY**

_Criminal Division_

No criminal cases were found for K███████ ███ in Riverside County.

_Civil Division_

No civil cases were found for K███████ ███ Riverside County.

**ORANGE COUNTY**

_Criminal Division_

The following 3 criminal cases were found for ██████████ in Orange County.

Case Name: People vs K██████ ███████
Case #: ███████
Filing date: ████ 2003
Case type: K█████████████ was charged with an infraction.
Orange County Superior Court was unable to provide any other information regarding this case.

Case Name: People vs K██████ ███████
Case #: ███████
Filing date: ████ ████
Case type: K█████████████ was charged with a misdemeanor.
Orange County Superior Court was unable to provide any other information regarding this case.

Case Name: People vs K██████ ███████
Case #: ███████
Filing date: ████ 2008
Case type: K█████████████ was charged with a misdemeanor.
Orange County Superior Court was unable to provide any other information regarding this case.

_Civil Division_

The following 1 civil case was found for K███████ ██ in Orange County.

Case Name: Pacifica National Guarantee vs ████████ ███████
Case #: ███████
Filing date: ████ ████
Case type: Unlawful detainer/Eviction
Orange County Superior Court was unable to provide any other details regarding this case.

**COLE COUNTY (Missouri)**

_Criminal Division_

No criminal cases were found for K███████ ███ in Cole County.

_Civil Division_

No civil cases were found for K███████ ███ in Cole County.

End of report

467



M.W. Thompson Investigation Services

1500 W. El Camino Avenue, Ste.# 382

Sacramento, CA   95833

CA. P.I.# 24051

## BACKGROUND INVESTIGATION

A criminal and civil background investigation was conducted on K███ M███. The results of the background investigation were as follows:

### RIVERSIDE COUNTY

#### Criminal Division

No criminal cases were found for K███ M███ in Riverside County.

#### Civil Division

No civil cases were found for K███ M███ in Riverside County.

### ORANGE COUNTY

#### Criminal Division

The following 3 criminal cases were found for K███ M███ in Orange County.

Case Name: People vs K███ M███
Case #:
Filing Date: 2003
Case Type: K███ M███ was charged with an infraction.
Orange County Superior Court was unable to provide any other information regarding this case.

Case Name: People vs K███ M███
Case #:
Filing Date: 1999
Case Type: K███ M███ was charged with a misdemeanor.
Orange County Superior Court was unable to provide any other information regarding this case.

Case Name: People vs K███ M███
Case #:
Filing Date: 1998
Case Type: K███ M███ was charged with a misdemeanor.
Orange County Superior Court was unable to provide any other information regarding this case.

<u>Civil Division</u>

The Following 1 Civil case was found for K████ M████ in Orange County:

Case Name: Western National Securities vs K████ M████
Case #: ████████
Filing Date: ████/2008
Case Type: Unlawful Detainer / Eviction

Orange County Superior Court was unable to provide any other details regarding this case.

Cole County (Missouri) ...

LAW OFFICE OF
**KENDALL DAWSON WASLEY**

1520 E. Covell Blvd., #B5-233
Davis, CA 95616

(408)827-5024
kendall@dawsonwasleylaw.com

November 18, 2023

### Confidential Attorney-Client Communication

Kyle J. Whitesides, CDCR# AR1462
Mule Creek State Prison
PO Box 409099
Ione, CA 95640

*Sent Via USPS*

Re:    Petition for Writ of Mandate
       Case# G061663

Dear Mr. Whitesides:

I received your two GettingOut.com messages sent on November 15, 2023(12:50pm and 1:47pm.) Please know that I now seldom check gettingout.com, and request that you communicate with my office via letter or phone call. I am not currently communicating with the Orange County District Attorney's office. I did communicate via telephone with David Phillips on November 13, 2023

As for legal mail, I cannot send you materials provided to me by third parties. Mr. Thompson was not hired by my office, and I cannot send you materials I received from his office via the legal mail system, and I am not sending materials from a third party via the regular mail system.

As for using the "Background Investigation" report in your pending Court of Appeal writ, this is not information verified by my office and I do not see it as beneficial or relevant to the narrow legal issue in the writ petition. I reviewed this issue with a staff attorney at Alternate Defenders, Inc., and she agreed.

Once I receive information or an order from the Court of Appeal, I will mail you a copy and an update letter.

Sincerely,

KENDALL DAWSON WASLEY



OFFICE OF THE

# DISTRICT ATTORNEY

ORANGE COUNTY, CALIFORNIA

TODD SPITZER



August 30, 2022

Kyle Whitesides, CDCR #AR-1462
Mule Creek State Prison
4001 Highway 104
Ione, California 95640

RE: Your request for judicial notice in *People v. Whitesides*, Orange County Sup. Ct Case No. 10NF0718

Mr. Whitesides:

The Office of the District Attorney of Orange County (OCDA) is in receipt of your letter dated August 18, 2022, requesting the superior court take judicial notice of our letter to you dated August 9, 2022. Your request for judicial notice is not authorized by Evidence Code sections 451 and 452, nevertheless, your concerns are addressed as follows.

In your letter, you complain to the court that you have not received the following from OCDA:

1) Handwritten notes from field investigators;
2) Criminal backgrounds;
3) False reports made by Kim M.;
4) Discovery on witnesses Baber, Burke, and Higgason; and
5) Transcripts of the recorded interviews of the witnesses

As to each request, be advised:

1) There are no handwritten notes by investigators from Anaheim Police Department;
2) There are no criminal convictions pertaining to trial witnesses;
3) There are no false reports made by Kim M;
4) All discovery relating to witnesses Baber, Burke, and Higgason are including in the reports sent to you previously. All information relating to Baber and Burke is found in Bates stamped pages 1-21. All information relating to Higgason is found in Bates stamped pages 22-41.
5) There are no transcripts of witness interviews, nor of the interview the police conducted with you.

REPLY TO: ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE                    WEB PAGE: http://orangecountyda.org/

☒ MAIN OFFICE      ☐ NORTH OFFICE       ☐ WEST OFFICE         ☐ HARBOR OFFICE        ☐ JUVENILE OFFICE       ☐ CENTRAL OFFICE
300 N. FLOWER ST   1275 N. BERKELEY AVE  8141 13TH STREET      4801 JAMBOREE RD       341 CITY DRIVE SOUTH    300 N. FLOWER ST
SANTA ANA, CA 92703 FULLERTON, CA 92632  WESTMINSTER, CA 92683 NEWPORT BEACH, CA 92660 ORANGE, CA 92808      SANTA ANA, CA 92703
P.O. BOX 808 (92702) (714) 773-4480      (714) 899-7261        (949) 476-4650          (714) 935-7624          P.O. BOX 808 (92702)
(714) 834-3600                                                                                                 (714) 834-3952


471

You should also be advised that while the court ordered the production of transcripts of the interviews of the witnesses and you pursuant to Penal Code section 1054.9, such order is predicated on two things: 1) That such transcripts are in OCDA's possession; and 2) That you would have been entitled to them at the time of trial. (See Penal Code section 1054.9, subdivision (c).)

Transcripts of interviews are required to be prepared and given to the opposing party only if a party seeks to enter the recordings of the interviews into evidence. (See California Rules of Court, rule no. 2.1040, subdivision (b).) As you know, no electronic recordings were introduced into evidence at any hearing prior to or during your trial. As such, you were not and are not entitled to a transcription of any of the interviews, whether or not OCDA is in possession of them, as section 1054.9(c) only authorizes you to obtain evidence you would have been entitled to at time of trial.

While you were not entitled to possession of transcriptions at time of trial, since you cannot now possess electronic media in prison, had OCDA transcribed the interviews, as a matter of comity, we would provide the transcriptions to you. However, OCDA has not ever transcribed them and we are under no obligation now to do so on your behalf.

As stated in the previous letter to you, should you hire an attorney or other representative, OCDA can provide the recordings to that person on your behalf.

Sincerely,

/s/ *Matthew Lockhart*

Matthew Lockhart
Senior Deputy District Attorney
Writs & Appeals Unit
Office of the District Attorney of Orange County

Court of Appeal, Fourth Appellate District, Division Three
Brandon L. Henson, Clerk/Executive Officer
Electronically FILED on 7/13/2023 by Alex Reynoso, Deputy Clerk



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

KYLE WHITESIDES,

    Petitioner,

      v.

THE SUPERIOR COURT OF ORANGE
COUNTY,

    Respondent;

THE PEOPLE OF THE STATE OF
CALIFORNIA,

    Real Party in Interest.

G061663

(Super. Ct. No. 10NF0718)

O R D E R

       On August 5, 2022, petitioner filed a petition for a writ of mandate seeking an order directing real party, the Orange County District Attorney's Office, to comply with the order filed by respondent court on May 4, 2022, granting petitioner's motion for postjudgment discovery pursuant to Penal Code section 1054.9. After ordering real party to file informal opposition, real party advised this court that it complied with the order of respondent court, but that discovery in the format of four CDs and two DVDs (hereinafter referred to as electronic discovery) had been rejected and returned by Mule Creek State Prison, the institution where petitioner is incarcerated.

       In February 2023 this court ordered the Attorney General to file an informal letter that offered solutions that provided for the transmission of court-ordered electronic discovery to an institutional setting. In response to this court's order, the Attorney General filed a letter stating Mule Creek State Prison does not currently have the

capability to allow petitioner to view the electronic discovery in its current format, but technological updates in the near future may resolve the issue if discovery is provided in a format other than CDs and DVDs.

On March 13, 2023, this court filed an order to show cause before this court why relief should not be granted based on real party's failure to comply with respondent court's order to transmit postjudgment discovery to petitioner at Mule Creek State Prison. This court also appointed counsel to represent petitioner in this proceeding and invited counsel to file any additional supplemental petitions, documents, or declarations that counsel deemed appropriate.

In April 2023 counsel filed a "Supplemental Request and Argument" and a declaration by counsel which requests that an investigator be appointed to receive the CDs and DVDs and play the recordings for petitioner at Mule Creek State Prison.

In May 2023 real party filed a return to the petition which states that real party transmitted the electronic discovery to appointed counsel with a letter suggesting that counsel seek court funding to prepare transcripts of the electronic discovery to facilitate petitioner's access to the discovery ordered by respondent court. The return also states that counsel returned the electronic discovery to real party. According to the return, real party "independently prepared transcripts that accurately and fully reflect the content of the outstanding electronic discovery items" and transmitted a copy of the transcripts to counsel.

This court is considering vacating the order to show cause filed on March 13, 2023, on the basis the issue is moot. No later than 10 days from the date of this order real party is ordered to transmit to counsel the electronic discovery that counsel returned to real party in April 2023. Counsel is ordered to review the electronic discovery and the transcripts of the electronic discovery transmitted to counsel in May 2023, and advise this court in writing no later than 70 days from the date of this order whether there are any substantive errors, omissions, misrepresentations, or discrepancies in the transcripts of the electronic discovery prepared by real party. Any errors, omissions, misrepresentations, or discrepancies identified by counsel shall include the time stamp of the electronic discovery and the corresponding page number in the transcript.

Real party is further ordered to transmit the electronic discovery in the format of a flash drive to the deputy appearing on behalf of the Attorney General's Office in this







case. In the event that discovery in the format of a flash drive becomes an acceptable and accessible format of discovery once the California Department of Corrections and Rehabilitations installs the software in the "recently obtained new inmate-approved laptops" commonly referred to as *Olson* computers identified in the letter from the Attorney General, the Attorney General is ordered to transmit the flash drive to the litigation coordinator at Mule Creek State Prison.

Oral argument scheduled for August 21, 2023, is VACATED.

Petitioner's request for judicial notice of the record in superior court case number 10NF0718 generated after July 2021 is GRANTED. (Evid. Code, §§ 452, 459.) Any further requests for judicial notice shall comply with rule 8.252 of the California Rules of Court, and shall be filed as a "separate motion" with the matter or matters to be noticed attached to the motion. (Cal. Rules of Court, rule 8.252(a)(1), (3).)

O'Leary, P.J.
_____
O'LEARY, P. J.

475

November 28, 2023

COPY 10

Kyle Whitesides
PO Box 409090
Ione, CA 95640

Dear Ms. Wesley,

    My objective as your client is to obtain discovery relevant to my case, and the alleged victim's criminal history as compiled by the licensed investigator is public information to which I would have been entitled to at trial under PC 1054.1 and now 1054.9, the latter being the subject of your representation. Rule 1.3 of the State Bar requires that an attorney act with diligence, commitment, and dedication to the interests of the client. And Rule 1.4 of the State Bar requires compliance with a client's reasonable request for information and documents to accomplish the client's objectives insofar as any assistance is not contrary to law or regulations.

    Here, my objective of obtaining the legitimate investigative document(s) in question requires your exercise of diligence, commitment, and dedication to my interests and objectives as set out above. And such assistance by you would not contravene any known law, rule, or regulations. These are not contrabands insofar as "contraband" is limited to physical matter in order to give effect to statutory provision for confidentiality of attorney mail (In re Jordan (1972) 7 Cal.3d 575).

    Please kindly remit to me the documents the investigator sent you regardless of whether you believe they will make any difference in my habeas case, for which I am prosecuting on my own. These are Brady material favorable to me, suppressed by the state, and is material as they are information that could have been used to impeach the trial witness's credibility or would have affected the defense's investigation had they been known, thereby satisfying all three prongs of Brady as it relates to the gist of this case where there was no forensic evidence other than the accuser's testimony, which could have been impeached had this and other Brady material been turned over. Please don't be a part of the state's blockade of information that I, your client, is legally entitled.

2

Also, please provide me a complete copy of the corrected transcripts of all interviews ASAP.

Sincerely yours,

Kyle Whitesides    11/28/23

Kyle Whitesides
PO Box 409090
Ione, CA 95640

    In Pro Per


FOURTH DISTRICT COURT OF APPEAL

DIVISION THREE

STATE OF CALIFORNIA


| | | |
|---|---|---|
| Kyle Whitesides, | ) | No. |
|        Petitioner, | ) | |
|   v. | ) | PETITION FOR WRIT OF MANDATE |
| Superior Court of Orange County, | ) | |
|        Respondent. | ) | |
| | ) | |


Petitioner alleges:

    1. On or about 7/7/2021 Petitioner Whitesides filed a PC 1054.9 motion with Respondent Superior Court who entered a minute order on 8/10/21 requesting the Orange County District Attorney to file a response in 30 days. When the D.A. failed to file a response, Petitioner filed a Notice and Request for Ruling asking the trial court to grant judgment in Petitioner's favor and order the D.A. to turn over the requested discovery. The Notice and Request for Ruling was filed on or about  9/25/21 . The trial court, i.e., Respondent Superior Court, did not and has not responded to date.

    2. Petitioner is a beneficially interested party in that PC 1054.9 entitles Petitioner to the discovery requested as set out in the attached copy of that 1054.9 motion.

    3. Respondent court has the duty under the law to order the requested discovery and failed to do so despite request by Petitioner.

4. Petitioner has no other plain, speedy, and adequate remedy under the law.

WHEREFORE, Petitioner requests the Court to order Respondent superior court by writ of mandate or by alternative writ to effect Respondent's duty under the law and to grant any other adequate remedy the Court deems proper.


VERIFICATION


I, Kyle Whitesides, declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief. Executed on the date below in Amador County, California.


DATE: 11/3/21                          By: _____

                                       Kyle Whitesides
                                       In pro per

INDEX OF EXHIBITS

| No. | Description | # of pages |
|-----|-------------|------------|
| 1 | PC 1054.9 Motion | 38 pages |
| 2 | Minute Order | 1 page |

480

PROOF OF SERVICE

I, Kyle Whitesides, prisoner petitioner pro per in the attached Petition for Writ of Mandate, declare under penalty of perjury that on the date below I personally effected the mailing of a true copy each of the mandate petition attached with postage fully paid and separately mailed them as follows:

Orange County Superior Court (Respondent)
700 Civic Center Drive West
Santa Ana, CA
92702

Orange County District Attorney (Real Party of Interest)
401 Civic Center Drive West
Santa Ana, CA
92701

Executed on the date below in Amador County, California.

DATE: 11/3/21                    By: Kyle Whitesides

Kyle Whitesides

481

CERTIFICATE OF INTERESTED PARTY

I, Kyle Whitesides, Petitioner in the attached cause of action, hereby certify
that the following party is a real party of interest:

> Orange County District Attorney
> 300 N. Flower Street
> Santa Ana, CA 92703

Exectued under penalty of perjury on the date below in Amador County, California.

DATE:  11/3/21                                   By: _____

                                                     Kyle Whitesides

482

# EXHIBIT COVER PAGE

19  F  1-2

### Exhibit

Description of exhibit ① Letter from Atty Wasley
dated 12/3/24 /// ② Court of Appeals Nov. 27
2024 Order, Vacating OSC

Number of pages to this exhibit    2 pgs

483

1520 E. Covell Blvd., #B5-233
Davis, CA 95616

**KENDALL DAWSON WASLEY**
Attorney at Law

(408)827-5024
kendall@dawsonwasleylaw.com

December 3, 2024

**Confidential Attorney-Client Communication**

Kyle J. Whitesides, #AR1462
Mule Creek State Prison
PO Box 409099
Ione, CA 95640

Re:    Petition for Writ of Mandate – End of Case
       Case# G061663

Dear Mr. Whitesides:

Enclosed is the Court of Appeal's November 27, 2024 order vacating its Order to Show Cause, and dismissing the petition for writ of mandate as moot. The Court of Appeal also ordered the "matter remanded for further proceedings in the superior court to resolve any remaining postjudgment discovery issues." This remand to the Superior Court allows you to further litigate the issues that you believe need to be litigated, such as those you referenced in the request for judicial notice.

Based on the Court of Appeal granting you access to the electronic recordings and remanding the matter to the Superior Court "to resolve any remaining post judgment discovery issues" I do not see a viable petition for review in the Supreme Court, and therefore will not be filing a petition for review. If you see things differently, you can file a petition for review in the California Supreme Court.

The petition for review must be filed 10 days after the Court of Appeal decision came final, and the dismissal order became final the day it was issued, November 27, 2024. (See Cal. Rules of Court, rule 8.366.) Therefore, the deadline to file the Petition for Review in the California Supreme Court is Monday December 9, 2024. (The 10th day is Saturday December 7, so the deadline moves to the next court day, Monday December 9, 2024.). Enclosed are some general instructions for preparing a petition for review; these instructions are for regular opinions, so not all information may apply, but I thought some of the information may be helpful if you decide you want to proceed forward. Because the order was final when issued, the petition must be filed ten days later.

When the matter is remanded to the superior court, I would recommend that you request the matter to be set for a status conference, and you be allowed to appear via telephone or video conference (zoom). I do not know if Orange County allows telephone or video conference appearances, but most courts do allow such appearances. Good luck!

Sincerely,

KENDALL DAWSON WASLEY

484

Court of Appeal, Fourth Appellate District, Division Three
Brandon L. Henson, Clerk/Executive Officer
Electronically FILED on 11/27/2024 by M. Castaneda, Deputy Clerk

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KYLE WHITESIDES, | |
| Petitioner, | |
| v. | G061663 |
| THE SUPERIOR COURT OF ORANGE COUNTY, | (Super. Ct. No. 10NF0718) |
| Respondent; | O R D E R |
| THE PEOPLE OF THE STATE OF CALIFORNIA, | |
| Real Party in Interest. | |

THE COURT:*

    The order to show cause issued on March 13, 2023, is VACATED. Inasmuch as counsel has filed a "Statement of Compliance" stating that "petitioner has been provided access to and has viewed the discovery contained in electronic format," the petition for writ of mandate is DISMISSED as moot as to this court and the matter remanded for further proceedings in superior court to resolve any remaining postjudgment discovery issues.

GOETHALS, ACTING P. J.

* Before Goethals, Acting P. J., Sanchez, J., and Delaney, J.

485

Name: Kyle Whitesides

Address: 4001 Hwy 104

Ione, CA 95640

HC-001

CDC or ID Number:

### State of California
~~Fourth District Court of Appeal~~ 2w
~~California Supreme Court~~

*(Court)*

| | |
|---|---|
| Kyle Whitesides | **PETITION FOR WRIT OF HABEAS CORPUS** |
| Petitioner | |
| vs. | No. ~~S262159~~ |
| Patrick Covello, Warden | *(To be supplied by the Clerk of the Court)* |
| Respondent | |

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the superior court, you only need to file the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original of the petition and one set of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and 10 copies of the petition and, if separately bound, an original and 2 copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court (as amended effective January 1, 2018). Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
HC-001 [Rev. January 1, 2019]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380
www.courts.ca.gov

486

HC-001

This petition concerns:

- [X] A conviction
- [ ] A sentence
- [ ] Jail or prison conditions
- [ ] Other *(specify):* _____
- [ ] Parole
- [ ] Credits
- [ ] Prison discipline

1. Your name: Kyle Whitesides

2. Where are you incarcerated? Mule Creek State Prison

3. Why are you in custody?  [X] Criminal conviction   [ ] Civil commitment

   *Answer items a through i to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Sexual assaults

   b. Penal or other code sections: 261(a)(2); 286(c)(2)

   c. Name and location of sentencing or committing court:
   Orange County Superior Court, Orange County, CA.

   d. Case number: 10NF0718

   e. Date convicted or committed: May 13, 2013

   f. Date sentenced: August 9, 2013

   g. Length of sentence: 100 years to life

   h. When do you expect to be released? When relief is granted

   i. Were you represented by counsel in the trial court? [X] Yes  [ ] No   *If yes, state the attorney's name and address:*

   David Nisson (since disbarred)
   17291 Irvine Blvd., Ste. 154, Tustin, CA 92780

4. What was the LAST plea you entered? *(Check one):*

   [X] Not guilty  [ ] Guilty  [ ] Nolo contendere  [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

HC-001

6.  GROUNDS FOR RELIEF
   **Ground 1:** State briefly the ground on which you base your claim for relief. For example, "The trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page 4. For additional grounds, make copies of page 4 and number the additional grounds in order.)*

   By committing Brady violations, among other sub-claims listed in the attacched pages,
   the prosecution had violated Petitioner Whitesides's Due Process rights under the U.S.
   Constitution.

   a.  Supporting facts:
      Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts on which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel, you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is, *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*.

      See attached pages, particularly page 3 where Petitioner explained the delay
      and substantiated the explication with exhibits. Furthermore, both Stewart v.
      Martinez-Villareal, 523 US 637 (1998) and Slack v. McDaniel, 529 US 473 (2000)
      exemplify the U.S. Supreme Court's tendency to "assume that Congress did not want
      to deprive state prisoners of first habeas corpus review" and the Court's practice
      of interpreting "statutory ambiguities accordingly." Duncan v. Walker, 533 US 167,
      192 (2001).  Thus this Court should follow US Supreme Court's precedent and allow
      Petitioner a full bite at his first habeas petition despite the superior court's
      procedural bar. The habeas trial court erred in contending that Petitioner could have
      filed a supplemental brief during the direct appeal. Petitioner could not have because
      he was a mental patient in the prison's enhanced level mental health care, drowned
      in depression and unaware of his right.

   b.  Supporting documents:
      Attach declarations, relevant records, transcripts, or other documents supporting your claim. (See *People v. Duvall* (1995) 9 Cal. 4th 464, 474.)

      See attached exhibits and habeas decision from the superior court

   c.  Supporting cases, rules, or other authority *(optional)*:
      (Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)

      See attached pages

                                    488

HC-001

7.  **Ground 2 or Ground** _____ *(if applicable):*
    See attached for Ground 2 & Ground 3

    Ground 2 - Ineffective assistance of counsel and subclaims
    Ground 3 - Eighth Amendment violation for for disproportionately long sentence

    a.  Supporting facts:
        See attached

    b.  Supporting documents:
        Same as 6b.

    c.  Supporting cases, rules, or other authority:
        See attached.

HC-001

8. Did you appeal from the conviction, sentence, or commitment? [X] Yes [ ] No    *If yes, give the following information:*

   a. Name of court ("Court of Appeal" or "Appellate Division of Superior Court"):
     Fourth District Court of Appeal

   b. Result: Affirmed          c. Date of decision:

   d. Case number or citation of opinion, if known:

   e. Issues raised: (1) No issue identified by counsel

             (2)

             (3)

   f. Were you represented by counsel on appeal? [X] Yes [ ] No   *If yes, state the attorney's name and address, if known:*

9. Did you seek review in the California Supreme Court? [ ] Yes [X] No   *If yes, give the following information:*

   a. Result:          b. Date of decision:

   c. Case number or citation of opinion, if known:

   d. Issues raised: (1)

             (2)

             (3)

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal (see *In re Dixon* (1953) 41 Cal.2d 756, 759):
   Ineffective assistance of counsel

11. Administrative review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Dexter* (1979) 25 Cal.3d 921, 925.) Explain what administrative review you sought or explain why you did not seek such review:
   N/A

   b. Did you seek the highest level of administrative review available? [ ] Yes [ ] No
   *Attach documents that show you have exhausted your administrative remedies. (See People v. Duvall (1995) 9 Cal.4th 464, 474.)*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court, including this court? (See *In re Clark* (1993) 5 Cal.4th 750, 767–769 and *In re Miller* (1941) 17 Cal.2d 734, 735.)
[X] Yes   *If yes, continue with number 13.*     [ ] No   *If no, skip to number 15.*

490

HC-001

13 a.  (1) Name of court:  Fourth District Court of Appeal

(2) Nature of proceeding (for example, "habeas corpus petition"):  Mandate Petition

(3) Issues raised:  (a)  PC 1054.9

(b) _____

(4) Result (attach order or explain why unavailable):  pending

(5) Date of decision: _____

b.  (1) Name of court:  Orange County Superior Court

(2) Nature of proceeding:  PC 1054.9 motion

(3) Issues raised:  (a)  post-trial discovery

(b) _____

(4) Result (attach order or explain why unavailable):  pending

(5) Date of decision: _____

c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
13a - some discovery was turned over but not all

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Robbins (1998) 18 Cal.4th 770, 780.)
Delay due to mental health issues are explained in the attached pages. Otherwise, there are no substantial delay insofar as Petitioner was conscientious in going about gathering all evidence before presenting the petition.

16. Are you presently represented by counsel? [X] Yes  [ ] No    If yes, state the attorney's name and address, if known:
R Kendall Dawson Wasley
1520 E. Covell Blvd., # B5-233
Davis, CA 95616

17. Do you have any petition, appeal, or other matter pending in any court? [X] Yes  [ ] No    If yes, explain:
Just those listed in 13 above.

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
N/A.

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 7/17/24

491

_____
(SIGNATURE OF PETITIONER)

For your protection and privacy, please press the Clear This Form button after you have printed the form.

[ Print this form ]  [ Save this form ]          [ Clear this form ]

PROOF OF SERVICE

I, Kyle Whitesides, prisoner habeas petitioner pro per, declare under penalty of perjury that on the date below I personally mailed the attached Petition for Writ of Habeas Corpus to the following entit(ies) with postage fully paid and addressed as follows:

Orange County District Attorney
300 N. Flower St.
Santa Ana, CA
                92703

California Attorney General
600 W. Broadway, Ste. 1800
San Diego, CA 92101

Court of Appeal
4th Appellate District
Division Three
601 West Santa Ana Blvd
    Santa Ana, CA. 92701

Executed on the date below in Amador County, California.

DATE: ~~12/9/23~~
        1/17/24

By: _____

            Kyle Whitesides

493

1  KYLE WHITESIDES
   PO Box 409090
2  Ione, CA 95640

3
        In Pro Per
4

5

6

7              SUPERIOR COURT OF CALIFORNIA

8                    ORANGE COUNTY

9

10  In re:                          )  No.
                                    )
11                                  )
        KYLE WHITESIDES,            )  PETITION FOR WRIT OF HABEAS
12                                  )  CORPUS
                                    )
13  On Habeas Corpus.               )
                                    )
14  _____)

15

16

17  //

18

19  //

20

21  (continued next page)

22

23

24

25

26

27

28



U.S. Central District Court
411 W. Fourth St. #2030
Santa Ana, CA     92701

RECEIVED
CLERK, U.S. DISTRICT COURT

FEB 2 0 2025

CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION   BY DEPUTY





‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
9632 0804 00 0 (0000 000 000) 0 00 7719 4274 5236

92701

TRK# 7719 4274 5236

FedEx
Home Delivery
H

REF: WHITESIDES AR1462    DEPT.
(209) 274-4911    INV:
SANTA ANA CA 92701    PO:

411 W. FOURTH ST. #2030

TO US CENTRAL DISTRICT COURT

(us)

FROM:    Mule Creek State Prison
(209) 274-4911    4001 highway 104
Ione CA 95640
US

941-4092

SP-PD 02-Y    ETP-1

9632080400000000000000077191274927478336

H    SANTA ANA CA
92701-4500-99    # 2030
411 W 4TH ST
US CENTRAL DISTRICT COURT
0520    FRI 02/14 09:30
0770000



